**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

Counsel for Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| WILLIAM WILSON, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> AURORA CANNABIS INC., TERRY BOOTH, STEPHEN DOBLER, GLEN IBBOTT, CAM BATTLEY and MICHAEL SINGER, <br><br> Defendants. | **Case No:** <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>JURY TRIAL DEMANDED</u> |

Plaintiff William Wilson ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and

belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, public filings, wire and press releases published by and regarding Aurora Cannabis Inc. ("Aurora" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Aurora securities between September 11, 2019 and November 14, 2019, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Aurora securities during the Class Period and was economically damaged thereby.

7.      Defendant Aurora purports to produce and distribute cannabis products. It is vertically integrated and horizontally diversified across various segments of the cannabis value chain, including facility engineering and design, cannabis breeding, genetics research, production, derivatives, high value-add product development, home cultivation, wholesale, and retail distribution. The Company produces various strains of dried cannabis, cannabis oil and capsules, and topicals kits. Aurora is a Canadian corporation with its principal executive office is located at Suite 500 –

10355 Jasper Avenue, Edmonton, Alberta, Canada. Aurora's securities trade on the New York Stock Exchange ("NYSE") exchange under the ticker symbol "ACB."

8.    Defendant Terry Booth ("Booth") has served as the Company's Chief Executive Officer ("CEO") and a Director of the Board during the Class Period. Defendant Booth is also a founder of Aurora.

9.    Defendant Stephen Dobler ("Dobler") has served as the Company's President and a Director during the Class Period. Defendant Dobler is a founder of Aurora.

10.    Defendant Glen Ibbott ("Ibbott") has served as the Company's Chief Financial Officer ("CFO") during the Class Period.

11.    Defendant Cam Battley ("Battley") has served as the Company's Chief Corporate Officer ("CCO") during the Class Period.

12.    Defendant Michael Singer ("Singer") has served as the Company's Executive Chairman during the Class Period.

13.    Defendants Booth, Dobler, Ibbott, Battley and Singer are collectively referred to herein as the "Individual Defendants."

14.    Each of the Individual Defendants:

> (a)    directly participated in the management of the Company;
>
> (b)    was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

15.     Aurora is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

16.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Aurora under *respondeat superior* and agency principles.

17.    Defendant Aurora and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

## Materially False and Misleading

## Statements Issued During the Class Period

18.    On September 11, 2019, Aurora filed with the SEC its Annual Report on Form 40-F for the year ended June 30, 2019 (the "2019 40-F"). Attached to the 2019 40-F were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Booth and Ibbott attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

19.    Attached to the 2019 40-F was Aurora's 2019 Annual Report ("Annual Report"). The Annual Report continually touted Aurora's continued year-over-year and quarter-over-quarter growth, stating in relevant part:

**Financial Highlights**

**Revenue**

*Total Cannabis Net Revenue*

***The Company continued to show strong growth in its consolidated net revenue, which increased to [CA]$98.9 million in Q4 2019 as compared to [CA]$65.1 million of net revenue in the prior quarter. The 52% quarter-over-quarter growth was driven by a [CA]$15.3***

-6-

*million increase in our consumer market cannabis sales and an [CA]$18.0 million increase in our wholesale bulk cannabis sales.*

\*   \*   \*

*Consumer Cannabis Net Revenue*

Consumer cannabis sales were [CA]$44.9 million in Q4 2019, an increase of [CA]$15.3 million, or 52%, from the prior quarter and contributed 45% to total consolidated net revenue. The revenue growth was primarily attributable to a [CA]$14.4 million, or 52%, increase in dried cannabis sales as well as a [CA]$1.0 million, or 45%, increase in cannabis extract sales. Dried cannabis yields a lower average net selling price as compared to extracts. As a result of the significant increase in dried cannabis sales in the consumer market, the average net selling price for total consumer market sales decreased in the period. Despite the [CA]$0.34 decrease in the average net selling price over prior quarter, consumer cannabis gross margin before fair value adjustments improved by 4% as a result of the expansion in production and continued realization of economies of scale.

*Wholesale Bulk Cannabis Net Revenue*

During Q4 2019, the Company generated [CA]$20.1 million in bulk wholesale revenue from the sale of 5,574 kilograms of dried cannabis, as compared to [CA]$2.1 million and 589 kilograms in the prior quarter. While the [CA]$3.61 average net selling price of wholesale bulk cannabis is lower than the average net selling prices achieved from medical and consumer cannabis sales, gross margins are generally higher at approximately 61% due to lower conversion, packaging and shipping costs.

We expect Canadian consumer market sales to continue to contribute lower average net selling prices per gram equivalent of cannabis than those achieved from the Canadian medical and European medical markets. We also expect that demand for our products will increase as the Canadian consumer market evolves and new regulations in Canada and international markets legalize these products. We are focused on ramping up growth and supply to the Canadian and international medical markets and will continue to introduce other higher margin products, such as softgel capsules and pre-rolls, into our product portfolio.

New regulations under the *Cannabis Act* are expected to be in place by the end of calendar 2019 which will also permit the sale of higher value, in-demand products such as vape pens, edibles, and other derivatives.

Given the early stage of development of the consumer market in Canada, we expect that quarter to quarter sales volumes and revenues will be volatile. ***Factors that are expected to continue to affect the slope and smoothness of Aurora's revenue ramp-up include, but are not limited to, the pace of provincial licensing of new retail stores and the ability of Aurora and its competitors to meet rapidly evolving consumer preferences for certain product forms and strains.***

\*      \*      \*

**Financial Review**

**Revenue**

The Company primarily operates in the cannabis market. Effective October 17, 2018, the *Cannabis Act* took effect in Canada and Aurora began selling cannabis to the consumer market across Canada. Aurora also derives revenues from auxiliary support functions, which include patient counseling services; design, engineering and construction services; and cannabis analytical product testing services. The table below outlines the reconciliation from the Company's total net revenue to its cannabis net revenue metric for the three and twelve months ended June 30, 2019 and their comparative periods.

\*      \*      \*

***For the three months ended June 30, 2019, cannabis net revenue increased by [CA]$36.0 million, or 61%, compared to the prior quarter. The increase was primarily due to increases in wholesale bulk cannabis and consumer market net revenues of [CA]$18.0 million and [CA]$15.3 million, respectively, in the period.*** Medical cannabis net revenue continued to grow with an increase of [CA]$2.7 million compared to the prior quarter.

***For the year ended June 30, 2019, cannabis net revenue increased by [CA]$182.7 million, or 427%, compared to the prior year.*** The increase is primarily attributable to (i) [CA]$96.6 million of consumer cannabis net revenue, which was not present in the prior comparative

period, and (ii) the inclusion of medical cannabis revenues generated by MedReleaf and CanniMed, which were acquired on July 25, 2018 and March 15, 2018, respectively, and contributed combined cannabis net revenue of [CA]$61.7 million and [CA]$20.2 million to the twelve month period ended June 30, 2019.

\* \* \*

*Consumer Cannabis Net Revenue*

***During the three months ended June 30, 2019, the Company continued to expand consumer cannabis net revenue with an increase of [CA]$15.3 million, or 52% compared to the prior quarter.*** The increase in consumer cannabis net revenue during Q4 2019 was primarily due to an increase in dried cannabis sales by [CA]$14.4 million, or 3,276 kilograms, sold over the prior period. The increase in volume sold was partially offset by a decrease in the average net selling price of [CA]$0.35 resulting from changes in the percentage of lower priced products sold.

For the year ended June 30, 2019, consumer cannabis net revenue increased by [CA]$96.6 million compared to the prior year as the *Cannabis Act* took effect in Canada on October 17, 2018 and Aurora began selling cannabis to the consumer market across Canada.

\* \* \*

**Adjusted EBITDA**

***Adjusted EBITDA increased by [CA]$24.8 million, or 68%, for the three months ended June 30, 2019 as compared to the prior quarter.*** The increase was primarily attributable to a [CA]$25.3 million increase in gross profit before fair value adjustments excluding the impact of depreciation allocated to cost of sales, offset by a [CA]$5.8 million increase in SG&A expenses.

Adjusted EBITDA decreased by [CA]$101.8 million, or 188.0%, for the year ended June 30, 2019 compared to 2018. The decrease was primarily attributable to a [CA]$112.1 million increase in gross profit before fair value adjustments excluding the impact of depreciation allocated to cost of sales, offset by a [CA]$199.2 million increase in SG&A, a [CA]$1.6 million increase in acquisition costs, and a [CA]$13.1 million increase in R&D expenses.

(Emphasis added.)

20.    In the Annual Report, Aurora also provided ever-increasing revenue over the previous eight quarters in with Net Revenue at [CA]$8,249,000, [CA]$11,700,000, [CA]$16,100,000,    [CA]$19,147,000,    [CA]$29,674,000,    [CA]$54,178,000, [CA]$65,145,000, and [CA]$98,942,000 for Q1 2018, Q2 2018, Q3 2018, Q4 2018, Q1 2019, Q2 2019, Q3 2019, Q4 2019, respectively.

21.    In the Annual Report, Aurora also touted its EBITDA improvements and prospects with losses giving way to profitability, including growing sales, stating in pertinent part:

**Adjusted EBITDA**

The Company defines adjusted EBITDA as net income (loss) excluding interest income (expense), accretion, income taxes, depreciation, amortization, changes in fair value of inventory sold, changes in fair value of biological assets, share-based compensation, foreign exchange, changes in fair value of financial instruments, gains and losses on deemed disposal, and non-cash impairment of equity investments, goodwill, and other assets.

Developing a profitable and robust global cannabis company is extremely important to Aurora. ***The Company continues to track toward positive adjusted EBITDA on a consolidated basis. In Q4 2019, we made progress toward this objective as our adjusted EBITDA loss improved to [CA]$11.7 million compared to [CA]$36.6 million in the prior quarter.*** While profitability remains a very important target for Aurora, we expect that the inherent volatility of revenue ramp-up in the developing cannabis industry, and the necessary investment to develop and manufacture new products for the Canadian consumer market, may result in near term challenges to achieving positive adjusted EBITDA. ***However, the Company expects adjusted EBITDA to continue to improve in the future due to higher sales,***

> ***further improvements in gross margins through economies of scale,
> and prudent SG&A [Selling, General and Administration] growth.***

(Emphasis added.)

22.    In its Annual Report, Aurora, touted its ever-increasing capacity for production, including its two largest facilities of Aurora Sun, with capacity of ">230,000 KG/YEAR[,]" and Aurora Nordic 2, with a capacity of ">120,000 KG/YEAR[.]"

23.    On September 12, 2019, Aurora held its Fourth Quarter Fiscal 2019 Results Conference Call for the three months ending June 30, 2019 ("Q4 2019 Conference Call").

24.    During the Q4 2019 Conference Call, Defendant Battley reassured investors that while Aurora missed revenue guidance by 1 percent, core cannabis revenue was strong, stating in pertinent part:

> The reason why it happened, we will discuss a little bit more, but it's essentially these things. One, these were not our core cannabis revenues. ***On our core cannabis revenues, we came in right at the top of our guidance at [CA]$95 million; by the way, the largest revenue figure in a quarter that any cannabis company has ever recorded for cannabis revenues.***

(Emphasis added.)

25.    Focusing on EBITDA, during the Q4 2019 Conference Call, Defendant Ibbott stated the following:

In Q4, our reported Adjusted EBITDA loss decreased to [CA]$11.7 million as compared to [CA]$36.6 million in the prior quarter. Considering the impact of year-end audit adjustments, we estimate our delivered EBITDA loss to be approximately [CA]$25 million, an improvement of over 32 percent from the previous quarter.

I'm extremely happy with the underlying achievements we've made in the last nine months and driving towards our EBITDA target. We have more work to do, but I'd highlight that nearly all of our [Key Performance Indicators] are showing sequential improvements.

*     *     *

As we continue to execute on our strategy, **the Company expects Adjusted EBITDA to improve in the future due to higher sales, improved gross margins and prudent SG&A growth.**

(Emphasis added.)

26.     During the Q4 2019 Conference Call, Defendant Battley stated the following regarding EBITDA, in pertinent part:

We put our guidance at the beginning of the year that we were targeting positive EBITDA and that created a seachange in our behavior and I think people have noticed. We went from a period of very rapid M&A to shifting gears to a period of really focused and disciplined execution and I think that's been reflected in our results.

27.     Regarding potential constraints and growth, during the Q4 2019 Conference Call, Defendant Ibbott stated the following:

We solved previously identified production bottlenecks and **we're seeing strong sell through on our products at the retail level.** There are remaining constraints to face the growth in the Canadian market that we would like to see resolved, including the timing of currently approved and future retail stores. **The resolution of these constraints will impact the timing of our EBITDA positive target, but we do expect these constraints to become less of an issue over the next several quarters.**

*     *     *

-12-

Matt, what we are signaling there—and **you know Aurora and you know how consistently our revenue continues to ramp quarter-to-quarter-to-quarter. The revenue curve is a nice, smooth continuously increasing curve** and we, specifically for us, just want to call out the fact that there are constraints on the consumer system right now and the provinces are starting to show that as well, as seen in July and August, where they're trying to work through some of the inventories that they have and have slowed their buying, and we expect it to pick up and to continue to pick up through the next quarter.

**But we did want to kind of signal that our continued sort of 40 percent quarter-to-quarter growth may take a bit of a pause just due to industry dynamics. That being said, we still expect to see growth in the core businesses** and, as Cam said, the Bulk opportunities may be there, but if the pricing is right we will execute on those as well.

One of the things that heartens me (inaudible) to look forward is from the data we see from the provinces is we are number-one in the country in sell through rates, so our products—we're delivering the right product, the right qualities that consumers are preferring. As long as we continue to sell through at healthier rates, then as the bumps kind of even themselves out and the retail stores roll out, then we'll benefit disproportionately, I think, from that increased market size.

(Emphasis added.)

28.   During the Q4 2019 Conference Call, Defendant Ibbott stated the following regarding capital expenditures, stating in pertinent part:

Tamy, you know a couple of the major facilities that are under construction—Sun and Nordic, and we've mentioned a couple of others. . . . So, the CAPEX, let's say, Q4 and spilling into Q1 a little bit would be a peak CAPEX for us. We are over [CA]$100 million dollars into our Aurora Sun build. It's progressing quite nicely. As we indicated a little bit earlier in our comments, we are looking at the timing of CAPEX and matching our supply to the demand.

\*      \*      \*

That's where we're at right now, Tamy.  **I think you would expect in Q1 to still see a significant CAPEX spend and it'll start to reduce over**

*future quarters, particularly most of these facilities are nearing completion and then we'll just have a couple of larger production facilities still ongoing.*

\*     \*     \*

As I said, we're kind of at a peak CAPEX spend right now with the major facilities underway. A lot of the construction going on right now will be complete over the next quarter or two on our manufacturing and distribution facilities across Canada. What we're then starting to look that is just the timing of the CAPEX on our major production facilities, Nordic and Sun.

*As it stands right now, our current plans are to bring those in and faze them in as demand requires, and that you can consider that to be over the next year or two as we phase those in.* Hopefully, ideally in my world, we need to phase them in earlier because the demand is there. But those are really the drivers.

Now, I need to caution you that that's our current—as we stand right now, *that's our CAPEX plans should we decide part of our move into the U.S. required more CAPEX, then we'll reset and recalibrate at that point. That's really how I kind of characterize the CAPEX over the next, say, eight quarters is continue to spend this quarter and start to see it trailing off then over the next couple of quarters* and then you're really just looking at the timing of Sun and Nordic.

(Emphasis added.)

29.    Discussing demand on the Q4 2019 Conference Call, Defendant Battley stated the following:

The first thing is the demand is actually there for Wholesale product. You'll notice that we got an extremely attractive price for trim, [CA]$3.61 a gram, and that the margins were even better than our overall gross margin. If we have opportunities, and it's likely that they will, we will proceed with additional Bulk Wholesale. But the bigger question you're asking is with respect to volatility and I think what we are signaling here is just to be aware as a lot of observers have suggested. *We're anticipating that there may be a bit of a plateau between now and the advent of the cannabis legalization 2.0 products*

-14-

*anticipated somewhere around the end of the year.* I think that's really what we are anticipating, that there's likely to be across the sector *a little bit of a plateau between now and then.*

(Emphasis added.)

30.    On October 3, 2019, Aurora issued a press release entitled "Aurora Cannabis Provides Update on Global Operations and Growth Initiatives" which provided an update on the various Aurora facilities under construction, stating in pertinent part:

**Aurora Sun and Aurora Nordic 2 Construction Update**

*Aurora continues to progress construction of its 1.6 million square foot facility, Aurora Sun, located in Medicine Hat, Alberta*, and its 1 million square foot facility, Nordic Sky, strategically located in Odense, Denmark. The new purpose-built, "Sky Class" facilities Aurora are constructing will have full control over all anticipated environmental and harvest conditions, resulting in the production of consistently high yielding, high-quality cannabis at low-cost.

Mr. Booth added, "Aurora Sun in Medicine Hat and Aurora Nordic in Denmark represent the next evolution of our "Sky Class" cultivation philosophy and construction of these projects is proceeding well. Aurora Sun is nearing completion with the majority of capital investment now behind us, while at Aurora Nordic the primary outdoor construction, including the enclosure of the facility, nears completion. Our design philosophy allows for flexibility in licensing and commissioning in-line with the long-term growth in global demand for medical cannabis."

(Emphasis added.)

31.    The October 3, 2019 press release also announced that *Aurora Insider*, an investor focused blog by the company had launched.

32.     On October 30, 2019, Aurora posted a news story on *Aurora Insider* entitled "Aurora has the best selling buds in Ontario!" The story touted Aurora's consumer cannabis sales, in pertinent part:

> ***Popular Aurora brands are dominating sales on Ontario's government-owned online cannabis store.***
>
> According to a list recently released by the Ontario Cannabis Store, San Rafael '71 Pink Kush is in the No. 1 spot, followed by Aurora Blue Dream in second place, and San Rafael '71 Tangerine Dream taking third position on OCS.ca. ***The website processed more than one million orders in the last year, nearly one transaction every 30 seconds.***
>
> *     *     *
>
> "It's gratifying to see that consumers trust and enjoy our brands," says Darren Karasiuk, Chief Commercial Officer at Aurora. "We are producing a premium cannabis product, and it is resonating with the consumer cannabis market. Canadian consumers continue to choose Aurora because they know they are getting a high-quality, consistent product."
>
> (Emphasis added.)

33.     The statements contained in ¶¶18-32 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) as opposed to the Company's representations, Aurora's revenue would decline in its first quarter of fiscal 2020 ended September 30, 2019; (2) the Company would halt construction on its Aurora Nordic 2 and Aurora Sun facilities; and (3) as a result, Defendants'

statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH BEGINS TO EMERGE

34.   On November 14, 2019, Aurora announced its first quarter of fiscal 2020 ended September 30, 2019, First Quarter 2020 Results ("Q1 2020 Results") & Corporate Action Plan.

35.   As opposed to statements made and released by Defendants during and after its first fiscal quarter 2020, Q1 2020 Results showed a CA$23.8 million, or a 25%, sequential decline of sales, well below analyst estimates.

36.   In particular, Aurora's consumer cannabis revenue fell by 33% sequentially.

37.   During Aurora's Q1 2020 Earnings Call on November 14, 2019, Defendant Ibbott stated the following, in pertinent part, regarding the substantial decrease in consumer cannabis revenue:

> ***This decline as we all know was driven by constraints in the distribution networks that have caused a temporary decline in ordering of the provincial distributors*** that they allow inventory levels to normalize. With adequate consumer choice now available, we're also seeing consumers exercise that choice to select those products that they prefer.
>
> ***We monitor the sell-through rates from the provinces to the retailers very carefully*** as we believe that to be a strong indicator that our products are meeting the needs of consumers for both quality and pricing. We are pleased that the Aurora family of brands continues to show strength across the major provinces for sell through.
>
> (Emphasis added.)

38.   In Aurora's Q1 2020 Earnings Call, Defendant Ibbott stated the following, in

pertinent part, about Aurora's EBITDA:

> ***Our adjusted EBITDA loss for Q1 was CAD 39.7 million compared
> to CAD 26.6 million loss in the prior quarter.*** Again when you take
> into account the impact of our year-end adjustments of Q4. ***The change
> in our adjusted EBITDA loss is primarily due to the quarter-over-
> quarter decrease in revenue.*** Developing a profitable and robust global
> cannabis company is extremely important to Aurora. We believe our
> industry leading gross margins and the high-quality cultivation for the
> last period will allow us to continue to drive under penetrating all
> market conditions.

(Emphasis added.)

39.   While touting its sales strength generally, and in Ontario specifically, Aurora

did not mention any hint of a substantial decrease in sales – during or after its fiscal

first quarter 2020 until the November 14 disclosures.

40.   Aurora's Corporate Action Plan includes a CA$190 million reduction in

capital expenditures.

41.   As part of its Corporate Action Plan, Aurora announced it was halting

construction on its Aurora Nordic 2 facility in Denmark and it was deferring final

construction on its Aurora Sun facility in Medicine Hat, Alberta – its facilities with

the two largest capacities for production.

42.   As opposed to Aurora's message of likely slowing capital expenditures or

even investing in the United States, Aurora abruptly ended capital expenditures on

its two largest facilities.

-18-

43.    That same day, Aurora announced an early conversion window for CA$230

million in convertible debt.

44.    On this news, shares of Aurora fell $0.56 per share or over 17% to close at

$2.73 per share on November 15, 2019, damaging investors.

45.    On November 18, 2019, *MarketWatch* published an article entitled "Aurora

Cannabis stock suffers worst day in more than five years, analyst says 'it would be

fair for investors not to believe them[.]'"

46.    The *MarketWatch* article cited multiple analysts, stating in relevant part:

> ***Analysts said that investors had a reason for anger and distrust after
> the report***, and should be thinking about whether it means that it is time
> to run away from the cannabis industry altogether.
>
> "If Aurora is less eager to deploy capital to this industry, we believe
> investors should also be reluctant to place capital in the industry,"
> MKM Partners analyst Bill Kirk, who has a sell rating and $3 price
> target on the stock, wrote in a note.
> ***Jeffries analyst Owen Bennett noted that dilution from the debenture
> conversion could swing investor sentiment even more***, and believes a
> writedown for a goodwill impairment from the MedReleaf acquisition
> could be on the way.
>
> ***He also suggested that beyond negative sentiment, investor trust could
> be a real issue after Aurora's optimistic statement before Thursday's
> disappointment.***
> ***"With possible cash pressures evident, announcing ceased
> construction at facilities despite a press release just 6 weeks ago
> praising progression, and now EBITDA (and cash) positive looking
> unlikely this year, it would be fair for investors not to believe them,"***
> wrote the analyst, who has a buy rating and $7 price target on the stock.
>
> (Emphasis added.)

47.    On this news, shares of Aurora fell $0.44 per share or over 16% to close at $2.28 per share on November 18, 2019, further damaging investors.

48.    As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

49.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Aurora securities publicly traded on the NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Aurora, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Officer or Director Defendants have or had a controlling interest.

50.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Aurora securities were actively traded on the NYSE exchange. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

51.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

52.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

53.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business of Aurora;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused Aurora to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of Aurora securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

54.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

55.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Aurora shares met the requirements for listing, and were listed and actively traded on the NYSE, an efficient market;

- As a public issuer, Aurora filed periodic public reports;

- Aurora regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- Aurora's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- Aurora was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

56.    Based on the foregoing, the market for Aurora securities promptly digested current information regarding Aurora from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

57.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I

### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder

### Against All Defendants

58.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59.    This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

60.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

61.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Aurora securities during the Class Period.

62. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Aurora were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Aurora, their control over, and/or receipt and/or modification of Aurora's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Aurora, participated in the fraudulent scheme alleged herein.

63. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made

by them or other Aurora personnel to members of the investing public, including Plaintiff and the Class.

64.     As a result of the foregoing, the market price of Aurora securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Aurora securities during the Class Period in purchasing Aurora securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

65.     Had Plaintiff and the other members of the Class been aware that the market price of Aurora securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Aurora securities at the artificially inflated prices that they did, or at all.

66.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

67.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Aurora securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act

### Against the Individual Defendants

68.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

69.    During the Class Period, the Individual Defendants participated in the operation and management of Aurora, and conducted and participated, directly and indirectly, in the conduct of Aurora's business affairs. Because of their senior positions, they knew the adverse non-public information about Aurora's misstatement of revenue and profit and false financial statements.

70.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Aurora's financial condition and results of operations, and to correct promptly any public statements issued by Aurora which had become materially false or misleading.

71.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Aurora disseminated in the marketplace during the Class Period concerning Aurora's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and

authority to cause Aurora to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Aurora within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Aurora securities.

72.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Aurora.

## **PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)     awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.


Dated:        November 21, 2019        Respectfully submitted,


**THE ROSEN LAW FIRM, P.A.**

s/ Laurence M. Rosen
Laurence M. Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

Counsel for Plaintiff