James E. Cecchi
Lindsey H. Taylor
Donald A. Ecklund
CARELLA, BYRNE, CECCHI, OLSTEIN,
   BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
973/994-1744 (fax)
jcecchi@carellabyrne.com
ltaylor@carellabyrne.com
decklund@carellabyrne.com

*Local Counsel for Lead Plaintiffs*

Samuel H. Rudman
Alan I. Ellman
ROBBINS GELLER RUDMAN &
   DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
aellman@rgrdlaw.com

Steve W. Berman
Shayne C. Stevenson
HAGENS BERMAN SOBOL
   SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone: 206/268-9340
206/623-0594 (fax)
steve@hbsslaw.com
shaynes@hbsslaw.com

*Co-Lead Counsel for Lead Plaintiffs*

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re AURORA CANNABIS INC. SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>   ALL ACTIONS. | Civil Action No. 19-20588(JMV)(JBC)<br><br>**AMENDED COMPLAINT and <u>DEMAND FOR JURY TRIAL</u>** |

Lead Plaintiffs Doug Daulton, Francisco Quintana, Matt Golis, Donald S. Parrish, and Quang Ma (collectively, "Lead Plaintiffs"), individually and on behalf of all others similarly situated, by Lead Plaintiffs' undersigned attorneys, for Lead Plaintiffs' complaint against Defendants (defined below), make the following allegations based upon personal knowledge as to Lead Plaintiffs and Lead Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiffs' counsel, which included, among other things, a review of United States Securities and Exchange Commission ("SEC") filings by Aurora Cannabis, Inc. ("Aurora" or the "Company"), Company press releases, analyst reports, media reports, and other publicly disclosed reports and information about the Company.  Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all purchasers of Aurora securities on the New York Stock Exchange ("NYSE") between October 23, 2018, and February 6, 2020, inclusive (the "Class Period"), against Aurora and certain of its officers and/or directors seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Aurora is headquartered in Edmonton, Alberta, Canada, and describes itself as one of the world's largest cannabis companies, using extensive automation to produce cannabis on a massive scale.  On October 23, 2018, Aurora common shares began trading on the NYSE under the ticker symbol "ACB" shortly after the legalization of recreational use of cannabis in Canada.

3.      During the Class Period, Defendants repeatedly touted the massive, growing demand for consumer cannabis in Canada and the Company's priority of ramping up production and capacity to meet this demand.  For example, during an earnings call hosted by Aurora on

February 11, 2019, to report on the Company's results for the fiscal second quarter of 2019,[1] defendant Terry Booth, Aurora's CEO, claimed that he "lose[s] sleep over [the Company's] ability to supply this global cannabis market."   Defendants were so confident of massive consumer demand and their plans to scale up to supply it that—unlike their competitors—they began projecting positive (and unrealistic) earnings before interest, taxes, depreciation and amortization ("EBITDA") for FQ4 2019, the quarter ending June 30, 2019.

4.       Throughout the Class Period, however, Aurora's sales of cannabis in Canada were severely constrained by three factors that were known, or recklessly disregarded, by Defendants: (1) immense over-production of cannabis by Aurora and other Canadian licensed producers; (2) woefully limited numbers of retail stores in Ontario and Quebec, where nearly two thirds of Canadian citizens reside; and (3) continued competition from the cannabis black market selling at roughly half the price per gram.

5.       Specifically, at around the same time that Defendants were touting the demand for cannabis and Aurora's ability to satisfy that demand, data that Defendants admitted to monitoring indicated that oversupply in the cannabis industry was then-occurring or imminent.   On February 8, 2019, Stone Fox Capital reported that Aurora "**has plans to alone flood the global market with production targets in excess of demand**."   Indeed, "[t]he mind-numbing stats from Health Canada support **a total cannabis market size in Canada that falls below the size of the production goals of Aurora Cannabis alone**."[2]   Stone Fox also stated that "all signs" indicate

---

[1]    Aurora's fiscal year ends on June 30 of the calendar year.  Accordingly, Aurora's first fiscal quarter ends on September 30 (FQ1); the second fiscal quarter ends on December 31 (FQ2); the third fiscal quarter ends on March 31 (FQ3); and the fourth fiscal quarter ends on June 30 (FQ4).

[2]    Health Canada is the public health agency of the federal government of Canada and the country's regulatory body for cannabis producers.

"that the cannabis market is going to face a fundamental oversupply scenario. . . ."  According to the author, Aurora, by itself, had forecasted 1.2 million kilograms of annual cannabis production; when combined with the other nine top cannabis producers, the total annual cannabis production was forecasted to be 3.3 million kilograms.  According to Stone Fox, however, Health Canada had projected total market demand in the Canadian cannabis market of only 926,000 kilograms per year.

6.      Unlike Defendants, Aurora's competitors expressed concern about oversupply.  Approximately one month after Booth's comments dismissing any concerns about oversupply of cannabis, one of Aurora's close competitors, Tilray Inc., hosted an earnings conference call during which Tilray's CEO stated that "[o]ver the next 18 months, we believe there will be oversupply, just as we have seen in certain U.S. states as operators in new legal markets race and government regulators catch up to find an equilibrium between supply and demand."

7.      Despite the existence of data before the start of the Class Period (detailed below) showing that oversupply was then-occurring or imminent in Canada, Defendants continued to mislead and failed to disclose this to investors, all while continuing their aggressive expansion strategy and rapid increase in production capacity.  During the Class Period, Aurora made at least five major acquisitions of cannabis companies, justifying the large capital expenditure as necessitated by the purported need to rapidly ramp up production to meet exploding consumer demand.  For example, on March 4, 2019, Aurora announced that the Company completed the acquisition of privately held Whistler Medical Marijuana Corporation ("Whistler"), one of Canada's ten original licensed producers.  Several critics condemned the deal given Aurora's stake in a similar organic cannabis company, The Green Organic Dutchman, which it first acquired in January 2018.

8.     As detailed further below, Defendants knew or recklessly ignored that the Company's rapid expansion strategy was conducted without a reasonable basis to believe that such expansion was necessary to meet actual consumer demand.  Furthermore, the Company executed its expansion strategy at the expense of shareholders.  All five of the acquisitions that Aurora completed during the Class Period were paid for using Company stock, demonstrating that Defendants unjustifiably and consistently diluted shareholder value.  Moreover, the use of Aurora stock to fund these acquisitions motivated Defendants to artificially inflate Aurora's stock price.

9.     In addition to contributing to an oversupplied cannabis market, Aurora was unable to adequately distribute its products to consumers in Ontario and Quebec.  Canada's two most populous provinces opted to sell cannabis through government-run retail monopolies, leaving the provincial governments to decide how many retail cannabis stores to open.  The result was a woefully inadequate number of stores that created a bottleneck in distribution of an already oversupplied product.  For example, in Ontario, the first licensed cannabis stores did not open until April 2019, and only 25 store licenses had been issued by then.  The planned 25 stores amounted to 0.2 stores for every 100,000 residents.  To compare that number with Colorado, which had legalized cannabis in 2014, Ontario would need to add nearly **1,400 stores** to close the gap.

10.     Compounding the profitability pressures of too much supply and too few stores through which to sell it, the cannabis black market continued to threaten Aurora's ability to achieve profitability in 2019.  Despite legalization in October 2018, the black market continued to flourish in Canada.  Indeed, the Canadian black market sold cannabis at roughly half the price per gram as Aurora.  A February 19, 2019 article by Winds Research indicated that "the cannabis black market in Canada is still thriving with control of 71 percent of sales in Canada the first year following the start of recreational adult use sales."

11.     In light of these facts known to Defendants, Aurora misled investors regarding the Company's expectations of achieving profitability.  Specifically, Defendants repeatedly stated that the Company expected to achieve positive EBITDA in FQ4 2019.  Even when the Company was "still a ways away from profitable" in the third fiscal quarter of 2019 according to an analyst, management reiterated its expectation of achieving positive EBITDA in FQ4 2019.

12.     Weeks after FQ4 2019 and full fiscal year 2019 had *already ended*, on August 6, 2019, the Company provided a corporate update for the quarter in which it stated that "[t]he Company continues to track toward positive adjusted EBITDA, and in particular adjusted EBITDA from cannabis operations."  Investors interpreted this to mean that the Company was still on track to achieve EBITDA profitability in FQ4 2019.

13.     Then, on September 11, 2019, Aurora reported its financial results for FQ4 2019 and the 2019 fiscal year.  Included in the financial results was the EBITDA metric, showing a loss of C$11.7 million[3] and a miss of Defendants' much-touted projection.  The Company stated that the loss resulted from "challenges at the retail level in key markets" that were experienced throughout "the Canadian consumer channel," and that "resolution of this issue [was] beyond the Company's control."  On this news, Aurora's stock price fell more than 9%.

14.     Although the scarcity of retail stores was beyond Aurora's control, speaking truthfully to the market was not.  As explained further below, Defendants made material misstatements and omissions to investors that were rendered false and misleading in light of information they knew or recklessly disregarded.  Indeed, Aurora's guidance miss in September 2019 was the first of numerous revelations that Defendants misled investors regarding oversupply, distribution problems, competition from the black market, consumer demand, and profitability.

---

[3]     As of the date of this filing, C$1 is equal to US$0.75.

15.     Approximately two months later, on November 14, 2019, Aurora reported its financial results for FQ1 2020.  Included in the financial results was a 24% decline in total net revenue, a 33% decline in Canadian consumer cannabis revenue, and an adjusted EBITDA loss of C$39.7 million.  The Company stated that "[t]he decline in cannabis net revenues is primarily attributable to previously identified constraints in Canadian consumer retail and distribution infrastructure coupled with a decline in wholesale revenues.  The Canadian wholesale market is rapidly evolving and remains an important long-term opportunity for Aurora."  Aurora also announced that it was ceasing immediately any construction activity at its Aurora Nordic 2 facility in Denmark and at its Aurora Sun facility.  Upon this news, Aurora's stock price plummeted 17%.

16.     Less than two months later, on January 6, 2020, news surfaced showing that Aurora was listing its Exeter, Ontario greenhouse for sale for C$17 million.  Analysts described the surreptitious listing discovered on Cushman & Wakefield's website as "the latest attempt for Aurora to conserve capital."  On this news, Aurora's stock price declined 5%.

17.     On February 6, 2020, Aurora announced that Booth was retiring from his position as CEO.  In the same statement, Aurora also announced "sweeping changes intended to rationalize the cost structure and balance sheet going forward."  These changes included significant and immediate decreases in selling, general and administrative (SG&A) expenses to the range of C$40 million to C$45 million per quarter by the end of the fourth fiscal quarter of 2020.  For context, SG&A expenses for the first fiscal quarter of 2020 topped C$59 million.  As part of the changes to operations, the Company eliminated about 500 full-time staff positions, including approximately 25% of its corporate positions.  Severance and other one-time charges related to the SG&A reductions were expected to range from C$2 million to C$4 million.

18.     Also on February 6, 2020, Aurora announced that it expected to report asset impairment charges on certain intangibles and property, plant and equipment in a range of C$190 million to C$225 million, and write-downs of goodwill in the range of C$740 million to C$775 million.  The Company also announced its intention to reduce capital expenditures to below C$100 million in total for the second half of fiscal 2020.  In its "business transformation plan," Aurora announced a number of amendments to its secured credit facilities, including removing EBITDA ratio covenants and reducing the total credit facility by C$141.5 million.  On this news, Aurora's stock price fell 22% over the next two trading days.

19.     As a result of Defendants' wrongful acts and omissions, Lead Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

20.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

21.     This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

22.     Venue is properly laid in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b) and (c).  The acts and transactions giving rise to the violations of law complained of occurred in part in this District, including the dissemination of false and misleading statements into this District.

23.     In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the NYSE, a national securities exchange.

## PARTIES

24.     Lead Plaintiffs, as set forth in the certifications previously filed with the Court and incorporated herein by reference, purchased Aurora common stock during the Class Period and were damaged thereby.

25.     Defendant Aurora is a manufacturer and distributor of cannabis products based in Canada.  Aurora's common stock trades on the NYSE under the ticker symbol "ACB."

26.     Defendant Terry Booth co-founded Aurora in 2006 and served as Chief Executive Officer ("CEO") of Aurora and a member of Aurora's Board of Directors ("Board") from December 9, 2014 until June 26, 2020.  Booth signed the Company's SEC filings, including the Annual Report on Form 40-F.

27.     Defendant Stephen Dobler also co-founded Aurora and served as the Company's President and a member of the Board from December 9, 2014 until June 30, 2020.

28.     Defendant Glen Ibbott also co-founded Aurora and has served as the Company's Chief Financial Officer ("CFO") from May 2017 through the present.  Ibbott is also a member of the Board and signed the Company's SEC filings, including the Annual Report on Form 40-F.

29.     Defendant Cameron Battley was the Company's Chief Corporate Officer ("CCO") and a corporate spokesperson from early 2018 until December 2019.

30.     Defendant Michael Singer has served as the Company's Executive Chairman since early 2019, and served as Interim CEO following Booth's departure in June 2020 until September 8, 2020.

31.     Defendant Jason Dyck has served as a member of the Board from March 2015 through the present.

32.     Defendants Booth, Dobler, Ibbott, Battley, Singer, and Dyck are collectively referred to herein as the "Individual Defendants."  Aurora and the Individual Defendants are collectively referred to as "Defendants."

33.     During the Class Period, the Individual Defendants ran the Company as hands-on managers overseeing Aurora's operations and finances and made the materially false and misleading statements described herein.  The Individual Defendants had intimate knowledge about core aspects of Aurora's financial and business operations, including demand for the Company's products, capital expenditures, and compliance with licensing requirements.  They were also intimately involved in deciding which disclosures would be made by the Company.

## CLASS ACTION ALLEGATIONS

34.     Lead Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all persons who purchased Aurora common stock during the Class Period and were damaged thereby (the "Class").

35.     Excluded from the Class are Defendants, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

36.     The members of the Class are so numerous that joinder of all members is impracticable.  More than one million shares of Aurora common stock were outstanding and actively traded during the Class Period.  The precise number of Class members is unknown to Lead Plaintiffs at this time but is believed to be in the thousands.  In addition, the names and addresses of the Class members can be ascertained from the books and records of Aurora or its transfer agent.  Notice can be provided to such record owners by a combination of published notice

and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

37.     Lead Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Lead Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intend to prosecute this action vigorously.

38.     Lead Plaintiffs' claims are typical of the claims of the other members of the Class because Lead Plaintiffs' and Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants.  Lead Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

39.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members to seek redress for the wrongful conduct alleged.  Lead Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

40.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants during the Class Period were materially false and misleading;

(c)     whether the price of Aurora common stock was artificially inflated during the Class Period; and

(d)     the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

41.     Defendant Aurora is a public company headquartered in Edmonton, Alberta, Canada.  The Company markets and sells cannabis, hemp, cannabis devices, and related products in the cannabis consumer and medical markets.  Aurora operates in more than 25 countries on five continents, presenting itself as one of Canada's leading licensed producers ("LP") and a developer of quality cannabis products.

42.     Aurora describes itself as vertically integrated and horizontally diversified across each segment of the value chain, from facility engineering and design to cannabis breeding and genetics research, cannabis and hemp production, derivatives, high value-add product development, home cultivation, wholesale and retail distribution.  Aurora describes its production facilities as intended to be replicable and scalable globally, and designed to produce cannabis of significant scale with low per gram production costs.

43.     Aurora was founded in 2006 and received its license to grow cannabis in Canada in 2014.  Aurora has been publicly traded on the Toronto Stock Exchange since July 2017, was traded over-the-counter in the United States under the ticker symbol "ACBFF" until October 2018, and has traded on the NYSE under the ticker symbol "ACB" since October 23, 2018.  Although cannabis is not legal in the United States on the federal level, certain foreign companies that sell, grow, or harvest cannabis can be traded on the NYSE and Nasdaq because they are not subject to the same restrictions as U.S. cannabis companies.

44.     Canadian cannabis sales comprise Aurora's core operations.  For FQ1 2019, the three months ended September 30, 2018, Aurora reported $29.674 million in total revenue.  Of that total, $25.865 million in revenue was attributed to the Company's business in Canada.  Thus, Canadian revenue constituted about 87% of the Company's total revenue for FQ1 2019.  For the same quarter, Aurora reported $28.316 million in cannabis revenue, constituting about 95% of the Company's total revenue for FQ1 2019.  For Aurora, Canadian cannabis revenue is clearly the foundation of its business.

### Legalization of Recreational Cannabis in Canada

45.     On June 18, 2018, Canada became the second country in the world to legalize recreational cannabis when the government approved the Cannabis Act.  Under the Cannabis Act, production of cannabis is regulated by the Canadian federal government, while provinces and cities have greater powers over retail sales either through private or government-owned stores.  Specifically, the Cannabis Act leaves much to the country's thirteen provinces and territories with respect to carrying out the new legislation and setting their own rules, creating a patchwork of regulations.

46.     Passage of the Cannabis Act in June 2018 paved the way for a fully legal cannabis market within eight to twelve weeks.  Critics accused the government of moving too quickly and said the new distribution and sales network was too limited to curb black market sales.  Similarly, Canada's ten provinces complained to the federal government that the eight- to twelve-week schedule put forth as of mid-June 2018 was too abbreviated for them to set up distribution and sales networks before scrambling to establish their regulations and distribution and sales networks.

47.     As an example of the varying marijuana availability across the country, Aurora planned to sell cannabis via its investment in Alcanna, Inc. ("Alcanna"), the largest private liquor retailer in Canada.  Alcanna planned to open 37 stores in the province of Alberta—the maximum

number of retail locations allowable by law in the province.  In contrast, the province of Ontario stated in September 2018 that federally licensed producers were allowed to open only one retail location in the province, before later announcing that it would have no stores until April 2019. Ontario is home to Toronto, Canada's most populous city.

### Aurora Aggressively Expanded Its Cannabis Production

48.     In response to the impending legalization of recreational cannabis in Canada, Aurora engaged in an aggressive expansion strategy leading up to and during the Class Period. The Company justified its expansion plans based on the purported need to rapidly ramp up production to meet massive, growing consumer demand, both in Canada as well as in the international medical-marijuana space.

49.     In one of its largest acquisitions to date, on May 1, 2018, Aurora announced that it completed the purchase of all issued and outstanding shares of CanniMed Therapeutics Inc. ("CanniMed"), which became the first federally regulated cannabis producer in Canada when it was granted a contract by Health Canada in 2000 to produce medical cannabis.  The Company executed the acquisition with the goal of transforming Aurora into a leading company in the global medical cannabis space.

50.     Less than three months later, on July 25, 2018, Aurora acquired all of the issued and outstanding common shares of MedReleaf Corp. ("MedReleaf"), a well-known Canadian Licensed Producer based in Markham, Ontario, that claimed to deliver "premium medical cannabis" products to domestic and global markets, and compelling brands for the adult-use recreational market.

51.     The MedReleaf acquisition sought to create a "well capitalized company positioned exceptionally well to generate further shareholder value, driven by the low-cost production of

high-quality cannabis products," according to Booth's statement in a press release.  The MedReleaf acquisition is still the largest completed deal in cannabis history, not counting equity investments.

52.     On August 14, 2018, weeks after the MedReleaf acquisition was completed, Aurora announced that it completed its acquisition of Anandia Laboratories Inc. ("Anandia").  Aurora claimed that Anandia was considered the industry leader in science, genetics, and independent cannabis product testing.  Aurora justified the acquisition by asserting that the strength of Anandia's expert staff, proprietary assets, and know-how would provide Aurora with an advantage in developing new cannabis cultivars.  In announcing the acquisition, Aurora also stated that Anandia intended to expand its research and development, product testing, and product development facilities to meet both domestic and international demand in advance of the forthcoming legalization of the adult-use market and associated growth.

53.     In addition to the aforementioned acquisitions completed before the Class Period began, Aurora acquired five entities during the Class Period: ICC Labs Inc. ("ICC"), Whistler, Chemi, EnWave, and Hempco.  All of these acquisitions were paid for, in whole or in part, with Aurora stock.

54.     Recognizing the Company's aggressive expansion strategy, a Laurentian Bank Securities analyst issued a report on December 7, 2018, naming Aurora as "one of the most aggressive" companies in the industry given "the largest acquisition (CanniMed) followed by the even larger acquisition of MedReleaf."  The analyst provided a near-term forecast "below consensus estimates for the next couple of years," reasoning that sales "will be hampered in the near-term by limited retail distribution outlets in [Ontario] and [British Columbia]."  The analyst also cited "broader concerns of an oversupplied market."

55.     On January 17, 2019, Stone Fox Capital Advisors, LLC ("Stone Fox" or "Stone Fox Capital"), a registered investment advisory firm, published an article on investing website Seeking Alpha stating that Aurora "continues to make the wrong deals," describing the Company as "making too many deals and aggressively expanding cannabis production into the inevitable sector crash."

56.     On February 19, 2019, Winds Research published an article stating that "Aurora's (ACB) acquisitions when looked through an objective lens are nothing short of gluttonous, as in, they are beyond the order of reason.  This vapid approach of Aurora to expansion, a company that to date displayed little strategic acumen, has rendered their balance sheet as a largely worthless amalgamation of intangible assets and goodwill."

57.     On March 13, 2019, a Jefferies analyst issued a report criticizing Aurora, writing that "they have spent large amounts on numerous assets across the value chain, with perhaps little thought to which are best suited."

58.     On October 29, 2019, Cornerstone Investments wrote that Aurora was overbuilding its cannabis-growing facilities.   In response to the question, "Is Aurora overbuilding?," Cornerstone explained:

> To answer this question, we only need to consider the fact that Aurora is building roughly 400,000 kg of annual capacity in its Canadian facilities alone, in addition to the >128,000 kg designed for its Denmark facilities.  However, the total Canadian cannabis market is running at 350,000 kg per year currently.  **By common sense, it seems almost impossible to see a scenario where Aurora will be able to find markets for its entire Canadian production**.[4]

---

[4]     Unless otherwise noted, emphasis has been added.

**Defendants' Projections of Profitability by FQ4 2019
Lacked a Reasonable Basis**

59.     As explained below, throughout the Class Period, Aurora's sales of cannabis in Canada were severely constrained by three factors that were known, or recklessly disregarded, by Defendants: (1) over-production of cannabis by Aurora and other Canadian licensed producers; (2) woefully limited numbers of retail stores in Ontario and Quebec, where approximately 61% of Canadian citizens reside; and (3) continued competition from the black market selling cannabis at roughly half the price per gram.

60.     Defendants knew, or recklessly disregarded, these facts at the time they made their materially false and misleading statements and omissions because, as defendant Ibbott acknowledged multiple times, they carefully monitored sell-through data from the provinces to cannabis retailers.  Indeed, sales and revenue from consumer cannabis in the Canadian market went to Aurora's core operations and were of critical importance to the Company, raising a strong inference that Defendants were aware of this data, and consequently knew or recklessly disregarded that their statements were false when made.

61.     Accordingly, Defendants' guidance to the market that Aurora would achieve positive EBITDA in the fourth fiscal quarter of 2019, and statements related thereto, were materially false and misleading when made because they lacked a reasonable basis.

**1.     Aurora and Its Competitors Created a Massive Oversupply of Cannabis in Canada**

62.     Even before the legalization of cannabis became effective in October 2018—and before the start of the Class Period—certain financial writers began to calculate the amount of cannabis that Canadian growers were planning to produce and warned about oversupply.

63.     For example, on January 9, 2018, Matt Lamers of *Marijuana Business Daily* wrote an article titled, "Canadian marijuana producers have bankrolled more than enough capacity to

meet rec demand." In the article, Lamers explained that Canada's publicly traded licensed producers already had capacity to produce *three times* more cannabis than would be needed to serve the legal cannabis market in the first year of legalization, stating as follows:

> **On paper, at least, the Canadian marijuana industry has plenty of paid-for production capacity to meet demand by mid-2019**.
>
> Companies, in short, have been spending hundreds of millions of dollars to boost production to meet demand starting this summer.
>
> The Marijuana Policy Group (MPG) – a Denver company that provides analysis and policy advice to private and government clients – and a *Marijuana Business Daily* analysis have found that **Canada's publicly traded licensed producers have already bankrolled (or mostly bankrolled) capacity to produce over 1.25 million kilograms (1,370 tons) of cannabis slated to come online between this year and 2019.**
>
> **That's about three times more than MPG believes will be needed to serve the legal cannabis market in the first year**. (The consultancy serves as an adviser to Health Canada, but this batch of data wasn't compiled for a particular government.)
>
> Two key questions will help determine Canada's supply-and-demand situation in the months ahead:
>
> - How much of the black market – estimated at more than 900,000 kilograms (992 tons) – can Canada expect to bring into the regulated fold in that time?
>
> - How successful will licensed producers be in actually meeting their disclosed cultivation targets?
>
> MPG reckons Canada will corral approximately 40% of the black market for recreational cannabis, meaning LPs would be expected to produce around 360,000 kilograms of marijuana in Year One.
>
> **The producers have to hit only 35% of their disclosed cultivation capacity to meet market demand in the first year, MPG estimates**.
>
> *        *        *
>
> **MPG sees any shortage of cannabis as the result of market distortions on the retail and wholesale end of the supply chain, after the marijuana is produced.**
>
> **"You're unlikely to have a systematic shortage or bottleneck in cultivation, but there may be bottlenecks further down the supply chain, especially in distribution and retailing**," Light said.

- 17 -

**That's because there may not be enough sales outlets, particularly in provinces opting for government-run retail monopolies, including Ontario and Quebec**.

Those two provinces, for example, account for almost two-thirds of Canada's population and will have around 70 adult-use marijuana outlets in 2019 – far less than their combined 1,066 government-run liquor stores — and the current crop of approximately 250 illegal marijuana dispensaries.

Market imbalances might be seen regionally, with some places having too much marijuana and other places not enough.

Conversely, analysts expect provinces with private-sector retail systems will see entrepreneurs address any retail bottleneck by opening outlets with a greater selection of products as well as a wider range of prices.

Khurram Malik – a partner with Jacob Capital Management, a Toronto-based financial advisory firm – said regional retail networks will be key.

**"If you have 50 stores in Ontario where you need 500 stores, that's not a supply glut, that's a bottleneck in distribution," he said. "There will be an inventory glut first before there is excess supply in the market."**

Any inventory glut in the industry will benefit smaller producers, who will find it easier to produce at a higher utilization rate, he said.

64.     Further, on March 10, 2018, Sean Williams wrote on the Motley Fool investing website about oversupply as follows:

As you might imagine, Canadian cannabis growers have been angling to get as much of the medicinal cannabis and recreational market as they possibly can, though recreational sales will account for a significantly larger share of total sales. Organic expansion, strategic partnerships, and acquisitions have been occurring at a blistering pace.  In fact, four of the five largest marijuana acquisitions of all-time have occurred within a four-month span.

**Unfortunately, this rush to grow capacity as quickly as balance sheets will allow could be setting Canada up for an overabundance of cannabis of epic proportions**.  Even though no one has any real idea how much marijuana Canadians will demand, there's no shortage of guesstimates. . . .

Everything is a guess at this point, and most folks probably have their preferred source, but **the relative consensus is that 730,000 kilograms to 800,000 kilograms is where the annual demand floor lies**.

65.     Williams analyzed the annual production estimates of the ten largest Canadian growers (including Aurora), and concluded that just this small group of growers—representing

only 20% of the growing licenses issued by Health Canada—are capable of 1,500,000 kilograms of capacity by 2020.  That was more than double the consensus estimate for demand in Canada, and it did not even take into account approximately 60 additional licensed growers.

66.     Indeed, by the start of the Class Period, more companies than ever were lining up to be licensed cannabis cultivators in Canada despite an increasingly competitive market outlook, according to data from Health Canada.  As of December 31, 2018, almost 840 site applications were in the licensing pipeline, which was a more than 40% increase from August 2018, when 588 applicants were in the queue.  As of January 2019, there were already 145 authorized cultivators, processors, and sellers licensed under the Cannabis Act.  An analyst from Beacon Securities estimated that the Canadian market alone could not support all the prospective cultivators in the pipeline: "Within Canada there are over 130 licensed producers, and we don't need 130 of anything for the Canadian market on its own.  There has to be a reckoning.  It's a when and not an if."

67.     On February 8, 2019, Stone Fox Capital reported that Aurora "has plans to alone flood the global market with production targets in excess of demand."  Indeed, "[t]he mind-numbing stats from Health Canada support **a total cannabis market size in Canada that falls below the size of the production goals of Aurora Cannabis alone**."  Stone Fox also stated that "all signs" indicate "that the cannabis market is going to face a fundamental oversupply scenario. . . ."  According to the author, Aurora, by itself, had forecasted 1.2 million kilograms of annual cannabis production; when combined with the other nine top cannabis producers, the total annual cannabis production was forecasted to be 3.3 million kilograms.  According to Stone Fox, however, Health Canada had projected total market demand in the Canadian cannabis market of 77,000 kilograms per month, or only *926,000 kilograms per year*.

68.     Stone Fox noted that "[w]hat is incredibly troubling for a company like Aurora Cannabis that is too focused on cannabis production growth is the ability of relatively small and unknown firms to have plans to join the top 10 list."  For example, British Columbia-based Zenabis "plans to ramp production from 10,000 kilograms to 480,000 kilograms by 2020.   The total cannabis production of an updated top 10 producers list would reach 3.7 million kilograms and the combined group of 3.8 million kilograms or **nearly 4x the forecasted demand**."  In a statement made around the time of the article, Zenabis's CEO said, "we believe there will be producers, ourselves included, who are able to grow high-quality product and **actually satisfy the recreational market in Canada**."  According to Stone Fox, "Such a statement from the CEO of a relatively unknown firm should scare investors in Aurora Cannabis and the sector in general. Zenabis is planning a production jump that alone would cover 50% of the projected demand in the country. . . .   The mind-numbing part is that [Aurora] itself links to a report by Deloitte that discusses a recreational market with cannabis demand of **only 600,000 kilograms**."  Moreover, "all of the numbers don't even take into account the illegal supplies that still exist and weren't welcomed into the Canadian legalization system."

69.     On February 25, 2019, Aurora announced that both its Aurora Sky and MedReleaf Bradford facilities were fully licensed by Health Canada for the production and sale of cannabis and cannabis derivative products.  Aurora stated that these two facilities would add more than 128,000 kilograms per year in capacity.  Stone Fox Capital reported the next day that Aurora was on a path to bring on nearly five times the quarterly supply of Canadian cannabis by June 2019.

70.     On March 21, 2019, during an earnings call, Brendan Kennedy, the CEO of Aurora competitor Tilray, provided the first real admission from a cannabis CEO of an oversupply situation on the horizon in Canada.  Kennedy stated, "Over the next 18 months, **we believe there**

**will be oversupply**, just as we have seen in certain U.S. states as operators in new legal markets race and government regulators catch up to find an equilibrium between supply and demand." Kennedy also said that "[w]e will not purchase or invest in what we believe to be **overpriced supply assets in Canada**, which we believe will erode in value in the medium to long term, as the market normalizes."

71.     On March 24, 2019, Sean Williams, writing for the Motley Fool, explained that "there's no way that Canada can support 1,000 licensed producers, let alone 200." The result, Williams wrote, would be plummeting prices:

> What happens if domestic supply gets out of hand? For that answer, just look at Colorado, Washington state, or Oregon. In each of these adult-use legal states, oversupply has run rampant, causing the per-gram price of dried cannabis flower to drop precipitously. Oregon's supply chain has been particularly troublesome since the state doesn't limit the number of licenses that can be issued. **If even a couple of hundred licensed producers make it to market in Canada, the country will be glutted with so much dried flower that wholesale and retail prices will plummet**.

72.     On April 10, 2019, Aurora announced plans to further expand its Aurora Sun cannabis cultivation facility. Aurora said it would expand production space by 33%. The facility would grow from the listed 150,000 kilogram goal to a new production capacity plan of more than 230,000 kilograms. According to Stone Fox Capital, which discussed the announcement the following day, "[i]nvestors need to take note that the forecast capacity went up over 50% on only a 33% increase in additional space." Stone Fox wrote further, "The company already had an aggressive expansion plan in the works and was just entering a period of additional inventory hitting the market to test the supply/demand equation. The question is why the company felt the need to rush into even more future expansion."

73.     Aurora, Stone Fox explained, "has consistently discussed plans for cannabis production capacity going from 120,000 kg currently to over 500,000 kg by mid-2020 or only one

year away now."   However, "[a]fter this quarter, Aurora Cannabis now expects production capacity to jump 6 fold to reach over 625,000 kg per annum of dried cannabis."

74.   According to Stone Fox, Aurora "faces a market that still wasn't showing much in the way of sales growth all the way through January.  Yes, after about 3.5 months of recreational-use sales, the Canada market is still only consuming about 7,000 kg of cannabis each month." Stone Fox illustrated the inventory and sales trends, using data from Health Canada, as follows:



75.   Pointing to the data, Stone Fox explained the concern based on supply and demand, as follows:

> The number is problematic as **sales actually declined in January from the November and December levels while finished inventory was growing**.  The big looming issue supporting the theory the market is going to be flooded with supply is that **the unfinished inventory is surging having reached 115,000 kg in January or nearly 20x monthly sales**.

> These key data points are problematic for the industry.

- Total sales of dried cannabis in January decreased by 3.7% compared to December (from 7,385 kg to 7,115 kg).

- Total sales of cannabis oil increased by 4.3% (from 7,534 litres to 7,856 litres).

- Total inventory of dried cannabis (finished and unfinished) held by cultivators, processors, distributors and retailers stood at 134,148 kg at the end of January – **18.9 times total sales in the month**. Cannabis oil inventories totaled 79,703 litres – over 10 times total sales.

- The total amount of finished dried cannabis products held in inventory at the end of January increased by 4.7% compared to the end of December (from 18,646 kg to 19,520 kg). The total amount of finished cannabis oil products increased 26.0% (from 41,986 litres to 52,921 litres).

**More importantly, the data points don't provide any logic for expanding production**. . . .

Despite any data points supporting a scenario where demand will exceed supply when all of the already planned capacity expansion reaches market, especially with a still strong black market, Aurora Cannabis is investing even more into their farming operations.

76.    On April 18, 2019, Cowen issued a report reflecting on investor meetings they hosted with Battley, Ibbott, and Carey Squires, Executive Vice President of Corporate Development and Strategy.   The report indicated that, during the meeting, "**management commented that it is not worried about a potential industry oversupply in the near term**."

77.    During Aurora's May 15, 2019 earnings call, Booth said that "one thing I lose sleep about is our ability to supply the global demand for cannabis. . . . [W]ith Australia, Mexico and other countries that are coming online, it would take nearly 50 years to meet that demand."   In response, Stone Fox Capital wrote, "The key investor takeaway is that **Aurora Cannabis is increasingly making us nervous that the company is blind to the oncoming flood of cannabis supply**.  The company appears far too bullish on the pricing environment under this scenario."

78.    On May 16, 2019, a Canaccord Genuity analyst issued a report stating that, "after speaking with management and considering its EBITDA guidance for Q4," Canaccord was "admittedly too high in our forecasts for the remainder of the year and have lowered our remaining

FY 2019 forecasts as summarized below."

79.     In a June 3, 2019 article, Stone Fox raised additional concerns that legal cannabis

sales were stalling at the same time that Aurora was set to start flooding the market with cannabis

inventory.  Stone Fox wrote, in pertinent part, as follows:

> Only back at the start of April, Aurora Cannabis announced the decision to increase
> production by ~80,000 kg to a total of 625,000 kg. The move remains troubling
> because demand in Canada isn't growing with the legalization of adult-use cannabis
> and the company is effectively blocked out of the U.S. market.
>
> After the initial boost in sales last October, Canadians haven't rushed to the legal
> weed due to a supposed shortage of legal supplies and retail locations. Or at least
> the market leaders suggested so, but the sales and inventory data from Health
> Canada continues to tell a far different story.
>
> During Q1, finished inventory of dried cannabis surged over 60% to 30,802 kg
> while sales in March was basically flat with December at 7,600 kg. Even more
> troublesome, unfinished inventory surged to 143,773 kg. **Combined inventory of
> 174,575 kg is enough supply for nearly 23 months or almost two years at
> current monthly sales levels**.

80.     Stone Fox cited the following chart to illustrate this trend:



81.     According to Stone Fox, "[w]hat is clear is that the supply flood is already showing up in the monthly data from Canada, yet companies like Aurora Cannabis haven't even seen a big ramp in production through the March data.  **The company expects to supply enough cannabis in Q2 alone at 25,000 kg to supply the whole dry cannabis market for the quarter**."  Indeed, "[e]ven in March, Aurora Cannabis reached over 9,000 kg of dried flower equivalent or enough for the whole country of Canada in the month."

82.     Stone Fox was concerned by Booth's statement during the May 15, 2019 earnings call that "it would take nearly 50 years to meet [global] demand," because it meant that "Management has the mindset that Canadian producers need to supply the world. . . ."  Stone Fox wrote that this mindset "should make investors very nervous based on the above data points."  "The key takeaway," wrote Stone Fox, "is that Aurora Cannabis still hasn't made the case of where all of this supply is going to end up when so many competitors are equally adding supply.  The legal demand in Canada hasn't shown up as expected to support any thesis of expanding supply at such a rapid clip by the end of 2020."

83.     On June 14, 2019, Common Sense Trades published an article criticizing Aurora for not devoting one second of their FQ3 2019 earnings call "to discussing the rate of growth in operating expenses versus revenues," leading the author "to believe that the problem will only get worse."  Moreover, the author referenced market data provided by Health Canada, depicted above in ¶80, "showing that Canadian marijuana sales have remained stagnant," with sales for March 2019 coming in at roughly the same as sales for December 2018.  The data further showed that "cannabis companies are saturating the market with supply at significantly increasing rates."  According to Common Sense Trades, "[o]ur analysis, therefore, is obvious – **ACB's increase in production in no way correlates to an increase in actionable demand**.  Not to mention any

chance of any increase in future revenues outpacing the increasing costs and expenses."

84.     On June 18, 2019, Stone Fox reported that Aurora had forecasted supply to reach 25,000 kilograms in the current June quarter, up from sales of only 9,160 kilograms in the prior quarter.  Aurora had recently increased production capacity by approximately 80,000 kilograms to a total target of 625,000 kilograms by 2020 excluding operations in South America.  Stone Fox wrote: "Within the course of a little over a year, Aurora Cannabis alone will grow cannabis production by ~140,000 kg per quarter or nearly 900% growth.  The company desperately needs demand to surge in just a few quarters."

85.     Although Defendants repeatedly affirmed their guidance of positive EBITDA by the fourth fiscal quarter ending June 30, 2019, Aurora's ability to achieve that goal was threatened by oversupply.  According to a July 1, 2019 article by Stone Fox, "[s]ooner or later, pricing is going to become problematic for reaching that goal."  Stone Fox wrote:

> If [Aurora] sold all of the supply while keeping prices at C$6 per gram, the company is indeed on path to solid EBITDA profits.  **The risk to the story is a gross margins squeeze along with the dip in the net average selling price per gram to C$5.00 or lower while sales fall far short of the 25,000 kgs available in inventory for FQ4**.
>
> - Revenue - 20,000 kgs @ C$6 per gram = C$120M
> - Gross Margins @ 60% = C$72M
> - OpEx = C$75M
> - Adj EBITDA = -C$3M
>
> What about the scenario where the company only sells 15,000 kgs to hold back inventory for edibles and vapes while gross margins dip from the 55% level in FQ3 instead of rising to 60%.
>
> - Revenue - 15,000 kgs @ C$5 per gram = C$75M
> - Gross Margins @ 50% = C$37.5M
> - OpEx = C$75M
> - Adj EBITDA = -C$37.5M
>
> \* The analysis doesn't include the C$6-7 million in non-cannabis sales that Aurora Cannabis has on a quarterly basis.

**In either scenario, higher supply crushing prices and gross margins have a devastating impact on the ability of Aurora Cannabis to reach adjusted EBITDA positive any time soon**. In FQ4, the company is likely to hit the top target of where adjusted EBITDA is within reach of positive territory, but the bottom scenario becomes the reality in the September quarter as industry inventories boom.

The likelihood of Aurora Cannabis maintaining average selling prices above C$5 per gram is unlikely suggesting any attempt to breakeven will quickly fade. . . .

**The key investor takeaway is that Aurora Cannabis is in a precarious position of being unable to reach adjusted EBITDA positive as industry inventories soar**. The opening up of Ontario stores helped boost cannabis sales in April, but the industry is far ahead of meager demand now.

86. On July 12, 2019, Cornerstone Investments published an article titled "The Looming Risk of Oversupply Is Real," explaining that the rising cannabis inventory would lead to falling prices in Canada. According to the article, "[t]he latest data from Statistics Canada just confirmed our long-held view that the Canadian domestic market will face a wall of supply in the coming quarters. Aurora stands to face immense pressure on pricing as it relies almost entirely on the Canadian market for its revenue." Cornerstone Investments analyzed the data from Statistics Canada,[5] stating in pertinent part as follows:

> Based on the latest data published by Statistics Canada, Canadians bought a total of 8,853 kg of dried cannabis in April. Although April saw a 16% increase in dried cannabis sold, **the bigger concern should be the amount of inventory and unfinished products that recorded**. Based on the data, there is currently 31,880 kg of finished inventory in the system which is held roughly equally between distributors/retailers and LPs. **More concerning, there is over 183k kg of dried cannabis that is currently labeled unfinished inventory that presumably should be in the process of being turned into finished products. In summary, the amount of finished inventory is roughly 4x current sales and 21x unfinished inventory. In other words, it takes 4 months to clear the current inventory and another 21 months to clear unfinished inventory**.

---

[5] Statistics Canada is the country's national statistical office. The government agency produces publicly available statistics to help Canadians better understand the country's population, resources, economy, society, and culture.

87.     Cornerstone Investments cited the following chart with data from Health Canada to illustrate this trend:

**Total Inventories and Sales – Dried Cannabis (Kilograms)**



88.     Another important observation, according to Cornerstone Investments, is that cannabis inventory had been rising steadily since legalization in October 2018.  Sales, meanwhile, had been stagnant and without any sustained growth.  "The surprising fact is that the media and consumers have been complaining about undersupply in Canada ever since legalization happened," Cornerstone wrote.  "However, official data suggests that there are more than enough finished inventory to support sales.  We think potential reasons for the disconnect include inferior product quality that resulted in unwarranted products sitting on the shelves.  It is also possible that

the distribution of productions is uneven among different markets and some provinces could face a worse situation than others."

89.     With respect to pricing pressure, Cornerstone wrote: "For Aurora, we believe the company will face increasing pressure to lower prices as supply and inventories increase while most consumers refuse to pay the current higher prices from legal channels. . . . Most consumers are already paying far less from illegal channels and we see the current undersupply turning into oversupply within the next few quarters."

90.     In addition, the international market for legal cannabis did not provide an outlet for Aurora's excess inventory.  On October 29, 2019, Cornerstone Investments wrote, "We have historically been very candid with readers about the limited near-term upside of international markets, and we remain of the view that it could take years for these markets to develop."

### 2.     The Lack of Cannabis Retail Stores in Canada's Most Populous Provinces Undermined Defendants' Profitability Projections

91.     Defendants' statements concerning Aurora's profitability were also false and misleading because they omitted to disclose that the woefully insufficient number of cannabis retail stores in Canada's most populous provinces was adversely impacting Aurora's ability to sell its cannabis products to consumers.

92.     Aurora was unable to adequately distribute its products to consumers in Ontario and Quebec, which account for nearly two-thirds of Canada's population.  Those provinces opted to sell cannabis through government-run retail monopolies, leaving the provincial governments to decide how many retail cannabis stores to open.  The result was an acutely inadequate number of stores that created a bottleneck in distribution of an already oversupplied product.

93.     After less than one month of legalization, the *Financial Post* reported on November 16, 2018, that Canada had struggled to meet demand for recreational cannabis, with

some licensed producers blaming the distribution methods employed by certain provinces, and provinces saying that they did not receive enough product from producers.  On November 15, 2018, Aurora CEO Booth spoke at the Marijuana Business Conference in Las Vegas, at a panel session titled "Canada: Assessing the First Month of Recreational Sales."  The *Financial Post* reported Booth's comments, which it described as at times laced with profanity, and met by the audience with a mix of laughter and shock.

94.     During the conference, Booth said that Ontario and British Columbia "shat the bed" when rolling out their retail models for recreational cannabis, and that the only provinces that "got it right" were Alberta and "perhaps" Saskatchewan.  Booth added, "I would say Ontario shat the bed the worst."  Booth said Aurora had lived up to its obligations but suggested that problems with the rollout were holding the Company back.   "We have contractual commitments with the provinces and we have met them," Booth said, adding that "we would be ready right now if the government had let us."  In response to Booth's assessment of the retail rollout, the Ontario Ministry of Finance stated, "the Government is moving forward with a strict private model for recreational cannabis by April 1, 2019."

95.     On December 13, 2018, Ontario's Attorney General and Minister of Finance released a statement concerning changes being made to the licensing process for recreational retail cannabis stores in Ontario.  The officials announced that a lottery would be conducted for the issuance of a mere 25 licenses to operators of retail cannabis stores in Ontario, which would not even open for business until April 1, 2019.  The lottery was scheduled for January 11, 2019.

96.     On May 3, 2019, *The Globe and Mail*, a Canadian newspaper, reported that since recreational cannabis was legalized the previous October, many Canadians were struggling to buy product in person due to the scant number of storefronts.  *The Global and Mail* compared Canada

to Colorado, which legalized recreational marijuana in 2014.  In 2019, Colorado had more than 560 recreational sales outlets serving a population of 5.7 million, or approximately 10 stores for every 100,000 residents.  Citing a May 2019 analysis from AltaCorp Capital, a Canadian investment bank, *The Globe and Mail* explained that Canada had just over 360 actual or planned retail locations, or 10% of the 3,640 locations that AltaCorp said were needed to match Colorado's density.  The shortage was less severe in some parts of Canada, but glaring in others.  For example, according the AltaCorp:

> [I]n Ontario, the first licensed cannabis stores didn't open until April [2019], and only 25 store licenses have been issued to date.  Though not every store has opened, **the planned 25 amounts to 0.2 stores for every 100,000 residents.  To close the gap with Colorado, Ontario would need to add nearly 1,400 stores**.

97.    AltaCorp suggested that Quebec would need to add more than 800 stores.  Ontario and Quebec, the largest two provinces based on population in the 2016 Canadian census, only had approximately 60 stores (as of May 2019), when the estimate was a need for *more than 2,200 stores based on Colorado*.  Not only are these two provinces the largest based on population, but the combined population of 21.6 million people accounts for 61.5% of the population in Canada.  "Canada needs more brick-and-mortar retail stores," AltaCorp said.  Cannabis sales growth was "weak," and AltaCorp attributed a big part of that to the "lack of physical retailers across the country."

98.    The following charts from AltaCorp illustrate the stores needed by province to match Colorado's density:



99.     On May 6, 2019, a GMP Securities analyst issued a report decreasing GMP's revenue forecasts for Aurora FQ3 2019 and FQ4 2019 "to reflect the low sales volumes reported by Health Canada in the recreational channel for January and February of 2019."  The analyst indicated that "the main reason for the limited sales growth is the cap that has been placed on the retail network by the provincial regulators, limiting the number of cannabis stores and hindering black market penetration."

100.    The need for retail cannabis stores despite the prevalence of e-commerce is underscored by the importance of the in-person shopping experience for cannabis consumers.  In a June 6, 2019 article discussing the dearth of retail cannabis stores in Canada's largest markets, *The Globe and Mail* explained that although cannabis users had been able to purchase product online since Day One of legalization, "Canadian consumers have shown a distinct preference for

shopping in-store" because, according to a business professor at Brock University, "cannabis is an 'experiential product' that many consumers want to see and smell before purchasing."

101.    Not surprisingly, Ontario's store openings on April 1, 2019, did not save the Canadian cannabis industry.  The province had only approved 25 stores and about half those stores were open by then.  The problem, as Stone Fox characterized it in a July 1, 2019 article, "isn't the doubt that sales would eventually start growing as more stores open and Cannabis 2.0[6] launches in mid-December.  The problem is that the market is going to be flooded with supply by the time all these stores open."  For April, Health Canada reported that dried flower inventory surged by approximately 41,000 kilograms.  By comparison, the March inventory level only jumped by 30,000 kilograms, demonstrating how supply was ramping up.  The surge in dried cannabis inventory in April 2019 is represented in the chart in ¶87 above.

102.    Indeed, total inventory of dried cannabis held by cultivators, processors, distributors, and retailers at the end of April 2019 stood at "an incredible" 216,000 kilograms, meaning, according to Stone Fox, that the industry then had more than 24 months of supply.

103.    On July 3, 2019, the Alcohol and Gaming Commission of Ontario ("AGCO") announced that a lottery would be held on August 20, 2019, to determine the recipients of licenses to open an additional 50 cannabis retail stores.  At the time of the July 3, 2019 announcement, AGCO anticipated that new stores would only begin to open in October 2019, as they become ready.[7]

---

[6]    Canadian cannabis industry participants described a new segment of the industry, defined by the launch of derivative products such as vapes, edibles, infused beverages, concentrates, and topicals, as "Cannabis 2.0."

[7]    As of December 2019, only 24 cannabis stores were open in the entire province of Ontario.

104.    On September 10, 2019, Stephen Kanaval, writing on business news website Equities, analyzed the problem of too few stores and too much supply in the cannabis industry, explaining, in pertinent part, as follows:

**The Story of Canadian Cannabis: Incremental Retail and Massive Amounts of Supply**

To cover that point more directly, Aurora Cannabis is partly directly responsible for this oversupply. There are only 600 retail locations across Canada (to compare, Colorado alone has 100,000 retail locations) amounting to a need of 10,000 kilograms per month. Just look at the numbers in Q2 [Aurora's FQ4], **Aurora produced 28,374 kilograms while all of Canada sold 9,976 kilograms** (numbers are for dried cannabis). **The total inventory total across Canada surpassed 250,000 kilograms of cannabis just sitting around.** Even as more stores open and legalization 2.0 – allowing the sale of edibles and infusions – kicks into gear, these numbers will rise incrementally over time. I stress *incrementally*.

This incremental methodology comes from Health Canada. I have covered this before, but in Ontario, the most populous province, only 75 stores have received approval. So, **Health Canada is grooming Canada for one scenario and its largest LPs are doing another, and what has transpired is a flood of supply. A flood that will take years to smoke**. . . .

You would think a supply correction would be made, but, no, **Canadian LPs are set to produce more than 2 million kilograms of cannabis next year and ACB is the biggest offender with 662,000 kilograms coming from its 15 total production facilities. This is a 5-fold increase from 2019**. The only question to ask is why?

105.    The swelling inventories at the end of June 2019 are depicted in the following graph based on Health Canada statistics, which was included in a September 10, 2019 analysis by Stone Fox Capital:



Figure 1. Total Inventories and Sales – Dried Cannabis (Kilograms)

106.    In its September 10 article, Stone Fox echoed its previous sentiment about the flood

of supply, writing as follows:

> My articles have constantly preached the Canadian market is headed towards a flood of supply.  **The issue is the additional retail locations in Canada aren't going to provide a leap forward in sales**.
>
> The details are clear that Canada lacks retail stores in comparison to the U.S. market. With Ontario having 25 stores now and planning to add up to 50 more in October, the market will see growth, but the growth rate will be muted.  **The new stores will cannibalize the existing ones, and the total growth rate won't match up**.
>
> Back in May, Canada only had 360 actual or planned retail locations per the *Globe and Mail* in comparison to the 560 outlets in Colorado alone.  Nobody doubts that more stores are needed, and the state needs over 3,600 stores to match the density of 10 stores per 100,000 locations currently in Colorado. . . .
>
> The problem here is that one can't invest based on the need when it differs from the reality of what the government is going to approve.  Ontario has only licensed 50 more stores for October bringing the total in the most populous province at only 75 stores by the end of 2019. . . .

In essence, the industry is building for the Colorado use case, but the government hasn't approved such a scenario. **Aurora Cannabis needs to lead the industry in reigning in supply growth. The top 10 companies are still on a path to produce ~2.5 million kg by next year**. . . .

**Aurora Cannabis is leading the industry with plans to go from the 30,000 kg available for sale in the June quarter to over 165,000 kg per quarter by only mid-2020. The industry already has plentiful supply, yet the leading cannabis producer still has plans to grow 5-fold in the next year**.

### 3.   The Black Market for Illegal Cannabis Impeded Aurora's Ability to Reach Its Profitability Projections

107.   Compounding the profitability pressures of too much supply and too few stores through which to sell it, the cannabis black market continued to threaten Aurora's ability to achieve profitability in 2019.  Despite legalization in October 2018, the black market continued to flourish in Canada.  A February 19, 2019 article by Winds Research indicated that "the cannabis black market in Canada is still thriving with control of 71 percent of sales in Canada the first year following the start of recreational adult use sales."

108.   In an April 11, 2019 article, Stone Fox Capital explained that media research "continues to show that the illicit market isn't going away.  The black market in Canada was still strong in the initial sales period according to an article in the *Washington Post*."  Even the more developed California market, according to media reports, still faced a strong black market.  The problem "is that legal weed is overtaxed and over-regulated allowing the black market to sell at lower prices."

109.   Moreover, due to the failure of the governments of Ontario, Quebec, and British Columbia to open sufficient numbers of retail stores, it was estimated that 72% of recreational cannabis sales in 2019 would take place on the black market.  This is despite the fact that displacing the illicit market was supposedly one of the top priorities of the Canadian government.  In a June 25, 2019 article, Jeff Nelson of *The Seed Investor* asked rhetorically, "How do you 'displace'

the black market for cannabis when there is practically no place for consumers to shop for legal cannabis?  You don't."

110.    On October 9, 2019, Statistics Canada published data for the third calendar quarter of 2019 showing that the average price of cannabis per gram in Canada's legal market was $10.23, compared to an average of $5.59 found in the black market, for a price differential of 45%.  The price gap widened from a gap of about 35% in the fourth calendar quarter of 2018.  The price gap is depicted in the following chart:



111.    According to BNN Bloomberg, "[t]he persistence of the black market, coupled with a relatively sluggish rollout of physical bricks-and-mortar cannabis stores in Ontario, has led the cannabis industry to fall well short of analyst earnings expectations since recreational use became legal on October 17, 2018."  Craig Wiggins, managing director of The Cannalysts Inc., an independent cannabis research firm, estimated that the black market accounted for a whopping 86% of cannabis sales in Canada as of October 2019.

112.    In a Seeking Alpha article published on November 14, 2019, Robert Manders illustrated Canadian cannabis supply and demand for both the legal and illegal markets:



*Note: Supply includes most recent quarterly figures group of 6 publicly traded companies. **The actual legal supply is higher as there are almost 200 licensed producers**.

113.    Manders explained that consumer price data from Statistics Canada showed that the black market was defending its market share by lowering prices by over 10% since Q4 2018.  At the same time, legal retail prices had not declined significantly, signaling that legal retailers were expanding their margins.   "This is clearly not working for the licensed producers that need the legal market to expand in order to take share from the black market."

**Aurora's EBITDA Projections Raised Red Flags**

114.    Despite providing EBITDA guidance to investors throughout much of the Class Period, Aurora's quarterly financial reports lacked general details on EBITDA, diluted shares, and earnings per share ("EPS").  On February 14, 2019, Stone Fox Capital wrote, "the big problem" with Aurora's FQ2 2019 earnings reported on February 11, 2019, "is that the company again left out key details such as diluted share counts, EPS numbers and an actual EBITDA number despite

discussing the goal of reaching positive EBITDA."  According to Stone Fox, "[t]he even more worrying fact is that **the management team discussed the path to turning EBITDA positive in FQ4 without even providing the FQ2 metric anywhere in the earnings release**."  Stone Fox added, "[o]ne can make an educated guess that the adjusted EBITDA loss was somewhere in the $34 million range" for FQ2 2019.  "The key investor takeaway," according to Stone Fox, "is that Aurora Cannabis continues to provide a lot of financial and operating details, yet the company manages to bury the key metrics.  In addition, the overall strategy continues to be scattered with the company flooding the market with cannabis over the next 18 months. . . ."

115.    On May 16, 2019, an analyst at Canaccord Genuity wrote, "[a]lthough improved, **FQ3/19 was still a ways away from profitable**; however, management once again reiterated its expectation of achieving positive EBITDA in [FQ4/19]."

116.    On May 18, 2019, Stone Fox Capital wrote, "[t]he biggest promise maintained by management is the goal to reach EBITDA positive by FQ4.  **The company produced a C$36.6 million EBITDA loss in the last quarter so Aurora Cannabis has a huge step to make in the current quarter**."

117.    On August 6, 2019, Aurora updated the market with a positive pre-announcement on FQ4 results for the period ending in June.  According to an August 8, 2019 Stone Fox Capital article, "Health Canada data doesn't support these healthy numbers with industry inventory levels soaring."  Stone Fox explained as follows:

> Remember, **Health Canada doesn't support the substantial growth in the market purported by the preliminary numbers from Aurora Cannabis**.  The data shows that both dried cannabis and cannabis oil has surging inventories and in quarter growth only in the 10% to 20% range.  Total inventory of dried cannabis (finished and unfinished) held by cultivators, processors, distributors and retailers stood at 264,000 kgs at the end of May – **27.8 times total sales in that month**.  Cannabis oil inventories totaled 128,000 litres – 13.1 times total sales.

118.  Stone Fox cited the following chart in support of its point:

| Source of cannabis sold and in inventory | April 2019 ★ | | May 2019 | |
|---|---|---|---|---|
| | Dried (kg) | Oil (litres) | Dried (kg) | Oil (litres) |
| Total Sales | 8,874 | 8,202 | 9,495 | 9,773 |
| Sales - medical | 2,129 | 4,760 | 1,697 | 5,688 |
| Sales - non-medical | 6,745 | 3,442 | 7,798 | 4,085 |
| Total finished inventory (end of month) | 31,293 | 72,418 | 39,891 | 85,639 |
| Federal licence holders | 13,413 | 36,935 | 17,725 | 46,139 |
| Provincial distributors/retailers | 17,880 | 35,483 | 22,166 | 39,500 |
| Total unfinished inventory (end of month) | 184,034 | 47,465 | 224,037 | 42,350 |
| Federal licence holders | 184,034 | 47,465 | 224,037 | 42,350 |

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING
## STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

119.  Throughout the Class Period, Defendants artificially inflated the trading price of Aurora common stock by issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements not misleading.

120.  On October 18, 2018, the week before Aurora shares began trading on the NYSE, Aurora announced that its common shares had been approved for listing on the NYSE and would commence trading effective with the opening of markets on October 23, 2018.  In the press release, Booth touted the "growing demand" for consumer cannabis, stating in pertinent part:

> Aurora has rapidly developed into a globally mature organization with industry leading and technologically advanced production facilities available to produce at unprecedented scale **to meet the growing demand for high-quality cannabis both in Canada and abroad**.  We are also uniquely committed to leveraging our deep knowledge base to further scientific research into medical applications of cannabis, and developing novel, higher-margin product offerings that strongly differentiate Aurora from our competition.

121.   Booth's statements on October 18, 2018, remained alive and uncorrected at the start of the Class Period on October 23, 2018.

122.   On November 12, 2018, the Company issued a press release noting its FQ1 2019 financial results for the quarter ended September 30, 2018.  The release stated that Aurora had achieved 260% revenue growth to $29.7 million and that pro forma revenues were up 333% during the quarter to $35.8 million.  In the release, Booth stated that "**[g]iven the strong unmet consumer demand evident across Canada, we are confident that our rapidly increasing production capacity will result in continued acceleration of revenue growth**."  The press release continued, in pertinent part:

**Facilities and Production update**

During and subsequent to the quarter, the Company made significant progress towards increasing its production capacity, including receipt of various sales and production licenses. Based on grow rooms in production, the Company currently is running at an annualized run rate of 70,000 kg. **Management anticipates that around calendar year end 2018 into the beginning of calendar 2019, Aurora will have a production run rate in excess of 150,000 kg per annum based on grow rooms in production, with subsequent scale up to over 500,000 kg per annum (excluding additional capacity through the acquisition of ICC Labs).**

\*        \*        \*

While the historic milestone of Canada becoming the first G7 nation to legalize the adult consumer-use market creates a very significant growth opportunity, the Company maintains its position that long term the international medical market has the most significant growth prospects, and is expected to grow to 10 million kilograms per annum according to industry observers.  The Company has established significant early mover advantage, has a presence on five continents, and is currently Europe's largest distributor of medical cannabis.  Aurora also currently owns two of the seven cannabis production facilities in the world that are EU GMP certified, and additionally owns one EU GMP certified distribution facility in Germany, ensuring continued access to restrictive markets. Management believes this early mover advantage, coupled with the strength of its growing international management teams, will enable the Company to continue expanding its significant market share in the global medical market.

123.    Aurora's management's discussion and analysis for the quarter, filed as an exhibit

to a Form 6-K on November 13, 2018, stated in pertinent part:

> The Company's financial results for the first quarter of fiscal 2019 continued to show strong growth in its core cannabis businesses. Compared to the prior quarter, total cannabis revenue increased by 65%, while at the same time Aurora was bolstering its inventory levels to continue serving multiple customer markets.

124.    Also on November 12, 2018, Aurora hosted a FQ1 2019 earnings call led by

defendants Booth, Ibbott, and Battley.  During the call, Battley emphasized an "excess of demand

over supply" in the Canadian cannabis market that purportedly justified ramping up inventory and

production capacity, stating in pertinent part:

> So again, while it's still early, it is clear that our brands have resonated strongly with the market, and we built a significant early market position.  And that validates our preparation for the launch of the adult consumer use market and the success of our production and rollout strategies.  **Similar to other Canadian LPs, we are facing demand that outstrip supply.  We anticipate this dynamic to continue for some time.**  However, we are successfully and rapidly scaling up our capacity, increasing product availability and driving accelerated growth across our different markets.
>
> *        *        *
>
> Currently, based on rooms in production, the company is running at an annualized run rate of approximately 70,000 kilograms and anticipate getting to approximately 150,000 kilograms per year annual run rate around the end of this year, 2018.  On deck are the Sky Class facilities Nordic II in Denmark and an Aurora Sun in Medicine Hat, Alberta.  Construction of Sun is underway with first planting expected in 2019, bringing our total funded capacity to over 500,000 kilograms annually.

**Aurora Begins Providing
Guidance and Profitability Expectations**

125.    On January 8, 2019, Aurora issued a press release providing updated FQ2 2019

results for the quarter ended December 31, 2018.  The Company continued to represent that its

strategic expansion was well underway and that it was not only increasing revenues, but also

controlling costs.  And for the first time as a public company, Aurora provided EBITDA guidance

to the market.  The press release stated in pertinent part:

> Paired with strong current and future anticipated demand for the Company's products across its different market segments, this is expected to result in continued strong revenue growth.

> \*       \*       \*

> Consequently, management believes the combination of substantial revenue growth and disciplined cost management positions the Company well to **achieve sustained positive EBITDA beginning in Fiscal Q4 2019 (Calendar Q2 2019)**.

> \*       \*       \*

> "Aurora continues to execute effectively across all market segments, as demonstrated by its revenue growth anticipated to exceed 68% as compared to last quarter, supported by continued strong performance in the Canadian adult consumer use market," said Terry Booth, CEO of Aurora.  "Our consistent and high-quality production continues to significantly ramp up as expected, fueling even further growth.  **Going forward, we see sustained strong demand from the adult usage market**, as evidenced by public statements from the Canadian provinces, as well as strong patient-driven demand for medical cannabis in Canada and abroad.  **These factors, together with our focus on disciplined management of operating expenses, and our growing portfolio of higher margin products, put us in a position to rapidly achieve positive EBITDA within the next two quarters**."

126.    Aurora's publicly traded competitors, however, did not provide financial guidance

to investors during the Class Period.

127.    Aurora's guidance was materially false and misleading because, as explained in

¶¶59-118, it lacked a reasonable basis.

128.    On February 11, 2019, the Company issued a press release announcing its FQ2

2019 results.  The press release stated that the Company had achieved "83% Sequential Net

Revenue Growth to $54.2 Million."   In addition, the Company promoted the progress it was

purportedly making on its Aurora Sky facility, which it claimed would yield production

efficiencies.  The press release stated in pertinent part:

Aurora Sky is now fully complete and commissioned, and is expected to reach its full production capacity, based on Health Canada approved planted rooms, shortly. Recent harvests completed to date at the facility have exceeded targeted yields, reflecting that the facility's commissioning has been successful, all environmental and nutrition systems, and operating protocols are dialed in, and technology components are functioning well.

*     *     *

The Company anticipates that with Aurora Sky operating at full capacity, as well as continued reduction in operating costs, the cash cost to produce per gram will trend significantly lower.  Management reiterates its expectation that the sustainable long-term operating cost at its Sky Class facilities will be well below $1 per gram.

129.   The press release quoted defendants Booth and Ibbott at length, highlighting the purported strong and sustained demand for the Company's products and the completion of progress milestones at the Company's production facilities.  The release stated in pertinent part:

Consequently, and consistent with previous guidance, management believes that the combination of substantial revenue growth, low cost of production, and disciplined operating cost management will position Aurora to **achieve sustained positive EBITDA beginning in fiscal Q4 2019 (calendar Q2 2019)**.

*     *     *

**Management Commentary**

"Aurora continues to execute strongly across all of its market segments, as demonstrated by the 83% revenue growth over last quarter and the significant increase in confirmed production results," said Terry Booth, CEO of Aurora. "Our brands continue to resonate extremely well in the consumer market, our patient numbers continue to increase steadily, and we have maintained our market leadership in Germany and other key international markets.  **We are experiencing exceptional demand for our Canadian medical and consumer products, as well as sustained strong demand internationally.  With our Aurora Sky and MedReleaf Bradford facilities ramping up production as anticipated and our other licensed facilities operating at full capacity, we are reiterating our earlier guidance of achieving sustained EBITDA positive results from the second calendar quarter of this year (our fiscal Q4)**."

Glen Ibbott, CFO of Aurora added, "We are also very pleased with our recent placement of US$345 million in convertible notes.  These convertible notes were subscribed by high-quality US, Canadian, and international institutions and offer Aurora the flexibility and optionality to settle the entire principal amount of the

notes in the future for cash, shares, or any combination thereof.  This funding sufficiently supports the global opportunity for us to continue our commitment to growth in the legal, regulated medical and consumer cannabis systems across the globe.  **This is a unique time and position as we maintain a high cadence of increasing product supply and international market expansion."**

Mr. Booth concluded, "With our strong performance in the Canadian medical and consumer markets, our early mover advantage in a growing list of important international markets, together with our leadership in high-quality, CBD-rich hemp production, **Aurora is strategically positioned across the entire cannabis industry value chain to further extend our rapid growth**."

130.    Also on February 11, 2019, Aurora hosted a FQ2 2019 earnings call led by defendants Booth, Ibbott, and Battley.  During the call, Battley emphasized the "strong market demand" for the Company's products that purportedly justified ramping up production, stating in pertinent part:

> **To address the continued strong market demand from the Canadian and international medical market and the Canadian consumer market, we are ramping up production rapidly**.  Currently, based on planted rooms approved by Health Canada, we are running at an annual production rate of about 120,000 kilograms or 120 million grams per year, and we expect to reach over 150,000 kilos of annual production by the end of next month based on planted and approved rooms.

131.    Battley also stated, "If you take a look around the world, and some of you have heard me say this before, that there's no shortage of cannabis in the world, but there is **a massive shortage of legal regulated cannabis**, particularly cannabis that can achieve – cannabis products that can achieve EU GMP certification."

132.    During the same call, Ibbott similarly emphasized the "very strong demand" for Aurora's products, and said that Aurora was "very comfortable in reiterating our earlier guidance of achieving positive EBITDA in our fiscal Q4," stating in pertinent part:

> **With the rapid scale-up of our production and the related increase in product availability, the continued very strong demand for our products**, our planned expansion of a derivative product portfolio of these higher-margin products and continued discipline in our operating cost, **we are very comfortable in reiterating our earlier guidance of achieving positive EBITDA in our fiscal Q4, that's**

**April to June 2019**, with positive operational cash flow following shortly thereafter.  We are executing well as reflected in these results and in our expectations going forward, and we are exceptionally well positioned as one of the clear leaders in the global cannabis industry.

133.    During the call, Booth claimed that Aurora had an "awesome demand" for its products.  Defendant Booth also stated that he would "**lose sleep over our ability to supply this global cannabis market.  It is – it's coming in.  It's very fast**."  He continued: "I see this world expansion as the cannabis-based [study] being close to being set properly.  **And it's at least 5 years before we have an oversupply situation for companies that can export under EU GMP-compliant facility**."

134.    During the same call, when asked by an analyst about pricing in the consumer market, Battley stated in pertinent part:

> **If in fact there is a lot of supply in the Canadian consumer market at any point, whether it's next year or the year after that,** that's a scenario that we planned for.  And as a low-cost producer, we're going to continue to thrive in that market.  Glen has modeled out what our margins will be at each of the different wholesale price points, and **it continues to look extremely healthy for us, well below points at which other companies would have to stop competing because they simply can't produce at that low cost.**  And they won't be able to compete.

135.    Despite data indicating that oversupply would be a problem earlier than Defendants were disclosing to the market, Aurora continued its aggressive expansion approach.  On March 4, 2019, Aurora announced that it completed the acquisition of all the issued and outstanding shares of privately held Whistler Medical Marijuana Corporation, a certified organic Canadian cannabis brand.  Through Whistler's two indoor licensed production facilities, Aurora sought to increase product offerings for both domestic and global markets.

136.    On April 10, 2019, Aurora issued a press release providing an update on its Aurora Sun construction project.  The press release stated in pertinent part:

> "Aurora Sun represents the next evolution in our Sky Class facility design, delivering massive scale, low cost production, and consistent, high-quality

cannabis," said Terry Booth, CEO of Aurora. "Particularly in newly-opened markets, establishing first-mover position and embedding Aurora's market share and brand requires a stable and reliable supply of high-quality cannabis for these markets. **The increased scale of Aurora Sun reflects our expectations for the long-term growth in global demand, especially the higher margin international medical markets which will be faced with significant supply shortages for the foreseeable future.** Sun is also designed with flexibility in mind to enable us to quickly meet changing market demands, particularly as breeding and cultivation technologies evolve and as customer preferences and requirements change."

\*       \*       \*

**Ground work at the facility is nearing completion, erection of the steel structure is advancing and installation of the glass at Sun is expected to be completed in May 2019.** Like Aurora Sky, Health Canada licensing requests have determined that rooms will be available for planting before the entire facility is completed.

137.    On April 18, 2019, Cowen issued a report reflecting on investor meetings they hosted with Battley, Ibbott, and Carey Squires, Executive Vice President of Corporate Development and Strategy. The report indicated that, during the meeting, "**management commented that it is not worried about a potential industry oversupply in the near term**."

138.    On May 14, 2019, Aurora issued a press release announcing its FQ3 2019 financial results for the quarter ended March 31, 2019. The release again highlighted Aurora's purported strong execution in meeting growing consumer demand and controlling costs. The press release stated in pertinent part:

"I'm exceptionally proud of our company and team as Aurora continues to deliver on our domestic and international growth strategy. We achieved solid revenue growth and strong operating results in a quarter proven challenging across the industry. We are laser focused on building a long-term sustainable business," said Terry Booth, CEO. "During the quarter, we formally welcomed Nelson Peltz a key strategic advisor. He has been incredibly engaged, collaborative, and strategically focused on assisting our pursuit of growth in global markets and with mature companies in adjacent industries."

Glen Ibbott, CFO, added, "Aurora is an extremely active and diversified company, leading the industry in cannabis research, product development, cultivation, global scale, and revenue growth. With a solid Q3 on all fronts, it's time to move the yardsticks for the industry again. **The company we have built with purpose**

through both organic growth and targeted acquisitions has provided a unique opportunity: continue to lead the industry in revenue growth while also progressing to positive operating earnings in the near term."

\*      \*      \*

Supply to Europe and other international markets is expected to increase as more of Aurora's production facilities receive EU GMP certification. The Bradford facility has recently undergone an audit to obtain EU GMP certification. In Q3, the Company began exports of full spectrum cannabis extracts in Germany. Management anticipates these sales will contribute to growth given the higher margins in extracts.

\*      \*      \*

**With Aurora Sky now operating at full capacity, the Company anticipates continued reduction in production and manufacturing costs allowing cash costs per gram to continue to trend lower**. Management reiterates its expectation that the average cash cost to produce per gram at its Sky Class facilities will be below $1.

With disciplined cost management, **the Company expects SG&A costs to grow modestly over the remainder of the fiscal year.** Consequently, management anticipates that with sustained revenue growth and lower cash costs per gram, **Aurora is well positioned to achieve positive EBITDA beginning in fiscal Q4 2019 (calendar Q2 2019)**.

139.    Aurora's Management's Discussion and Analysis for the quarter, filed as an exhibit

to a Form 6-K on May 15, 2019, stated in pertinent part:

Furthermore, **we believe that there will be a significant shortage of regulated, quality-controlled cannabis**. With the industry at such an early stage, well-controlled, quality supply chains do not exist at the scale required globally. We are, therefore, focused on building, operating and replicating our world-class scalable production facilities.

\*      \*      \*

**With our increased availability of supply and broad global reach, Aurora is well on its way to near term profitability and the shift to a strong cash flow position**. Based on currently planted, regulator approved, cultivation rooms, Aurora is on track to harvest and dry in excess of 25,000 kilograms of high-quality cannabis in the quarter ended June 30, 2019, with additional production through the remainder of the calendar year as Sky and Bradford achieve optimal production levels. With additional capacity coming onstream over the next 12 to 18 months, product availability will continue to increase materially.

* * *

As we continue to scale up our production capacity, we are also focused on initiatives to reduce our manufacturing constraints and timelines as we scale up our manufacturing capabilities to meet market demand.

* * *

**Aurora continues to construct purpose-built facilities with a strong focus on producing a consistent supply of quality, low-cost product to meet market demand**. We also remain committed to establishing, expanding and securing significant market share in the Canadian and International medical market and Canadian consumer market, which was legalized effective October 17, 2018 pursuant to the Cannabis Act.

* * *

The Company expects adjusted EBITDA to continue to improve due to higher sales, improved gross margins through economies of scale, and contained SG&A growth. **For fiscal Q4 2019, the Company is targeting to achieve positive adjusted EBITDA**.

* * *

**Facility Updates**

On April 10, 2019, the Company announced an update on the status of Aurora Sun, the Company's latest and largest "Sky Class" facility, which is currently under construction in Medicine Hat, Alberta. **To support rapidly growing global demand for high-quality medical cannabis in Canada and abroad, the facility will be expanded to 1.62 million square feet, representing a 33% increase from its originally planned 1.2 million square feet.** With the Sky Class production philosophy proven at Aurora Sky, the Company is confident in projecting an expected production capacity at Aurora Sun in excess of 230,000 kg of high-quality cannabis per annum.

140.   Also on May 15, 2019, Aurora hosted an earnings call led by defendants Booth, Ibbott, and Battley. During the call, Battley reiterated prior guidance, stating, "**I'm happy to say that we are still tracking for positive EBITDA in this quarter**," ending June 30, 2019. Additionally, Battley further articulated his view that "substantial additional capacity is needed" in the international markets, purportedly justifying the Company's "upscaling of Aurora Sun in

Medicine Hat and the construction of Aurora Nordic in Denmark."  Moreover, when asked during the call about oversupply, Battley stated in pertinent part:

> We -- looking at the -- our view of the need for capacity, first thing is that, **you're right, the market is undersupplied in Canada**.  We're -- and **we see continued strong demand.**  We also were not necessarily in line with some people's expectations as to what max capacity will be, particularly given the advent of the new products as per the new regulations that will be coming out this year. So there's that. Second thing is that -- and we said this before, **the central fact of the global cannabis sector is a massive excess of demand over supply**.  And we know that we're going to have to supply a lot of international markets with product that we cultivated in Canada.  So that's why we're doing this.  And also, we have a massive cost advantage here.  And there are a lot of companies that are promising to have X capacity available in 12 or 18 to 24 months; we're delivering it now but we're also delivering it incredibly economically.  **So we're going to have massive capacity to supply the Canadian market, to supply international markets and we don't see any shortage anytime soon**.

141.     Booth reiterated the sentiment he expressed during the previous quarter's earnings call, conveying to investors that he did not perceive oversupply in the market, stating:

> I think I said last quarter that if there's **one thing I lose sleep about is our ability to supply the global demand for cannabis**.  And I'll lose a little bit more sleep with my 2-week-old baby, but it is definitely something that still is at the top of our agenda, increasing our capacity to feed the globe's need.

142.     Booth repeated himself one more time during the same call: "Again, I lose sleep over being able to supply this global market."

143.     Battley echoed Booth's point, stating, "I think anybody who tells you they know when the market will be properly – or supplied is probably pulling your leg."

144.     During the same call, Ibbott reiterated the Company's guidance, stating in pertinent part:

> In Q3 2019, our adjusted EBITDA loss decreased by 20% in the quarter to $36.6 million from the $45.5 million in Q2. I should note that we have defined adjusted EBITDA in our Q3 2019 MD&A. Through the combination of substantial revenue growth, a declining unit cost of production, increased availability of higher-margin derivative products, increased shipments to the EU and ongoing disciplined operating cost management, **Aurora continues to track towards achieving positive EBITDA beginning in this current fiscal Q4 2019**.

145.    During the call, when asked by an analyst about how quickly the markets will open in Europe, Battley referred to Germany, "where most of [the Company's] international medical cannabis sales have gone thus far," as "a really exciting market," stating in pertinent part:

> We talked about Canada having more than 1% of the population with a script for medical cannabis.  If we assume that, that's going to happen in Europe and probably faster because most patients are getting insurance reimbursement, you're talking about very short-term to like 850,000 patients in that one country alone.  So these markets are opening up so fast.  **I'll recall what Terry said that our biggest nightmare is we just want to produce more cannabis and be able to supply these opportunities.  So that's happening**.  Remember that, when we emphasize we'll have about 400,000 kilograms of production in Canada**, we don't see any constraints for years and years on the ability to export.**  And a lot of those export markets are premium priced.  Europe, for example, we get the benefits of the currency differences.

146.    On June 13, 2019, the *Financial Post* interviewed Battley and asked him about a potential oversupply scenario.  Battley responded, "**I'm not worried about it.  Thus far, it has not played out that way so we'll see.  We're completely sanguine of what will happen in that eventuality**."  Battley added, "**As long as you have an undersupplied market, which we have right now in Canada**, it is very hard to evaluate market strategy because **you're selling all you can produce**."  Meanwhile, according to the *Financial Post*, in March 2019, just 7,627 kilograms of dried cannabis were sold in the legal market, but total inventory reached a staggering 143,773 kilograms.

147.    On June 21, 2019, Aurora issued a press release stating that it was "prepared" for the "expansion of Canada's cannabis market."  The press release continued in pertinent part:

> "Aurora is the world's leading producer of high-quality cannabis and we're ready to introduce high-value product additions to this improved, federally legal market," said the Company's CEO Terry Booth.  "From the beginning, we've invested in industry-leading production and distribution technology, and in consumer research to drive products to market that consumers will desire. These things, together with the dynamic partnerships we've entered into on the accessory and technology fronts, position us well for this new market launch in December as per Health Canada's recent regulatory amendments."

148.    On August 6, 2019, Aurora issued a press release providing an update on its FQ4 2019 results for the quarter ended June 30, 2019.  The press release stated in pertinent part:

> "Our Q4 2019 guidance highlights Aurora's continued leadership," said Terry Booth, CEO of Aurora.  "We set out to be best-in-class cultivators, and through carefully evaluated acquisitions, that vision continues to drive exceptional results today.  We are the leader in cultivation capacity, production available for sale and revenues for cannabis in the Canadian medical and consumer markets.  We continue to lead the build out of European and other international medical cannabis markets.  Our success to date comes from a focus on quality, regulatory compliance, appropriate Board of Directors oversight, and delivering a profitable, low risk and sustainable business for our shareholders."

149.    The press release also indicated that the "**Company continues to track toward positive adjusted EBITDA, and in particular adjusted EBITDA from cannabis operations**."  In the press release, the Company projected net revenue of C$100 million to C$107 million, net of excise taxes.  At the time of the August 6, 2019 press release, Aurora's fiscal quarter had already been over for more than a month.

150.    On August 23, 2019, Battley was interviewed by James West of Midas Letter.  The interview focused on Aurora's ability to meet its guidance for FQ4, which had already ended nearly two months earlier.  Battley conveyed the sense that Aurora was confident it had met its guidance, which was supposed to be announced before September 15, 2019.  Battley stated, in pertinent part, as follows:

> **James West:** And your recent projections suggest that, the guidance suggests that, you are getting very close to that and some serious revenue.
>
> **Cam Battley:** Well, so, yeah. We put out guidance, you know, a little over a week ago, and I think it was pretty important. **We've seen some kind of weak earnings reports from some companies; we wanted it to be clear that we're not experiencing some of the challenges that some of the others are, temporary or otherwise**. And so based on our guidance, we're anticipating in excess of 100 million in net revenues – over 90 million, between 90 and 95 million, in cannabis revenues, and that makes Aurora the global revenue leader in the cannabis sector, which is gratifying, because it's something that we anticipated quite some time ago, and I think a lot of people found – I think they had a hard time believing that we'd be able to achieve it.

But we have, and you know, if you just take a look at **the last 18 months, Aurora's production has gone from about 5,000 kilograms per year to over 150,000 kilograms per year. So it's a, you know, 30 times increase in a very short period of time**. And beyond that, we've established what we believe is the global benchmark for cannabis production: no lost crops, very high quality, yields that I don't think anybody's ever seen at scale before. And we've found the markets, globally, to be able to distribute that. So we're the leaders in medical cannabis in Canada. We're the leaders in medical cannabis internationally. And we're the leaders now, apparently, according to third party reports, in the Canadian adult consumer market, as well.

151.    When pressed on how Aurora's EBITDA number was going to look relative to analysts' consensus, Battley confidently said that Aurora was "going to be pretty darn close," stating, in pertinent part, as follows:

James West: Okay. So you're reporting your Q4 and year-end for fiscal 2018, correct? Now, how is your net number going to look relative to analysts' consensus?

**Cam Battley: We're going to be pretty darn close**. We, you know, obviously maintain close relationships with the analysts; we give them access to all the information that they need. **So we're going to be pretty close to where analysts have anticipated that we would be. It's one of the reasons that we put out this guidance; we want there to be no surprises**. We want to lead this sector in transparency as well as in other things, and we want to have clarity, and we want to let people know what to expect.

**So that's why we put out the guidance. We are continuing to track towards positive EBITDA, as indicated earlier in the year, and I'm very, very pleased with that.** And I'll tell you why: we, by putting a stake in the ground that we were taking profitability and that that path to profitability, seriously, it applied a whole new level of discipline to our operations. We're not pushing out the promise of profitability, you know, year after year after year. And while we do believe that it's critical to establish infrastructure globally while this window of opportunity exists, we don't think that that conflicts with the opportunity to achieve profitability.

**So, I'm very, very pleased with the way we're doing**. . . .

152.    Defendants' statements referenced above in ¶¶119-151 above were materially false and/or misleading because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to or recklessly disregarded by Defendants:

(a)     that Aurora's ability to sell products had been materially impaired by massive market oversupply, including oversupply that was the product of Aurora's own aggressive ramp in production capacity;

(b)     that Aurora's ability to distribute products to customers had been materially impaired by the drastically inadequate number of retail stores in Ontario, Quebec, and British Columbia;

(c)     that Defendants had materially overstated the potential market for Aurora's consumer cannabis products due to the strength of the illegal black market in Canada;

(d)     that demand generated by the cannabis market was not as large as Defendants had claimed; and

(e)     that all of the foregoing had negatively impacted the Company's business, operations, and prospects, and impaired the Company's ability to achieve profitability as represented by Defendants.

## THE TRUTH BEGINS TO EMERGE

153.    On September 11, 2019, after the market closed, Defendants issued a press release announcing Aurora's FQ4 2019 and full-year 2019 financial results and filed a quarterly report on Form 6-K.  Defendants disclosed that Aurora incurred an *adjusted EBITDA loss of C$11.7 million*. Aurora's EBITDA loss came despite Defendants' repeated, positive pronouncements throughout much of the Class Period of EBITDA positivity by the end of FQ4 2019.  Defendants blamed the EBITDA loss on "challenges at the retail level in key markets," stating, in pertinent part, as follows:

> [T]he Canadian consumer channel continues to experience challenges at the retail level in key markets and resolution of this issue is beyond the Company's control. Aurora is working closely with all our regulatory and channel partners to streamline distribution as the Company continues to track toward positive adjusted EBITDA on a consolidated basis.

154.    Despite this partial corrective disclosure, Defendants continued to conceal Aurora's true financial condition and oversupply of cannabis.  The September 11, 2019 press release represented that Aurora was continuing to meet evolving demand and successfully keeping costs under control as it continued to ramp up production.  The press release stated in pertinent part:

> Glen Ibbott, CFO, added, "**We continue to see strong growth in cannabis revenues in both medical and consumer categories.  Our cultivation execution continues to drive production costs lower and improve gross margins.  Aurora's diversified product portfolio remains in demand with patients and consumers alike**.  With the Canadian launch of derivative products in the coming months, we have made the necessary investments to ensure readiness and focus on a variety of value added products.  We are very excited to supply an expanded consumer market with premium cannabis and new product forms."
>
> *        *        *
>
> The global cannabis and hemp markets represent a significant opportunity for Aurora and the Company will continue to make the necessary investments today to build long-term value for shareholders.  However, Aurora will take a balanced approach to these investments with a focus on operating a sustainable and profitable business.
>
> The introduction of new product formats to the Canadian consumer market this fall represents a significant opportunity for the Company.  Aurora expects to have a robust product line-up ready to launch in December.  Given the very early stage of development of the consumer market in Canada and international medical markets, management anticipates that quarter to quarter sales volumes and revenues may be volatile.  **The Company expects adjusted EBITDA to continue to improve in the future due to expected revenue growth, improvements in gross margin and prudent SG&A growth**.

155.    Also on September 11, 2019, after the market closed, Aurora filed its Form 40-F Annual Report, stating in pertinent part:

> While we continue to expand our business into international markets, we have faced supply shortages in Europe.  Our ability to allocate more product to international markets in 2019 is increasing significantly as we continue to develop our international infrastructure and distribution channels as more of our facilities become European Union ("EU") Good Manufacturing Practice ("GMP") certified.
>
> *        *        *

**We also expect that demand for our products will increase as the Canadian consumer market evolves and new regulations in Canada and international markets legalize these products**.  We are focused on ramping up growth and supply to the Canadian and international medical markets and will continue to introduce other higher margin products, such as softgel capsules and pre-rolls, into our product portfolio.

*     *     *

Aurora continues to be the leader in developing purpose-built growing facilities with a focus on producing a consistent supply of high-quality, low-cost product to meet evolving market demands.  Our design philosophy allows us to respond to market conditions quickly with shorter lead times, increased harvest cycles and higher plant yields, which allows us to be more flexible in our facilities and reactive to changes in demand.

156.    On September 12, 2019, Aurora hosted an earnings call led by defendants Booth, Ibbott, Singer, and Battley.  During the call, Battley indicated that the Company generated C$99 million of net revenue, **missing the guidance it provided to the market only five weeks earlier**, having previously projected C$100 million to C$107 million in overall net revenue. Battley further stated in pertinent part:

**While retail distribution in key provinces has been a constraint in fiscal 2019, we will see retail infrastructure expand in 2020 through the launch of new brick-and-mortar stores across Canada**.  With more stores, we expect to see further consumer engagement.

157.    Battley also explained that Aurora's failure to achieve positive EBITDA was due to the constraints in retail infrastructure, which Defendants were aware of much earlier.  Battley stated, in pertinent part, as follows:

**Now would we have like to be at positive EBITDA at this point?  Sure.  Part of the reason that we're still working towards that is, as Glen mentioned earlier, we would have liked to have seen greater retail infrastructure in Canada**.  **More stores, obviously is better for the whole sector and disproportionately beneficial to us as the leaders in the consumer market**.

158.    During the call, Ibbott reiterated the impact of retail-store constraints on Aurora's profitability, stating in pertinent part:

**There are remaining constraints to face the growth in the Canadian market that we would like to see resolved, including the timing of currently approved and future retail stores**.  The resolution of these constraints will impact the timing of our EBITDA positive target, but we do expect these constraints become less of an issue over the next several quarters.  **As we continue to execute on our strategy, the company expects adjusted EBITDA to improve in the future due to higher sales, improved gross margins and prudent SG&A growth**.

*     *     *

**I should also note that we continue to evaluate our global capacity expansion**.  We have identified opportunities to defer certain CapEx as we rebalance the growth of demand with our increase in supply.  **We're continuing to build out our full production facility pipeline but in concert with the growth of the total global cannabis market**.

*     *     *

The revenue curve is a nice move, continuously increasing curve, and we specifically for us just want to call out the fact that **there are constraints on the consumer system right now and the provinces are starting to show that as well and have seen in July and August where they're trying to work through some of the inventories that they have and slowed their buying** and we expected to pick up and continue to pick up through the next quarter, but we did want to kind of signal that our continuing sort of 48% quarter-to-quarter growth may take a bit of a pause just due to industry dynamics.

*     *     *

In terms of our language, **how we're doing is we are still at the mercy, I think, of the timing of the retail footprint rollout, how strong it is.  We're excited that Ontario has licensed a number of new stores, but they should be licensing hundreds of new stores**.  So there's still a lot of room to go, and the timing of that will dictate exactly how large the market grows over what period of time.  And certainly, we don't yet know exactly when the provinces will start loading in for the new products for consumer 2.0.  So will they start buying in advance in December?  Or will they wait until towards the end of the year?  So there's some timing there quarter-to-quarter that we're a little comfortable with, and we'll have to wait to see how that rolls out specifically.

159.    During the call, an analyst asked about Defendants' expectations regarding volatility in Aurora's anticipated consumer revenues.  Battley responded, in pertinent part, as follows:

- 57 -

But the bigger question you're asking is with respect to volatility.  And I think what we're signaling here is just to be aware.  **As a lot of observers have suggested, we're anticipating that there may be a bit of a plateau between now and the advent of the cannabis legalization 2.0 products anticipated somewhere around the end of the year.  I think that's really what we're anticipating.  This is likely to be across the sector, little bit of plateau between now and then**.

160.   In addition, Booth stated, "I don't see price compression around the corner."

161.   Also on September 12, 2019, Aurora's Executive Chairman Michael Singer, during an interview with BNN Bloomberg, underscored the importance of adding retail stores to achieving positive EBITDA, implying that there were not sufficient stores during the Class Period for Aurora to achieve its oft-repeated guidance.  Singer said: "If [there is a] rollout of additional retail outlets in Canada and a successful rollout by Health Canada with regards to the derivative market, we anticipate that going into the second half of this year, we should be able to deliver positive EBITDA."

162.   On September 13, 2019, Jonathan Cooper, writing on Seeking Alpha, discussed Aurora's missed projections, stating:

Unfortunately, Aurora also sho[t] itself in the foot by making promises it could not keep consistently promising EBITDA profits in the fourth quarter and failing to hit its own preliminary revenue forecast range.  The market punished Aurora for those missteps, and management should learn to provide more conservative guidance or to skip providing guidance altogether.

163.   Discussing the guidance miss on September 24, 2019, Stone Fox Capital wrote:

For anybody fighting against supply rationalization, the FQ4 revenues, margins and prices flew in the face of those theories.  The company had long predicted positive adjusted EBITDA during the June quarter and the actual results didn't come close.

Aurora Cannabis generated an adjusted EBITDA loss of C$11.7 million in the quarter **while even missing preliminary revenue guidance provided over 35 days after the quarter closed**. At this point, investors shouldn't focus on the pure growth metrics over the bottom line numbers and the ability to hit corporate targets.

Aurora Cannabis guided to FQ4 revenues of at least C$100.0 million and the company only hit C$98.9 million. **Good companies just don't miss updated guidance from after the quarter closed**. . . .

**The real issue remains the amount of supply and the pricing scenario.**

164.     On September 13, 2019, Sean Williams published an article on the Motley Fool website titled, "Aurora Cannabis Missed Its Own Sales Guidance … From 5 Weeks Ago," stating, in pertinent part, as follows:[8]

**No joke: Aurora Cannabis missed its own recently issued guidance**

To many investors, the headline figures for this quarterly report looked like nothing more than a formality, with a number of other underlying numbers expected to take precedence. That's because, **five weeks ago on Aug. 6, Aurora Cannabis provided an update on its fourth-quarter operating results**.

Included in that update was (unaudited) guidance to expect 100 million Canadian dollars (CA$100 million) to CA$107 million in fourth-quarter net revenue after accounting for net excise taxes paid. The company also guided for CA$90 million to CA$95 million in cannabis revenue and upped its quarterly production from a previous forecast of 25,000 kilos to a fresh range of 25,000 kilos to 30,000 kilos. Lastly, the company suggested that it was continuing to "track toward positive adjusted EBITDA [earnings before interest, taxes, depreciation, and amortization]."

Put a bow on it and it's ready to serve, right? Well, not exactly.

**When Aurora reported its fiscal fourth-quarter results on Wednesday, a few things were... amiss. For starters, even though the company's adjusted EBITDA headed in the right direction -- negative CA$11.7 million in Q4 2019, vs. negative CA$36.6 million in Q3 2019 -- this isn't exactly "on track toward positive adjusted EBITDA." Aurora has made it seem for months that the company would be turning the corner to recurring positive adjusted EBITDA by the fourth quarter, and that simply wasn't the case**.

More egregious, though, was the fact that Aurora Cannabis only generated CA$98.9 million in net revenue. That's right. **Despite providing quarterly guidance just five weeks earlier, Aurora Cannabis missed its own range by more than CA$1 million. It also missed Wall Street's consensus revenue figure by more than CA$9 million**.

---

[8]     Alterations in original.

165.    In response to Defendants' partial corrective disclosures, the price of Aurora common stock declined materially.  On September 12, 2019, Aurora's share price fell more than 9%, on unusually heavy trading volume.

166.    Defendants, however, continued to misrepresent the true condition of Aurora's business and operations.  Defendants' statements referenced above in ¶¶153-161, were materially false and misleading for the reasons explained in ¶152.

167.    On October 3, 2019, Aurora issued a press release updating investors on its global growth initiatives and operations, and specifically on the status of its construction projects for the Aurora Nordic 2 and Aurora Sun facilities.  The press release stated in pertinent part:

> "Aurora takes its leadership position in the global cannabis industry seriously, and is committed to being open and transparent with all of our stakeholders," said Terry Booth, CEO of Aurora.  "The Aurora team is working to advance several major strategic initiatives in Canada, the United States and abroad aimed at further strengthening Aurora's global position.  We are laser-focused on delivering on our business plan and prudently managing our investors' capital."
>
> **Update on Facilities in Construction**:
>
> As Aurora executes on its strategy of leading scalable, purpose-built cultivation, it continues to prudently manage capital allocation decisions driven by global forecasts for demand. Many of the Company's significant construction projects are nearing completion of major milestones with significant capital investments concluded.
>
> **Aurora Sun and Aurora Nordic 2 Construction Update**
>
> **Aurora continues to progress construction of its 1.6 million square foot facility, Aurora Sun, located in Medicine Hat, Alberta**, and its 1 million square foot facility, Nordic Sky, strategically located in Odense, Denmark. **The new purpose-built, "Sky Class" facilities Aurora are constructing will have full control over all anticipated environmental and harvest conditions, resulting in the production of consistently high yielding, high-quality cannabis at low-cost**.
>
> Mr. Booth added, "**Aurora Sun in Medicine Hat and Aurora Nordic in Denmark represent the next evolution of our "Sky Class" cultivation philosophy and construction of these projects is proceeding well.  Aurora Sun is nearing completion with the majority of capital investment now behind us, while at Aurora Nordic the primary outdoor construction, including the**

**enclosure of the facility, nears completion**.  Our design philosophy allows for flexibility in licensing and commissioning in-line with the long-term growth in global demand for medical cannabis."

168.    Defendants' statements referenced above in ¶167 were materially false and misleading because Defendants' positive statements regarding Aurora Sun and Aurora Nordic 2 concealed the true financial condition of the Company and the plain fact that demand could not justify the massive expansion of production facilities.

169.    On November 14, 2019, Aurora announced deeply disappointing financial results for its FQ1 2020, ended September 30, 2019.  In a Form 6-K, the Company stated it had generated net income of only C$12.8 million compared to C$105.5 million in the year-ago period, representing a nearly 90% decline.  The Company also posted an adjusted loss of C$39.7 million, nearly 50% larger than the C$20.8 million expected by analysts.  The results further showed a C$23.8 million, or 25%, sequential **decline** in sales, despite Defendants' claims of plateauing, or stable, demand.  Shockingly, Aurora's consumer cannabis revenue fell by 33% and its wholesale bulk revenue fell by 49% sequentially.  In the release, Aurora admitted that recreational cannabis orders from the provinces had "slowed considerably" in the summer.  Aurora also announced that it was indefinitely deferring the remaining construction and commission activities at Aurora Sun and Aurora Nordic 2, despite reassuring investors about the purportedly successful progress on the facilities only six weeks previously.

170.    Regarding the 33% decrease in cannabis revenue, Defendants stated in their November 14, 2019 Form 6-K:

Consumer cannabis revenue was $30.0 million in Q1 2020, a decrease of $14.9 million or 33% from the prior quarter.  Consumer cannabis revenue comprises 40% of our total consolidated net revenue.  **Constraints in the provincial retail distribution network have caused a temporary decrease in provincial ordering of consumer cannabis. Overall, the roll-out of retail stores across Canada has been slower than expected, impacting the pace of growth in consumer revenue**.  As the consumer cannabis infrastructure continues to develop and expand

throughout calendar 2020 with the launch of new retail stores across Canada, we expect demand to resume its sequential increases through further consumer engagement.

171.    In the November 14, 2019 Form 6-K, Aurora, for the first time, informed investors that the lack of sufficient numbers of retail stores would affect the growth of Aurora's revenue. Importantly, Aurora finally acknowledged that quarter-to-quarter sales volumes and revenues were difficult to forecast with precision, despite providing financial forecasts to the market regarding EBITDA profitability since January 2019.  Aurora stated, in pertinent part, as follows:

> Given the early stage of development of the consumer market in Canada, **quarter to quarter sales volumes and revenues are difficult to forecast with precision. Factors that are expected to continue to affect the ramp and growth of Aurora's revenue includes, but are not limited to, the pace of provincial licensing of new retail stores**, the ability to capitalize on wholesale bulk sales opportunities, the impact of industry supply and demand balance on average market pricing, and the ability of Aurora and its competitors to meet rapidly evolving consumer preferences for certain product forms and strains.

172.    In the same Form 6-K, Defendants acknowledged that Aurora management monitors the forecast balance of supply and demand in the domestic and international cannabis markets as part of its production planning, stating, "Management **continues to monitor** the forecast balance of supply and demand in the Canadian and international cannabis markets in order to time the scale-up of further Aurora production capacity as needed."

173.    During Aurora's earnings call to discuss the FQ1 2020 results on the same day, Booth belatedly acknowledged the market oversupply and stated that this drop-off was **anticipated** heading into the quarter, stating that, "**yes, we had a drop in cannabis sales, but it was anticipated.  The provinces were oversupplied**."   Thus, Booth demonstrated the falsity of Battley's September 12, 2019 statement that Aurora expected revenue to plateau, when, in fact, Aurora expected revenue to decline.

174.     On the same call, Ibbott noted how Defendants closely monitor sales data from the provinces to retailers, stating: "We monitor the sell-through rates from the provinces to the retailers very carefully as we believe that to be a strong indicator that our products are meeting the needs of consumers for both quality and pricing."  Ibbott also said, "We continue to monitor and forecast the supply and demand in the Canadian and international cannabis market in order to time our scale up of further Aurora production capacity as needed."  Ibbott further explained Defendants' monitoring of sell-through data, stating:

> I mentioned in my prepared comments that **we monitor sell-through from the provinces to the retailers closely.  I think that's a good indicator of the viability of the health of the business.**  So you're producing products that consumer wants.

175.     Analysts were shocked and dismayed by the Company's disclosures. For example, an article in *Marketwatch.com* dated November 18, 2019, titled "Aurora Cannabis stock suffers worst day in more than five years, analyst says 'it would be fair for investors not to believe them,'" provided the following additional detail:

> Analysts said that investors had a reason for anger and distrust after the report, and should be thinking about whether it means that it is time to run away from the cannabis industry altogether.

> "If Aurora is less eager to deploy capital to this industry, we believe investors should also be reluctant to place capital in the industry," MKM Partners analyst Bill Kirk, who has a sell rating and $3 price target on the stock, wrote in a note.

> Jeffries analyst Owen Bennett noted that dilution from the debenture conversion could swing investor sentiment even more, and believes a writedown for a goodwill impairment from the MedReleaf acquisition could be on the way.  He also suggested that beyond negative sentiment, investor trust could be a real issue after Aurora's optimistic statement before Thursday's disappointment.

> **"With possible cash pressures evident, announcing ceased construction at facilities despite a press release just 6 weeks ago praising progression, and now EBITDA (and cash) positive looking unlikely this year, it would be fair for investors not to believe them,"** wrote the analyst.

176.    The report further suggested that Aurora would likely have to take goodwill impairments.

177.    Daniel Jones of Seeking Alpha described the cessation of construction of the Nordic 2 and Sun facilities as "necessary in order to curb excess production in an industry that's already being faced with oversupply."

178.    Accordingly, the announcement that Aurora was ceasing production of Sun and Nordic 2 was a corrective disclosure that Aurora was facing oversupply and insufficient demand to support these two facilities.

179.    In addition, on November 15, 2019, analysts from Jefferies wrote that "(lack of) investor trust likely to remain a headwind," stating in pertinent part as follows:

> **The main pushback on ACB is trust it won't further dilute shareholders.  To this, we think they've let themselves down**.  Despite conversations suggesting the debenture (C$230mn due March 2020) would look to be extended and no indication the ATM would be used, early conversion happened (on C$155mn - 4% dilution), and a big chunk of the ATM utilised (US$124mn of $400mn - 3% dilution).  With possible cash pressures evident, announcing ceased construction at facilities despite a press release just 6 weeks ago praising progression, and now EBITDA (and cash) positive looking unlikely this year, **it would be fair for investors not to believe them.  Linked to trust are possible surprises on write-downs**.

180.    Following these revelations, the price of Aurora common stock plummeted.  On November 15, 2019, Aurora's share price fell by more than 17%, on unusually heavy trading volume.

181.    Defendants, however, continued to misrepresent the true condition of Aurora's business and operations.  Defendants' statements referenced above in ¶¶169-171, were materially false and misleading for the reasons explained in ¶152.

182.    Shortly thereafter, on Saturday, December 21, 2019, after an internal memo leaked, Aurora issued a press release announcing that Battley, the Company's CCO, would be stepping down. Media reports stated that Battley had been forced out.

183.   On December 23, 2019, Jefferies analysts downgraded Aurora stock, and wrote

about Battley's departure and investors' lack of trust in Aurora, stating in pertinent part as follows:

> For many **this is likely to be seen as Battley jumping ship from a company that has struggled to support credibility on the back of a number of recent actions**. . . . It is clear to us that the market is lacking conviction in Aurora . . . . The biggest issue though, for us, and one we highlighted again at recent numbers is trust, with multiple instances of Aurora missing targets or going against its word, and with Battley the 'face' of the company this could have been a factor in his departure.  **Key examples are missing revenue guidance despite issuing it after quarter-end at Q4, still little visibility on near-term profitability despite promised since January and throughout 2019 this would happen by Q4**, continued dilution (debenture conversion, ATM used) despite reassurances this would not be the case, **announcement of ceasing facility constructions just weeks after a press release praising their progression**, and most recently the embarrassment of having to freeze sales in German over an investigation into the company's processing methods.

184.   On this news, the price of Aurora common stock fell once again.  Aurora's share

price fell by more than 10%.

185.   On January 6, 2020, media reports stated that the Company had listed its nine-

hectare greenhouse in Exeter, Ontario, for sale for $17 million.  Aurora had obtained the

greenhouse as part of its $3.2 billion acquisition of MedReleaf Corp. in 2018.   Analysts

immediately connected the move as implying that significant writedowns could be on the horizon.

For example, MKM Partners analyst Bill Kirk said in a January 6, 2020 note to clients: "This

listing, for 75% of former MedReleaf's capacity, signals major writedowns ahead."  Kirk further

criticized Aurora's management for their lack of candor: "We are also discouraged with the

visibility of Aurora's strategy – investors were unaware Aurora was trying to sell Exeter," despite

a corporate update on December 23, 2019. Kirk said he expected the Company to record C$2

billion worth of write-downs.  Kirk wrote, in pertinent part, as follows:

> The Exeter facility represented [75%] of MedReleaf's capacity. . . .  Aurora then said the first harvest would be 1Q'19. As far as we can tell, the facility was never licensed, and no product was ever sold from Exeter. This listing, for 75% of former MedReleaf's capacity, signals major writedowns ahead. Aurora's acquisition of

MedReleaf (C$3.2b) added ~C$2.4b to the goodwill & intangibles on Aurora's balance sheet (currently C$3.9b). . . . We are extremely surprised Aurora did not have to take a large goodwill impairment at its year end, but we anticipate ~C$2.0b worth of writedowns coming (market cap just C$2.7b). We believe more divestitures are likely. . . . With profitability timing uncertain, Aurora's obligations will continue to be difficult to meet. We are also discouraged by the visibility of Aurora's strategy—investors were unaware Aurora was trying to sell Exeter (despite a facilities update on Dec. 23, 2019) and in the dark regarding timing as Aurora used its ATM equity facility.

186.     Following these revelations, the price of Aurora common stock declined again. On January 6, 2020, Aurora's share price fell by nearly 10%.

187.     On February 6, 2020, the Company announced that Booth would be "retiring" and that Executive Chairman Michael Singer was appointed Interim CEO, effective immediately.  In the same statement, the Company announced that two new independent directors were joining the board.

188.     Aurora also announced "sweeping changes intended to rationalize the cost structure and balance sheet going forward."  These changes included significant and immediate decreases in SG&A expenses to the range of C$40 million to C$45 million per quarter by the end of the fiscal fourth quarter of 2020 (by contrast, SG&A expenses for the first fiscal quarter of 2020 topped C$59 million).  As part of the changes to operations, the Company eliminated about 500 full-time staff positions, including approximately 25% of its corporate positions.  Severance and other one-time charges related to the SG&A reductions were expected to range from C$2 million to C$4 million.

189.     In addition, on February 6, 2020, Aurora announced that it expected to report asset impairment charges on certain intangibles and property, plant, and equipment in a range of C$190 million to C$225 million and write-downs of goodwill in the range of C$740 million to C$775 million.  The Company also announced its intention to reduce capital expenditures to below C$100 million in total for the second half of fiscal 2020.  In its "business transformation plan," Aurora

announced a number of amendments to its secured credit facilities, including removing EBITDA ratio covenants and reducing the total credit facility by C$141.5 million.  On this news, Aurora's stock price fell 22% over the next two trading days.

## POST-CLASS PERIOD DEVELOPMENTS

190.     On June 29, 2020, Aurora announced that Booth "retired" from his role as Director of the Company.

191.     On May 11, 2020, Aurora carried out a reverse stock split after shares plunged so low that the NYSE threatened to drop the stock from its listings.  Specifically, Aurora announced that it would grant shareholders one share for every 12 currently outstanding, reducing the amount of shares from more than 1.3 billion to roughly 110 million, but also issue even more stock.  In total, these actions would dilute shares more than 30%, according to an analyst estimate.

192.     In addition to splitting its stock to maintain its NYSE listing status, Aurora planned to sell more shares to generate cash reserves.  Specifically, the Company planned to raise more cash via a stock sale, selling as much as C$350 million in shares into the open market in small batches.  The Company said that it exhausted its prior at-the-market financing program of C$400 million, meaning that Aurora burned through more than C$200 million during the Company's third fiscal quarter, according to a Cowen analyst.

193.     On June 16, 2020, Aurora announced that co-founder Steve Dobler was retiring from his roles as President and Director, effective June 30, 2020.  Dobler had been the President of Aurora and a member of the Board since December 2014.  The Company cited its "business transformation plan" as part of the reason for Dobler's departure.

194.     On June 23, 2020, Aurora provided additional updates on its business transformation plan.  Specifically, the Company announced that it planned to close operations at five facilities over the next two quarters, including Aurora Prairie, Aurora Mountain, Aurora

Ridge, Aurora Vie, and Aurora Eau.  In connection with the closing of facilities, Aurora announced that it expected to record production asset impairment charges of up to C$60 million during the fourth fiscal quarter of 2020.  In the same corporate update, the Company announced that it expected to record a charge of up to C$140 million in the carrying value of certain inventory.

195.    On September 8, 2020, Aurora again announced that it expected to record a number of balance sheet adjustments in FQ4 2020, including a fixed asset impairment charge of up to $90 million, a charge of approximately $140 million in the carrying value of certain inventory, and a write-down of goodwill and intangible assets of up to $1.8 billion.

## ADDITIONAL SCIENTER ALLEGATIONS

196.    As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading, knew, or recklessly disregarded, that such statements or documents would be issued or disseminated to the investing public, and knowingly or recklessly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Aurora, their control over, and receipt and modification of, Aurora's allegedly materially misleading misstatements, and their associations with the Company which made them privy to confidential proprietary information concerning Aurora, participated in the fraudulent scheme alleged herein.

197.    Defendants had a motive to conceal this information from the investing public. Aurora needed to keep the price of its stock inflated in order to continue with its acquisition and expansion strategy, which included five acquisitions paid for with inflated Aurora stock, as follows:

|  | **Date** | **Shares Issued** |
|---|---|---|
| ICC Labs | 11/27/2018 | 31,904,668 |
| Whistler | 3/1/2019 | 13,667,933 |
| Chemi | 4/25/2019 | 833,300 |
| EnWave | 4/26/2019 | 840,576 |
| Hempco | 8/21/2019 | 2,610,642 |

198.    Aurora filed a shelf registration statement on Form F-10 on April 2, 2019, and May 10, 2019, to make offerings of common shares, debt securities, subscription receipts, units, warrants or any combination thereof of up to US$750 million during the Class Period.

199.    The adverse developments at issue also impacted the Company's most important revenue streams and directly contradicted Defendants' public representations regarding the state of Aurora's business and the success of its strategic initiatives.  For example, Aurora revealed that it was halting construction on facilities only a few weeks after it had praised the construction of such facilities.

200.    The Individual Defendants have also held themselves out to investors as the executives most knowledgeable about the adverse facts impacting Aurora's business alleged herein, and have belatedly admitted on conference calls that they knew about slowing demand trends during the Class Period.  As such, the Individual Defendants knew or were reckless in not knowing of the undisclosed facts detailed herein.

**DEFENDANTS VIOLATED ITEM 303 BY FAILING TO DISCLOSE THAT OVERSUPPLY OF CANNABIS WAS OCCURRING IN CANADA AND THAT LACK OF RETAIL STORES AND THE PERSISTENCE OF BLACK MARKET SALES WAS SEVERELY LIMITING SALES GROWTH**

201.    Pursuant to Item 303 of SEC Regulation S-K, 17 C.F.R. §229.30 ("Item 303") and the SEC's related interpretive releases thereto, an issuer is required to disclose known trends, uncertainties or risks that have had, or are reasonably likely to have, a materially adverse impact

on net sales or revenues, or income from continuing operations.  Such disclosure is required by an issuer in regulatory reports.

202.    The SEC issued an interpretive release on Item 303 on or about May 18, 1989, stating:

> Required disclosure is based on currently known trends, events, and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.
>
> *       *       *
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

203.    Item 303 required Aurora's regulatory filings to describe "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. §229.303(a)(3)(ii).  Similarly, Item 303 required Aurora's regulatory reports to disclose events that Aurora knew would "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected."  17 C.F.R. §229.303(a)(3)(i), (ii).

204.    Defendants were required to disclose the impact that an oversupply of cannabis in Canada would have on Aurora's operations and financial results.  As early as January 2018, *Marijuana Business Daily* was reporting that the Canadian cannabis industry had enough paid-for production capacity to meet demand by mid-2019.  As retail challenges presented themselves in Canada during the first few months following legalization, including issues related to supply,

logistics, packaging, and distribution, Aurora ramped up production and product began to sit on the shelves of licensed producers throughout Canada.

205.   Ignoring the warnings of analysts and market participants that oversupply of cannabis in Canada was then-occurring or imminent—indeed, taking the position that the industry in general was making a miscalculation and that more supply was needed than was currently being provided—Aurora continued to misinform investors that oversupply was not an issue and that its aggressive expansion strategy was necessary to meet demand.   Additionally, analysts observed that Aurora's supply alone—not to mention the supply of the rest of the industry—far exceeded demand.  Aurora failed to disclose that oversupply in Canada would materially adversely affect its net sales and revenues, particularly given the massive capital expended by the Company on risky acquisitions.

206.   Defendants also failed to disclose the known trend and uncertainty that Aurora was unable to adequately distribute its products to consumers in Ontario and Quebec, which account for nearly two-thirds of Canada's population.  Because the governments of Ontario and Quebec had not issued an adequate number of licenses to open retail stores there, the result was a bottleneck in distribution of an already oversupplied product.   For example, in Ontario the first licensed cannabis stores did not open until April 2019, and only 25 store licenses had been issued by then. The planned 25 stores amounted to 0.2 stores for every 100,000 residents.  To compare that number with Colorado, which had legalized cannabis in 2014, Ontario would need to add nearly *1,400 stores*.

207.   On May 6, 2019, a GMP Securities analyst illustrated the problem in a report decreasing GMP's revenue forecasts for Aurora for FQ3 2019 and FQ4 2019 "to reflect the low sales volumes reported by Health Canada in the recreational channel for January and February of

2019."  The analyst indicated that "the main reason for the limited sales growth is the cap that has been placed on the retail network by the provincial regulators, limiting the number of cannabis stores and hindering black market penetration."

208.    Furthermore, the black market posed a known risk to the recreational cannabis market in Canada.  Government efforts to stem illegal cannabis had proven unsuccessful, and the constrained rollout of retail stores actually strengthened the black market.  The Company hardly even mentioned the illicit market, except for an earnings call hosted on May 15, 2019 in which Battley merely stated that there were "still many consumers that have yet to purchase their cannabis legally."  The Company next mentioned the black market on an earnings call hosted after the Class Period, on February 13, 2020, in which Interim CEO Singer acknowledged that "the black market is still a $5 billion annual opportunity, and the regulated market is somewhere just below $1 billion – approximately $1.5 billion."  Thus, Aurora was required, but failed to, disclose the known risks presented by the robust black market and the material adverse effect the market would have on the Company's revenues.

## LOSS CAUSATION/ECONOMIC LOSS

209.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Aurora common stock and operated as a fraud or deceit on Class Period purchasers of Aurora common stock by failing to disclose and misrepresenting the adverse facts detailed herein.  As detailed above, when the truth about Aurora's misconduct was revealed over time, the value of the Company's common stock declined precipitously as the prior artificial inflation no longer propped up the common stock's prices.  The declines in the prices of Aurora common stock were the direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the price declines negate any inference that the losses suffered by Lead

Plaintiffs and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of the Company's common stock and the subsequent significant decline in the value of the Company's common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

210.    At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by Lead Plaintiffs and other Class members.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Aurora's business, operations, and financial condition, as alleged herein.  Throughout the Class Period, Defendants issued materially false and misleading statements and omitted material facts necessary to make defendants' statements not false or misleading, causing the prices of Aurora's common stock to be artificially inflated.  Lead Plaintiffs and other Class members purchased Aurora common stock at those artificially inflated prices, causing them to suffer damages as complained of herein.

**NO SAFE HARBOR**

211.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein,

Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and the forward-looking statement was authorized and approved by an executive officer of Aurora who knew that those statements were false when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

212.   Lead Plaintiffs are entitled to a presumption of reliance under the fraud-on-the-market doctrine, because the market for Aurora's publicly traded common stock was open, well-developed, and efficient at all times during the Class Period.  As a result of the materially false and misleading statements alleged herein, Aurora's common stock traded at artificially inflated prices during the Class Period.  Further, Lead Plaintiffs and other members of the Class purchased Aurora's common stock in reliance on the integrity of the market price of the common stock and the market information relating to Aurora, and were damaged thereby.

213.   At all relevant times, the market for Aurora common stock was an efficient market for the following reasons, among others:

(a)   Aurora common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b)   as a regulated issuer, Aurora filed periodic public reports with the SEC and the NYSE;

(c)   Aurora regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   Aurora was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their

respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

214.    As a result of the foregoing, the market for Aurora common stock promptly digested current information regarding Aurora from all publicly available sources and reflected such information in the price of the common stock.  Under these circumstances, all purchasers of Aurora securities during the Class Period suffered similar injury through their purchase of Aurora securities at artificially inflated prices and a presumption of reliance applies.

215.    Lead Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon omissions of material fact for which there was a duty to disclose.  Specifically, Lead Plaintiffs are entitled to a presumption of reliance throughout the Class Period because, as more fully alleged above, Defendants failed to disclose material information regarding the Company's manufacturing, operations, forecasts, and business prospects.

**COUNT I**

**Violation of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder
Against All Defendants**

216.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

217.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

218.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

219.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Aurora securities.  Lead Plaintiffs and the Class would not have purchased Aurora common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

220.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Aurora securities during the Class Period.

### COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

221.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

222.    The Individual Defendants acted as controlling persons of Aurora within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and directors of Aurora, and their ownership of Aurora securities, the Individual Defendants had the power and authority to cause Aurora to engage in the wrongful conduct complained of herein.

223.    By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Lead Plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

A.    Determining, pursuant to Rule 23 of the Federal Rules of Civil Procedure, that this action may be maintained as a class action, and certifying Lead Plaintiffs as Class representatives and Lead Plaintiffs' counsel as Class counsel;

B.    Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such other relief as the Court deems just and proper.

### JURY DEMAND

Lead Plaintiffs demand a trial by jury.

DATED:  September 21, 2020          CARELLA, BYRNE, CECCHI, OLSTEIN,
                                     BRODY & AGNELLO, P.C.
                                    JAMES E. CECCHI
                                    LINDSEY H. TAYLOR
                                    DONALD A. ECKLUND


                                    */s/ James E. Cecchi*
                                    JAMES E. CECCHI

- 77 -

5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
973/994-1744 (fax)
jcecchi@carellabyrne.com
ltaylor@carellabyrne.com
decklund@carellabyrne.com

*Local Counsel*

ROBBINS GELLER RUDMAN
    & DOWD LLP
SAMUEL H. RUDMAN
ALAN I. ELLMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
aellman@rgrdlaw.com

HAGENS BERMAN SOBOL SHAPIRO LLP
STEVE W. BERMAN
SHAYNE C. STEVENSON
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone: 206/268-9340
206/623-0594 (fax)
steve@hbsslaw.com
shaynes@hbsslaw.com

HAGENS BERMAN SOBOL SHAPIRO LLP
REED R. KATHREIN
LUCAS GILMORE
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone:  510/725-3000
510/725-3001 (fax)
reed@hbsslaw.com
lucasg@hbsslaw.com

*Co-Lead Counsel for Lead Plaintiffs and the
Proposed Class*

SCHALL LAW FIRM
BRIAN SCHALL
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: 310/301-3335
310/338-0192 (fax)
brian@schallfirm.com

*Additional Plaintiffs' Counsel*