**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re AURORA CANNABIS INC. SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>    ALL ACTIONS. | Civil Action No. 19-20588(JMV)(JBC) |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

James E. Cecchi
Lindsey H. Taylor
Donald A. Ecklund
CARELLA, BYRNE, CECCHI, OLSTEIN,
  BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
973/994-1744 (fax)
jcecchi@carellabyrne.com
ltaylor@carellabyrne.com
decklund@carellabyrne.com

*Local Counsel for Lead Plaintiffs*

Samuel H. Rudman
Alan I. Ellman
Margaret S. Sanborn-Lowing
ROBBINS GELLER RUDMAN &
  DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
aellman@rgrdlaw.com
mlowing@rgrdlaw.com

Steve W. Berman
Shayne C. Stevenson
HAGENS BERMAN SOBOL
  SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone: 206/268-9340
206/623-0594 (fax)
steve@hbsslaw.com
shaynes@hbsslaw.com

*Co-Lead Counsel for Lead Plaintiffs*

*[Additional counsel appear on signature page.]*

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION................................................1

II.   STATEMENT OF FACTS.........................................5

      A.    Aurora's core operation in Canadian cannabis
            sales and production faced limited
            opportunity to reach consumers following
            legalization..........................................5

      B.    Aurora aggressively expanded its production
            and created a massive oversupply of
            cannabis..............................................6

      C.    Defendants misled investors and concealed
            the financial impact of the known,
            fundamental limitations on consumer access
            to its products.......................................8

      D.    Defendants also misled investors by
            concealing the ongoing financial impact of
            robust sales in the black market......................9

      E.    Defendants misrepresented that profitability
            was imminent because of massive demand...............10

      F.    The truth about Aurora's reckless financial
            projection is belatedly revealed along with
            the truth surrounding its unwarranted
            overproduction of cannabis and ravenous
            acquisitions and expansion of cannabis
            facilities...........................................14

III.  ARGUMENT..................................................17

      A.    The amended complaint sufficiently alleges
            defendants' knowing and reckless violation
            of federal securities laws..........................17

      B.    Plaintiffs allege several actionable,
            materially false and misleading statements
            and omissions that are not protected by any
            safe harbor..........................................19

            1.    Defendants' financial projections and
                  statements and omissions regarding

cannabis inventory, capacity, consumer access, and illegal sales lacked a reasonable basis and were false and misleading when made............................19

    a.    Defendants misrepresented a vast market demand requiring a massive cannabis supply build-up and omitted known facts that——to the contrary——the market was oversupplied................................19

    b.    Defendants misrepresented the impact that limited retail outlets and the extant black market had on demand for its products and its profitability..............................22

2.    Defendants' false and misleading statements and omissions are not protected.......................................24

    a.    The safe harbor for some forward-looking statements does not apply here because defendants' statements addressed the then-present state of affairs, and were made without meaningful cautionary statements and with knowledge of their falsity.............................24

        (1)   Several of the material misleading statements are simply not forward-looking............24

        (2)   Any actual forward-looking statements fail the safe harbor test because they lacked accompanying, meaningful cautionary language and because they were made with knowledge of their falsity.........................27

    b.    Defendants' misleading statements were not mere puffery and the "truth on the market" doctrine is inapplicable here.........................30

- ii -

C.    Plaintiffs' allegations give rise to a
strong inference of scienter.........................33

        1.    Plaintiffs sufficiently allege both
              conscious misbehavior and recklessness..........34

        2.    Defendants were motivated to maintain
              Aurora's inflated stock price so to
              acquire other cannabis companies
              financed with Aurora's stock....................37

        3.    Inferences excusing defendants' conduct
              are not more compelling than the
              inference of scienter...........................38

D.    Plaintiffs adequately plead loss causation...........39

E.    Plaintiffs allege sufficient claims against
      the individual defendants under Section
      20(a) of the Exchange Act............................39

IV.    CONCLUSION...............................................40

**TABLE OF AUTHORITIES**

**Page(s)**

<span style="font-variant: small-caps">Cases</span>

*In re Aetna Sec. Litig.*,
  617 F.3d 272 (3d Cir. 2010) ..................................27

*In re Agria Corp. Sec. Litig.*,
  672 F. Supp. 2d 520 (S.D.N.Y. 2009) ........................36

*In re ATI Techs., Inc., Sec. Litig*,
  216 F. Supp. 2d 418 (E.D. Pa. 2002) .....................37, 38

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................18

*Belmont v. MB Inv. Partners, Inc.*,
  708 F.3d 470 (3d Cir. 2013) ................................40

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ...............................36

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) .......................29, 30, 34

*In re Cambrex Corp. Secs. Litig.*,
  2005 WL 2840336 (D.N.J. Oct. 27, 2005) .................25, 26

*In re Celgene Corp. Sec. Litig.*,
  2019 WL 6909463 (D.N.J. Dec. 19, 2019) .................28, 35

*In re CPI Card Grp. Inc. Sec. Litig.*,
  2017 WL 4941597 (S.D.N.Y. Oct. 30, 2017) ...................36

*In re Craftmatic Secs. Litig. v. Kraftsow*,
  890 F.2d 628 (3d Cir. 1989) ................................29

*Dartell v. Tibet Pharms., Inc.*,
  2016 WL 718150 (D.N.J. Feb. 22, 2016) ......................32

*In re Dr. Reddy's Lab. Ltd. Secs. Litig.*,
  2019 WL 1299673 (D.N.J. Mar. 21, 2019) .....................40

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) ........................................39

*Emps. Ret. Sys. of the P. R. Elec. Power Auth. v.
  Conduent Inc.*,
  2020 WL 3026536 (D.N.J. June 5, 2020) ......................32

*In re Enzymotec Secs. Litig*,
   2015 WL 8784065 (D.N.J. Dec. 15, 2015) .......................28

*EP Medsystems, Inc. v. EchoCath, Inc.*,
   235 F.3d 865 872 (3d Cir. 2000) ...............................30

*In re EQT Corp. Secs. Litig.*,
   2020 WL 7059556 (W.D. Pa. Dec. 2, 2020) ......................32

*Fan v. StoneMor Partners LP*,
   927 F.3d 710 (3d Cir. 2019) ..................................33

*Freeland v. Iridium World Commc'ns, Ltd.*,
   545 F. Supp. 2d 59 (D.D.C. 2008) .............................29

*Friedberg v. Discreet Logic Inc.*,
   959 F. Supp. 42 (D. Mass. 1997) ..............................36

*In re Galena Biopharma, Inc. Sec. Litig.*,
   336 F. Supp. 3d 378 (D.N.J. Aug. 21, 2018) ..................19

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000) ..............................31, 32

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
   2017 WL 1536223 (D.N.J. Apr. 27, 2017) ..................23, 31

*Hull v. Glob. Dig. Sols., Inc.*,
   2017 WL 6493148 (D.N.J. Dec. 19, 2017) ......................37

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009) .............................*passim*

*In re Interpool, Inc. Sec. Litig.*,
   2005 WL 2000237 (D.N.J. Aug. 17, 2005) ......................38

*Laborers' Int'l Union v. Foster Wheeler Corp.*,
   26 F.3d 375 (3d Cir. 1994) ...................................16

*McCabe v. Ernst & Young, LLP*,
   494 F.3d 418 (3d Cir. 2007) ..................................39

*Meyer v. Concordia Int'l Corp.*,
   2017 WL 4083603 (S.D.N.Y. July 28, 2017) ....................21

*Mill Bridge V, Inc. v. Benton*,
   2009 WL 4639641 (E.D. Pa. Dec. 3, 2009) ......................4

*In re NAHC, Inc. Sec. Litig.*,
   306 F.3d 1314 (3d Cir. 2002) ................................37

*In re Newell Brands, Inc. Sec. Litig.*,
   2019 WL 6715055 (D.N.J. Dec. 10, 2019) ...........3, 21, 22, 30

*In re Newell Brands, Inc. Sec. Litig.*,
   2020 WL 7040968 (3d Cir. Dec. 1, 2020) .....................33

*Roofer's Pension Fund v. Papa*,
   2018 WL 3601229 (D.N.J. July 27, 2018) .....................34

*Semerenko v. Cendant Corp.*,
   223 F.3d 165 (3d Cir. 2000) ................................27

*Setzer v. Omega Healthcare Investors, Inc.*,
   968 F.3d 204 (2d Cir. 2020) ................................38

*Shapiro v. UJB Fin. Corp.*,
   964 F.2d 272 (3d Cir. 1992) ................................19

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
   552 U.S. 148 (2008) ........................................17

*Takata v. Riot Blockchain, Inc.*,
   2020 WL 2079375 (D.N.J. Apr. 30, 2020) .....................31

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ...........................18, 33, 37, 38

*Tomaszewski v. Trevena, Inc.*,
   2020 WL 5095865 (E.D. Pa. Aug. 28, 2020) ...............34, 35

*In re Toronto-Dominion Bank Sec. Litig.*,
   2018 WL 6381882 (D.N.J. Dec. 6, 2018) ..................35, 37

*In re Urban Outfitters, Inc. Sec. Litig.*,
   103 F. Supp. 3d 635 (E.D. Pa. 2015) ...................31, 35

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
   2017 WL 1658822 (D.N.J. Apr. 28, 2017) .....................35

*Van Dongen v. CNinsure Inc.*,
   951 F. Supp. 2d 457 (S.D.N.Y. 2013) ........................32

*Virginia Bankshares, Inc. v. Sandberg*,
   501 U.S. 1083 (1991) .......................................31

- vi -

*In re ViroPharma, Inc. Sec. Litig.*,
   21 F.Supp.3d 458 (E.D. Pa. 2014) ..............................24

*Zhengyu He v. China Zenix Auto Int'l Ltd.*,
   2020 WL 3169506 (D.N.J. June 12, 2020) ..........18, 27, 34, 38

**STATUTES**

15 U.S.C. § 78t(a).............................................40

15 U.S.C. § 78u-4(b)(1)........................................18

15 U.S.C. § 78u-5(i)(1)........................................25

15 U.S.C. § 78u-5(i)(1)(A),(B),(C), and (D)....................25

15 U.S.C. § 78u-5(c)(1)(A)(i)............................24, 27, 28

15 U.S.C. § 78u-5(c)(1)(B)..................................24, 27

**OTHER AUTHORITIES**

17 C.F.R. § 229.303............................................18

Fed. R. Civ. P. 8(a)..........................................39

Fed. R. Civ. P. 9(b)..........................................18

Fed. R. Civ. P. 15(a)(2)......................................40

## I.    INTRODUCTION

Plaintiffs lay bare in their Amended Complaint[1] the means by which defendants inflated Aurora's stock price by misrepresenting (1) Aurora's profitability, (2) the massive oversupply of cannabis and over-expansion of cannabis production facilities across Canada, (3) the effect of limited cannabis retail stores on consumer sales, and (4) the impact of competition from the black market.

Defendants were well aware, or acted in reckless disregard, of the plain but undisclosed fact that Aurora's core operation—sales in the Canadian cannabis market, from which nearly 90% of its revenue was generated[2]—suffered from oversaturation and limited stores competing with a robust black market. Nevertheless, defendants falsely represented to investors a massive demand commensurate with its massive supply. And defendants, unlike their competitors, falsely told investors

---

[1] Amended Complaint, Dkt. 24, at ¶ 1. Unless noted, all "¶" citations are to the Amended Complaint, brought on behalf of a class of investors who purchased shares of Aurora (NYSE: ACB) from Oct. 23, 2018 to Feb. 6, 2020 (the "Class Period").

[2] Though fancying itself "at its core" a "medical company striving to help patients," Aurora is not Pfizer. Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Amended Complaint, ("MTD"), Dkt. 32-1, at 1, 6. Both before and during the Class Period, defendants drew investors to, in their words, the "tens of billions of dollars in potential recreational cannabis sales at stake." *Id.* at 2. In Q4 2019, Aurora's revenue from "recreational" cannabis was $44.9 million; revenue from "medical" cannabis was only $25.2 million.

- 1 -

that Aurora was close to achieving positive earnings, repeatedly forecast as likely by the last fiscal quarter of 2019,[3] emphasizing Aurora's financial superiority over competitors.

Defendant Booth, Aurora's CEO, assured investors that the only thing to lose sleep over was *undersupply*, not *oversupply*, of cannabis. Choosing to speak about supply-and-demand, Aurora's acquisition and expansion strategy, and its overall profitability and expectations of same, defendants were obligated to speak truthfully. But they did not. And though this kept Aurora's inflated stock price afloat for several quarters, helping it to acquire several other companies using its inflated stock, a reckoning lay ahead.

The reckoning began in September 2019, when Aurora reported its Q4 earnings that "didn't come close" to its much-touted positive earnings before interest, taxes, depreciation, and amortization ("EBITDA") guidance to investors——guidance affirmed "over 35 days after the quarter closed."[4] On this news, Aurora's stock price dropped over 9%.[5]

---

[3] Aurora's fiscal year ends on June 30. Accordingly, its first fiscal quarter ends Sept. 30 (Q1); its second fiscal quarter ends Dec. 31 (Q2); its third fiscal quarter ends March 31 (Q3); and its fourth fiscal quarter ends June 30 (Q4).

[4] ¶ 163.

[5] ¶ 13.

- 2 -

Two months later, reporting results for Q1 of 2020, Aurora announced another adjusted EBITDA loss of $39.7 million,[6] and an immediate halt to construction of its Aurora Nordic 2 and Aurora Sun cannabis factories——a mere six weeks after touting their progress in a press release.[7] This news sank Aurora's stock by 17%.[8] Just two months after that, on January 6, 2020, it was revealed that Aurora was selling its large Ontario greenhouse, causing a 5% drop in its stock price.[9]

Continuing to unravel, on February 6, 2020, Aurora announced the departure of CEO Booth and 500 full-time staff positions, along with expected impairments and write-downs of goodwill totaling *roughly $1.0 billion*.[10] Investors reacted strongly to this news; over the next two trading days, Aurora's stock plummeted more than 22%.[11] And unlike the facts in *Newell Brands*, these belated disclosures do not reflect merely "bad business decisions,"[12] but a knowing and reckless effort to

---

[6] Financial figures are presented in Canadian currency. As of the filing of the Amended Complaint, the exchange rate of U.S. dollars to Canadian dollars was U.S. $1.00 to $1.33.

[7] ¶¶ 15, 167, 169.

[8] *Id.*

[9] ¶ 16.

[10] ¶¶ 17-18.

[11] ¶ 18.

[12] *In re Newell Brands, Inc. Sec. Litig.*, 2019 WL 6715055, at *10 (D.N.J. Dec. 10, 2019)(Vazquez, J.). *Newell* is discussed below at 21-22.

- 3 -

mislead and conceal from investors Aurora's true predicament in order to inflate its stock price.

Predictably, defendants argue that plaintiffs are tilting at windmills because Aurora was a victim of a "new market [that] was uncertain."[13] That market, their story goes, unexpectedly punished investors for Aurora's admitted pursuit of "an aggressive expansion plan" with "ramped up...production facilities" and "several" acquisitions of other cannabis companies.[14] Still, they claim, "Aurora repeatedly disclosed" the risks that caused it to miss its projections, including potential "sale and distribution" fluctuations and competition from the black market.[15]

In fact, defendants offered empty boilerplate risk disclosures that did not warn of Aurora's oversupply of

---

[13] MTD at 2, 38. Defendants' curious citations to random news articles pointing, *e.g.*, to performances of *other* cannabis companies, *see id.*, is neither proper nor relevant. *See Mill Bridge V, Inc. v. Benton*, 2009 WL 4639641, at *14 (E.D. Pa. Dec. 3, 2009) ("Newspaper articles . . . are not matters of public record for purposes of consideration on a motion to dismiss.").

[14] *Id.*

[15] MTD at 3. Defendants cite their own document in error. Aurora did not there "disclose...the concomitant risk" associated with its irrational build-up in supply and capacity. MTD at 3, citing Ex. F at 35-36 (Q1 2019 Management's Discussion and Analysis of the Financial Condition and Results of Operations ("MD&A")). The words "[f]uture growth expansion plans," without more, are simply *listed* in another section of the filing. In fact, at the page cited, more than 30 "risk factors" *are* listed——oversupply of cannabis is not one of them. Ex. F at 36.

- 4 -

cannabis, limited retail outlets, the black market, or the known impact they would have on profitability. Contrary to any such boilerplate recitations of risk, they repeatedly stressed the need to produce *more* cannabis not *less* because of actual consumer demand making profitability imminent. These statements are not protected under any safe harbor. In fact, defendants' risk warnings did not begin to resemble anything close to adequate cautionary language until *after* Aurora missed its Q4 2019 projections. In addition, plaintiffs' allegations, taken as a whole, create a strong inference of scienter.

As argued further below, plaintiffs sufficiently allege violations of the Exchange Act in satisfaction of the Private Securities Litigation Reform Act of 1995 (PSLRA), and respectfully request that the Court deny defendants' motion.

## II.  STATEMENT OF FACTS

### A.  Aurora's core operation in Canadian cannabis sales and production faced limited opportunity to reach consumers following legalization.

Aurora Cannabis is a Canadian corporation whose core operation concerns the manufacturing, distribution, and sale of cannabis products to the Canadian market.[16] It has traded on NYSE since October 23, 2018.[17] In its last fiscal quarter before the Class Period, more than 85% of Aurora's revenue was attributed

---

[16] ¶¶ 41, 44.

[17] ¶ 43.

to its business in Canada, with just under $30 million in total quarterly revenue, about 95% of which came from cannabis.[18]

Canada legalized recreational cannabis in June 2018. Sale of cannabis products was permitted across the country shortly thereafter.[19] Critics questioned the hurried retail rollout.[20] With regulation largely left to the discretion of the provinces, each offered vastly different opportunities for retail sales.[21] Critically, Ontario, home to nearly 40% of Canada's population, announced in September 2018 that licensed producers could open a mere single retail location within the entire province, later announcing no stores would open until April 2019.[22] Given the bewildering complexities of regulation across provinces, defendants' statements on demand for Aurora's products and revenue expectations were critically important to investors.

**B.    Aurora aggressively expanded its production and created a massive oversupply of cannabis.**

Notwithstanding the plain limits to consumer demand, Aurora rapidly expanded its cannabis footprint, including through ramping up production and conducting several jaw-dropping

---

[18] ¶ 44.

[19] ¶¶ 45-46.

[20] ¶ 46.

[21] ¶ 45.

[22] ¶ 47.

acquisitions of other cannabis producers. Deemed "gluttonous,"[23] Aurora completed acquisitions of prominent licensed producers CanniMed Therapeutics in early 2018 and, three months later, MedReleaf——the largest deal in industry history——before proceeding to acquire five more cannabis companies during the Class Period, largely financed with Aurora's inflated stock.[24]

This spending spree was untethered to any reasonable expectation of demand and sell-through ability. Aurora's build-up was utterly reckless——one researcher noted in early 2019 that statistics "from Health Canada support a total cannabis market size in Canada that falls below the size of the production goals of Aurora Cannabis alone."[25] But Aurora said otherwise.

By February 25, 2019, when Aurora announced that its Aurora Sky and MedReleaf Bradford cannabis facilities were set to add more than 128,000 kilograms of cannabis to an already massive supply, it was on a trajectory to add *nearly five times* the quarterly supply of Canadian cannabis within four months.[26]

The admission the following month by the CEO of Aurora's competitor Tilray that "over the next 18 months...there [would]

---

[23] ¶ 56.

[24] ¶¶ 49-53, 197.

[25] ¶ 67.

[26] ¶ 69.

- 7 -

be oversupply"[27] in Canada was contradicted by defendants, who informed investors in April 2019 that Aurora was *expanding* production capacity at Aurora Sun by 33%.[28] This translated to a "6 fold" jump in production capacity, to "over 625,000 kg per annum of dried cannabis."[29] And this in a "Canada market...still only consuming about 7,000 kg of cannabis each month."[30]

But defendants continued to tell investors not to worry. Put more strongly the following month by CEO Booth on Aurora's May 15 earnings call, "it would take 50 years" to meet global demand for cannabis——he only "los[t] sleep" over "the ability to supply the global demand."[31] One analyst responded that "[t]he key investor takeaway is that Aurora Cannabis is increasingly making us nervous that the company is blind to the oncoming flood of cannabis supply."[32]

**C.   Defendants misled investors and concealed the financial impact of the known, fundamental limitations on consumer access to its products.**

Aurora misled investors by touting a consumer demand that did not exist and failing to disclose the impact of its basic inability to sell its massive oversupply of cannabis products.

---

[27] ¶ 70.

[28] ¶ 72.

[29] ¶ 73.

[30] ¶ 74.

[31] *Id.*

[32] ¶ 77.

As defendants were well aware, Quebec and Ontario——home to nearly two-thirds of Canada's population——severely limited access to consumer sales with a miniscule number of stores in their provinces, creating a fundamental bottleneck for an already oversupplied product.[33] Defendants failed to disclose the material impact of this reality as they proceeded to tout the need for ever-greater cannabis supply. Even when Ontario expanded the number of permitted stores in April 2019, it was too late, because "the market" would "be flooded with supply by the time these stores [did] open."[34]

**D.   Defendants also misled investors by concealing the ongoing financial impact of robust sales in the black market.**

In addition to the undisclosed reality of overproduced cannabis creating a glut in the limited retail market, Aurora was also well aware of the ongoing threat to profitability caused by the robust black market. A February 2019 report indicated that the black market controlled "71 percent of sales in Canada."[35] The black market only strengthened throughout 2019 due to oversupply, limits on retail outlets, and a massive price

---

[33] ¶ 92.

[34] ¶ 101. In April of 2019, the number of approved stores in Ontario was increased from one to only 25, and even then just half those stores were open. *See id*. To match the density of stores in Colorado, which legalized cannabis in 2014, Ontario would have needed to add nearly 1,400 stores. ¶ 96.

[35] ¶ 107.

gap—with illegal sales per ounce at roughly half the price.[36] As Bloomberg noted, this led companies like Aurora to "fall well short" and led to the conclusion that things were "clearly not working" for "licensed producers" who "need[ed] the legal market to expand."[37] Aurora continually misrepresented its ability to reach positive earnings despite this reality.

**E.   Defendants misrepresented that profitability was imminent because of massive demand.**

Aurora misled investors throughout the Class Period regarding its imminent profitability purportedly resulting from its rapid, exponential increase in inventory and production capacity supplying a hungry recreational market demand. Defendants continued making misrepresentations in Aurora's SEC filings and press releases, and other material misstatements to the market throughout the Class Period, as follows:

- October 18, 2018 press release and statement from CEO Booth the week before listing on NYSE wherein Aurora stated, as it would emphasize throughout: "Aurora has rapidly developed...*to produce at an unprecedented scale to meet the growing demand for high-quality cannabis both in Canada and abroad.*"[38]

- November 12, 2018 press release supporting its Q1 2019 results, wherein Booth stated: "given the strong unmet consumer demand evident across Canada, *we are confident that our rapidly increasing production capacity will result in continued acceleration of*

---

[36] ¶¶ 110-112.

[37] ¶ 113.

[38] ¶ 120 (all emphases are added, unless otherwise noted).

*revenue growth*"[39] with an anticipated production "in excess of 150,000 kg per annum...with subsequent scale up to over 500,000 kg per annum."[40]

• November 13, 2018 earnings call, where Battley emphasized an "excess of demand over supply" in the Canadian cannabis market requiring a ramp-up in production capability, adding "*we are facing demand that outstrip[s] supply*" and "*anticipate this dynamic to continue for some time*" thus "we are successfully and rapidly scaling up our capacity...."[41]

• January 8, 2019 press release updating Q2 2019 results, which provided EBITDA guidance to investors for the first time, forecasting "*sustained positive EBITDA beginning FQ4 2019*" (just two quarters away) based upon defendants' assessment of "strong current and future anticipated demand," and "sustained strong demand."[42]

• February 11, 2019 press release supporting its Q2 2019 results, touting the savings and production increase resulting from completion of its Aurora Sky facility, reiterating positive EBITDA guidance; defendant Booth claimed "exceptional demand for our Canadian medical and consumer products."[43]

• February 11, 2019 earnings call, during which Battley announced that "[t]o address the continued strong market demand" and "massive shortage of legalized cannabis" Aurora was "ramping up production rapidly"; Ibbott added Aurora was "very comfortable in reiterating" the prior positive EBITDA guidance because of "the continued very strong demand for our products"; and Booth pointed to "awesome demand" causing him to "lose sleep over our ability to supply"

---

[39] ¶ 122.

[40] *Id*. Aurora's MD&A included in its Form 6-K filed on Nov. 13, 2018 highlighted Aurora's actions "bolstering its inventory levels to continue serving multiple consumer markets." ¶ 123.

[41] ¶ 124.

[42] ¶ 125.

[43] ¶ 129.

the market, with "at least 5 years before we have an oversupply situation."[44]

Critically, Battley further distinguished Aurora's situation from other cannabis producers: noting that, even if oversupply were to impact the market in the future, "as a low-cost producer, we're going to continue to thrive in that market" and be "extremely healthy" even though "other companies would have to stop competing."[45]

• April 10, 2019 press release addressing progress with its Aurora Sun facility, noting expectations for demand and "higher margin international medical markets which will be faced with supply shortages for the foreseeable future."[46]

• April 18, 2019 report on investor meetings hosted by Battley and Ibbott, revealing that "management commented that it is not worried about a potential industry oversupply in the near term."[47]

• May 14, 2019 press release announcing Q3 2019 financials, again reiterating "Aurora is well positioned to achieve positive EBITDA beginning in fiscal Q4 2019" (*i.e.*, the following quarter)[48]; its MD&A for the quarter, filed the following day, again stating "*we believe that there will be a significant shortage of regulated, quality-controlled cannabis*" and "*continue[] to construct purpose-built facilities...to meet market demand.*"[49]

• May 15, 2019 earnings call, where Battley stated he was "happy to say that we are *still tracking for positive EBITDA in this quarter*," reiterating "our view of the need for capacity, first thing is that, you're right, *the market is undersupplied in Canada*" therefore "we see continued strong demand" and "*we*

---

[44] ¶¶ 130-133.

[45] ¶ 134.

[46] ¶ 136.

[47] ¶ 137.

[48] ¶ 138.

[49] ¶ 139.

*don't see any shortage anytime soon,"*[50] specifically stating "we'll have about 400,000 kg of production in Canada [and] we don't see any constraints for years and years on the ability to export";[51] with Booth adding his refrain——"if there's one thing I lose sleep about [it is] our ability to supply the global demand for cannabis."[52]

•     June 13, 2019 interview with the *Financial Post* wherein Battley responded to the question of potential cannabis oversupply thusly: "*I'm not worried about it,*" and "*[a]s long as you have an undersupplied market, which we have right now in Canada,* it is very hard to evaluate market strategy because you're selling all you can produce."[53]

•     August 6, 2019 press release updating its Q4 2019 results, in which Aurora noted the "*Company continues to track toward positive adjusted EBITDA, and in particular adjusted EBITDA from cannabis operations.*"[54]

•     August 23, 2019 interview of Battley wherein he claimed that Aurora was "*not experiencing some of the challenges that some of the other [cannabis companies] are*" with "Aurora's production of cannabis" experiencing "*30 times increase in a very short period of time*"[55] and that Aurora would be "pretty darn close" to where "analysts have anticipated," given its long-standing claims of positive EBITDA.[56]

With respect to these aforementioned misrepresentations, defendants did not disclose that Aurora's ability to generate positive EBITDA was materially impaired by (i) cannabis oversupply resulting in part from its own buildup of cannabis;

---

[50] ¶ 140.

[51] ¶ 145.

[52] ¶ 141.

[53] ¶ 146.

[54] ¶ 149.

[55] ¶ 150.

[56] ¶ 151.

- 13 -

(ii) the inability to distribute its oversupply of cannabis to consumers given the small number of retail stores across Canada; (iii) the ongoing strength of the illicit black market; and (iv) a fundamental consumer demand that was entirely insufficient to meet the inflated cannabis supply.[57]

**F.    The truth about Aurora's reckless financial projection is belatedly revealed along with the truth surrounding its unwarranted overproduction of cannabis and ravenous acquisitions and expansion of cannabis facilities.**

On September 11, 2019, Aurora announced its much-anticipated Q4 results, disclosing not *positive* EBITDA as projected, but an unexpected adjusted EBITDA *loss of $11.7 million*.[58] This partial disclosure continued to conceal Aurora's true financial condition. Aurora minimized the quarterly results that missed guidance from just five weeks prior[59] and blamed "retail infrastructure" and "constraints on the consumer system" for the disappointing results.[60] One analyst noted that Aurora had "long predicted positive adjusted EBITDA during the June quarter and the actual results didn't come close," and defendants "even miss[ed] preliminary revenue guidance provided

---

[57] ¶ 152.

[58] ¶ 153. Defendants here press a different fact, that Aurora's *projected net revenue* was a mere 1% miss, MTD at 12-13, 25-26. But the metric touted by defendants and watched by analysts and investors was Aurora's *EBITDA*—repeatedly projected, even weeks prior, to be positive; it was negative by $11.7 million. *Id.*

[59] ¶ 156.

[60] ¶ 158.

- 14 -

over 35 days *after* the quarter closed."[61] In response, Aurora's stock closed down more than 9% on September 12.[62]

Just weeks later, on October 3, 2019, defendants issued a press release touting progress on two massive production facilities while concealing Aurora's true financial condition and lack of demand to justify the builds.[63] Then, on November 14, in reporting on Q1 2020, Aurora disclosed declining revenues and a sudden reversal and halt of activity at those *same two facilities*, just weeks after assuring investors things were full-speed-ahead.[64] In its Form 6-K, Aurora *for the first time* admitted that the lack of retail stores would impact its revenue, though claiming to "continu[e] to monitor" supply and demand.[65] And, during Aurora's earnings call the same day, Booth admitted "provinces were oversupplied" but claimed the "drop in cannabis sales...*was anticipated*," though defendants claimed just earlier that revenues were expected to *plateau* not *decline*.[66] Ibbott stated during the call that Aurora "monitor[s]

---

[61] ¶ 163.

[62] ¶¶ 13, 165.

[63] ¶¶ 167-168.

[64] ¶ 169. Defendants *did not disclose* that these closures were because of an oversupply of cannabis.

[65] ¶ 172.

[66] ¶ 173; ¶ 159 (Sept. 12, 2019 earnings call: "there may be a bit of a plateau"). Defendants contend that "it does not follow that one market having slow sales will result in the entire company attaining less revenue across all of its markets." MTD

sell-through from the provinces to the retailers closely."[67]

In response, a Jefferies analyst commented:

> With possible cash pressures evident, announcing ceased construction at facilities despite a press release just weeks ago praising progression, and now EBITDA (and cash) looking positive unlikely this year, *it would be fair for investors not to believe them.* Linked to trust are possible surprises on write-downs.[68]

These partial disclosures drove Aurora's price down more than 17% the following day.[69] Just weeks later, it was reported that CCO Battley had been forced out and would soon step down, leading Jefferies to downgrade the stock; Aurora's share price fell by more than 10% on December 23 in response.[70]

Investors continued to suffer after a leaked disclosure two weeks later, on January 6, 2020, that Aurora had listed for sale its Exeter, Ontario cannabis facility at $17 million, a space

---

at 25 n.9. Consumer cannabis, however, represented the bulk of Aurora's business. *See supra* at 1 n.2. Otherwise, defendants do not address, and thus waive response to, this belated disclosure of decline. *See Laborers' Int'l Union v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief"). So too they waive response to the belated disclosures on the Nordic 2, Aurora Sun, and Exeter production facilities, having not addressed these in their motion.

[67] ¶ 174.

[68] ¶ 179.

[69] ¶ 180.

[70] ¶¶ 182-184.

representing 75% of MedReleaf's capacity——an acquisition that cost $3.2 billion.[71] Aurora's share price fell 10% on the news.[72]

Worse still, on February 6, 2020, investors learned that (a) CEO Booth was being replaced and "retiring"; (b) 500 full-time positions would be eliminated; and (c) expected asset impairments and write-downs of goodwill could total $1.0 billion.[73] These disclosures dropped Aurora's stock price more than 22% over the following two trade days.[74]

### III. ARGUMENT

**A.    The amended complaint sufficiently alleges defendants' knowing and reckless violation of federal securities laws.**

Plaintiffs state a claim under Section 10(b) of the Exchange Act by alleging: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection with the purchase or sale of securities; (4) reliance; (5) economic loss; and (6) loss causation.[75] Defendants seek dismissal on three grounds——that plaintiffs fail to allege "any actionable material misrepresentation or omission," scienter, and loss causation.[76] Plaintiffs sufficiently plead each of these.

---

[71] ¶ 185.

[72] ¶ 186.

[73] ¶¶ 187-189.

[74] ¶ 189.

[75] *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

[76] MTD at 16.

As stated in *Tellabs*, "*[f]irst*, faced with a Rule 12(b)(6) motion to dismiss a §10(b) action, courts must...accept all factual allegations in the complaint as true."[77] Plaintiffs provide "enough facts to state a claim to relief that is plausible on its face."[78] And, satisfying the PSLRA, plaintiffs both plead "with particularity the circumstances constituting fraud"[79] and also specify "the statement[s] alleged to have been misleading, [and] the reason or reasons why the statement[s] [are] misleading...."[80]

Plaintiffs also satisfy the PSLRA's scienter pleading requirement because "all the facts in the complaint as alleged, taken collectively, give rise to a 'strong inference of scienter.'"[81] And a person of reason would "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."[82]

---

[77] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007).

[78] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[79] Fed. R. Civ. P. 9(b).

[80] 15 U.S.C. § 78u-4(b)(1); *see Tellabs,* 551 U.S. at 321.

[81] *Zhengyu He v. China Zenix Auto Int'l Ltd.,* 2020 WL 3169506, at *5 (D.N.J. June 12, 2020) (citing *Tellabs*, 551 U.S. at 323).

[82] *Tellabs, Inc.*, 551 U.S. at 324. Plaintiffs withdraw their allegations, at ¶¶ 201-208, regarding Item 303, 17 C.F.R. § 229.303, of SEC Regulation S-K. *See* SEC Final Rule Adoption, REG S-K, Nov. 19, 2020, at https://www.sec.gov/rules/final/2020/33-10890.pdf (affirming distinct treatment of Canadian issuers).

**B.    Plaintiffs allege several actionable, materially false and misleading statements and omissions that are not protected by any safe harbor.**

Defendants argue in error that plaintiffs allege no actionable false and misleading statements and that risks were disclosed.[83] In fact, material risks were not properly disclosed and the law does not otherwise protect their misrepresentations.

**1.    Defendants' financial projections and statements and omissions regarding cannabis inventory, capacity, consumer access, and illegal sales lacked a reasonable basis and were false and misleading when made.**

In the Amended Complaint, plaintiffs "specify each allegedly misleading statement [and] the reason or reasons why the statement is misleading."[84] Because defendants chose to speak to profitability, cannabis supply, consumer access, and competitive forces, they were obligated to disclose "certain facts contradicting th[ose] representations."[85] Because they did not, investors could not reasonably "decide for themselves whether the strategy was sound."[86]

**a.    Defendants misrepresented a vast market demand requiring a massive cannabis supply build-up and**

---

[83] MTD at 16.

[84] *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 259 (3d Cir. 2009). These statements are identified *supra* at 10-13.

[85] *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992). The "duty to disclose may arise...when there is...a corporate statement that, absent disclosure, would be inaccurate, incomplete, or misleading." *In re Galena Biopharma, Inc. Sec. Litig.*, 336 F. Supp. 3d 378, 390 (D.N.J. Aug. 21, 2018) (internal quotation omitted).

[86] MTD at 18.

**omitted known facts that——to the contrary——the market was oversupplied.**

Just before the Class Period, on October 18, 2018, CEO Booth stated that Aurora was "rapidly" moving "to produce at an unprecedented scale to meet the growing demand for high-quality cannabis...."[87] This enthusiasm for massive supply never wavered during the Class Period and no "specific risks" were ever timely or fully disclosed in response to known market conditions.[88]

To the contrary, investors were bombarded with unqualified confidence for, as Booth put it in November 2018, "rapidly increasing production capacity" because, defendants told them, Aurora was "facing demand that outstrip[s] supply," "we are confident" it will "result in continued acceleration of revenue growth."[89] So confident, in fact, that Aurora assured investors in January 2019 that it would reach "sustained positive EBITDA beginning FQ4 2019," less than six months away.[90]

And so it continued: February 2019, "massive shortage of legalized cannabis" and "los[ing] sleep over our ability to

---

[87] ¶ 120.

[88] MTD at 17. Defendants ask the Court to parse through "pp. 7-12" of their brief to find these purported disclosures of "specific risks" associated with its "unprecedented" supply and capacity build-up. *Id*. A review of the statements in its SEC filings, earnings calls, and press releases makes plain that no *actual* relevant, specific disclosure of risk was made until late 2019, and then only partially. *See infra* at 22 n.101.

[89] ¶¶ 122, 124.

[90] ¶ 125.

supply" the market;[91] April 2019, "supply shortages for the foreseeable future" internationally;[92] May 2019 (Q3 MD&A), "we believe that there will be a significant shortage" so "continue[] to construct purpose-built facilities...to meet market demand" and earnings call; "you're right, the market is undersupplied in Canada...we don't see any shortage any time soon;[93] August 2019, we are "not experiencing some of the challenges" facing competitors, despite a "30 times increase in a very short period of time...."[94] These uncorrected misstatements, notwithstanding boilerplate references to "uncertain" markets, required disclosure of known facts which defendants chose to conceal.[95]

The decision in *Newell* does not aid defendants here.[96] Plaintiffs there, relying on the report of an activist investor "as the basis of its case,"[97] challenged a consumer brand retailer on grounds that, *inter alia*, it failed to disclose that

---

[91] ¶¶ 130-133 (statements by Battley and Booth respectively).

[92] ¶ 136 (statement by Booth).

[93] ¶ 139 (statements by Battley on earnings call).

[94] ¶ 151 (statements by Battley).

[95] *See, e.g.*, *Meyer v. Concordia Int'l Corp.*, 2017 WL 4083603, at *5 (S.D.N.Y. July 28, 2017) ("[E]ven warnings of specific risks do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described.").

[96] MTD at 17-19.

[97] *Newell*, 2019 WL 6715055, at *11.

inventory levels were "42% higher than industry averages."[98] But, critically, defendants there did not deny that fact or make misstatements of demand.[99] This case is not premised on second-hand comparisons of industry competitors. Defendants here, in the face of direct questioning by analysts and despite a *compelling body of evidence of oversupply*, let loose a flurry of affirmative statements throughout the Class Period that cannabis demand *continued to* "outstrip" supply, and that the Canadian market remained "undersupplied."[100]

> **b.    Defendants misrepresented the impact that limited retail outlets and the extant black market had on demand for its products and its profitability.**

Defendants failed to disclose that limited retail outlets and a dominant illegal market adversely impacted Aurora's profitability during the Class Period. Defendants did not fail to disclose the *fact* of limited outlets and a black market—they failed to timely disclose that those known facts were adversely and materially impacting revenue.[101]

---

[98] *Id*. at *3.

[99] *Id*. As the Court noted in its opinion, the 42% comparative figure was of no moment—"Plaintiff does not explain why such a comparison is indicative of fraud." *Id*. at *12. Broad statements by the CEO in that case do not come close to the specific misleading statements by defendants alleged here.

[100] Contrary to defendants' argument, MTD at 18-19, neither use of internal documents nor statements from former employees are necessary at the pleading stage. *See infra* at 34-35 n.161.

[101] *See* MTD at 8 (belatedly disclosing in its FY2019 MD&A, on September 11, 2019, *nearly a year after legalization and almost*

- 22 -

Given the limits on consumer stores and decisions by the most populous provinces to continue these limits, defendants' belated statements and feigned surprise on November 14, 2019 that "constraints in Canadian consumer retail" contributed to declining revenue is not credible.[102] Any earlier boilerplate warnings about store numbers utterly failed to qualify the many misstatements by defendants that *despite limited consumer outlets* Aurora needed to produce more cannabis, acquire more capacity, and swallow more cannabis companies to meet *serviceable* demand.

Similarly any disclosures about the black market came late and did nothing to qualify the repeated assurances by defendants that profitability was imminent and massive supply was necessary to meet demand. Defendants admit they did not see fit to disclose the reality of the black market——a market controlling

---

*eleven months into the Class Period*, that "the pace of provincial licensing" could "affect the slope and smoothness of Aurora's revenue ramp-up..."); *id.* at 10 (belatedly disclosing in the same MD&A the existence of "competition from illegal cannabis dispensaries..."). This cautionary language——introduced *subsequent* to Aurora's missed guidance announcement——was more specific than any used previously. *Compare* Aurora's Form F-10 filed Apr. 2, 2019: "the Canadian non-medical cannabis market is subject to significant provincial and territorial regulation"; *cf. In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *15 (D.N.J. Apr. 27, 2017) (finding that when "vague cautionary language never change[s]" it "strongly suggests that it was not tailored to the specific future projection").

[102] ¶ 15.

upwards of 70% of sales three months after legalization[103]——until an earnings call in mid-2019 and its fiscal year filing in September 2019.[104] This despite months of assurances that financial projections were on track.

> ## 2. Defendants' false and misleading statements and omissions are not protected.

> ### a. The safe harbor for some forward-looking statements does not apply here because defendants' statements addressed the then-present state of affairs, and were made without meaningful cautionary statements and with knowledge of their falsity.

The PSLRA's safe harbor applies only if statements are both forward-looking and "accompanied by meaningful cautionary statements"[105] or "immaterial" or "made without actual knowledge that the statement was false or misleading."[106] Defendants fail this safe harbor test on all fronts.[107]

> #### (1) Several of the material misleading statements are simply not forward-looking.

The threshold inquiry is whether the challenged statements

---

[103] ¶ 107.

[104] MTD at 20.

[105] 15 U.S.C. § 78u-5(c)(1)(A)(i).

[106] 15 U.S.C. § 78u-5(c)(1)(B).

[107] Defendants' material *omissions* about the impact on Aurora's finances and projections of oversupply, limited retail stores, and illicit sales are unprotected——"omissions of existing facts or circumstances are not forward-looking, and thus do not qualify for safe harbor protection." *In re ViroPharma Inc. Sec. Litig.*, 21 F.Supp.3d 458, 471 (E.D. Pa. 2014).

qualify as "forward-looking" under the statute.[108] Where a statement contains a mix of then-present or past facts, it "is not entitled to the safe harbor with respect to the part of the statement that refers to the present."[109] Many of defendants' challenged statements are not "actually forward-looking" at all.[110] Instead, they are then-current statements regarding then-existing supply and demand conditions and then-existing confidence in profitability.[111] Among them are the following:

- Nov. 12, 2018 release (Booth): "*given the strong unmet* consumer *demand evident across Canada*, we are confident that our rapidly increasing production capacity will result in continued acceleration of revenue growth."[112]

- Nov. 13, 2018 earnings call (Battley): "*we are facing demand that outstrip[s] supply*" and "we are successfully and rapidly scaling up our capacity..."[113]

- Jan. 8, 2019 release: giving positive EBITDA guidance based upon "*strong current* and anticipated *demand*" and "*sustained strong demand*."[114]

---

[108] 15 U.S.C. § 78u-5(i)(1).

[109] *Avaya,* 564 F.3d at 255 (further citation omitted).

[110] *In re Cambrex Corp. Secs. Litig.*, 2005 WL 2840336, at *7 (D.N.J. Oct. 27, 2005).

[111] They are not, *e.g.*, "projection[s] of revenues, income, earnings..." or "statement[s] of the plans and objectives of management for future operations" or "statement[s] of future economic performance" or of "assumptions underlying" any of the above. 15 U.S.C. § 78u-5(i)(1)(A),(B),(C), and (D).

[112] ¶ 122.

[113] ¶ 124.

[114] ¶ 125.

- Feb. 11, 2019 release (Booth): claiming "*exceptional demand for our Canadian medical and consumer products.*"[115]

- Feb. 11, 2019 earnings call (Battley): "[t]o address *the continued strong market demand*" and "*massive shortage of legalized cannabis*" Aurora was "ramping up"; (Booth) "*awesome demand*" causing him to "*lose sleep* over our ability to supply" the market.[116]

- May 14, 2019 release: Aurora is "well positioned to achieve positive EBITDA" and in its MD&A affirming it would "*continue[] to construct purpose-built facilities...to meet market demand.*"[117]

- May 15, 2019 earnings call (Battley): "the *market is undersupplied in Canada...*we see *continued strong demand*" while Booth "*lose[s] sleep* about [Aurora's] ability to supply the global demand for cannabis."[118]

- June 13, 2019 interview (Battley): "not worried" about oversupply "*[a]s long as you have an undersupplied market, which we have right now in Canada....*"[119]

There is no safe harbor for these non-forward-looking false and misleading statements to investors——"the forward-looking statement protection disclosure is not available for a representation of present fact because the statement is misleading when made."[120] Because the safe harbor only applies

---

[115] ¶ 129.

[116] ¶¶ 130-133.

[117] ¶ 139.

[118] ¶¶ 140-141.

[119] ¶ 146.

[120] *Cambrex*, 2005 WL 2840336, at *7 (finding "several statements alleged by defendants to be protected are...not forward-looking" and "therefore protection is not available") (internal citation omitted).

- 26 -

"when an allegation involves a prediction," it does not shelter the aforementioned statements.[121]

> **(2)    Any actual forward-looking statements fail the safe harbor test because they lacked accompanying, meaningful cautionary language and because they were made with knowledge of their falsity.**

As to any remaining challenged statements, they nonetheless fail the safe harbor test for lack of "meaningful cautionary statements"[122] and because the statements were made with "actual knowledge" of their falsity.[123]

First, defendants' purported "cautionary language in each of its yearly and quarterly SEC filings"[124] missed the mark—"[c]autionary language must be extensive, specific, and directly related to the alleged misrepresentation."[125] Defendants' "vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks" is "inadequate to prevent misinformation."[126] And warnings of risk are insufficient when

---

[121] *China Zenix Auto*, 2020 WL 3169506, at *5.

[122] 15 U.S.C. § 78u-5(c)(1)(A)(i).

[123] 15 U.S.C. § 78u-5(c)(1)(B). Contrary to defendants' argument that plaintiffs' claims constitute "fraud by hindsight," MTD at 1, 4, 24, defendants simply did not have a reasonable basis for their projections at the time they were made. *See infra* at 29-30; 34-36.

[124] MTD at 22.

[125] *In re Aetna Sec. Litig.*, 617 F.3d 272, 282 (3d Cir. 20210).

[126] *Semerenko v. Cendant Corp.*, 223 F.3d 165 at 182 (3d Cir. 2000) (internal quotations and citations omitted).

"risks had already come to pass,"[127] as they had throughout the Class Period.

Defendants admit that instead of giving revised cautions "during the Class Period" they "included substantially similar cautionary language" in SEC filings throughout.[128] But their boilerplate definitions of "forward-looking" are insufficient[129] and their repetitive disclosures——omitting *actual* risks that manifested *during* the Class Period——were not "specifically directed" at "the risks associated with the projected financial results of the business," and concealed the known oversupply of cannabis, instead restating the opposite *ad nauseam*.[130]

---

[127] *In re Enzymotec Secs. Litig*, 2015 WL 8784065, at *22 (D.N.J. Dec. 15, 2015) (because risks had already come to pass "it was therefore unreasonable to make generalized warnings...").

[128] MTD at 23. Instead of confining their argument to the Court's space limitations, defendants ask us to look at a lengthy supplemental "table" to find their evidence. *Id.*, Ex. A. They also argue they had "no duty to correct or to update any statements," specifically Aurora's financial projection. MTD at 31-32. But in choosing to *speak* to Aurora's financial projection, even weeks after the quarter closed, defendants were obliged to speak truthfully, which they did not. *See In re Celgene Corp. Sec. Litig.*, 2019 WL 6909463, at *17 (D.N.J. Dec. 19, 2019) (Vazquez, J.) (upholding plaintiff's allegations that "[d]efendants were obligated to speak truthfully and completely" on a particular subject on which they "chose to speak").

[129] MTD at 22 (citing 2018 and 2019 SEC filings with "extensive explanation[s]" of what forward-looking means). These catch-all, unspecified recitations failed to provide "meaningful" caution. 15 U.S.C. § 78u-5(c)(1)(A)(i).

[130] MTD at 23. Defendants' "table" is littered with boilerplate risk disclosures and scores of *non-forward-looking* misleading statements, *e.g.*, "we are facing demand that outstrips supply,"

- 28 -

Second, defendants' misrepresentations are also unprotected because, as pled, they were made with knowledge of their falsity and "actionably unsound when made."[131] Defendants' unreasonable financial projection of positive EBITDA——made to investors in the face of known omitted facts regarding oversupply, limited stores, and illicit competition——was "made with...an inadequate consideration of the available data" regarding these omitted facts.[132] It is long-established that a projection is actionable as a false statement when made "without a reasonable basis."[133] Because "federal securities laws do not obligate companies to disclose their internal forecasts," where "a company voluntarily chooses to disclose a forecast or projection, that disclosure is

---

Ex. A at 3, "we are experiencing exceptional demand," *id.* at 10, "there is a massive shortage of legal regulated cannabis" and "continued very strong demand for our products," *id.* at 11. It was not until September 11, 2019——subsequent to Aurora's missed guidance——when defendants first provided risk disclosures with any semblance of specificity. *See supra* at 22 n.101.

[131] *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1430 (3d Cir. 1997). Defendants attempt to evade liability for certain statements, arguing that "statements contained in analyst reports cannot be attributed to defendants." MTD at 24 n.8. But defendants are liable for statements made in analyst meetings with the intention of conveying information to investors. *See Freeland v. Iridium World Commc'ns, Ltd.*, 545 F. Supp. 2d 59, 75-76 (D.D.C. 2008) (upholding allegations where defendants made statements to third parties with the intent that they be communicated to the market).

[132] *Burlington*, 114 F.3d at 1424.

[133] *In re Craftmatic Secs. Litig. v. Kraftsow*, 890 F.2d 628, 645-46 (3d Cir. 1989).

susceptible to attack on the ground that it was issued without a reasonable basis."[134] Here, plaintiffs sufficiently allege that defendants knew or recklessly ignored plain facts that would prevent Aurora from reaching positive EBITDA as projected.[135]

### b. Defendants' misleading statements were not mere puffery and the "truth on the market" doctrine is inapplicable here.

Defendants seek additional refuge in the sanctuary of nonactionable "puffery" for "[m]any of the challenged statements" regarding its inflated inventory and production capacity.[136] But the statements are not "statements of subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism...."[137] As the Supreme Court has held, the use of "conclusory terms,"——e.g., "strong unmet consumer demand,"[138] "we are facing demand that outstrips supply,"[139] "massive shortage of legalized cannabis,"[140]

---

[134] *Burlington*, 114 F.3d at 1427.

[135] *Newell*, 2019 WL 6715055, at *11. Because they lacked a reasonable basis, plaintiffs need not "cite evidence that Aurora's management believed the critical press reports and not their more optimistic forecasts." MTD at 36 n.13.

[136] MTD at 28-29.

[137] *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865 872 (3d Cir. 2000). Defendants cite mostly to language not disputed, failing to cite, *e.g.*, their flurry of statements about demand. MTD at 29.

[138] ¶ 122.

[139] ¶ 124.

[140] ¶¶ 130-133 ("continued very strong demand").

"the market is undersupplied in Canada,"[141] and "as long as you have an undersupplied market, which we have right now in Canada"[142]——when made "in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading."[143]

The statements challenged here are far from "non-specific statements of optimism or hope."[144] And the question whether the statements are nonactionable, immaterial puffery is fact-intensive and can be made on a motion to dismiss only where the statements "are so obviously unimportant" that all reasonable minds would agree.[145] Such is not the case here.

Defendants also conjure the "truth on the market" doctrine, which provides that an otherwise actionable misstatement or omission may be deemed immaterial if the truth is already fully known to the public.[146] But that "analysis is intensely fact

---

[141] ¶ 140.

[142] ¶ 146.

[143] *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093 (1991).

[144] *Takata v. Riot Blockchain, Inc.*, 2020 WL 2079375, at *12 (D.N.J. Apr. 30, 2020). Defendants' citation to *Hertz* is inapt, MTD at 28, and the statements here bear no resemblance to, *e.g.*, we "feel very confident the story is intact" and "[o]ur profitability trend has been fairly significant." *Hertz*, 2017 WL 1536223, at *10-11.

[145] *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 650-51 (E.D. Pa. 2015).

[146] MTD at 29-30.

specific and thus seldom appropriate at the pleading stage."[147] To prevail under the doctrine, "the corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misrepresentations."[148] Where defendants repudiate information that might have disclosed details of the fraud, the truth remains concealed.[149] By publicly rejecting an account that could reveal the truth, it "entrenche[s] the alleged fraud."[150] Here, reports of cannabis oversupply did not rebut, in the minds of reasonable investors, the repeated statements by defendants that

---

[147] *In re EQT Corp. Secs. Litig.*, 2020 WL 7059556, at *13 (W.D. Pa. Dec. 2, 2020) (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000); *see also Emps. Ret. Sys. of the P. R. Elec. Power Auth. v. Conduent Inc.*, 2020 WL 3026536, at *6 (D.N.J. June 5, 2020)("such a defense is...rarely an appropriate basis for dismissing a §10(b) complaint") (citation omitted).

[148] *Ganino,* 228 F.3d at 167.

[149] *See, e.g., Dartell v. Tibet Pharms., Inc.*, 2016 WL 718150, at *6 (D.N.J. Feb. 22, 2016) (disclosure on foreign website not corrective disclosure where "repudiated by management in an official press release"); *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 478 n.10 (S.D.N.Y. 2013) (rejecting argument that share price reflected information on internet where company disputed it). Defendants argue that these were not new facts and therefore cannot support loss causation. *See* MTD at 39. This argument fails, however, because defendants repudiated this information.

[150] *Dartell*, 2016 WL 718150, at *6 (holding that a "press release entrenched the alleged fraud by stating that the rumors were 'untrue and incorrect' and were the result of a completely 'mistaken report'").

- 32 -

cannabis was *not* oversupplied and that its financial projections were reasonable.[151]

**C.    Plaintiffs' allegations give rise to a strong inference of scienter.**

Plaintiffs allege facts sufficient to create a "strong inference" of scienter that is "at least as likely as any plausible opposing inference."[152] Scienter can "be demonstrated by pleading an extreme departure from the standards of ordinary care,"[153] where plaintiffs "allege facts giving rise to a strong inference of either reckless or conscious behavior."[154] As cautioned in *Tellabs*, "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences'."[155] And "federal courts certainly need not close their eyes to circumstances that are probative of scienter

---

[151] Defendants invoke the "business judgment rule," but as the Third Circuit recently held——"[t]he business judgment rule does not shield actors from federal securities fraud." *In re Newell Brands Inc. Sec. Litig.*, 2020 WL 7040968, at *6 (3d Cir. Dec. 1, 2020).

[152] *Tellabs,* 551 U.S. at 322, 328.

[153] *Fan v. StoneMor Partners LP*, 927 F.3d 710, 718 (3d Cir. 2019) (internal quotation and citation omitted); *Avaya,* 564 F.3d at 252 (under §10(b), scienter is a "mental state embracing intent to deceive, manipulate, or defraud, and requires a knowing or reckless mind").

[154] *Avaya*, 564 F.3d at 267.

[155] 551 U.S. at 324.

viewed with a practical and common-sense perspective."[156] Allegations of "motive and opportunity" may strengthen the inference.[157] At the pleading stage, "the case may be a circumstantial one" if allegations raise the inference of scienter.[158] Plaintiffs' allegations raise that inference.

### 1. Plaintiffs sufficiently allege both conscious misbehavior and recklessness.

Plaintiffs sufficiently allege defendants' "conscious misbehavior [and] recklessness."[159] Defendants made an "extreme departure from the standards of ordinary care"[160] during the Class Period, forecasting positive EBITDA despite massive oversupply of cannabis, fundamental limits on consumer access to its products, and robust sales on the black market, and touting to investors a massive consumer demand for their products that did not exist, facts "either known to the defendant[s] or...so obvious that the[y]...must have been aware of it."[161]

---

[156] *Avaya*, 564 F.3d at 272-73 (internal quotation omitted).

[157] *Id*. at 277.

[158] *China Zenix Auto,* 2020 WL 3169506, at *8.

[159] *Burlington*, 114 F.3d at 1418 (citation and internal quotation omitted).

[160] *Avaya*, 564 F.3d at 267 n.42 (internal citation omitted).

[161] *Id*. Defendants misstate the law with an erroneous citation to *Roofer's Pension Fund v. Papa*, 2018 WL 3601229 (D.N.J. July 27, 2018). MTD at 35. *Roofer's* nowhere states that plaintiffs must ("generally" or otherwise) obtain and publish confidential corporate documents or include witness statements to survive a motion to dismiss. There is no such requirement. *See Tomaszewski v. Trevena, Inc.,* 2020 WL 5095865, at *10 (E.D. Pa. Aug. 28,

Plaintiffs provide "sufficient circumstantial evidence to suggest" that defendants' misleading statements were "at a minimum, recklessly made" and that they "recklessly disregard[ed] the risk of misleading the public" with respect to profitability, supply, consumer demand and access, and illicit sales.[162] Defendants admitted that they carefully monitored sell-through data from the provinces to cannabis retailers.[163] And Canadian cannabis sales comprise Aurora's core operations.[164] In *Toronto-Dominion Bank*, the court found that the core operations doctrine supports scienter where, as here, defendants made misleading statements concerning a business segment that was of "central importance to [the Company's] success."[165]

But defendants say things just "did not pan out" given a "tumultuous and uncertain market," perhaps because of "corporate mismanagement" rather than any "extreme departure from ordinary

---

2020). Pre-discovery, confidential information is not necessary to support an inference of scienter. *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, 2017 WL 1658822, at *11 (D.N.J. Apr. 28, 2017).

[162] *In re Celgene Corp. Secs. Litig.*, 2019 WL 6909463, at *63.

[163] ¶¶ 5, 60, 172, 174.

[164] ¶ 44.

[165] *In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *17 (D.N.J. Dec. 6, 2018); *see also Urban Outfitters*, 103 F. Supp. 3d at 653-54 ("[U]nder the core operations doctrine, misstatements and omissions made on core matters of central importance to the company and its high-level executives gives rise to an inference of scienter....") (internal citations and quotations omitted).

care."[166] This defense against scienter is belied by several facts, *e.g.*, defendants' August 6, 2019 confirmation weeks *after* the close of the fiscal quarter that it expected to reveal positive EBITDA in just five weeks;[167] the shocking announcement on November 14, 2019 that it would cease operations at two *major facilities just weeks after praising progress at them*;[168] and the quiet sale of its touted Exeter facility less than two months later.[169] The "temporal proximity" of the misleading statements and the subsequent disclosures "bolster[s]" the inference that defendants knew about the undisclosed facts when they made the statements.[170] These facts, among others, support an inference of scienter as compelling as any innocent explanation.

---

[166] MTD at 36-37 (citations omitted).

[167] *E.g.* ¶¶ 12-13 (missing that projection by nearly $12m).

[168] ¶ 167.

[169] ¶ 185 ("investors were unaware Aurora was trying to sell").

[170] *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 n.5 (9th Cir. 2008); *see also In re CPI Card Grp. Inc. Sec. Litig.*, 2017 WL 4941597, at *4 (S.D.N.Y. Oct. 30, 2017) ("the timing of the IPO and the trend's manifestation supports an inference of pre-IPO knowledge"); *In re Agria Corp. Sec. Litig.*, 672 F. Supp. 2d 520, 528 (S.D.N.Y. 2009) (factual allegation of a key executive approaching the board with a compensation demand in January 2008 was "adequate to support an inference that discussions took place concerning" the issue prior to the company's IPO in November 2007); *Friedberg v. Discreet Logic Inc.*, 959 F. Supp. 42, 50-51 (D. Mass. 1997) (proximity in time of secondary offering to negative announcement months later supported the inference that defendants were aware of problems at the time of the offering).

### 2. Defendants were motivated to maintain Aurora's inflated stock price so to acquire other cannabis companies financed with Aurora's stock.

Though not itself an independent route to scienter, plaintiffs "have offered particularized allegations as to motive and opportunity"[171] regarding not a "general motive[] to aid the company,"[172] but a specific motive to effectuate five acquisitions during the Class Period financed with stock the defendants inflated.[173] Specifically, Aurora issued over 45 million shares at a value of $430,000,000 between November 2018 and August 2019 to acquire five companies.[174] Not until *the month after* these deals were completed did defendants begin to disclose known truths about market challenges.[175] Absent

---

[171] *Toronto-Dominion Bank*, 2018 WL 6381882, at *14. As held in *Tellabs*, though "true that motive can be a relevant consideration," still "the absence of a motive allegation is not fatal." 551 U.S. at 325; *accord Avaya*, 564 F.3d at 277.

[172] MTD at 34, quoting *Avaya*, 564 F.3d at 279.

[173] ¶ 197. *Hull v. Glob. Dig. Sols., Inc*., 2017 WL 6493148, at *20 (D.N.J. Dec. 19, 2017) ("importantly, when corporate defendants materially misrepresent the financial status of a company to enable stock-based business acquisitions at the time of the alleged misrepresentations, that alleged motive can give rise to a strong inference of scienter"); *In re ATI Techs., Inc., Sec. Litig*, 216 F. Supp. 2d 418, 440 (E.D. Pa. 2002) (finding motive in stock-based acquisitions during period of alleged misstatements).

[174] *Id*. Disclosed in Aurora's Form F-10 filed Apr. 3, 2019; Form F-10/A filed May 10, 2019; and Form 6-K filed Nov. 14, 2019. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (upholding judicial notice of documents filed with the SEC).

[175] ¶ 197.

- 37 -

defendants' inflation of Aurora's share price, these deals could not have been completed on such terms. Thus "[c]ourts have found sufficiently alleged motive to mislead investors by artificially inflating the company stock price where the acquisitions were at least partially funded by the company stock."[176]

### 3. Inferences excusing defendants' conduct are not more compelling than the inference of scienter.

*Tellabs* puts the question thusly: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"[177] Here, plaintiffs' allegations "raise a strong inference that Defendants acted, at the very least, recklessly in choosing to disclose incomplete and misleading information regarding"[178] profitability and impact of oversupply, limited stores, and the black market. Defendants' argument that they acted in "good faith" throughout the Class Period and "believed that demand" somehow "would grow"[179] even when they told investors repeatedly *it was already manifest* is no more

---

[176] *In re Interpool, Inc. Sec. Litig.*, 2005 WL 2000237, at *10 (D.N.J. Aug. 17, 2005); *accord In re ATI Techs.*, 216 F. Supp. 2d at 438.

[177] 551 U.S. at 326; *see also China Zenix Auto*, 2020 WL 3169506, at *9 (the test is "whether the allegations *as a whole* support a strong inference of scienter").

[178] *Setzer v. Omega Healthcare Investors, Inc.*, 968 F.3d 204, 215 (2d Cir. 2020).

[179] MTD at 37.

plausible or more reasonable an inference at this stage. In fact, it is less reasonable than the inference of scienter.[180]

## D.    Plaintiffs adequately plead loss causation.

With little argument, defendants claim plaintiffs fail to allege loss causation.[181] First, it is generally premature to rule on loss causation at the pleading stage, which requires only satisfaction of Rule 8(a).[182] Second, plaintiffs' allegations "show that the revelation of...misrepresentation[s] [and] omission[s] was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff."[183] This challenge is premature and baseless.

## E.    Plaintiffs allege sufficient claims against the individual defendants under Section 20(a) of the Exchange Act.

Plaintiffs sufficiently allege claims against the individual defendants for their acts in "directly or indirectly"

---

[180] Plaintiffs' scienter allegations are hardly "far-fetched." MTD at 38. Defendants may well have adhered to the cannabis gospel of *eventual* prosperity——but that does not explain the many false and misleading statements and omissions regarding *then-known facts* alleged here.

[181] MTD at 38-39.

[182] Fed. R. Civ. P. 8(a); *see also Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (at pleading stage, Rule 8(a) standard applies); *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 427 (3d Cir. 2007) (noting same).

[183] *McCabe*, 494 F.3d at 425-26. Plaintiffs directly connect each "revelation" with corresponding price drops. ¶¶ 153-189. In response to defendants' argument that new facts were not disclosed, *see supra* at 32 n.149.

aiding and abetting the violations of federal securities law.[184] First, because "liability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person," and plaintiffs sufficiently allege claims under Section 10(b), the claims cannot be dismissed on that ground.[185] Second, plaintiffs plead "culpable participation" by defendants in the underlying fraudulent conduct, identify misstatements by them, and "adequately allege[] that the individual Defendants were controlling persons; an intensely factual question."[186] Therefore, plaintiffs' claims against the individual defendants should be permitted to advance.[187]

## IV.  CONCLUSION

For the reasons argued, plaintiffs respectfully ask the Court to deny defendants' motion to dismiss.[188]

---

[184] 15 U.S.C. § 78t(a).

[185] *Avaya*, 564 F.3d at 252.

[186] *In re Dr. Reddy's Lab. Ltd. Secs. Litig.*, 2019 WL 1299673, at *19 (D.N.J. Mar. 21, 2019)(internal citation omitted).

[187] *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 484 (3d Cir. 2013).

[188] If the Court does grant defendants' motion to dismiss, plaintiffs request that the Court provide for leave to amend and file a Second Amended Complaint, per Fed. R. Civ. P. 15(a)(2).

Dated: January 19, 2021    Respectfully submitted,

CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.

By     /s/ James E. Cecchi
    James E. Cecchi
Lindsey H. Taylor
Donald A. Ecklund
5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
973/994-1744 (fax)
jcecchi@carellabyrne.com
ltaylor@carellabyrne.com
decklund@carellabyrne.com

*Local Counsel for Lead Plaintiffs*

Samuel H. Rudman
Alan I. Ellman
Margaret S. Sanborn-Lowing
(*pro hac vice* motion pending)
ROBBINS GELLER RUDMAN & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
aellman@rgrdlaw.com
mlowing@rgrdlaw.com

Steve W. Berman
Shayne C. Stevenson
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone: 206/268-9340
206/623-0594 (fax)
steve@hbsslaw.com
shaynes@hbsslaw.com

*Co-Lead Counsel for Lead Plaintiffs*

- 41 -

Brian Schall
SCHALL LAW FIRM
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: 310/301-3335
310/338-0192 (fax)
brian@schallfirm.com

*Additional Plaintiffs' Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2021, I electronically filed the foregoing Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Complaint with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

_/s/ James E. Cecchi_
James E. Cecchi

- 43 -