# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

*In re* AURORA CANNABIS, INC.
SECURITIES LITIGATION

Civil Action No. 19-20588
(JMV) (JBC)

**OPINION**

**John Michael Vazquez, U.S.D.J.**

This putative class action concerns allegations of securities fraud by purchasers of Aurora Cannabis, Inc.'s stock between October 23, 2018 and February 6, 2020 (the "Class Period"). Plaintiffs allege that Aurora and six of its key officers engaged in securities fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission (the "SEC"), 17 C.F.R. § 240.10b-5. Currently pending before the Court is Defendants' motion to dismiss Plaintiffs' First Amended Complaint. The Court reviewed all the submissions in support and in opposition[1] and considered the motion without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b). For the reasons discussed below, Defendants' motion to dismiss is **GRANTED**.

---

[1] Defendants' brief in support of their motion to dismiss will be referred to as "Def. Br.," D.E. 32-1. Plaintiffs' opposition brief will be referred to as "Opp. Br.," D.E. 35. Defendants' reply brief will be referred to as "Reply," D.E. 37.

## I.    BACKGROUND[2]

### A.  The Parties

Defendant Aurora Cannabis, Inc. ("Aurora" or the "Company") is headquartered in Edmonton, Alberta, Canada; it manufactures and distributes cannabis products. FAC ¶¶ 2, 25. Aurora operates in over 25 countries and purports to be one of Canada's leading licensed producers. *Id.* ¶ 41. In 2014, the Company obtained its license to grow cannabis in Canada. *Id.* ¶ 43. Aurora has been publicly traded on the Toronto Stock Exchange since July 2017 and, until October 2018, "was traded over-the-counter in the United States." *Id.* ¶ 43. On October 23, 2018 – shortly after Canada's legalization of recreational cannabis use – Aurora's common shares began trading on the New York Stock Exchange (NYSE). *Id.* ¶¶ 2, 43. Revenue from Canadian cannabis sales comprises the foundation of Aurora's business. *Id.* ¶ 44.

"Aurora's fiscal year ends on June 30. Accordingly, its first fiscal quarter ends Sept. 30 (Q1); its second fiscal quarter ends Dec. 31 (Q2); its third fiscal quarter ends March 31 (Q3); and its fourth fiscal quarter ends June 30 (Q4)." Opp. Br. at 2, n.3. In the first quarter of the Company's fiscal year 2019, Canadian revenue comprised 87% of the Aurora's total revenue, and cannabis revenue comprised 95% of its total revenue. *Id.*

Defendant Terry Booth was a co-founder of Aurora who served as its Chief Executive Officer ("CEO") and a member of its Board of Directors ("Board") from December 9, 2014 through June 26, 2020. *Id.* ¶ 26. Defendant Stephen Dobler was an Aurora co-founder; he served as President and a member of the Board from December 9, 2014 through June 30, 2020. *Id.* ¶ 27.

---

[2] The factual background is taken from the First Amended Complaint ("FAC"), D.E. 24. When reviewing a motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

Defendant Glen Ibbott was also an Aurora co-founder; he has served as its Chief Financial Officer ("CFO") and a member of its Board since May 2017. *Id.* ¶ 28. Defendant Cameron Battley served as Aurora's Chief Corporate Officer ("COO") and a corporate spokesperson from early 2018 until December 2019. *Id.* ¶ 29. Defendant Michael Singer has served as Aurora's Executive Chairman since early 2019 and was Interim CEO from June 2020 through September 8, 2020. *Id.* ¶ 30. Defendant Jason Dyck has served as a member of the Board since March 2015. *Id.* ¶ 31. Booth, Dobler, Ibbott, Battley, Singer, and Dyck are collectively referred to as the "Individual Defendants." *Id.* ¶ 32.

The named Plaintiffs are individuals and entities who purchased Aurora common stock during the Class Period. *Id.* ¶¶ 1, 24. Plaintiffs bring this securities class action on behalf of themselves and all purchasers of Aurora securities on the New York Stock Exchange (NYSE) during the Class Period. *Id.* ¶ 1.

### B. Cannabis Legalization in Canada

Canada legalized recreational cannabis on June 18, 2018, with the passage of the Cannabis Act. *Id.* ¶ 45. Pursuant to the act, the Canadian federal government regulates cannabis production, while provinces and cities exercise greater authority over cannabis retail. *Id.* Individual provinces and territories were empowered by the Cannabis Act to establish their own rules, which has resulted in a patchwork of regulations. *Id.* For instance, Plaintiffs indicate that in Alberta, a private liquor retailer (through which Aurora planned to sell cannabis) could open 37 stores; however, in Ontario, which is home to Canada's most densely populated city, federally licensed producers could open just one retail location, and no stores were permitted to open until April 2019. *Id.* ¶ 47.

The law's passage in June 2018 "paved the way for a fully legal cannabis market within eight to twelve weeks." *Id.* ¶ 46. This timeframe was criticized for being too fast and for providing too limited of a distribution and sales network to curb black market sales. *Id.* Canadian provinces complained that the timeframe provided was "too abbreviated for them to set up distribution and sales networks before scrambling to establish their regulations and distribution and sales networks." *Id.*

The provinces of Ontario and Quebec, which together account for nearly two-thirds of Canada's population, opted to sell cannabis through government-run retail monopolies. *Id.* ¶ 92. The FAC asserts that this resulted in "an acutely inadequate number of stores that created a bottleneck in distribution of an already oversupplied product." *Id.* In December 2018, Ontario officials announced they would conduct a lottery for the "issuance of a mere 25 licenses to operators of retail cannabis stores in Ontario"; these new stores would not open until April 1, 2019. *Id.* ¶ 95. In July 2019, Ontario announced it would hold a lottery for an additional 50 cannabis retail store licenses, which were expected to begin to open in October 2019. *Id.* ¶ 103.

### C. Aurora's Expansion Strategy

Aurora engaged in an aggressive expansion strategy, which it justified based on a need to rapidly increase cannabis production to meet massive, growing consumer demand in both Canada and the international medical marijuana market. *Id.* ¶ 48. On May 1, 2018, Aurora announced that it had acquired CanniMed Therapeutics Inc., which was Canada's first federally regulated cannabis producer. *Id.* ¶ 49. On July 25, 2018, Aurora acquired MedReleaf Corp., another Canadian licensed producer. *Id.* ¶ 50. On August 14, 2018, Aurora announced that it completed its acquisition of Anandia Laboratories Inc., which Aurora considered to be "the industry leader in science, genetics, and independent cannabis product testing." *Id.* ¶ 52. On March 4,2019,

Aurora completed the acquisition of privately held Whistler Medical Marijuana Corporation. *Id.* ¶ 135. In addition to these acquisitions, which were completed before the start of the Class Period, Aurora acquired five entities during the Class Period: ICC Labs Inc., Whistler, Chemi, EnWave, and Hempco. *Id.* ¶ 53. All of these acquisitions "were paid for, in whole or in part, with Aurora stock." *Id.*

Besides the acquisitions, Aurora also built production facilities to cultivate cannabis at "significant scale with low cost per gram production costs." *Id.* ¶ 42. On April 10, 2019, Aurora announced plans to expand production in its Aurora Sun facility. *Id.* ¶ 72. On that date, Aurora provided an update on Aurora Sun's construction in a press release, explaining that the ground work was "nearing completion" and that the "erection of the steel structure is advancing and installation of the glass . . . is expected to be completed in May 2019." *Id.* ¶ 136. As of May 14, 2019, Aurora Sky was "operating at full capacity." *Id.* ¶ 138. In a Form 6-K filed the next day, Aurora indicated that it "continues to construct purpose-built facilities with a strong focus on producing a consistent supply of quality, low-cost product to meet market demand." *Id.* ¶ 139. Further, the Company provided "Facility Updates" in the same exhibit which indicated that Aurora Sun would be expanded to 1.62 million square feet, a 33% increase over its planned size of 1.2 million square feet." *Id.* During the Class Period, construction was also underway at the Nordic II facility in Denmark. *Id.* ¶ 124.

### D. Alleged Materially False and Misleading Statements and Omissions

Plaintiffs allege that throughout the Class Period, Aurora "repeatedly touted the massive, growing demand for consumer cannabis in Canada and the Company's priority of ramping up production and capacity to meet this demand." *Id.* ¶ 3. Plaintiffs continue that Aurora projected positive, unrealistic earnings before interest, taxes, depreciation and amortization ("EBITDA") for its fourth fiscal quarter of 2019 ("FQ4 2019"), which ended on June 30, 2019. *Id.* ¶ 3. The FAC

alleges that Aurora's statements that it would achieve positive EBITDA in FQ4 2019 were materially false or misleading because they lacked a reasonable basis. Plaintiffs point to three factors that Defendants knew or recklessly disregarded that "severely constrained" Aurora's cannabis sales: "(1) immense over-production of cannabis by Aurora and other Canadian licensed producers; (2) woefully limited numbers of retail stores in Ontario and Quebec, where nearly two thirds of Canadian citizens reside; and (3) continued competition from the cannabis black market selling at roughly half the price per gram." *Id.* ¶ 4, 59.

The first challenged statement occurred before the start of the Class Period. In an October 18, 2018 press release, Booth touted growing consumer demand for high-quality cannabis in Canada and abroad. *Id.* ¶ 120. This statement, Plaintiffs allege, "remained alive and uncorrected at the start of the Class Period on October 23, 2018." *Id.* ¶ 121.

The second alleged statements occurred around Aurora's release of its FQ1 2019 financial results. On November 12, 2018, Aurora issued a press release in which Booth said that the Company was "confident" that its "rapidly increasing production capacity will result in continued acceleration of revenue growth" "[g]iven the strong unmet consumer demand evident across Canada." *Id.* ¶ 122 (alteration in original). The press release further indicated Aurora's expectation that it would "have a production run rate in excess of 150,000 kg per annum" at the end of calendar year 2018 into the beginning of 2019. *Id.* The same day, Aurora hosted an earnings call led by Booth, Ibbott, and Battley, on which Battley emphasized that, like other Canadian producers, Aurora was "facing demand that outstrip[s] supply" and "anticipate[s] this dynamic to continue for some time." *Id.* ¶ 124. Battley went on to explain that Aurora was scaling up its production capabilities and constructing new facilities. *Id.*

The third challenged statements were made in a January 8, 2019 press release, in which the Company stated its belief that it was well-positioned to "achieve sustained positive EBITDA beginning in Fiscal Q4 2019." *Id.* ¶ 125. The press release noted that Aurora expected "sustained strong demand from the adult usage market" going forward, and that this demand, coupled with its "disciplined management of operating expenses, and [its] growing portfolio of higher margin products, put [it] in a position to rapidly achieve positive EBITDA within the next two quarters." *Id.*

The fourth group of statements, which occurred in February 2019, concern the Company's FQ2 2019 earnings. In a February 11, 2019 press release, Booth stated that the Company was "experiencing exceptional demand for [its] Canadian medical and consumer products, as well as strong demand internationally." *Id.* ¶ 129. The executives also indicated their belief that "the combination of substantial revenue growth, low cost production, and disciplined operating cost management [would] position Aurora to achieve sustained positive EBITDA beginning in fiscal Q4 2019." *Id.* Additional challenged statements were made on an earnings call that same day. Battley emphasized "the strong market demand from the Canadian and international medical market and the Canadian customer market." *Id.* ¶ 130. He continued that "there's no shortage of cannabis in the world, but there is a massive shortage of legal regulated cannabis," and particularly "cannabis products that can achieve EU GMP certification." *Id.* ¶ 131. Booth also claimed that Aurora had "awesome demand" for its products and that he would "lose sleep over [Aurora's] ability to supply this global cannabis market," and predicted that "it's at least 5 years before we have an oversupply situation for companies that can export under EU GMP compliant facility." *Id.* ¶ 133. Ibbott stated that Aurora was "very comfortable in reiterating [its] earlier guidance of achieving positive EBITDA in [its] fiscal Q4," and once again indicated that the Company was

"exceptionally well positioned" as a leader in the global cannabis industry. *Id.* ¶ 132. When asked about pricing in the consumer market, Battley said that "[i]f in fact there is a lot of supply in the Canadian consumer market at any point, whether it's next year or the year after that, that's a scenario that we planned for." *Id.* ¶ 134. He explained that as a low-cost producer, Aurora would "continue to thrive in that market" "well below points at which other companies would have to stop competing because they simply [could not] produce at that low cost." *Id.*

The fifth challenged statement occurred in an April 10, 2019 press release. While providing an update on the Aurora Sun expansion, Aurora explained that Aurora Sun's "increased scale . . . reflects our expectations for the long-term growth in global demand, especially the higher margin international medical markets which will be faced with significant supply shortages for the foreseeable future." *Id.* ¶ 136.

The sixth group of allegedly misleading statements were made in conjunction with the release of Aurora's FQ3 2019 financial results. On May 14, 2019, Aurora issued a press release which stated that "through both organic growth and targeted acquisitions," the Company has had "a unique opportunity" to "continue to lead the industry in revenue growth while also progressing to positive operating earnings in the near term." *Id.* ¶ 138. Aurora anticipated that its average cash cost to produce per gram would continue to trend lower because the Aurora Sky was operating at full capacity. *Id.* Additionally, the Company stated that it was "well positioned to achieve positive EBITDA beginning in fiscal Q4 2019." *Id.* The next day, in a Form-6-K exhibit, Aurora reiterated that "[f]or fiscal Q4 2019, the Company is targeting to achieve positive adjusted EBITDA" and that it was "well on its way to near term profitability and the shift to a strong cash flow position." *Id.* ¶ 139. This sentiment was also expressed by Battley on a May 15, 2019 earnings call when he relayed that he was "happy to say that [Aurora] [was] still tracking for positive EBITDA" in FQ4

2019, and by Ibbott during the same call when he stated that "Aurora continues to track towards achieving positive EBITDA beginning in this current fiscal Q4 2019." *Id.* ¶¶ 140, 144.

A seventh group of challenged statements were made concerning Aurora's FQ3 2019 financial results. On May 15, 2019, Aurora indicated in its Form 6-K exhibit that it believed that "there will be a significant shortage of regulated, quality-controlled cannabis," and stated that it was "focused on building, operating and replacing [its] world-class scalable production facilities." *Id.* ¶ 139. During an earnings call that same day, Battley stated that "substantial additional capacity [was] needed" in international markets, which explained why the Company was "upscaling" its Aurora Sun and Aurora Nordic facilities. *Id.* ¶ 140. When asked about oversupply, Battley stated that "the market is undersupplied in Canada" and that Aurora "see[s] continued strong demand." *Id.* He acknowledged that the Company was "not necessarily in line with some people's expectations as to what max capacity will be" in light of new products and new regulations due that year. *Id.* He reiterated that "the central fact of the global cannabis sector is a massive excess of demand over supply" and that the Company would "have massive capacity to supply the Canadian market, to supply international markets and [it] [doesn't] see any shortage anytime soon." *Id.* Booth reiterated that he "lose[s] sleep about [the Company's] ability to supply the global demand for cannabis." *Id.* ¶ 141. Battley also stated that he "think[s] anybody who tells you they know when the market will be properly – or supplied is probably pulling your leg." *Id.* ¶ 143. When asked specifically about Europe, Battley explained that the European markets were "opening up so fast," the Company's "biggest nightmare" was not being able to supply these markets, and that the Company did not foresee "any constraints for years and years on the ability to export" to premium priced markets like Europe. *Id.* ¶ 145.

Battley was interviewed by a financial reporter on June 13, 2019 and asked about a potential oversupply. *Id.* ¶ 146. He responded that he was "not worried about it," and that the Company was "completely sanguine of what will happen in that eventuality" but "[a]s long as you have an undersupplied market, which we have right now in Canada, it is very hard to evaluate market strategy because you're selling all you can produce." *Id.*

The final challenged statements occurred in August 2019. In an August 6 press release, Aurora indicated that it "continues to track toward positive adjusted EBITDA, and in particular adjusted EBITDA from cannabis operations." *Id.* ¶ 149. Then, during an August 23 interview after the close of FQ4 2019 but before that quarter's earnings were reported, Battley stated that Aurora was "not experiencing some of the challenges" that other companies were, and that Aurora would be "pretty darn close" to reaching the EBITDA number predicted by analysts. *Id.* ¶¶ 150-51. He stated that Aurora was "continuing to track towards positive EBITDA" and that he was pleased with the Company's performance. *Id.* ¶ 151.

### E. Disclosures

Plaintiffs allege that Aurora began to make partially corrective disclosures in September 2019 when its FQ4 2019 and full-year 2019 financial results were released. *Id.* ¶ 153. In a September 11, 2019 press release, Defendants disclosed that Aurora incurred an adjusted EBITDA loss of C$11.7 million, despite its "repeated, positive pronouncements through much of the Class Period of EBITDA positivity" by the end of this quarter. *Id.* Defendants blamed the EBITDA loss on "challenges at the retail level in key markets." *Id.* Plaintiffs allege that this statement was only partially corrective because "Defendants continued to conceal Aurora's true financial condition and oversupply of cannabis." *Id.* ¶154. Also on September 11, 2019, Aurora issued a press release in which Ibbott stated that the Company "continue[d] to see strong growth in cannabis

revenues in both medical and consumer categories," and that "Aurora's diversified product portfolio remain[ed] in demand with patients and consumers alike." *Id.* ¶ 154. Ibbott continued that "[t]he global cannabis and hemp markets represent a significant opportunity for Aurora" and that the Company would "continue to make the necessary investments today to build long-term value for shareholders," while taking "a balanced approach to these investments with a focus on operating a sustainable and profitable business." *Id.* Ibbott also stated that Aurora expected adjusted EBITDA to continue to improve in the future because of expected revenue growth, improvements in gross margin and prudent [selling, general, and administrative expenses ("SG&A") expenses]." *Id.* Aurora also filed its Form 40-F Annual Report on September 11, 2019, indicating its expectation "that demand for [its] product [would] increase as the Canadian consumer market evolves and new regulations in Canada and international markets legalize these products." *Id.* ¶ 155.

On a September 12, 2019 earnings call, Battley indicated that Aurora generated C$99 million of net revenue and missed the guidance it provided to the market just five weeks earlier, projecting C$100 million to C$107 million in overall net revenue. *Id.* ¶ 156. Battley explained that the retail distribution in key provinces was a constraint in fiscal 2019, but he expected retail infrastructure to expand in 2020 with more brick-and-mortar stores in Canada. *Id.* ¶¶ 156-57. Ibbott reiterated the impact of retail-store constraints on Aurora's profitability and noted that "[t]here are remaining constraints to face the growth in the Canadian market . . . including the timing of currently approved and future retail stores." *Id.* ¶ 158. Ibbott explained that Aurora "continue[d] to evaluate [its] global capacity expansion" and was "continuing to build out [its] full production facility pipeline but in concert with the growth of the total global cannabis market. *Id.*

As for inventory, Ibbott noted that "there are constraints on the consumer system right now" and that buying has slowed as provinces are "trying to work through some of the inventories that they have and slowed their buying." *Id.* However, he expected that buying would "pick up and continue to pick up through the next quarter," but wanted to "signal that [Aurora's] continuing sort of 48% quarter-to-quarter growth may take a bit of a pause just due to industry dynamics." *Id.* Ibbott continued that Aurora's overall performance was "still at the mercy . . . of the timing of the retail footprint rollout" and that the Company was "excited that Ontario has licensed a number of new stores, but they should be licensing hundreds of new stores." *Id.* When asked about expectations of volatility in Aurora's anticipated consumer revenues, Battley explained that the Company was "anticipating that there may be a bit of a plateau between now and the advent of the cannabis legalization 2.0[3] products anticipated somewhere around the end of the year." *Id.* ¶ 159. Singer was interviewed by BNN Bloomberg the same day and said that if additional retail outlets were rolled out in Canada and Health Canada successfully rolled out the derivative market, Aurora "anticipate[d] that going in to the second half of this year, [it] should be able to deliver positive EBITDA." *Id.* ¶ 161.

The FAC alleges that these disclosures were only partially corrective; Defendants continued to misrepresent the true conditions of Aurora's business and operations omitting knowledge of risks posed by oversupply, limited retail stores, the impact of the black market, and limited demand. *Id.* ¶ 166. Plaintiffs claim that, in response to these partial corrective disclosures, "the price of Aurora common stock declined materially," falling more than 9% on September 12, 2019. *Id.* ¶ 165.

---

[3] "Canadian cannabis industry participants described a new segment of the industry, defined by the launch of derivative products such as vapes, edibles, infused beverages, concentrates, and topicals, as 'Cannabis 2.0.'" FAC ¶ 101, n.6.

As to additional partially corrective disclosures, Plaintiffs point to Aurora's October 3, 2019 press release which updated investors on its global growth initiatives, operations, and the construction status of Aurora Nordic 2 and Aurora Sun. *Id.* ¶ 167. The press release stated that "Aurora Sun is nearing completion with the majority of capital investment now behind us, while at Aurora Nordic the primary outdoor construction, including the enclosure of the facility, nears completion." *Id.* ¶ 167. According to Plaintiffs, these statements "were materially false and misleading because Defendants' positive statements regarding Aurora Sun and Aurora Nordic 2 concealed the true financial condition of the Company and the plain fact that demand could not justify the massive expansion of production facilities." *Id.* ¶ 168.

The next partial disclosures came on November 14, 2019 when Aurora announced its financial results for FQ1 2020. *Id.* ¶ 169. In its Form 6-K, Aurora stated that it had generated C$12.8 million, a 90% decline when compared to C$105.5 million in the same period a year ago before. *Id.* Aurora also posed an adjusted loss of C$39.7 million, nearly 50% larger than the C$20.8 loss expected by analysts. *Id.* The results showed a decline in sales of C$23.8 million or 25%, despite Defendants' claims of plateauing, or stable, demand. *Id.* "Aurora's consumer cannabis revenue fell by 33% and its wholesale bulk revenue fell by 49% sequentially." *Id.* Aurora admitted that recreational cannabis orders from the provinces had "slowed considerably" in the summer and announced that it was "indefinitely deferring the remaining construction and commission activities at Aurora Sun and Aurora Nordic 2," despite its update about successful progress on those facilities six weeks earlier. *Id.* Plaintiffs allege that Aurora's announcement that it was ceasing production of its Sun and Nordic 2 facilities was a corrective disclosure that Aurora was facing oversupply and insufficient demand to support these two facilities. *Id.* ¶ 178.

Concerning the 33% decrease in cannabis revenue, Aurora's November 14, 2019 Form 6-K stated that "[c]onstraints in the provincial retail distribution network have caused a temporary decrease in provincial ordering of consumer cannabis" and that "[o]verall, the roll-out of retail stores across Canada has been slower than expected, impacting the pace of growth in consumer revenue." *Id.* ¶ 170. However, the Company went on to state its expectation that "[a]s the consumer cannabis infrastructure continues to develop and expand throughout calendar 2020 with the launch of new retail stores across Canada," consumer demand would resume. *Id.* Plaintiffs allege that in this Form 6-K, Aurora for the first time informed investors that the growth of its revenue would be affected by the lack of retail stores. *Id.* ¶ 171. The Company also stated for the first time that "[g]iven the early stage of development of the consumer market in Canada, quarter to quarter sales volumes and revenues are difficult to forecast with precision," and that the pace of new retail store licensing – along with other factors – would affect the growth of Aurora's revenue. *Id.* The Form 6-K additionally indicated that Aurora's management "continues to monitor the forecast balance of supply and demand in the Canadian and international cannabis markets in order to time the scale-up of further Aurora production capacity as needed." *Id.* ¶ 172.

Also on November 14, 2019, Aurora held an earnings call to discuss the FQ1 2020 results, during which Booth stated that the Company's drop in cannabis sales "was anticipated" and that "[t]he provinces were oversupplied." *Id.* ¶ 173. Plaintiffs allege that this statement demonstrates the falsity of Battley's September 12, 2019 statement that Aurora expected revenue to plateau. *Id.* During this same call, Ibbott stated that Defendants "monitor the sell-through rates from the provinces to the retailers very carefully as we believe that to be a strong indicator that our products are meeting the needs of consumers for both quality and pricing." *Id.* ¶ 174.

Following the November 2019 disclosures, Aurora's common stock price fell by more than 17%. *Id.* ¶ 180. Plaintiffs allege that these statements were only partially corrective because Defendants "continued to misrepresent the true condition of Aurora's business and operations. *Id.* ¶ 181.

On December 21, 2019, following the leak of an internal memo, Aurora issued a press release announcing that Battley was stepping down as CCO; Plaintiffs allege that media reports indicated that Battley was forced out. *Id.* ¶ 182. Following this news, Aurora's common stock price "fell by more than 10%." *Id.* ¶ 184.

The FAC alleges that on January 6, 2020, "media reports" indicated that Aurora was selling its nine-hectare greenhouse in Ontario, which it obtained when it acquired MedReleaf in 2018. *Id.* ¶ 185. Following this news, Aurora's common stock price "fell by nearly 10%." *Id.* ¶ 186.

Aurora made several disclosures on February 6, 2020 – the end date of the Class Period. It announced "that it expected to report asset impairment charges on certain intangibles and property, plant, and equipment in a range of C$190 million to C$225 million and write-downs of goodwill in the range of C$740 million to C$775 million." *Id.* ¶ 189. Additionally, the Company "announced its intention to reduce capital expenditures to below C$100 million for total for the second half of fiscal 2020." *Id.* It also announced its "business transformation plan," which included several "amendments to its secured credit facilities, including removing EBITDA ratio covenants and reducing the total credit facility by C$141.5 million." *Id.* Following these announcements, "Aurora's stock price fell 22% over the next two trading days." *Id.*

## F. Developments After the Close of the Class Period

The FAC includes several allegations concerning "post-class period developments." On May 11, 2020, "Aurora carried out a reverse stock split after shares plunged so low that the NYSE

threatened to drop the stock from its listings." *Id.* ¶ 191. Aurora announced that it would grant

shareholders one share for every twelve currently outstanding, which would reduce the amount of

shares "from more than 1.3 billion to roughly 110 million." *Id.* The FAC alleges that these actions

diluted shares more than 30%. *Id.* Aurora also announced that it would be selling more shares to

generate cash reserves. *Id.* ¶ 192. The Company planned to raise cash through "selling as much

as C$350 million in shares into the open market in small batches." *Id.*

On June 16, 2020, Aurora announced that Dobler was retiring from his roles as President

and Director, effective June 30, 2020, citing its "business transformation plan" as part of the reason

for his departure. *Id.* ¶ 193. On June 23, 2020, Aurora provided additional updates on its business

transformation plan, announcing that it would close operations at five facilities over the next two

quarters. *Id.* ¶ 194. "In connection with the closing of facilities, Aurora announced that it expected

to record production asset impairment charges of up to C$60 million during the fourth fiscal

quarter of 2020." *Id.* Additionally, the Company announced its expectation to "record a charge

of up to C$140 million in the carrying value of certain inventory." *Id.* On June 29, 2020, Aurora

announced that Booth was retiring from his role as Director. On September 8, 2020, "Aurora again

announced that it expected to record a number of balance sheet adjustments in FQ4 2020, including

a fixed asset impairment charge of up to $90 million, a charge of approximately $140 million in

the carrying value of certain inventory, and a write-down of goodwill and intangible assets of up

to $1.8 billion." *Id.* ¶ 195.

### G. Alleged Violation of Item 303

Plaintiffs allege that, pursuant to Item 303 of SEC Regulation S-K, Defendants were

required "to disclose known trends, uncertainties or risks that have had, or are reasonably likely to

have, a materially adverse impact on net sales or revenues, or income from continuing operations."

*Id.* ¶ 201-03. Under Item 303, Plaintiffs indicate that Aurora was required, but failed, to disclose the impact that a Canadian oversupply, inadequate distribution to Ontario and Quebec, and the black market would have on Aurora's operations and financial results. *Id.* ¶ 204-08

## H. Scienter

The FAC alleges that Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that the statements or documents would be publicly disseminated; and knew or recklessly participated or acquiesced in the issuance or dissemination of the statements or documents. *Id.* ¶ 196. Plaintiffs further allege that Defendants had a motive to conceal this information from the investing public – Aurora needed to keep its stock price inflated to continue its acquisition and expansion strategy. *Id.* ¶ 197. As for the Individual Defendants, Plaintiffs claim they knew or were reckless in not knowing the undisclosed facts because they "held themselves out to investors as the executives most knowledgeable about the adverse facts impacting Aurora's business . . . and . . . belatedly admitted on conference calls that they knew about slowing demand trends during the Class Period." *Id.* ¶ 200.

## I. Loss Causation; Presumption of Reliance

Plaintiffs assert that Defendants' deceptive scheme "artificially inflated the price of Aurora common stock and operated as a fraud or deceit on Class Period purchasers of Aurora common stock by failing to disclose and misrepresenting the adverse facts detailed herein." *Id.* ¶ 209. Plaintiffs continue that "when the truth about Aurora's misconduct was revealed over time, the value of the Company's common stock declined precipitously as the prior artificial inflation no longer propped up the common stock's prices." *Id.* Plaintiffs assert that the decline in Aurora

common stock prices was the direct result of Defendants' fraud being revealed to investors and the market. *Id.*

The FAC submits that Plaintiffs are entitled to a presumption of reliance under the fraud-on-the-market doctrine because the market for Aurora's publicly traded common stock was open, well-developed, and efficient at all relevant times. *Id.* ¶ 212. Plaintiffs add that Aurora stock was listed on the NYSE, Aurora filed public reports with the SEC, Aurora communicated with public investors via established market communication mechanisms, and Aurora was followed by securities analysts who wrote reports that were publicly available and entered the public marketplace. *Id.* ¶ 213. As a result, Plaintiffs conclude, the market for Aurora common stock promptly digested current information from all publicly available sources and that information was reflected in the price of the common stock. *Id.* ¶ 214. Plaintiffs further allege that they are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because their claims are predicated in part upon material omissions for which there was a duty to disclose. *Id.* ¶ 215.

### J. No Safe Harbor

Plaintiffs indicate that the PSLRA safe harbor for forward-looking statements does not apply to any of Defendants' allegedly false statements because the statements were not identified as forward-looking statements when made. *Id.* ¶ 211. Alternately, Plaintiffs allege that Defendants are liable because at the time the statements were made, the speaker knew the statement was false and the statements was authorized and approved by an Aurora executive officer who knew that the statements were false when made. *Id.*

## II.    PROCEDURAL HISTORY

Plaintiff William Wilson filed a class action Complaint on November 21, 2019.  D.E. 1.
On July 23, 2020, this Court entered an order granting Wilson's motion to consolidate his case
with another case filed by Plaintiff Andrew L. Warren.  D.E. 16.  The FAC was filed on September
21, 2020.  D.E. 24.  The FAC alleges two counts: (1) violation of Section 10(b) of the Exchange
Act and Rule 10b-5 promulgated thereunder; and (2) violation of Section 20(a) of the Exchange
Act against the Individual Defendants.  FAC ¶¶ 216-223.  Defendants moved to dismiss, D.E. 32,
which Plaintiffs opposed, D.E. 35, and to which Defendants replied, D.E. 37.  Defendants filed a
notice of supplemental authority on May 14, 2021, D.E. 40, to which Plaintiffs replied on May 19,
2021, D.E. 41.

## III.    LEGAL STANDARDS

### A.  Federal Rule of Civil Procedure 12(b)(6)

To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts
to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,
570 (2007).  A complaint is plausible on its face when there is enough factual content "that allows
the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."
*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Although the plausibility standard "does not impose
a probability requirement, it does require a pleading to show more than a sheer possibility that a
defendant has acted unlawfully."  *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016)
(internal quotation marks and citations omitted).  As a result, a plaintiff must "allege sufficient
facts to raise a reasonable expectation that discovery will uncover proof of [his] claims."  *Id.* at
789.

In evaluating the sufficiency of a complaint, a district court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).  A court, however, is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations."  *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007).  If, after viewing the allegations in the complaint most favorable to the plaintiff, it appears that no relief could be granted under any set of facts consistent with the allegations, a court may dismiss the complaint for failure to state a claim.  *DeFazio v. Leading Edge Recovery Sols., LLC*, No. 10-2945, 2010 WL 5146765, at *1 (D.N.J. Dec. 13, 2010).

### B.  Federal Rule of Civil Procedure 9(b)

"Independent of the standard applicable to Rule 12(b)(6) motions, Rule 9(b) imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud."  *In re Rockefeller Ctr. Props., Inc. Sec. Litig.,* 311 F.3d 198, 216 (3d Cir. 2002).  Thus, pursuant to Rule 9(b), when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake . . . [m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  A party alleging fraud must therefore support its allegations with factual details such as "the who, what, when, where and how of the events at issue."  *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016).  Accordingly, "[t]o satisfy the particularity standard, 'the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation.'"  *Feingold v. Graff*, 516 F. App'x 223, 226 (3d Cir. 2013) (citing *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007)).  This heightened pleading standard is designed to "ensure that defendants are placed on notice of the precise misconduct with

which they are charged, and to safeguard defendants against spurious charges of fraud." *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (internal quotation marks omitted).

### C. The Private Securities Litigation Reform Act (PSLRA)

The PSLRA imposes further pleading requirements. "The PSLRA established heightened pleading requirements for a plaintiff to meet in order to plead a cause of action successfully in class actions alleging securities fraud." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 241 (3d Cir. 2013). The PSLRA "requires that a complaint state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud." *Id.* at 241-42 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)) (internal quotations omitted). In other words, plaintiffs bringing a claim involving an allegedly false or misleading statement must "(1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' 15 U.S.C. § 78u-4(b)(1), and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' § 78u-4(b)(2)." *Rahman*, 736 F.3d at 242 (quoting *Tellabs*, 551 U.S. at 321).

Both provisions of the PSLRA pleading standard require that facts be pled "with particularity," echoing the requirement set forth in Federal Rule of Civil Procedure 9(b). *Id.* at 241 n.3. Although the "PSLRA replaced Fed. R. Civ. P. 9(b) as the applicable pleading standard in private securities class actions," Rule 9(b)'s particularity requirement "is comparable to and effectively subsumed by the requirements" of the PSLRA. *Id.* This standard "requires plaintiffs to plead the who, what, when, where and how: the first paragraph of any newspaper story." *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009). Section 78u-4(b)(1) also

adds the requirement that where "an allegation regarding [a defendant's] statement or omission is made on information or belief," plaintiffs must "state with particularity all facts on which that belief is formed"; that is, they must describe the sources of information with particularity, including "the who, what, when, where and how of the sources, as well as the who, what, when, where, and how of the information those sources convey." *Id.*; *see* 15 U.S.C. § 78u-4(b)(1).

As to state of mind, the PSLRA's approach for pleading scienter sharply deviates from Rule 9(b), which allows plaintiffs to plead the scienter element generally. *Avaya*, 564 F.3d at 253. Under the PSLRA, the court must evaluate whether all the facts in the complaint as alleged, taken collectively, give rise to a "strong inference of scienter" – not whether any individual allegation viewed in isolation meets that standard. *Tellabs*, 551 U.S. at 323. In determining whether the pleaded facts give rise to a strong inference of scienter, the court must "take into account plausible opposing inferences." *Id.* This involves a comparative inquiry that evaluates how likely one conclusion is as compared to others, in light of the pleaded facts. *Id.* Thus, the court must consider plausible, nonculpable explanations for the defendant's conduct as well as inferences favoring the plaintiff. *Id.* at 324. Although the inference that the defendant acted with scienter need not be irrefutable, the inference must be more than merely "reasonable" or "permissible." *Id.* A complaint will survive only if a reasonable person would "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

## IV.   ANALYSIS

### A.  Securities Fraud (Count One)

In Count One, Plaintiffs allege that Defendants violated Section 10(b) and Rule 10b-5:

> Section 10(b) of the Exchange Act prohibits the "use or employ[ment], in connection with the purchase or sale of any security . . . [, of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the

[SEC] may prescribe." 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements this provision by making it unlawful to, among other things, "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). The Supreme Court has implied a private cause of action from the text and purpose of [S]ection 10(b). *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 36-37 (2011).

*City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014). Accordingly, to state a securities fraud claim under Section 10(b) and Rule 10b-5, Plaintiffs "must allege (1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *Id.* at 167. Defendants assert that Plaintiffs have failed "to allege (1) any actionable material misrepresentation or omission, (2) scienter, and (3) loss causation." Def. Br. at 16.

## 1. Material Misrepresentations or Omissions

As to the first element, a plaintiff must "identify a false representation of material fact or omission that makes a disclosed statement materially misleading." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1419 (3d Cir. 1997)). "[A] fact or omission is material only if 'there is a substantial likelihood that it would have been viewed by the reasonable investor as having significantly altered the "total mix" of information' available to the investor." *Id.* (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-232 (1988)). In other words, courts must "examine statements in the full context of the documents which they are a part" and not engage in a "selective reading" of the statements. *Pfizer, Inc.*, 754 F.3d at 168-69 (citing *Burlington Coat Factory*, 114 F.3d at 1426; *Tellabs*, 551 U.S. at 322).

The crux of Plaintiffs' case is that Aurora's statements about the Company's ability to achieve positive EBITDA were materially false and misleading because of omissions of known risks – the Company knew or recklessly disregarded that its sales were severely constricted by (1) an oversupplied market, (2) lack of sufficient retail stores, and (3) a robust black market. Defendants argue that Plaintiffs fail to plausibly allege any material misrepresentation or omission because these "risks were repeatedly and expressly disclosed by the Company and were well-known to investors as a result of information in the public domain[.]" Def. Br. at 16. Alternately, Defendants assert that the statements are not actionable. *Id.*

Defendants point to a series of disclosures as to the alleged risks. Turning first to the risk of an oversupplied market, Defendants argue that Aurora disclosed the risks associated with its expansion strategy, highlighting several examples. Def. Br. at 17. Aurora's September 24, 2018 FY 2018 Management's Discussion & Analysis ("MD&A") disclosed that the "price of production, sale and distribution of marijuana will fluctuate widely due to how young the marijuana industry is and is affected by numerous factors beyond the Company's control," including "increased production due to new production and distribution developments and improved distribution methods." Def. Br. at 9; D.E. 33-4 at 58. The Company's October 5, 2018 40-F Registration Statement indicated that its forward-looking statements included statements pertaining to "product demand," "revenue growth," and "competition," and cautioned that "[f]orward-looking information is not a guarantee of future performance and involves risks, uncertainties and assumptions, which are difficult to predict." Def. Br. at 9; D.E. 33-9 at 4. Additionally, Aurora's November 9, 2018 Q1 2019 MD&A disclosed that its "future growth expansion plans" were "subject to certain risks and uncertainties." D.E. 33-6 at 36-37.

Critically, Plaintiffs do not sufficiently contest the sufficiency of these disclosures. Plaintiffs state that no "specific risks" were timely disclosed and assert in a footnote that "[a] review of the statements in [Aurora's] SEC filings, earnings calls, and press releases make plain that no actual relevant, specific disclosure of risk was made until late 2019, and then only partially." However, Plaintiffs provide no discussion or analysis as to why the disclosures Defendants cite were insufficient. "[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived." *John Wyeth & Brother Ltd. v. Cigna Int'l Corp.*, 119 F.3d 1070, 1076, n.6 (3d Cir. 1997). Defendants' purported disclosures on this point, and the sufficiency of those disclosures, remain essentially unrefuted.

As to the second risk, insufficient retail stores, Defendants again argue that they made adequate disclosures and highlight several examples. Aurora's FY 2018 MD&A, which was issued on September 24, 2018, before the start of the Class Period, stated that:

> The legislative framework pertaining to the Canadian recreational cannabis market will be subject to significant provincial and territorial regulation, which will vary across provinces and territories and result in an asymmetric regulatory and market environment, different competitive pressures and significant additional compliance and other costs and/or limitations on the Company's ability to participate in such market.

Def. Br. at 8; D.E. 33-4 at 50. During Aurora's February 11, 2019 Q2 Earnings Call, Battley, while discussing initial supply chain issues, disclosed that "it's going to take some time to iron out all the bugs" and that Aurora would "have to see a better retail infrastructure in provinces across the country, in order to see the kind, the level of sales that I think everybody is anticipating." D.E. 33-14 at 15-16. And in its September 11, 2019 MD&A, Aurora disclosed that, due to "the early stage of development of the consumer market in Canada, we expect that quarter to quarter sales volumes and revenues will be volatile," and that one factor that would "continue to affect the slope

and smoothness of Aurora's revenue ramp-up" is "the pace of provincial licensing of new retail stores." D.E. 33-5 at 36.

In opposition, Plaintiffs argue that these disclosures were "belated" and "boilerplate." Opp. Br. at 23. Plaintiffs are correct that the September 11, 2019 cautionary language was released after the Company missed its EBITDA protection for FQ4 2019. But Plaintiffs do not contest that (1) the initial warnings were rendered prior to the start of the Class Period; or that (2) the February 2019 disclosures directly connected the issue of retail infrastructure to the Company's sales and revenue. Again, Plaintiffs do not adequately address the sufficiency of Defendants' disclosures.

Finally, Defendants contend that Aurora adequately disclosed the risk of competition from black market sales. Def. Br. at 20. Defendants submit that "after the black market problem came to light in the first half of 2019,"[4] the Company promptly disclosed the risk in its next earnings call on May 15, 2019, and in its next earnings statement in September 2019. *Id.*; D.E. 33-5 at 63; Once this specific risk was publicly disclosed, Defendants argue, Aurora was not required to repeat the disclosure each time it made public statements. *Id.* at 20-21. In opposition, Plaintiffs emphasize that Defendants waited to disclose the "reality of the black market," which "controlled upwards of 70% of sales three months after legalization" until mid-2019. Opp. Br. at 23-24.

The FAC alleges that a February 19, 2019 article detailed that *Canada's* cannabis black market was "thriving"; the article appears to be the earliest indication of black market competition based on Plaintiffs' allegations. FAC ¶ 107. Plaintiffs do not appear to contest the sufficiency of the disclosure of the black-market risk during Aurora's May 15, 2019 earnings call. As a result,

---

[4] Defendants appear to concede that Aurora became aware of the risk of the black market in the first half of 2019 through press reports. Def. Br. at 20.

viewing the facts and reasonable inferences in a light most favorable to Plaintiffs, it appears that the critical time frame is February 19, 2019 to May 15, 2019.

On April 10, 2019, Plaintiff alleges that an Aurora press release indicated the Company's expectations "for the long-term growth in global demand, especially the higher margin international medical markets." *Id.* ¶ 136. Plaintiffs fail to allege how omissions about the *Canadian* illegal market render this statement about *global* demand and *international medical markets* materially misleading. Another challenged statement in the same press release provided a construction update on the Aurora Sun facility. *Id.* Again, the FAC does not adequately allege why the omission about the Canadian black markets made this statement materially misleading.

A group of challenged statements were also made on May 14, 2019 in a press release. Ibbott stated that "[t]he company we have built with purpose through both organic growth and targeted acquisitions has provided a unique opportunity: continue to lead the industry in revenue growth while also progressing to positive operating earnings in the near term." *Id.* ¶ 138. Plaintiffs fail to allege how the omitted risk of the black market made this statement materially misleading. The next challenged statements from that press release, concerning the operating capacity at Aurora Sky and SG&A expenses, are also not alleged to be materially misleading in light of the black-market risk omission. *Id.* ¶ 138. The final challenged statement in that press release concerns the projection of positive EBITDA in FQ4 2019. *Id.* But Plaintiffs once again fail to allege how the omission rendered this statement misleading.[5]

---

[5] Plaintiffs also allege that on April 18, 2019, "Cowan [(an independent analyst)] issued a report reflecting on investor meetings they hosted with Battley, Ibbot," and Aurora's Executive Vice President of Corporate Development and Strategy, during which, Aurora's management "commented that it is not worried about a potential industry oversupply in the near term." FAC ¶ 137. Defendants argue that statements contained in analyst reports cannot be attributed Defendants, absent Defendants' adoption or endorsement of the report. Def. Br. at 24, n.8 (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997). In opposition, Plaintiffs

For the foregoing reasons, the Court finds that Plaintiffs have failed to adequately allege any false or misleading statements.[6]

## 2. Item 303

Although the FAC alleges that Aurora violated Item 303, FAC ¶¶ 201-208, Plaintiffs' opposition brief indicates that they "withdraw their allegations . . . regarding Item 303." Opp. BR. at 18, n.82. As a result, the Court does not consider these allegations.

## 3. Scienter

Although the Court need not reach the issue of scienter given Plaintiffs' failure to plausibly allege a claim for securities fraud, the Court briefly discusses this element because it is granting Plaintiffs leave to amend. "Scienter is a mental state embracing intent to deceive, manipulate, or defraud, and requires a knowing or reckless state of mind."[7] *Avaya*, 564 F.3d at 252 (internal citations and quotations omitted) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12

---

cite to *Feeland v. Iridium World Communs., Ltd.*, 545 F. Supp. 2d 59 (D.D.C. 2008). There, the court considered unendorsed/unadopted analyst statements because the Defendant "used third parties as conduits, making false and misleading statements with the intent that the third parties communicate those statements to the market." 545 F. Supp. at 75-76. The FAC includes no allegations from which this Court can infer that Aurora executives spoke to third parties with the intent that false and misleading statements would be communicated to the market. As a result, the Court does consider any third-party statements that were not endorsed or adopted by Defendants.

[6] As a separate ground for dismissal, Defendants argue that many alleged misstatements are forward-looking and protected by the PSLRA's Safe Harbor. Def. BR. at 21. PSLRA's Safe Harbor provision, 15 U.S.C. § 78u-5(c), "immunizes from liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Avaya*, 564 F.3d at 254. The Court makes no findings related to the Safe Harbor at this time but notes that to ultimately prevail, Plaintiffs would need to effectively refute Defendants' arguments and demonstrate that the challenged statements are not protected by the Safe Harbor.

[7] This standard is distinguishable from the mental state for forward-looking statements, which requires actual knowledge, under the PSLRA Safe Harbor provision. *See* 15 U.S.C. § 78u-5(c).

(1976) and citing *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534-35 (3d Cir. 1999)). The PSLRA scienter standard "requires plaintiffs to allege facts giving rise to a 'strong inference' of 'either reckless or conscious behavior.'" *Id.* at 267 (quoting *Advanta*, 180 F.3d at 534-35). A reckless statement is one "involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* at 267 n.42 (citing *Advanta*, 180 F.3d at 535). "'[C]laims essentially grounded on corporate mismanagement' do not adequately plead recklessness." *Id.* (citing *Advanta*, 180 F.3d at 540).

A "strong inference" of scienter is one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 267 (quoting *Tellabs*, 551 U.S. at 324). It is more than "merely 'reasonable' or 'permissible.'" *Tellabs*, 551 U.S. at 324. To make this determination, a court must "weigh the plausible nonculpable explanations for the defendant's conduct against the inferences favoring the plaintiff." *Avaya*, 564 F.3d at 267 (quoting *Tellabs*, 551 U.S. at 324) (internal quotations omitted). However, "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Id.* (quoting *Tellabs*, 551 U.S. at 324). "The pertinent question is 'whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 267-68 (quoting *Tellabs*, 551 U.S. at 323). "Omissions and ambiguities 'count against inferring scienter.'" *Id.* at 268 (quoting *Tellabs*, 551 U.S. at 326). "Motive and an opportunity to commit fraud" are just a factor in this analysis. *Advanta*, 180 F.3d at 534-35. In sum, "[a] complaint will survive . .

. only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

The FAC alleges that Defendants had a motive to conceal information from the investing public in order to keep Aurora's stock price artificially inflated so that it could continue its expansion. FAC ¶ 197. Defendants argue that Plaintiffs fail to plausibly plead scienter for a variety of reasons. Def. Br. at 34-37.

The Court agrees that it is suspicious that on August 6, 2019 – after the close of FQ4 2019 but before the results from that quarter were released – Defendants reiterated their expectation of achieving positive EBITDA in a press release and, ultimately, fell short of that metric when the results were released on September 11, 2019. FAC ¶¶ 148-49, 153. It is also suspicious that Aurora issued a press release on October 3, 2019, detailing its progress on construction of the Aurora Sun and Nordic Sky facilities, yet announced its decision to halt construction activities at these facilities on November 14, 2019. *Id.* ¶¶ 167, 169.

Plaintiffs' scienter allegations, however, appear to depend on the fact that Defendants either knew, or consciously disregarded, risks about oversupply, the black market, and insufficient Canadian retail that were published in a variety of media sources. FAC ¶¶ 59-118. This third-party information could support the inference of scienter if, for example, Aurora's management relied upon these articles and/or provided information that was materially inconsistent with their own internal information. But the FAC does not make such allegations. Plaintiffs instead rely on Defendants' statement that they monitor "sell-through data." *Id.* ¶ 174. But the FAC does not allege what the sell-through data showed or how it could support the plausible inference that Defendants acted with the requisite scienter. Nevertheless, the Court does not make a definitive finding on scienter because it is granting leave to amend.

#### 4. Loss Causation

Although it need not reach the issue, the Court briefly discusses loss causation because it is giving Plaintiffs an opportunity to amend. Loss causation requires "a causal connection between the material misrepresentation and the loss." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)). Specifically, the "loss causation inquiry asks whether the misrepresentation or omission proximately caused the economic loss." *Id.* at 426 (citing *Semerenko v. Cendant Corp.*, 223 F.3d 165, 185-87 (3d Cir. 2000)). To establish loss causation in a typical § 10(b) case in which a plaintiff alleges that public misstatements or omissions affected the price of publicly traded stock, "a plaintiff must show that its 'losses are related specifically to the market's discovery of the misrepresentation and the corresponding decrease in price due to that misrepresentation.'" *De Vito v. Liquid Holdings Grp., Inc.*, No. 15-6969, 2018 WL 6891832, at *39 (D.N.J. Dec. 31, 2018) (quoting *Pure Earth, Inc. v. Call*, 531 F. App'x 256, (3d Cir. 2013)).

Plaintiffs utilize the "materialization of the risk" approach to demonstrate proximate cause. Under this approach, Plaintiffs must prove that "the materialization of the undisclosed risk caused the alleged loss." *McCabe*, 494 F.3d at 429 (quoting Dane A. Holbrook, *Measuring & Limiting Recovery Under Rule 10b-5: Optimizing Loss Causation and Damages in Securities Fraud Litigation*, 39 Tex. J. Bus. L. 215, 260-62 (2003)). Plaintiffs also use a corrective disclosure approach, meaning that "[a]fter a misrepresentation has been made, a corrective disclosure reveals 'the falsity of the alleged misrepresentation, and introduces new information on the market.'" *De Vito*, 2018 WL 6891832, at *39 (D.N.J. Dec. 31, 2018) (quoting *In re DVI, Inc. Sec. Litig.*, No. 03-5336, 2010 WL 3522090, at *6 (E.D. Pa. Sept. 3, 2020), *aff'd* 639 F.3d 623 (3d Cir. 2011)).

Defendants argue that Plaintiffs fail to plausibly allege loss causation because "if the large volume of press reports about the problems with Canada's recreational cannabis market and Aurora's growth strategy were true and so widely known that Defendants were reckless in not heeding them," then these were "not 'new facts' that could support loss causation." Def. Br. at 39. Plaintiffs respond to this argument by asserting that (1) "it is generally premature to rule on loss causation at the pleading stage" and (2) the FAC's allegations demonstrate that the revelation of misrepresentations and omissions was a substantial factor in a decline in the security's price. Opp. Br. at 39.

The FAC appears to allege that the risks of the provincial retail distribution network and an oversupplied market were disclosed by Aurora in a November 14, 2019 Form 6-K. FAC ¶¶ 170-173. Plaintiffs further allege that the next day Aurora's share price fell by more than 17%. *Id.* ¶ 180. Plaintiffs should have addressed the legal impact, if any, third-party information had vis-à-vis proximate cause. The Court can envision arguments which cut both ways. For example, all information available to the market could arguably be relevant. Moreover, Plaintiffs appear to rely on such third-party information in attributing knowledge/recklessness to Defendants. On the other hand, a company's disagreement with such public reporting and analyses would seem to be critical. Nevertheless, as was the case with scienter, the Court does not make a definitive finding on loss causation because it is granting leave to amend.

### B. Control Person Liability (Count Two)

"Section 20(a) of the Exchange Act imposes joint and several liability on any individual who exercises control over a 'controlled person' who violates Section 10(b)." *Carmack v. Amaya Inc.*, 258 F. Supp. 3d 454, 466 (D.N.J. 2017) (citing 15 U.S.C. § 78t(a); *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 275 (3d Cir. 2005)). The three elements to this claim are "(1) the

defendant controlled another person or entity; (2) the controlled person or entity committed a primary violation of the securities laws; and (3) the defendant was a culpable participant in the fraud." *Id.* (citing *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 286 (3d Cir. 2006)). Thus, "liability under Section 20(a) is contingent upon sufficiently pleading an underlying violation of Section 10(b) by the controlled person." *Id.* Because the Section 10b claim is dismissed for failure to state a claim in this instance, Plaintiffs' Section 20(a) claim is also dismissed.

## V. CONCLUSION

For the foregoing, the Court grants Defendants' motion to dismiss Plaintiffs' FAC, D.E. 32. The dismissal is without prejudice. Plaintiffs shall have thirty (30) days to file a second amended complaint, which cures the deficiencies noted herein. If Plaintiffs do not do so, this matter will be dismissed with prejudice. An appropriate Order accompanies this Opinion.

Dated: July 6, 2021

John Michael Vazquez, U.S.D.J.