**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re AURORA CANNABIS INC. SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>    ALL ACTIONS. | Civil Action No. 19-20588(JMV)(JBC) |

**MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

James E. Cecchi
Lindsey H. Taylor
Donald A. Ecklund
CARELLA, BYRNE, CECCHI,
OLSTEIN,
  BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
973/994-1744 (fax)
jcecchi@carellabyrne.com
ltaylor@carellabyrne.com
decklund@carellabyrne.com

*Local Counsel for Lead*
*Plaintiffs*

Samuel H. Rudman
Alan I. Ellman
ROBBINS GELLER RUDMAN
   & DOWD LLP
58 South Service Road,
Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
aellman@rgrdlaw.com

Steve W. Berman
Shayne C. Stevenson
HAGENS BERMAN SOBOL
   SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone: 206/268-9340
206/623-0594 (fax)
steve@hbsslaw.com
shaynes@hbsslaw.com

*Co-Lead Counsel for Lead*
*Plaintiffs*

*[Additional counsel appear on*
*signature page.]*

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION...........................................1

II.  FACTUAL BACKGROUND.....................................5

    A.   Aurora's recognition and reporting of a sham transaction during 4Q19 violated applicable accounting standards and materially inflated its earnings and stock price.........................5

        1.   The 4Q19 Transaction lacked commercial substance......................................6

        2.   Collection on the 4Q19 Transaction was improbable....................................12

        3.   Aurora failed to disclose the related-party nature of the 4Q19 Transaction...........13

    B.   Despite a saturated cannabis market and limited stores, defendants misrepresented that Aurora's profitability was imminent because it was secretly utilizing a sham transaction to materially improve its earnings.............................................14

    C.   Aurora's true financial condition is belatedly revealed and the risk associated with Aurora's undisclosed sham transaction with Radient and other false and misleading statements materializes.............................17

III. ARGUMENT..............................................19

    A.   Defendants made several actionable, materially false and misleading statements and omissions not protected by any safe harbor...............................................20

        1.   Defendants' statements regarding Aurora's financial condition and projections were knowingly false and misleading—concealing as they did a massive sham transaction and eventual improper revenue recognition...................20

2.    Defendants' false and misleading
statements and omissions are not
protected by any safe harbor....................26

B.    Plaintiffs' allegations regarding the 4Q19
Transaction, supported by statements from
former Radient employees with knowledge,
give rise to a strong inference of scienter..........29

1.    Plaintiffs sufficiently allege a strong
inference of defendants' conscious
misbehavior and recklessness....................30

2.    Inferences excusing defendants' conduct
are not more compelling than the
inference of scienter—particularly in
light of witness allegations regarding
the 4Q19 Transaction............................32

C.    Plaintiffs adequately plead loss causation...........35

D.    Plaintiffs sufficiently allege Section 20(a)
claims................................................40

IV.    CONCLUSION................................................40

**TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Adams v. LexisNexis Risk & Info. Analytics Grp., Inc.*,
  2010 WL 1931135 (D.N.J. May 12, 2010) .......................39

*In re Apollo Grp., Inc. Sec. Litig.*,
  2010 WL 5927988 (9th Cir. June 23, 2010) ...............39, 40

*In re Audible Inc. Sec. Litig.*,
  2007 WL 1062986 (D.N.J. Apr. 3, 2007) ......................34

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ........................................21

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................20

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ...............................27

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004) ........................21, 33, 34

*In re Cambrex Corp. Sec. Litig.*,
  2005 WL 2840336 (D.N.J. Oct. 27, 2005) .....................28

*In re Campbell Soup Co. Sec. Litig.*,
  145 F. Supp. 2d 574 (D.N.J. 2001) ..........................31

*City of Sterling Heights Police & Fire Ret. Sys. v.
  Kohl's, Corp.*,
  2015 WL 1478565 (E.D. Wis. Mar. 31, 2015) ..................20

*Dartell v. Tibet Pharms., Inc.*,
  2016 WL 718150 (D.N.J. Feb. 22, 2016) ......................17

*DeVito v. Liquid Holdings Grp., Inc.*,
  2018 WL 6891832 (D.N.J. Dec. 31, 2018) .....................36

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) ....................................35, 36

*EP Medsystems, Inc. v. EchoCath, Inc.*,
  235 F.3d 865 (3d Cir. 2000) ................................35

*Fan v. StoneMor Partners LP*,
927 F.3d 710 (3d Cir. 2019) ..................................29

*Fergus v. Immunomedics, Inc.*,
2020 WL 2832565 (D.N.J. June 1, 2020) .......................21

*FTC v. Wyndham Worldwide, Corp.*,
799 F.3d 236 (3d Cir. 2015) ..................................20

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000) ..............................18, 39

*Gauquie v. Albany Molecular Rsch., Inc.*,
2016 WL 4007591 (E.D.N.Y. July 26, 2016) ....................31

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ...............................40

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) .........................................19

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992) ................................40

*Hull v. Glob. Dig. Sols., Inc.*,
2017 WL 6493148 (D.N.J. Dec. 19, 2017) ......................32

*Institutional Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) .............................*passim*

*In re Interpool, Inc. Sec. Litig.*,
2005 WL 2000237 (D.N.J. Aug. 17, 2005) ......................32

*Kux-Kardoz v. VimpelCom, Ltd.*,
151 F. Supp. 3d 471 (S.D.N.Y. 2016) .........................38

*McCabe v. Ernst & Young, LLP*,
494 F.3d 418 (3d Cir. 2007) ..............................35, 37

*In re Merck & Co., Inc. Sec., Derivative & ERISA
Litig.*,
2011 WL 3444199 (D.N.J. Aug. 8, 2011) ...................37, 38

*In re Merck & Co., Inc. Sec. Litig.*,
432 F.3d 262 (3d Cir. 2005) .................................40

*Monk v. Johnson & Johnson*,
2011 WL 6339824 (D.N.J. Dec. 19, 2011) ..............29, 30, 31

*Nat'l Junior Baseball League v. PharmaNet Dev. Grp. Inc.*,
   720 F. Supp. 2d 517 (D.N.J. 2010) ........................34, 35

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015) ........................................26

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010) ...............................40

*In re PTC Therapeutics, Inc. Sec. Litig.*,
   2017 WL 3705801 (D.N.J. Aug. 28, 2017) ....................21

*Rahman v. Kid Brands, Inc.*,
   736 F.3d 237 (3d Cir. 2013) ...............................34

*Sawabeh Info. Servs. Co. v. Brody*,
   832 F. Supp. 2d 280 (S.D.N.Y. 2011) .......................29

*Teachers' Ret. Sys. of La. v. Hunter*,
   477 F.3d 162 (4th Cir. 2007) ..............................23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ...................................*passim*

*Thomas v. Roach*,
   165 F.3d 137 (2d Cir. 1999) ...............................32

*Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016) ...............................26

*In re Toronto-Dominion Bank Sec. Litig.*,
   2018 WL 6381882 (D.N.J. Dec. 6, 2018) .....................31

*In re Urban Outfitters, Inc. Sec. Litig.*,
   103 F. Supp. 3d 635 (E.D. Pa. 2015) .......................37

*In re ViroPharma Inc. Sec. Litig.*,
   21 F. Supp. 3d 458 (E.D. Pa. 2014) ........................27

*In re Wilmington Tr. Sec. Litig.*,
   29 F. Supp. 3d 432 (D. Del. 2014) .....................35, 36

**STATUTES**

15 U.S.C. § 78u-4(b)(1).......................................20

15 U.S.C. § 78u-5(c)(1)(A)(i)................................27

15 U.S.C. § 78u-5(c)(1)(B)........................................27

### OTHER AUTHORITIES

17 C.F.R. § 229.404..............................................13

Fed. R. Civ. P. 9(b).............................................20

FASB ASC 850-10-50...............................................13

## I.    INTRODUCTION

Plaintiffs set forth in their Second Amended Complaint the means by which defendants artificially inflated Aurora's stock price during the Class Period through a series of false and misleading statements and omissions regarding Aurora's earnings, financial prospects, and operations.[1] Most egregiously, defendants orchestrated, executed, and misrepresented a $21.7 million sham transaction (the "4Q19 Transaction") with an affiliated entity in order to try and reach positive earnings.

Despite awareness, or reckless disregard, of the fact that the Canadian recreational cannabis market was inhibited by excessive supply, falling prices, and limited store capacity, defendants misleadingly represented to investors that Aurora's inflated cannabis production aligned with demand. And, unlike Aurora's peers, defendants falsely told investors that Aurora was headed toward positive earnings by the last fiscal quarter of 2019.[2] But defendants, by early 2019, understood that Aurora

---

[1] Second Amended Complaint ("SAC"), Dkt. 49. All "¶" citations are to the SAC, brought on behalf of a class of investors who purchased shares of Aurora (NYSE: ACB) from Oct. 23, 2018 to Feb. 6, 2020 (the "Class Period"). Emphasis is added unless otherwise specified, and internal citations and quotations are omitted unless otherwise noted. Capitalized terms not defined herein have the meanings ascribed to them in the SAC.

[2] Aurora's fiscal year ("FY") ends on June 30. Accordingly, its Q1 ends Sept. 30; Q2 ends Dec. 31; Q3 ends March 31; Q4 ends June 30. ¶ 3 n.1.

would not come close to achieving its much-touted earnings projections by the end of 4Q19. So they contrived a scheme that enabled Aurora to report the 4Q19 Transaction with a fledgling, affiliated entity, Radient Technologies, Inc., over which Aurora possessed significant influence.

In November 2017, Radient and Aurora entered into a Master Services Agreement ("MSA") whereby Radient agreed to process cannabis biomass received from Aurora into extracts, distillates, concentrates or oils for a specified fee or "toll." During the Class Period, however, Aurora and Radient circumvented the MSA with a massive faux sale of cannabis biomass in order to falsely boost revenue. Defendants concocted the scheme with ease because Aurora then held a roughly 14% ownership interest in Radient and its CEO and COO alternately sat on Radient's board of directors.[3]

Although it improperly recognized $21.7M in revenue during 4Q19, Aurora still reported negative adjusted EBITDA for that quarter—notwithstanding that Aurora's guidance was affirmed to investors *more than 35 days* after the quarter closed.[4] On the announcement of its inability to meet its baseless EBITDA

---

[3] ¶ 118.

[4] In its filings with the SEC, Aurora states that adjusted EBITDA is a "Key Performance Indicator" used by the Company to evaluate its business on a day-to-day basis. ¶ 108 n.7.

projection on September 11, 2019, Aurora's stock price dropped over 9%.[5] Nonetheless, its stock price remained inflated, primarily as a result of Aurora's failure to disclose the impropriety of its $21.7M biomass "sale" with Radient.

As the Court observed previously,[6] "it is suspicious that on August 6, 2019——after the close of FQ4 2019 but before the results from that quarter were released——defendants reiterated their expectation of achieving positive EBITDA," but still fell short,[7] and "[i]t is also suspicious that Aurora issued a press release on October 3, 2019, detailing its progress on construction of the Aurora Sun and Nordic Sky facilities, yet announced its decision to halt construction activities at these facilities on November 14, 2019."[8]

The first hint that Aurora's transaction with Radient was suspect was revealed when Craig Wiggins, a cannabis industry analyst, issued a report on October 9, 2019.[9] Wiggins raised the specter of a questionable "round-trip" transaction between Aurora and Radient. In response, Aurora's stock price fell by 9.5%. On October 17, 2019, *Yahoo Finance Canada* reported on

---

[5] ¶ 10.

[6] Order on Motion to Dismiss Plaintiffs' Amended Complaint ("Order"), Dkt. 42, at 30.

[7] *Id*. at 30.

[8] *Id*.

[9] ¶¶ 227-234.

Wiggins' analysis of the 4Q19 Transaction,[10] causing Aurora's stock to fall 5.4%. Additional corrective disclosures revealed Aurora's true predicament——and, in particular, that its 4Q19 Transaction inflated its stock price during the Class Period.[11]

Defendants now ask the Court to disregard the sham sale allegations as mere "speculation."[12] But they do not dispute that, if adequately pled, they suffice for both falsity and scienter. Instead, defendants: (i) put forth hypothetical factual alternatives of the 4Q19 Transaction at the pleading stage; (ii) claim that former Radient employees with knowledge should be ignored anyway; and (iii) argue that because Aurora never admitted the transaction was a sham, plaintiffs were not harmed by it.[13]

But hypotheticals are irrelevant and plaintiffs' new allegations regarding the 4Q19 Transaction are supported by former Radient employees ("FEs") with direct knowledge. As defendants are aware, this Court must accept all well-pled factual allegations in the SAC as true. This includes the

---

[10] ¶¶ 235–237.

[11] ¶¶ 12–15.

[12] Defs.' Mem. in Supp. of Mot. to Dismiss the Second Am. Compl. ("MTD"), Dkt. 55-1, at 1. Defendants mostly argue as if it were a trial, repeating that the transaction *wasn't* a sham—— though notably *not* contesting the allegations' materiality and particularity.

[13] *Id.*

statements by knowledgeable FEs of the counterparty to the sham transaction, which more than suffice to plead falsity and scienter at this stage of the litigation. And Aurora's failure to disclose the impropriety of the transaction does not shield it from liability where the deception caused Aurora's share price to remain artificially inflated before it collapsed and harmed investors upon revelation of the truth.

Further, Aurora's risk disclosures were not "clear and on-point."[14] Not only did defendants fail to inform investors that $21.7M of Aurora's 4Q19 revenue was improperly recognized, but the PSLRA's safe harbor does not apply to defendants' numerous statements and omissions of then-current fact.

Accordingly, plaintiffs sufficiently allege violations of the Exchange Act and respectfully request that the Court deny defendants' motion to dismiss the SAC.

## II.  FACTUAL BACKGROUND

**A.   Aurora's recognition and reporting of a sham transaction during 4Q19 violated applicable accounting standards and materially inflated its earnings and stock price.**

Defendants repeatedly told the market Aurora would achieve positive adjusted EBITDA, despite cannabis oversupply and limited retail outlets, in part, because they were concocting a secret sham transaction with Radient.[15] Aurora's recognition and

---

[14] *Id.*

[15] ¶ 208.

- 5 -

reporting of $21.7M in revenue on this transaction during 4Q19 violated International Financial Reporting Standards ("IFRS").[16] As a result, Defendants' representation that Aurora's financial statements for the year ended June 30, 2019 were prepared in accordance with IFRS was a material misrepresentation of fact.[17] As noted in the SAC, the accounting rules governing the 4Q19 Transaction are neither complex nor a matter of subjective interpretation, and compliance with these accounting rules is a basic and fundamental obligation of publicly traded companies.[18]

### 1.   The 4Q19 Transaction lacked commercial substance.

Aurora's financial statements disclose that it applied IFRS 15 in accounting for its reported revenue.[19] But the 4Q19 Transaction lacked commercial substance and the recognition of revenue on it violated IFRS 15.[20]

First, the 4Q19 Transaction lacked commercial substance because defendants, with "access to material confidential information" about Radient,[21] knew Radient did not have the ability to pay Aurora $21.7 million in June 2019. In fact, Radient, a development-stage company with only $214,000 in

---

[16] ¶¶ 111–112.

[17] *Id.*

[18] ¶¶ 110, 139.

[19] ¶ 139 (IFRS 15 – *Revenue from Contracts with Customers*).

[20] *Id.*

[21] ¶ 118.

revenue in 2019, *never* paid for the biomass.[22] During FY 2019, Radient's operations consumed cash of $6.7M *per quarter* and it possessed a cash balance on March 31, 2019 of only $23.5M.[23] Given its limited revenue, its cash-burn rate, and its non-cancellable commitment to construct a manufacturing facility obligating it to pay $12.7M, Radient, as defendants knew or recklessly ignored, was poised to run out of cash within the next twelve months.[24]

Radient's financial distress was overt and in plain sight of defendants. FE 1, a manager in Radient's corporate office during the relevant period, confirmed that at the time of the 4Q19 Transaction, Radient's equipment was being repossessed for non-payment, and in the months that followed, Radient informed employees that it could not make its roughly $150,000 bi-weekly payroll.[25] FE 4, a Radient finance department employee in 2019-2020 with access to all of Radient's payable information, stated Radient did not have the funds to pay for the 4Q19 Transaction and was struggling to pay bills in September 2019.[26] FE 4 explained that the payable to Aurora sat on Radient's books

---

[22] ¶ 149.

[23] ¶¶ 149-150.

[24] *Id.*

[25] ¶¶ 123, 135-136.

[26] ¶¶ 137, 155-156.

- 7 -

throughout his tenure with Radient, noting that certain vendors attempted to repossess equipment for non-payment and that bills were 12 months past due in or around May 2020.[27] Radient's financial situation through 2019 was so dire that, according to FE 4, 90-95% of the invoices processed during his tenure were still unpaid when he left later in 2020.[28]

FE 3, a Radient finance department employee in 2019-2020 who had access to Radient's accounting system and knowledge of the 4Q19 Transaction, echoed that Radient was experiencing cash-flow problems in May 2019 and was unable to make payroll in March 2020.[29] FE 2, a Radient operational employee until mid-2019, stated that Radient could not afford to finish paying to construct the new manufacturing facility.[30]

Given Radient's inability to pay for the biomass received from Aurora, the 4Q19 Transaction lacked commercial substance, and Aurora never relinquished, nor did Radient acquire, the significant risks and rewards of ownership of the biomass. Rather, it was simply warehoused and returned to Aurora.[31]

---

[27] ¶ 143 ("It was never paid and it was processed pretty close to when I had just started there. It sat there for a year, at least."), ¶ 155.

[28] ¶ 155.

[29] ¶¶ 133, 154.

[30] ¶¶ 125, 153.

[31] ¶¶ 140-141.

Second, the 4Q19 Transaction lacked commercial substance because Aurora and its Radient affiliate engineered a "round-trip" sale solely to inflate the parties' reported revenues.[32] In fact, the MSA between Radient and Aurora specifically provided that *Aurora was to pay Radient a specified fee* to process cannabis biomass——obviating the need for massive "sales" to go back and forth.[33] Radient was never Aurora's customer——it was Aurora's affiliated service provider.[34]

As Wiggins noted, the fact that a sale took place *outside* the provisions of the MSA was a red flag if Aurora took back the product——"Essentially there's potential to double dip on sales."[35] Wiggins also characterized Aurora's extension of $21M in trade credit to Radient as "astonishing," given that it began the previous quarter with $0 of dried cannabis biomass and total quarterly revenue of only $61,000.[36]

Lastly, the 4Q19 Transaction lacked commercial substance because it was not a bona fide sale in the ordinary course of

---

[32] ¶¶ 131–134, 138, 141–142, 145–146.

[33] ¶¶ 114–115, 128.

[34] ¶ 129.

[35] ¶ 237. As discussed *infra* at 24 n.106, plaintiffs allege that Aurora took back the *unprocessed* biomass, not extract, from Radient.

[36] ¶¶ 228, 236. Especially so because producers typically require down payments and often payment within about 30 days. ¶ 236.

business.[37] As the SAC makes plain, Radient did not possess the financial wherewithal to pay for the 4Q19 Transaction and the parties entered into the MSA to account for such a transaction. Moreover, there was no plausible business reason for Radient to purchase $21.7M of biomass in June 2019, particularly when: (i) Radient's extraction technology capability was very limited; (ii) the potency of cannabis biomass diminishes over time, limiting its shelf life; and (iii) cannabis oversupply was then resulting in a steady decline in its price.[38]

In early 2019, it was readily apparent to defendants, with access to Radient's material confidential information, that Radient's ability to process biomass was very limited and that any potential additional processing capabilities were not expected to be complete until *late 2020*.[39] Former Radient operational employees familiar with the 4Q19 Transaction provide compelling support for Radient's inability to process $21.7M of biomass in June 2019. FE 1 described the 4Q19 Transaction as "outrageous" and "abnormal," stating that Radient's operating

---

[37] ¶ 130.

[38] ¶ 122; *see also* ¶ 252 (Wiggins: "I would need to hear a VERY compelling story to understand why RTI purchased +$21 million biomass and then purchased $4 million more, when they were strapped for cash, so far in advance of sales, in a market where they could buy biomass today at a cheaper rate than in June 2019[.] I am deeply puzzled by the decision making at RTI.").

[39] ¶ 121.

plant lacked capacity to process that massive volume.[40] FE 2 stated that by May 2019, Radient's extraction process was merely in a testing phase and still not a "validated process" when he left later that year.[41]

Because Radient's extraction technology could not process $21.7M of cannabis biomass in the summer of 2019, FE 2 stated it made "no sense" for Radient to make such a large biomass purchase rather than a series of purchases over time, particularly because Radient was cash-strapped and the yield would diminish over time.[42]

FE 3 stated "the vast majority, my understanding was going to be sold right back to Aurora."[43] FE 3 further noted, "we were just hemorrhaging cash so it was always going to be a turnaround deal because we were never going to be able to pay cash for $21 million of cannabis that we hadn't processed yet without lining up any other customers yet."[44]

Because the 4Q19 Transaction lacked commercial substance, the recognition of revenue on it violated IFRS 15. Nonetheless, defendants fraudulently caused Aurora to record revenue on the

---

[40] ¶ 123.

[41] ¶ 126.

[42] *Id.*

[43] ¶ 133.

[44] ¶ 134.

faux sale that Radient later returned to Aurora, which Radient itself recorded as a sale.[45]

**2.    Collection on the 4Q19 Transaction was improbable.**

In addition to lacking commercial substance, Aurora's recognition of revenue on the 4Q19 Transaction violated IFRS 15 because, armed with material confidential information about Radient, defendants knew, or recklessly ignored, that Radient's ability to pay for the 4Q19 Transaction was improbable.[46] Pursuant to IFRS 15, collection of the sales price by the seller must be probable before revenue is recognized.[47]

Nonetheless, Aurora, in violation of IFRS 15, falsely and misleadingly recognized and reported $21.7M in revenue on the 4Q19 Transaction when collection of the sales price was improbable. Thereafter, in its financial statements for the quarter ended September 30, 2019, Aurora, in an attempt to mask the impropriety of the 4Q19 Transaction, issued the following false and misleading statement of fact: "[a]ll outstanding wholesale accounts receivable as at June 30, 2019 [*i.e.*, the 4Q19 Transaction] were collected by November 13, 2019."[48] This

---

[45] ¶ 132. FE 4 noted that the funds from Radient's "sale" of cannabis back to Aurora during the March 2020 quarter had not been received from Aurora as of May 2020—Radient's bank balance was "not over $1 million." ¶ 137.

[46] ¶ 151; *see also supra* at 6-8.

[47] ¶ 148.

[48] ¶ 159.

statement was false because Radient was unable to——and never did——pay for the 4Q19 Transaction.[49]

### 3. Aurora failed to disclose the related-party nature of the 4Q19 Transaction.

In furtherance of their attempt to avoid scrutiny, and in violation of IFRS, defendants failed to disclose the related-party nature of the 4Q19 Transaction.[50] Under IFRS, such disclosures are necessary because, *inter alia*, related parties may enter into transactions that unrelated parties would not or at different prices.[51] Related parties include an entity that possesses significant influence over an investee entity.[52]

Aurora had the ability to exert significant influence over Radient at the time the parties entered into the 4Q19 Transaction.[53] In fact, Radient, in its financial statements for the year ended March 31, 2020, conceded as much——"[Radient] has

---

[49] ¶ 252; *cf*. MTD at 29.

[50] ¶ 163.

[51] ¶ 161. According to IFRS, related-party transactions involve a transfer of resources, services, or obligations between a reporting entity and a related party, regardless of whether a price is charged. ¶ 160 n.19.

[52] *Id.*; 17 C.F.R. § 229.404; FASB ASC 850-10-50 ("related parties" include "other parties that can significantly influence the management or operating policies of the transacting parties or that have an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests.").

[53] ¶¶ 117-120, 162, 232, 236, 272.

determined that a related party relationship with Aurora exists as at March 31, 2020 through their ability to exert significant influence over [Radient]."[54] It is reasonable to infer that a related-party relationship existed at the time of the 4Q19 Transaction because of Aurora's ownership interest in Radient and its representation on Radient's board.[55]

As Radient disclosed, "Aurora and its affiliates," because of Aurora's power within Radient, had "access to material confidential information respecting [Radient]." In fact, Aurora's power over Radient at the time the parties entered into the 4Q19 Transaction was such that Radient disclosed, for the fiscal year ended March 31, 2020, "the future of [Radient] would be uncertain and [Radient's] business and financial condition may suffer," if Aurora were to transfer a substantial portion of its ownership interest to a third party.[56]

**B.   Despite a saturated cannabis market and limited stores, defendants misrepresented that Aurora's profitability was imminent because it was secretly utilizing a sham transaction to materially improve its earnings.**

Around the time Aurora orchestrated its sham transaction with Radient, statistics from Health Canada showed a "total cannabis market size in Canada that falls below the size of the

---

[54] ¶ 162.

[55] ¶¶ 118–119. Indeed, at the time of the 4Q19 Transaction, Aurora owned an even larger share of Radient's stock. *Id.*

[56] ¶ 119.

production goals of Aurora Cannabis alone."[57] Aurora told investors otherwise. And defendants were also aware that Ontario and Quebec——with two-thirds of Canada's population——authorized a miniscule number of stores in their provinces, creating a bottleneck for an oversupplied product.[58]

Aurora misled investors throughout the Class Period with statements regarding imminent positive earnings as it planned and executed its sham transaction with Radient, *e.g.*:

- January 8, 2019 press release, which provided EBITDA guidance to investors for the first time, forecasting "*sustained positive EBITDA beginning in Fiscal Q4 2019*" (then just one quarter away) based upon defendants' assessment of "strong current and future anticipated demand," and "sustained strong demand."[59]

- February 11, 2019 earnings call, during which CCO Battley announced that "[t]o address the continued strong market demand" and "massive shortage of legal regulated cannabis" Aurora was "ramping up production rapidly"; CFO Ibbott added Aurora was "very comfortable in reiterating" the prior positive EBITDA guidance because of "the continued very strong demand for our products"; and CEO Booth pointed to "awesome demand" causing him to "lose sleep over our ability to supply" the market, with "at least 5 years before we have an oversupply situation."[60]

- May 14, 2019 press release, reiterating "Aurora is well positioned to achieve positive EBITDA beginning in fiscal Q4 2019" (*i.e.*, the current quarter);[61] its MD&A for the quarter again stating, "*we believe that there will be a significant shortage of regulated, quality-controlled cannabis*" and "*continue[] to construct purpose-built*

---

[57] ¶ 65; *see also* ¶¶ 60-87.

[58] ¶ 89; *see also* ¶¶ 88-103.

[59] ¶ 181.

[60] ¶¶ 186-189.

[61] ¶ 194.

*facilities...to meet market demand*."[62]

- May 15, 2019 earnings call, where Battley stated he was "happy to say that we are *still tracking for positive EBITDA in this quarter*," reiterating "our view of the need for capacity, first thing is that, you're right, *the market is undersupplied in Canada*," therefore "we see continued strong demand" and "*we don't see any shortage anytime soon*,"[63] with Booth adding his refrain——"if there's one thing I lose sleep about [it is] our ability to supply the global demand for cannabis."[64]

- June 13, 2019 interview wherein Battley responded to the question of potential cannabis oversupply thusly: "*I'm not worried about it*," and "*[a]s long as you have an undersupplied market, which we have right now in Canada,* it is very hard to evaluate market strategy because you're selling all you can produce."[65]

- August 6, 2019 press release, noting the "*Company continues to track toward positive adjusted EBITDA, and in particular adjusted EBITDA from cannabis operations*."[66]

- August 23, 2019 interview of Battley wherein he claimed that Aurora would be "pretty darn close" to where "analysts have anticipated," given its long-standing claims of positive EBITDA.[67]

In addition, defendants' statements regarding cannabis supply, demand, and retail stores were patently unreasonable in light of publicly available information, and were only made because defendants knew they were planning the 4Q19 Transaction to reach EBITDA positivity. Thus, defendants' EBITDA projections

---

[62] ¶ 195.

[63] ¶ 196.

[64] ¶ 197.

[65] ¶ 202.

[66] ¶ 205. The 4Q19 had ended five weeks earlier.

[67] ¶ 207.

lacked a reasonable basis.[68] Of course, defendants did not disclose that Aurora's financial projection was knowingly false and misleading by virtue of the 4Q19 Transaction and that its ability to generate positive EBITDA was materially impaired by cannabis oversupply and a small number of retail stores.[69]

**C.    Aurora's true financial condition is belatedly revealed and the risk associated with Aurora's undisclosed sham transaction with Radient and other false and misleading statements materializes.**

On September 11, 2019, following execution of the 4Q19 Transaction, Aurora disclosed in its Q4 results an unexpected adjusted EBITDA *loss of $11.7 million*.[70] Analysts noted that defendants "even miss[ed] preliminary revenue guidance provided over 35 days *after* the quarter closed."[71] Knowing that the 4Q19 Transaction was a one-time affair, Ibbott cautioned against expecting another bulk sale "of the magnitude" of biomass that it achieved with Radient that quarter——yet another false and

---

[68] Although certain facts about oversupply and retail limits were publicly available, defendants' statements to the contrary concealed and obfuscated the truth from investors. *See, e.g., Dartell v. Tibet Pharms., Inc.*, 2016 WL 718150, at *6 (D.N.J. Feb. 22, 2016) ("press release entrenched the alleged fraud by stating that the rumors were 'untrue and incorrect' and were the result of a completely 'mistaken report'"); *see also* Pl. Mem. in Opp. to Def. Mot. to Dismiss the Am. Compl., Dkt. 35, at 31-33.

[69] ¶ 208.

[70] ¶ 209.

[71] ¶ 221.

misleading statement.[72] In response, Aurora's stock declined more than 9%.[73]

On October 9, 2019, Wiggins published his first analysis of the 4Q19 Transaction.[74] In response, Aurora's stock price fell 9.5%, from $49.32 on Oct. 9 to $44.64 the next day. On October 17, 2019, *Yahoo Finance Canada* reported on Wiggins' analysis, providing comment from Radient and Aurora, and further insight from Wiggins.[75] In response, Aurora's stock price fell 5.4%, from $46.68 on Oct. 17 to $44.16 the next day.[76]

On November 14, 2019, Aurora disclosed a halt of activity at the *same two production facilities* it touted progress on just *five weeks earlier*.[77] And defendants *for the first time* admitted that the lack of retail stores would hurt revenue, though claiming to "continu[e] to monitor the forecast balance of supply and demand."[78] Booth finally admitted "provinces were oversupplied" but claimed the "drop in cannabis sales . . . *was*

---

[72] ¶ 213.

[73] ¶ 223.

[74] ¶¶ 227-234.

[75] ¶¶ 235-237.

[76] Yahoo Finance, Aurora Cannabis Inc. (ACB), https://finance.yahoo.com/quote/ACB/history. (Aurora stock price on Oct. 9-10 and 17-18, 2019). "[T]he district court may take judicial notice of well-publicized stock prices." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000).

[77] ¶¶ 225; 238.

[78] ¶ 241.

*anticipated*."[79] In response, Aurora's stock price fell 17%.[80]

Aurora's stock price then fell 10% on December 23, 2019, on news that Battley had been forced out.[81] On January 6, 2020, it was revealed that Aurora had listed for sale its Exeter, Ontario facility; analysts connected the move as implying that large writedowns were ahead.[82] Aurora's price fell 10% in response.[83] Finally, on February 6, 2020, investors learned that: (a) Booth was being replaced; (b) 500 positions would be eliminated; and (c) asset impairments and goodwill write-downs could total $1 billion——Aurora's stock fell 22% over the next two days.[84]

### III.   ARGUMENT

Plaintiffs sufficiently allege, under Section 10(b): (1) a material misrepresentation or omission by defendants; (2) scienter; (3) a connection with the purchase or sale of securities; (4) reliance; (5) economic loss; and (6) loss causation.[85] Defendants seek dismissal for failure to allege a material misrepresentation or omission, scienter, and loss

---

[79] ¶ 243.

[80] ¶ 250.

[81] ¶¶ 254-256.

[82] ¶ 257.

[83] ¶ 258.

[84] ¶¶ 259-261.

[85] *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014).

- 19 -

causation.[86] The SAC sufficiently pleads each.

On a Rule 12(b)(6) motion, a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."[87] Here, plaintiffs provide "enough facts to state a claim to relief that is plausible on its face."[88] Plaintiffs also both plead "with particularity the circumstances constituting fraud"[89] and specify the "statement[s] alleged to have been misleading, [and] the reason or reasons why[.]"[90]

**A.    Defendants made several actionable, materially false and misleading statements and omissions not protected by any safe harbor.**

**1.    Defendants' statements regarding Aurora's financial condition and projections were knowingly false and misleading——concealing as they did a massive sham transaction and eventual improper revenue recognition.**

In their SAC, plaintiffs "specify each allegedly misleading

---

[86] MTD at 19.

[87] *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 242 (3d Cir. 2015); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007). Defendants improperly rely on Radient's SEC filings that are not referenced in the SAC for the truth of the statements themselves. MTD at 10-13; *City of Sterling Heights Police & Fire Ret. Sys. v. Kohl's Corp.*, 2015 WL 1478565, at *4 (E.D. Wis. Mar. 31, 2015) (even though SEC-filed documents are judicially noticeable, "the content of the documents cannot be used for the truth of the matters asserted").

[88] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[89] Fed. R. Civ. P. 9(b).

[90] 15 U.S.C. § 78u-4(b)(1); *see also Tellabs,* 551 U.S. at 321.

statement [and] the reason or reasons why the statement is misleading."[91] Under the PSLRA, a complaint need only allege facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission."[92] The standard for pleading falsity is plausibility.[93] Though under no general obligation to disclose all material information, "disclosure is required when necessary to make statements made, in the light of the circumstances in which they were made, not misleading."[94]

Defendants' statements are plainly material and created a "substantial likelihood that the disclosure of the omitted fact [of the sham transaction] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information[.]"[95] Each of the identified statements was false and misleading by virtue of omitted information, in particular the 4Q19 Transaction. On January 8, 2019——when Booth sat on Radient's board——Aurora touted "strong current...demand"

---

[91] *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 259 (3d Cir. 2009); *see supra* at 15-16.

[92] *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004).

[93] *In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, at *10 (D.N.J. Aug. 28, 2017).

[94] *Fergus v. Immunomedics, Inc.*, 2020 WL 2832565, at *3 (D.N.J. June 1, 2020).

[95] *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). The SAC pleads the materiality of the misstatements (¶¶ 164-169), and defendants do not challenge the SAC on materiality grounds.

for cannabis and for the first time told investors that Aurora was "position[ed]" to "achieve sustained positive EBITDA beginning in [4Q19]," less than six months away.[96] This guidance was false and misleading, both lacking a reasonable basis and premised upon defendants' plan to engage in a sham sale.[97]

Given defendants' orchestration and execution of the 4Q19 Transaction, their continued statements regarding Aurora's financial prospects and consumer demand were also knowingly false and misleading.[98] These statements failed to disclose known truths, including that Aurora's EBITDA projections were premised on the 4Q19 Transaction, the oversupplied cannabis market, and store limitations—as evidenced, in part, by the very decision to execute the 4Q19 Transaction. Defendants continued to issue false and misleading statements and omissions when announcing the negative adjusted EBITDA of $11.7M for 4Q19[99] and commenting on quarterly performance, including their statements regarding the "approximately $20 million is [sic] wholesale bulk cannabis revenue" for the quarter,[100] which included the improperly recorded 4Q19 Transaction.

---

[96] ¶ 181.

[97] ¶¶ 108, 125.

[98] *See supra* at 15-16.

[99] ¶ 165.

[100] ¶ 213.

Defendants respond to these allegations by supplying their own competing narrative: a lengthy detour arguing that plaintiffs allege no actionable misstatements because the 4Q19 Transaction allegations are mere "unsupported speculation."[101] First, the Court must accept all well-pled factual allegations in the SAC as true. The standard for pleading falsity is plausibility and courts cannot weigh inferences of falsity to determine which inference is more likely.[102] The SAC adequately alleges the false and misleading statements.

Second, defendants cite irrelevant authority for the proposition that *some* so-called "reciprocal" business agreements are permitted.[103] But the bona fides of any such arrangement are fact-specific, and the allegations *here* support a round-trip sale with "both legs...washing each other out."[104]  Third, defendants strangely rely on Wiggins' "speculation" (as defendants themselves characterize it)[105] that extracts—not

---

[101] MTD at 21-31 (attempting to explain why Radient's lack of customers, cash-flow problems, and paucity of revenue "does not give rise to an inference of anything nefarious").

[102] Such weighing is only proper with respect to scienter. *See Tellabs*, 551 U.S. at 314.

[103] MTD at 21-22.

[104] MTD at 22 (quoting *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 179 (4th Cir. 2007)).

[105] MTD at 18 ("Wiggins . . . repeatedly emphasized that his view about the substance of the transactions . . . were his speculation and opinion.").

biomass⸺were sold back to Aurora by Radient. But this is plainly a question of fact fit for resolution only at summary judgment.[106] In addition, defendants' factual claim that "[t]here is nothing unusual . . . about a 'Bill and Hold' agreement" is a red herring;[107] there is nothing in the record about the 4Q19 Transaction being a "Bill and Hold" arrangement.

Alternatively, defendants contend that under IFRS 15 even if Aurora sold biomass to Radient and later repurchased the same biomass from Radient, "Aurora still would have appropriately recognized the sale as revenue under the circumstances alleged here."[108] Their argument is specious. The SAC alleges the 4Q19 Transaction violated IFRS by setting forth numerous factual

---

[106] MTD at 22 ("there was no round-trip sale at all...Aurora sold *biomass* to Radient...Aurora separately purchased *extracted products* from Radient...")(emphasis in original). Defendants disingenuously argue that plaintiffs contradict themselves and allege both that Aurora engaged in a round-trip sale of cannabis biomass *and also* that Aurora purchased processed biomass extracts from Radient. MTD at 13-15, 22. That is incorrect. Plaintiffs only allege a round-trip sale of cannabis *biomass*: biomass transferred by Aurora to Radient and then returned to Aurora. ¶¶ 7, 109, 131-134, 141-144. Defendants wrongly attribute to plaintiffs the speculation by analyst Wiggins that *extracts* were sold back to Aurora⸺and they concede as much: "Wiggins...forthrightly and repeatedly emphasized that his view about *the substance of the transaction...were his speculation and opinion*." MTD at 18. Unlike plaintiffs, Wiggins was not privy to the investigation by plaintiffs' counsel, including the benefit of learning from former Radient employees that the biomass could not be and was not processed and that no payment was made by either party on either end of the sham transaction.

[107] MTD at 26.

[108] *Id*. at 22-23.

allegations demonstrating: (i) why and how it lacked commercial substance, and (ii) Radient's ability to pay for it was improbable. Contrary to defendants' argument, the SAC alleges that Aurora never relinquished control of the biomass and Radient was "obliged to resell" the biomass back to Aurora.[109]

Defendants' argument that Aurora and Radient were not related parties[110]——though Radient admitted they were——fails in light of the well-pled facts raising a plausible inference to the contrary.[111] As defendants note, a related-party relationship exists where an entity "is controlled or subject to significant influence by a person who is considered to be a related party to either company."[112] The SAC alleges Aurora's significant influence over Radient: (1) Aurora owned approximately 14% of Radient's stock during the Class Period; (2) Aurora's CEO Booth and COO Cleiren alternately sat on Radient's board; (3) Aurora was Radient's largest supplier; and (4) Aurora was likely Radient's largest creditor.[113] Radient's admission that its

---

[109] MTD at 23; ¶ 141. Thus, defendants' argument that "Plaintiffs do not allege that Aurora had the ability to force Radient to purchase biomass from Aurora" is inapt. MTD at 27.

[110] MTD at 29-31.

[111] *See supra* at 13-14.

[112] MTD at 29. IFRS defines significant influence as the power to participate in, but not control, the financial and operating policy decisions of the investee. ¶ 119 n.11.

[113] ¶¶ 118, 272. Defendants ignore the latter two factual allegations. *Cf*. MTD at 30. Indeed, in its financial statements

"future . . . would be uncertain and [its] business and financial condition may suffer" if Aurora transferred all, or a substantial portion, of its ownership interest in Radient to a third party validates Aurora's significant influence.[114]

Defendants misplace reliance on *Omnicare*, arguing the SAC fails to allege defendants did not honestly believe that Aurora and Radient were not related.[115] But an issuer must have "conducted a meaningful inquiry and ha[ve] a reasonable basis upon which to make such an assertion" of opinion.[116] Assuming *arguendo* that statements on related-party status are opinions, the SAC plausibly alleges that defendants lacked a reasonable basis to conclude that the two were not related. This is buttressed by Radient's own conclusion of relatedness.

### 2. Defendants' false and misleading statements and omissions are not protected by any safe harbor.

Defendants do not present argument supporting any safe harbor for their several false and misleading statements and omissions in the context of the 4Q19 Transaction. The PSLRA's safe harbor applies only if statements are both forward-looking

---

for the year ended March 31, 2020, Radient reported total revenue of $18.4 million, *98% of which*, or $18.1 million, were from "sales" made to Aurora. ¶ 132.

[114] ¶ 119. Still, related-party status is not determinative of the question whether the 4Q19 Transaction is sufficiently pled.

[115] *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2015); MTD at 31.

[116] *Tongue v. Sanofi*, 816 F.3d 199, 214 (2d Cir. 2016).

and "accompanied by meaningful cautionary statements" or "immaterial"[117] or not "made with actual knowledge . . . that the statement was false or misleading."[118] Here, no cautionary statement regarding sham transactions or improperly recognized revenue was given; the omission of the 4Q19 Transaction was plainly material; and the identified statements were made with actual knowledge of the 4Q19 Transaction. Thus, defendants fail this safe harbor test on all fronts.

First, defendants' material *omissions* regarding the 4Q19 Transaction are categorically unprotected——"omissions of existing facts or circumstances are not forward-looking, and thus do not qualify for safe harbor protection."[119] Second, omissions of existing facts in projections receive no safe-harbor protection where the omitted facts show that defendants lacked a reasonable basis for making those projections.[120]

Lastly, several of the materially misleading statements are simply not forward-looking, but instead are then-current

---

[117] 15 U.S.C. § 78u-5(c)(1)(A)(i).

[118] 15 U.S.C. § 78u-5(c)(1)(B)(i).

[119] *In re ViroPharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 471 (E.D. Pa. 2014) (citing cases).

[120] *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427 (3d Cir. 1997) ("[I]f a company voluntarily chooses to disclose a []projection, that disclosure is susceptible to attack on the ground that it was issued without a reasonable basis.").

- 27 -

statements regarding then-existing conditions and then-existing confidence in profitability, all made with knowledge of the design to engage in the 4Q19 Transaction, *e.g.*:[121]

- Jan. 8, 2019 press release: giving positive EBITDA guidance based upon "*strong current* and future anticipated *demand*" and "*sustained strong demand.*"[122]

- Feb. 11, 2019 earnings call (Battley): "[t]o address *the continued strong market demand*" and "*massive shortage of legal regulated cannabis*" Aurora was "ramping up"; (Booth) "*awesome demand*" causing him to "*lose sleep* over our ability to supply" the market.[123]

- May 14, 2019 release: Aurora is "*well positioned* to achieve positive EBITDA" and in its MD&A affirming it would "*continue[] to construct purpose-built facilities...to meet market demand.*"[124]

- May 15, 2019 earnings call (Battley): "the *market is undersupplied in Canada*...we see *continued strong demand*" while Booth "*lose[s] sleep* about [Aurora's] ability to supply the global demand for cannabis."[125]

- June 13, 2019 interview (Battley): "not worried" about oversupply "[a]s long as you have an undersupplied market, *which we have right now* in Canada...."[126]

As to any remaining misstatements, they fail the safe

---

[121]   *In re Cambrex Corp. Sec. Litig.*, 2005 WL 2840336, at *7 (D.N.J. Oct. 27, 2005) ("the forward-looking statement protection disclosure is not available for a representation of present fact because the statement is misleading when made").

[122] ¶ 181.

[123] ¶¶ 186-189.

[124] ¶¶ 194-195.

[125] ¶¶ 196-197.

[126] ¶ 202; *see also* ¶ 214 (re: future wholesale deals like the 4Q19 Transaction: "First thing is, *the demand is actually there for wholesale product.*"); ¶ 159 ("[a]ll outstanding wholesale accounts receivable as at June 30, 2019 [*i.e.*, the FQ4 2019 Transaction] *were collected* by November 13, 2019.").

harbor test for lack of meaningful cautionary statements, and because the statements were made with actual knowledge of their falsity, particularly in light of the 4Q19 Transaction.

**B.    Plaintiffs' allegations regarding the 4Q19 Transaction, supported by statements from former Radient employees with knowledge, give rise to a strong inference of scienter.**

Plaintiffs allege facts sufficient to create a "strong inference" of scienter that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."[127] As cautioned in *Tellabs*, "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'"[128]

Scienter can "be demonstrated by pleading an extreme departure from the standards of ordinary care,"[129] where plaintiffs "allege facts giving rise to a strong inference of either reckless or conscious behavior."[130] A plaintiff "must sufficiently plead defendants' knowledge of facts or access to information contradicting their public statements[,] [*i.e.*, that] defendants knew or, more importantly, should have known

---

[127] *Tellabs,* 551 U.S. at 322, 324.

[128] *Id*. at 324; *Sawabeh Info. Servs. Co. v. Brody*, 832 F. Supp. 2d 280, 295 (S.D.N.Y. 2011) ("tie...goes to the plaintiff").

[129] *Fan v. StoneMor Partners LP*, 927 F.3d 710, 718 (3d Cir. 2019).

[130] *Avaya*, 564 F.3d at 267.

that they were misrepresenting material facts related to the corporation."[131] Though not required, allegations of "motive and opportunity" may strengthen the inference, as they do here.[132]

The allegations here, supported by statements from former Radient employees familiar with its operations and the 4Q19 Transaction, as well as Radient's own admissions, more than suffice to create such an inference.

### 1. Plaintiffs sufficiently allege a strong inference of defendants' conscious misbehavior and recklessness.

Plaintiffs sufficiently allege defendants' conscious misbehavior and recklessness. Defendants' orchestration and execution of a sham transaction with an affiliated entity over which Aurora possessed significant influence are, by definition, a product of conscious misbehavior. Defendants deny the 4Q19 Transaction was a sham. They do not, and cannot, deny that, as pled, Aurora's accounting and reporting of the 4Q19 Transaction violated applicable accounting standards in numerous respects.

Defendants made an "extreme departure from the standards of ordinary care"[133] by executing a fraudulent sale of cannabis biomass during the Class Period. As alleged in the SAC, defendants, with access to material confidential information

---

[131] *Monk v. Johnson & Johnson*, 2011 WL 6339824, at *8 (D.N.J. Dec. 19, 2011).

[132] *Avaya*, 564 F.3d at 277.

[133] *Id*. at 267 n.42.

about Radient by dint of Aurora's ownership interest and seat on Radient's board, knew that Radient could not, and did not, pay for or process the $21.7M biomass from Aurora.[134] The alleged facts were certainly "either known to the defendant[s] or...so obvious that the[y]...must have been aware of it."[135]

Additionally, courts have drawn the inference that with respect to facts critical to a company's core business, their "knowledge may be imputed" to a company's key corporate officers.[136] The magnitude of the 4Q19 Transaction was so significant to Aurora's core operation of selling cannabis that such knowledge should be imputed,[137] particularly when reaching adjusted EBITDA positivity was a matter that defendants repeatedly spoke to investors about during the Class Period.[138]

Plaintiffs also allege particularized allegations as to

---

[134] ¶ 118.

[135] *Avaya*, 564 F.3d at 267 n.42; *Monk*, 2011 WL 6339824, at *8 (scienter pled via "*access* to [contradictory] information").

[136] *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001); *see also In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *17 (D.N.J. Dec. 6, 2018).

[137] ¶ 42. Knowledge of widely reported, massive cannabis oversupply and severe retail constraints is also imputed to defendants under the core operations doctrine. In fact, Aurora acknowledged that management "monitor[s] the forecast balance of supply and demand in the . . . cannabis markets[.]" ¶ 241.

[138] ¶¶ 181, 188, 194, 196, 205, 207; *Gauquie v. Albany Molecular Rsch., Inc.*, 2016 WL 4007591, at *2 (E.D.N.Y. July 26, 2016) ("Actively communicating with the public about [an] issue demonstrates defendants' sensitivity to it" and supports the inference they knew information contradicting such statements).

motive: Aurora effectuated five acquisitions during the Class Period financed with stock that defendants artificially inflated.[139] "Courts have found sufficiently alleged motive to mislead investors by artificially inflating the company stock price where the acquisitions were at least partially funded by the company stock."[140] Not until the month after these deals were completed did defendants begin to disclose the truth about the misstatements and omissions alleged in the SAC.[141] Absent the inflation in Aurora's share price, these deals could not have been completed on such favorable terms.[142]

### 2. Inferences excusing defendants' conduct are not more compelling than the inference of scienter—particularly in light of witness allegations regarding the 4Q19 Transaction.

The analysis, according to *Tellabs*, is this: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"[143] Here, plaintiffs'

---

[139] ¶ 274.

[140] *In re Interpool, Inc. Sec. Litig.*, 2005 WL 2000237, at *10 (D.N.J. Aug. 17, 2005); *accord Hull v. Glob. Dig. Sols., Inc.*, 2017 WL 6493148, at *20 (D.N.J. Dec. 19, 2017).

[141] ¶ 274.

[142] Defendants do not dispute that plaintiffs' motive allegations are probative of scienter, and have therefore conceded the argument at this stage. *See, e.g., Thomas v. Roach*, 165 F.3d 137, 145 (2d Cir. 1999) (argument is waived unless a party raises it in its opening brief).

[143] 551 U.S. at 326.

allegations raise a strong inference that defendants acted, at the very least, recklessly in choosing to record and report $21.7M in revenue on the 4Q19 Transaction.

Defendants do not propose a more compelling inference——they simply deny they engaged in a sham transaction and argue the statements by FEs should be ignored. Their argument that Radient's employees "cannot possibly have had meaningful personal knowledge about Aurora's accounting for revenues," misses the point.[144] The FEs held positions that provided them with direct knowledge of underlying facts about the 4Q19 Transaction that speak to why Aurora's accounting for it violated IFRS and was wholly improper.[145]

Defendants' absolutist position that only witnesses employed by a defendant can be considered in support of scienter allegations has no support in law. None of the cases defendants rely upon stand for that radical proposition——quite the opposite.[146] In *Chubb*, the Third Circuit noted that "the PSLRA is silent regarding the sources of a plaintiff's facts."[147] The court went on to hold that "so long as plaintiffs supply sufficient facts to support their allegations" they can "meet

---

[144] MTD at 15-16.

[145] *See supra* at 7-8.

[146] MTD at 33-34.

[147] 394 F.3d at 147.

- 33 -

the pleading requirement" simply "by providing sufficient documentary evidence and/or a sufficient description of the personal sources of the plaintiff's beliefs."[148] There is no *further* requirement that witnesses *under all circumstances* must have been employed by the defendant or had conversations with those who were.[149]

Defendants put forth several hypothetical, mutually exclusive, and fact-specific alternative explanations for the transaction*, to wit*, perhaps it was mere reciprocal dealing,[150] or maybe "Aurora sold biomass to Radient" and "separately

---

[148] *Id.* The underlying facts in *Chubb* as it concerns confidential witnesses ("CWs") are inapposite. There, plaintiffs relied primarily on low-level branch employees to support a claim "concerning Chubb's business on a national scale," and "fail[ed] to aver...when any of them were employed by Chubb," much less "how any of these former employees had access to such information." *Id.* at 147-48.

[149] The balance of cases relied upon by defendants are easily distinguished, mainly for failures by plaintiffs to rely upon sufficiently relevant witnesses, inadequate identification of the respective CWs' sources of knowledge, and/or the timing and relevance of the information acquired. *E.g.*, *Nat'l Junior Baseball League v. PharmaNet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 538 (D.N.J. 2010)(agreeing with defendants that "none of these low- and mid-level operational employees worked in [the] finance department..." or "was privy to any information relevant to Plaintiff's claims"); *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 244-246 (3d Cir. 2013) (discounting CW statements for insufficient basis of knowledge and "little more than generalized allegations"); *In re Audible Inc. Sec. Litig.*, 2007 WL 1062986, at *10-*11 (D.N.J. Apr. 3, 2007)(finding claims by two CWs insufficient to impute knowledge of wrongdoing to defendants).

[150] MTD at 21.

purchased extracted products from Radient,"[151] or perhaps "Aurora sold and then repurchased biomass" but did so without a "right to repurchase,"[152] or maybe a "Bill and Hold" agreement was reached, explaining why Aurora never actually gave Radient the biomass for processing.[153] Such guesswork cannot be accepted as true and defendants' speculations hardly create a sufficiently countervailing inference. Viewed "holistically,"[154] plaintiffs' allegations more than provide for an inference of scienter here that equals the innocent explanations offered by defendants.

**C.    Plaintiffs adequately plead loss causation.**

Well-established "Third Circuit precedent instructs that loss causation is a fact intensive inquiry which is best resolved by the trier of fact."[155] Plaintiffs "need not satisfy the PSLRA or Rule 9(b)'s heightened pleading requirements to survive a motion to dismiss for loss causation; rather, a plaintiff need only satisfy the requirements of Rule 8(a)(2)."[156]

---

[151] *Id.* at 22.

[152] *Id.* at 23.

[153] *Id.* at 26.

[154] *Tellabs*, 551 U.S. at 326.

[155] *In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 450 (D. Del. 2014) (citing *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000)).

[156] *Nat'l Junior Baseball League*, 720 F. Supp. 2d at 558; *see also Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (at pleading stage, Rule 8(a) standard applies); *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 427 (3d Cir. 2007) (noting same).

As observed in *Dura*, there exists no "special further requirement in respect to the pleading of proximate causation or economic loss" beyond a "short and plain statement" that provides "fair notice" to defendants——just "some indication of the loss and the causal connection that the plaintiff has in mind."[157] Plaintiffs' allegations in the SAC provide defendants with abundant notice of "a causal connection between the material misrepresentation[s] and the loss[es]" they suffered.[158]

The SAC adequately pleads loss causation because: (1) the loss was foreseeable and caused by the materialization of the risk concealed by defendants' fraudulent statements; and (2) the market reacted negatively to corrective disclosures of the fraud.[159] On either ground, "the exposure of the alleged fraud need not occur in a single, all-encompassing corrective disclosure; instead, the truth can be revealed through a series

---

[157] 544 U.S. at 346-347.

[158] *Id.* at 341-42. Defendants claim that the Court previously found certain alleged disclosures to be inactionable. *See* MTD at 17, 37. The Court made no such finding.

[159] *De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at *39, n.37 (D.N.J. Dec. 31, 2018) (noting both the "materialization of the risk" and "corrective disclosure" theories for loss causation); *Wilmington Tr.*, 29 F. Supp. 3d at 450 ("where some or all of the risk is concealed by the defendant's misrepresentation or omission" and its materialization causes a loss, "courts have found loss causation sufficiently pled").

of partial corrective disclosures."[160]

Defendants mistakenly argue that absent an admission by Aurora of improperly "recognized revenue from its sale of biomass to Radient," Plaintiffs could not have suffered loss.[161] There is no such "mirror image" requirement for loss causation in this Circuit.[162] The 4Q19 Transaction and defendants' attendant misstatements regarding it and Aurora's financial results and prospects, constitute "undisclosed risk[s]" that materialized beginning in September 2019, when plaintiffs first began to suffer losses as a result of certain corrective, iterative disclosures.[163]

In fact, the manner in which the "misrepresentation[s] or omission[s] proximately caused the economic loss" alleged here is straightforward.[164] In early 2019, while Booth sat on Radient's board, defendants orchestrated and then executed the

---

[160] *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 655-56 (E.D. Pa. 2015).

[161] MTD at 36.

[162] *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 2011 WL 3444199, at *32 (D.N.J. Aug. 8, 2011) ("*Dura* and its progeny do not demand, as set forth above, that corrective disclosures be complete, or put differently be the 'mirror image' of the alleged fraud. As the Fifth Circuit observed, '[i]f a fact-for-fact disclosure were required to establish loss causation, a defendant could defeat liability by refusing to admit the falsity of its prior misstatements.'").

[163] ¶ 223; *McCabe*, 494 F.3d at 426.

[164] *McCabe*, 494 F.3d at 426.

4Q19 Transaction and inflated Aurora's stock as they misled investors with fraudulent predictions about Aurora's earnings.

Defendants' misrepresentations regarding Aurora's financial performance in 4Q19 were revealed, in part, on September 11, 2019, when defendants disclosed that Aurora missed its much-touted projection of positive adjusted EBITDA for 4Q19, *notwithstanding* the 4Q19 Transaction.[165] The damages to plaintiffs caused by defendants' misstatements regarding Aurora's revenue and earnings were first manifested with this disclosure and 9% decline in Aurora's stock price.[166]

Still, defendants did not disclose that Aurora's negative EBITDA for 4Q19 was in fact *approximately 47% understated*, thereby continuing to present a false and misleading picture of Aurora's finances.[167] Aurora's stock remained inflated through the period of later partial disclosures.[168] Each disclosure

---

[165] ¶ 209.

[166] ¶ 10. Defendants' argument that plaintiffs failed to plead why "market conditions, macroeconomic or industry factors" did not cause the stock decline is a non-starter. MTD at 38-39.  The law does not "impose such a pleading requirement on a securities fraud plaintiff" so plaintiffs need not "rule out the possibility that other market forces" caused the stock to decline. *Merck*, 2011 WL 3444199, at *31.

[167] ¶ 166.

[168] *Kux-Kardos v. VimpelCom, Ltd.*, 151 F. Supp. 3d 471, 476 (S.D.N.Y. 2016) ("loss causation may be premised on partial revelations that do not uncover the complete extent of the falsity of specific prior statements where the partial

caused additional harm to plaintiffs who paid an inflated price for the stock by virtue of the improper 4Q19 Transaction and the related false statements regarding Aurora's finances.

On October 9, 2019 and October 17, 2019, when Wiggins and *Yahoo Finance* respectively called into question the propriety of the 4Q19 Transaction, Aurora's stock price declined materially in response.[169] Defendants argue that "opinion articles based on publicly available information—such as those here—cannot support a finding of loss causation."[170] Defendants are wrong. In *In re Apollo Group, Inc. Securities Litigation*, the Ninth Circuit held that a "jury could have reasonably found that [securities analyst] reports following various newspaper articles were 'corrective disclosures' providing additional or more authoritative fraud-related information that deflated the

---

disclosure somehow reveals to the market that a defendant's prior statements were not entirely true").

[169] *See supra* at 18. Although the stock-price declines in response to the Wiggins and *Yahoo Finance* articles are not pled in the SAC, the nature of these articles as corrective disclosures is explicitly and extensively discussed in the SAC, *e.g.*, ¶¶ 227-237, and the price declines are judicially noticeable. *Ganino*, 228 F.3d at 166 n.8. Defendants even concede that "Aurora's stock price sometimes fell . . . around the time of Wiggins [sic] articles." MTD at 18. The Court may consider these price declines. *See Adams v. LexisNexis Risk & Info. Analytics Grp., Inc.*, 2010 WL 1931135, at *2 n.2 (D.N.J. May 12, 2010) (on a motion to dismiss, the court may consider materials that are "necessarily embraced by the pleadings."). If the Court requires, plaintiffs request leave to amend the SAC to plead these stock-price declines for purposes of loss causation.

[170] MTD at 4, 37.

stock price."[171] Here, Wiggins' articles were based on extensive analysis of myriad SEC filings by both Radient and Aurora, and revealed the suspicious nature of the 4Q19 Transaction. The cases defendants rely on are readily distinguished.[172]

**D.  Plaintiffs sufficiently allege Section 20(a) claims.**

Because plaintiffs have pled Section 10(b) claims against defendants, plaintiffs have pled Section 20(a) claims as well.[173]

## IV.  CONCLUSION

For the reasons argued, plaintiffs respectfully ask the Court to deny defendants' motion to dismiss.[174]

---

[171] 2010 WL 5927988, at *1 (9th Cir. June 23, 2010) (citing *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1058 (9th Cir. 2008) (later disclosure corrective when public initially "failed to appreciate [the] significance" of negative information); and *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 503 (9th Cir. 1992) (what market understands depends on "intensity and credibility" of information)).

[172] MTD at 37-38. In *In re Omnicom Group, Inc. Securities Litigation*, unlike here, "the use of the [allegedly fraudulent] transaction as an accounting method to remove losses from Omnicom's books was *known to the market a year before* [the Audit Committee Chair's] resignation. . . . All that the June 12 article stated was that [the] resignation was due to general concerns over an aggressive accounting strategy . . ." 597 F.3d 501, 511-12 (2d Cir. 2010). In *In re: Merck & Co., Inc. Securities Litigation*, the court rejected a purported corrective disclosure that consisted of a reporter "simply [doing] the math" using "minimal[] arithmetic complexity" on information disclosed two months earlier. 432 F.3d 261, 270-71 (3d Cir. 2005).

[173] *See Avaya*, 564 F.3d at 280.

[174] If the Court does grant defendants' motion to dismiss, plaintiffs request that the Court provide for leave to amend and file a Third Amended Complaint.

Dated: February 23, 2022      Respectfully submitted,

CARELLA, BYRNE, CECCHI, OLSTEIN,
BRODY & AGNELLO, P.C.


By _____/s/ James E. Cecchi_____
    James E. Cecchi
Lindsey H. Taylor
Donald A. Ecklund
5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
973/994-1744 (fax)
jcecchi@carellabyrne.com
ltaylor@carellabyrne.com
decklund@carellabyrne.com

*Local Counsel for Lead Plaintiffs*

Samuel H. Rudman
Alan I. Ellman
ROBBINS GELLER RUDMAN & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
aellman@rgrdlaw.com

Steve W. Berman
Shayne C. Stevenson
HAGENS BERMAN SOBOL
SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone: 206/268-9340
206/623-0594 (fax)
steve@hbsslaw.com
shaynes@hbsslaw.com

*Co-Lead Counsel for Lead Plaintiffs*

- 41 -

Brian Schall
SCHALL LAW FIRM
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: 310/301-3335
310/338-0192 (fax)
brian@schallfirm.com

*Additional Plaintiffs' Counsel*