# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re AURORA CANNABIS INC. SECURITIES LITIGATION<br><br>This Document Relates To:<br>  ALL ACTIONS | Case No. 2:19-cv-20588-JMV-JBC<br><br>Motion Date: April 4, 2022<br><br>**ORAL ARGUMENT REQUESTED** |

## DEFENDANTS' REPLY BRIEF
## IN SUPPORT OF THEIR MOTION TO DISMISS THE
## SECOND AMENDED CLASS ACTION COMPLAINT

Kevin H. Marino
John D. Tortorella
MARINO, TORTORELLA & BOYLE P.C.
437 Southern Boulevard
Chatham, NJ 07928-1488
Phone: 973-824-9300
Fax: 973-824-8425
kmarino@khmarino.com
jtortorella@khmarino.com

Stephen L. Ascher (*pro hac vice*)
Andrew J. Lichtman
JENNER & BLOCK LLP
919 Third Avenue
New York, NY 10022-3908
Phone: 212-891-1600
Fax: 212-891-1699
sascher@jenner.com
alichtman@jenner.com

Howard S. Suskin (*pro hac vice*)
Theo A. Lesczynski (*pro hac vice*)
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654-3456
Phone: 312-222-9350
Fax: 312-527-0484
hsuskin@jenner.com
tlesczynski@jenner.com

*Attorneys for Defendants*

**TABLE OF CONTENTS**

INTRODUCTION.................................................................................................1

ARGUMENT.......................................................................................................2

I.    **Plaintiffs Do Not Allege Any Actionable Misstatement or Omission** .................................................................................................2

     A.    Plaintiffs' Inconsistent and Conclusory Allegations Do Not Support That a Round-Trip Transaction Occurred .........................2

     B.    Plaintiffs Fail to Resurrect Previously Rejected Arguments Regarding Cannabis Oversupply and Lack of Retail Stores............8

     C.    Many of the Alleged Statements Are Protected by the Safe Harbor and Are Not Otherwise Actionable ....................................9

II.   **Plaintiffs Do Not Adequately Allege Scienter** ......................................10

III.  **Plaintiffs' Loss Causation Allegations Are Inadequate.**.....................12

CONCLUSION..................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adams Golf, Inc. Sec. Litig.*,
  381 F.3d 267 (3d Cir. 2004) ...............................................................................15

*In re Apollo Grp., Inc. Sec. Litig.*,
  No. 08-16971, 2010 WL 5927988 (9th Cir. June 23, 2010) ..............................15

*In re Audible Inc. Sec. Litig.*,
  No. CIV A 05-1027 JAG, 2007 WL 1062986 (D.N.J. Apr. 3, 2007) ..................6

*In re Campbell Soup Co. Sec. Litig.*,
  145 F. Supp. 2d 574 (D.N.J. 2001)....................................................................11

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)...........................................................................................13

*In re Gilead Sciences Securities Litigation*,
  536 F.3d 1049, 1053 (9th Cir. 2008) .................................................................15

*Institutional Invs. Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009) ........................................................................10, 12

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*,
  720 F. Supp. 2d 517 (D.N.J. 2010).....................................................................2

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
  834 F.3d 481 (3d Cir. 2016) ...........................................................................9, 10

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010) ..............................................................................14

*Roofer's Pension Fund v. Papa*,
  No. CV 16-2805, 2018 WL 3601229 (D.N.J. July 27, 2018) ...........................11

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016) ................................................................................8

*Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*,
  836 F.2d 173 (3d Cir. 1988) ..............................................................................14

**Statutes**

15 U.S.C. § 78u-5(c)(1) ................................................................................................9

## INTRODUCTION

The Second Amended Complaint should be dismissed for three independent reasons: (1) Plaintiffs fail to allege an actionable misstatement or omission; (2) Plaintiffs fail to allege a strong inference of scienter; and (3) Plaintiffs fail to allege loss causation.  Having already dismissed Plaintiffs' claims once, the Court should dismiss them again—this time with prejudice.

First, Plaintiffs' own allegations demonstrate that Aurora did not execute— let alone make an actionable misstatement about—a "round trip" sale.  Plaintiffs allege that Aurora sold one product to Radient (dried cannabis biomass), and that Radient later sold an entirely different product to Aurora (cannabis extracts). Plaintiffs now ask the Court to selectively ignore those allegations, but they provide no basis for doing so.

Second, Plaintiffs' scienter arguments do not meet the strict pleading standards of the PSLRA.  Plaintiffs do not point to any internal Aurora reports, documents, or communications whatsoever, let alone any that would support allegations of scienter.  Instead, they rely solely on former Radient employees who do not attribute any knowledge to anyone at Aurora.  Plaintiffs argue that Defendants have taken "an absolutist position that only witnesses employed by a defendant can be considered in support of scienter," but Defendants argue no such thing.  Rather, Defendants established that courts reject confidential witnesses who do not "claim[]

1

to have met, emailed with, spoken to, or otherwise heard or read anything by" the defendants. *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 555 (D.N.J. 2010).

Third, Plaintiffs fail to allege loss causation for several reasons. As an initial matter, Plaintiffs acknowledge that Aurora never made a corrective disclosure about Radient that is linked to a drop in Aurora's stock price. Plaintiffs nonetheless argue that they have suffered a loss because "Aurora's stock remained inflated." But the Supreme Court has confirmed that allegations of purchase-price inflation do not establish economic loss. In addition, Plaintiffs admit (as they must) that the Second Amended Complaint does not contain any allegations about stock-price drops following the articles published about the Radient transactions. But even if the Court were to take judicial notice of Plaintiffs' new allegations, Plaintiffs fail to explain how articles expressing a journalist's opinion about publicly available information can plead loss causation. The cases make clear that they cannot.

## ARGUMENT

### I.    Plaintiffs Do Not Allege Any Actionable Misstatement or Omission

#### A.    Plaintiffs' Inconsistent and Conclusory Allegations Do Not Support That a Round-Trip Transaction Occurred

Plaintiffs claim that Defendants have offered a "competing narrative" and a "hypothetical factual alternative[]," Opp. at 4, 23, but in fact it is Plaintiffs who rely on a selective and inconsistent reading of their own allegations. Defendants'

arguments are based on Plaintiffs' allegations and the documents Plaintiffs cite.

To briefly recap, Plaintiffs allege that the sale of extracts did not become legal until "Cannabis 2.0" in late 2019, SAC ¶ 97, and therefore it is hardly surprising that Radient's "extraction technology capability was limited and generated revenue of only $214,000 during the year ended March 31, 2019," *id.* ¶ 121.  In anticipation of legalization, Plaintiffs allege that "Radient's 2019 public disclosures" reflect "efforts to expand its manufacturing capability." *Id.* ¶ 121.  After alleging that "Radient may be pursuing extracted sales," *id.* ¶ 227, thus moving away from MSAs, Plaintiffs expressly allege that Aurora "has the ability to sell/purchase to/from Radient outside the tolling agreement," *id.* ¶ 233.  Thus, Plaintiffs' argument that "the fact that a sale took place *outside* the provisions of the MSA was a red flag" is inconsistent with Plaintiffs' own allegations.  Opp. at 9.

Plaintiffs' "round-trip" theory is also inconsistent with and unsupported by Plaintiffs' other allegations.  Plaintiffs allege that "Radient 'sold' approximately $18 million of cannabis *biomass* back to Aurora," SAC ¶ 132 (emphasis added), but the financial statements on which they rely do not say that Aurora purchased "biomass" from Radient.  MTD at 14.  Likewise, the Wiggins articles on which Plaintiffs rely repeatedly state that Aurora purchased "extract[s]" from Radient—not biomass. SAC ¶¶ 227-228, 232, 234, 237, 262, 272.  Thus, Plaintiffs' own allegations foreclose a "round-trip" sale of biomass.  Faced with that blatant inconsistency,

3

Plaintiffs argue that "Defendants wrongly attribute to plaintiffs the speculation by analyst Wiggins that extracts were sold back to Aurora." Opp. 24 n.106. But Plaintiffs cannot walk away from their own allegations, particularly given that their entire theory of the case is based on Wiggins's reporting.

Plaintiffs' additional arguments flow from the same selective reading of their allegations. For example, Plaintiffs argue that the transaction with Radient "lacked commercial substance" because Defendants "knew Radient did not have the ability to pay Aurora $21.7 million in June 2019." *Id*. at 6. In support of that allegation, Plaintiffs point to Radient's low revenue, *id.* at 6-7, but ignore their own claim that Radient had significant access to capital from investors, SAC ¶ 117-118, 121.

Plaintiffs also claim that Aurora "*never* paid for the biomass," but support that argument by reference to an allegation in the SAC that says no such thing. Opp. at 7 (citing SAC ¶ 149, which generally describes Radient's 2019 revenue and expenditures). Relatedly, Plaintiffs continue to argue that the following statement in Aurora's financials was false and misleading: "[a]ll outstanding wholesale accounts receivable as at June 30, 2019 were collected by November 13, 2019." *Id.* at 12. But Plaintiffs do not point to any documents or other specific facts in support of that allegation. Instead, Plaintiffs infer it was "false because Radient was unable to—and never did—pay for the 4Q19 Transaction," Opp. at 13. As explained above, such conclusory and inconsistent allegations fail to state a claim.

4

Likewise, Plaintiffs argue that the Radient transactions "lacked commercial substance" because "there was no plausible business reason for Radient to purchase $21.7M of biomass in June 2019, particularly when . . . Radient's extraction technology capability was very limited." Opp. 10. Again, this argument ignores Plaintiffs' allegations, including the legalization of extracts under Cannabis 2.0 and Plaintiffs' discussion of Radient's "efforts to expand its manufacturing capability." SAC ¶ 97, 121.

Plaintiffs cast Defendants' argument that "[t]here is nothing unusual—let alone fraudulent—about a 'Bill and Hold' agreement," MTD at 26, as a "red herring" because "there is nothing in the record about the 4Q19 Transaction being a 'Bill and Hold' arrangement," Opp. at 24. That Plaintiffs did not use the label "Bill and Hold" in the SAC is beside the point. Plaintiffs allege that "Aurora never relinquished control over the biomass it transferred to Radient on the F4 2019 Transaction," SAC ¶ 141—thus describing a Bill-and-Hold arrangement—and allege why such an arrangement makes sense here: because "Radient could not process [the biomass] in [its] current facility," *id.* ¶ 126. Plaintiffs cannot avoid the economic substance of their allegation by eschewing the label. Notably, Plaintiffs do not address the relevant accounting rule (IFRS 15.38(c)) or the legal authority Defendants cited, demonstrating there is nothing improper about such an arrangement. Opp. at 24.

Even under Plaintiffs' erroneous and unsupported assumption that Radient

5

sold back biomass, not extracts, Aurora still was entitled under IFRS 15 to recognize the revenue on its sale because Plaintiffs do not allege that Aurora had a "contractual right" to repurchase anything from Radient or that Radient was "obliged to resell" anything to Aurora.  MTD at 23 (citing IFRC 15.BC423).  Recognizing this fundamental deficiency in their claim, Plaintiffs argue that "Radient was 'obliged to resell' the biomass back to Aurora."  *Compare* Opp. at 25 *with* MTD at 23.  But they simply quote the governing accounting rule—not the SAC.  Plaintiffs nowhere allege that Radient was "obliged to resell" anything to Aurora.  This defeats their claim.

Plaintiffs also fail to resuscitate their confidential witnesses.  Plaintiffs accuse Defendants of taking "an absolutist position that only witnesses employed by a defendant can be considered in support of scienter." Opp. at 33.  This mischaracterizes Defendants' argument.  Defendants have never argued that Plaintiffs must rely on current or former Aurora employees.  Instead, Defendants argued that none of the former Radient employees is alleged to have ever communicated with anyone at Aurora about anything.  MTD at 28.

Plaintiffs also argue that the former Radient employees "held positions that provided them with direct knowledge of underlying facts about the 4Q19 Transaction that speak to why Aurora's accounting for it violated IFRS," but that misses the point.  Opp. at 33.  "[N]othing in their statements implies that [Aurora]

6

shared their knowledge" about the alleged accounting violations. *In re Audible Inc. Sec. Litig.*, No. CIV A 05-1027 JAG, 2007 WL 1062986, at *11 (D.N.J. Apr. 3, 2007).

Moreover, Plaintiffs repeatedly point to their confidential witnesses to support the proposition that "Radient's financial distress was overt and in plain sight." Opp. at 7. For example, the confidential witnesses state that Radient had trouble making its payroll and could not afford to finish construction on a new manufacturing facility. *Id.* at 7-8. But these former Radient employees do not say that anyone at Aurora knew about these alleged issues. Courts do not rely on confidential witnesses in these circumstances. *See* MTD at 28 (collecting cases).

Finally, Plaintiffs fail to offer a meaningful response to Defendants' argument that Aurora and Radient were not related parties. Although Defendants' opening brief explains why they are not related under the IAS 24.9, *see* MTD at 29-30, Plaintiffs never mention this governing accounting standard. Instead, Plaintiffs argue that Aurora exerts "significant influence over Radient" because "(1) Aurora owned approximately 14% of Radient's stock during the Class Period; (2) Aurora's CEO Booth and COO Cleiren alternately sat on Radient's board; (3) Aurora was Radient's largest supplier; and (4) Aurora was likely Radient's largest creditor." Opp. at 25-26.

As for point (1), Plaintiffs never respond to Defendants' citation to IAS 28.5,

7

which provides that, "if the entity holds . . . less than 20 per cent of the voting power of the investee, it is presumed that the entity <u>does not</u> have significant influence . . . ." MTD at 30 (emphasis added). Similarly, as for point (2), IAS 24.11 makes clear that two entities are not related "simply because they have a director or key manager in common." *Id.* Again, Plaintiffs ignore the accounting guidance. As for points (3) and (4), these allegations do not fit within the recognized standard for determining influence, and Plaintiffs fail to cite any authority that adopts these two allegations as factors for determining significant influence. *See* Opp. at 25-26.

Plaintiffs also point to Radient's post-Class Period statement that a related-party relationship existed as of March 31, 2020. Opp. at 25. But Defendants' stated opinion regarding whether Radient was a related party to Aurora is not misleading "simply because [Radient] disagreed" months later "with Defendants' interpretation" of how to apply the various IAS 24.9 factors. *Tongue v. Sanofi*, 816 F.3d 199, 214 (2d Cir. 2016). Along the same lines, Plaintiffs argue that Defendants' accounting judgment was not protected under *Omnicare* because Aurora "lacked a reasonable basis to conclude that the two were not related." Opp. at 26. But Plaintiffs' allegations confirm that Aurora had a reasonable basis: not a single factor under the IAS 24.9 analysis supported a finding of relatedness. MTD at 29.

### B.    Plaintiffs Fail to Resurrect Previously Rejected Arguments Regarding Cannabis Oversupply and Lack of Retail Stores

Plaintiffs attempt to resurrect arguments the Court has rejected regarding

8

(1) oversupply and (2) retail stores. They recycle their prior allegations that defendants' "statements regarding Aurora's financial prospects and consumer demand were also knowingly false and misleading" because they failed to disclose "the oversupplied cannabis market, and store limitations." Opp. at 22. The Court already rejected this argument when it granted Aurora's first motion to dismiss, concluding that "Plaintiffs do not adequately address the sufficiency of Defendants' disclosures." ECF No. 42 ("MTD Op.") at 25-26. Because Plaintiffs do not offer any additional allegations on these issues, the Court should not reconsider them.

### C.    Many of the Alleged Statements Are Protected by the Safe Harbor and Are Not Otherwise Actionable

The Court did not previously reach the issue of whether Defendants' statements were protected by the PSLRA's Safe Harbor for forward-looking statements, but warned that, "to ultimately prevail, Plaintiffs would need to effectively refute Defendants' arguments and demonstrate that the challenged statements are not protected by the Safe Harbor." MTD Op. at 28 n.6. Plaintiffs have not done so.

Under the PSLRA, a forward-looking statement is not actionable if it is (1) forward looking and accompanied by meaningful cautionary language, (2) immaterial, or (3) made without actual knowledge that the statement was false or misleading. *See* 15 U.S.C. § 78u-5(c)(1); *OFI Asset Mgmt. v. Cooper Tire & Rubber,* 834 F.3d 481, 490-91 (3d Cir. 2016). A forward-looking statement is

9

protected if it satisfies *any* of these prongs.  *See id.* at 502.

Plaintiffs argue that certain statements cannot qualify for Safe Harbor protection because they were "made with knowledge of the design to engage in the 4Q19 Transaction."  Opp. at 28.  As Defendants explained at length in their motion to dismiss the Amended Complaint, many of the challenged statements (1) are classic forward-looking statements about future growth plans, financial forecasts and targets, production capacity expectations, among other things; and (2) were accompanied by meaningful cautionary language.  *Avaya*, 564 F.3d at 254; ECF No. 32-1 at 21-32; *see* ECF 33-1, Ex. A ("Forward-Look Statements Challenged in the Amended Complaint & Associated Cautionary Language.").  Plaintiffs failed to respond to these arguments, let alone "effectively refute" them.

## II.    Plaintiffs Do Not Adequately Allege Scienter

As an independent basis for dismissal, the Court should reject Plaintiffs' scienter arguments, which fall far short of the demanding standard of the PSLRA.

Plaintiffs argue that "by dint of Aurora's ownership interest and seat on Radient's board, [Aurora] knew that Radient could not, and did not, pay for or process the $21.7M biomass from Aurora." Opp. at 31.  However, as discussed above, Plaintiffs' own allegations show that Radient had access to significant money from investors (and thus could pay), and Plaintiffs fail to offer any particularized allegations showing that Radient did not pay.  Moreover, Plaintiffs fail to allege what

10

the Defendant board members supposedly learned and when.  "[A]llegations that a securities-fraud defendant, because of his position within the company, must have known a statement was false or misleading are precisely the types of inferences which courts, on numerous occasions, have determined to be inadequate."  *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 598 (D.N.J. 2001).  Here, Plaintiffs suggest only "[g]eneralized imputations of knowledge," which "do[es] not suffice, regardless of the defendants' positions within the company." *Id.*  Plaintiffs further contend that knowledge of the supposed sham are "facts critical to [Aurora's] core business" that should be imputed to "[their] key corporate officers," but Plaintiffs have failed to adequately allege there was a sham sale.  Opp. at 31.

Moreover, Plaintiffs do not point to any "internal reports, documents, or communications" about Radient, or statements from "confidential witnesses" who attribute any knowledge to anyone at Aurora.  *Roofer's Pension Fund v. Papa*, No. CV 16-2805, 2018 WL 3601229, at *19 (D.N.J. July 27, 2018).  Instead, Plaintiffs rely on former Radient employees who do not claim to have ever communicated with anyone at Aurora, and they mischaracterize Defendants' argument explaining why courts do not accept such confidential witnesses.  *See supra* Section I.A.

Next, Plaintiffs argue that Aurora was motivated to make misleading statements to "effectuate[] five acquisitions during the Class Period financed with stock that defendants artificially inflated." Opp. at 32.  That argument gets Plaintiffs

11

nowhere.  Allegations of motives are "not required," Opp. at 30, and Plaintiffs cannot "establish scienter through proof of motive and opportunity alone." *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 276 (3d Cir. 2009).

Finally, Plaintiffs argue that "Defendants do not propose a more compelling inference" and that Defendants "put forth several hypothetical, mutually exclusive, and fact-intensive alternative explanations for the transaction."  Opp. at 33-34.  To the contrary, the most plausible inference in Defendants' favor is actually supported by Plaintiffs' allegations and the documents on which they rely.  Far from engaging in a "round trip" sale, Aurora sold biomass to Radient, and Radient later sold extracted products to Aurora as part of an industry standard two-way relationship. Plaintiffs' theory, on the other hand, is contradicted by their own allegations, including particularly Plaintiffs' repeated allegation that Aurora purchased "extract[s]" from Radient.  *See supra* Section I.A.

## III.   Plaintiffs' Loss Causation Allegations Are Inadequate.

As a third independent basis for dismissal, Plaintiffs do not adequately allege loss causation.  In dismissing their prior complaint, the Court instructed Plaintiffs that their amended pleading "must show that [their] 'losses are related specifically to the market's discovery of the misrepresentation and the corresponding decrease in price due to that misrepresentation.'" MTD Op. at 31 (quoting *De Vito v. Liquid Holdings Grp., Inc.*, No. 15-6969, 2018 WL 6891832, at *39 (D.N.J. Dec. 31,

12

2018)).  Plaintiffs failed to make such a showing.

Most notably, Plaintiffs acknowledge that Aurora never made any corrective disclosure in which Aurora admitted that it should not have recognized revenue from its sale of biomass to Radient.  Indeed, Plaintiffs admit that Defendants "did not disclose that Aurora's negative EBITDA for 4Q19 was in fact *approximately 47% understated*" as a result of its transactions with Radient and thus "Aurora's stock remained inflated."  Opp. at 38 (emphasis added).  But the Supreme Court has made clear that merely alleging purchase-price inflation does not satisfy "the law's requirement that a plaintiff prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005).

Plaintiffs confusingly attempt to circumvent this pleading deficiency by arguing that "[t]here is no such 'mirror image' requirement for loss causation in this Circuit," meaning that "*Dura* and its progeny do not demand . . . that corrective disclosures be complete."  Opp. at 37 & n.162 (quoting *In re Merck & Co., Inc. Sec., Deriv. & ERISA Litig.*, 2011 WL 3444199, at *32 (D.N.J. Aug. 8, 2011)).  Defendants do not argue otherwise.  Rather, Defendants argue that Aurora never made a corrective disclosure about the Radient transactions (because there was no misrepresentation or omission and therefore nothing to correctively disclose)—not that Aurora made an incomplete disclosure.

13

In the absence of a corrective disclosure by Aurora, Plaintiffs argue that "[o]n October 9, 2019 and October 17, 2019, when Wiggins and *Yahoo Finance* respectively called into question the propriety of the 4Q19 Transaction, Aurora's stock price declined materially in response." Opp. at 39. This argument fails for several reasons. As an initial matter, Plaintiffs admit that the "stock-price decline in response to the Wiggins and *Yahoo Finance* articles are not pled in the SAC." *Id.* at 39 n.169. Indeed, Plaintiffs allege five specific stock drops, none of which has anything to do with reporting on Radient. *See* SAC at ¶¶ 223, 250, 256, 258, 261. The Court should reject Plaintiffs' improper attempt to amend their pleading through their opposition brief. *Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.").

Even if the Court were to credit Plaintiffs' new allegations and take judicial notice of the October articles and stock drops, Plaintiffs fail to offer a meaningful response to Defendants' argument that these opinion pieces do not constitute corrective disclosures that both revealed to the market the falsity of any prior statement by Aurora and caused any loss. Rather, these articles contain one journalist's opinions based on his review of publicly available information. *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) ("A negative journalistic characterization of previously disclosed facts does not constitute a

14

corrective disclosure of anything but the journalists' opinions.").

Plaintiffs assert that such opinion pieces can support a finding of loss causation, but their cases are not on point. Opp. at 39. In *In re Gilead Sciences Securities Litigation*, the market was not merely reacting to an opinion piece based on publicly available facts (in that case, an FDA warning letter). 536 F.3d 1049, 1053 (9th Cir. 2008). Instead, the stock price there dropped 12% in reaction to third quarter financial results and the company's admission that "there had been substantially more overstocking by wholesalers than previously reported," which made clear that suppliers had already been reacting to the warning letter. Plaintiffs also rely on *In re Apollo Grp., Inc. Sec. Litig.*, No. 08-16971, 2010 WL 5927988 (9th Cir. June 23, 2010), but that one-page, unpublished decision from another circuit offers almost no detail as to the relevant facts there.

## CONCLUSION

For each of the grounds set forth in Defendants' opening memorandum and above, the Second Amended Complaint should be dismissed with prejudice.[1]

---

[1] Plaintiffs do not explain what facts they would allege (other than the two alleged October 2019 stock drops, which fail for the reasons discussed above). The Court should therefore deny leave to amend. *See In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 280 (3d Cir. 2004).

15

Dated: March 25, 2022          By: _____

Kevin H. Marino
John D. Tortorella
Marino, Tortorella & Boyle, P.C.
437 Southern Boulevard
Chatham, NJ 07928-1488
Phone: 973-824-9300
Fax: 973-824-8425
kmarino@khmarino.com
jtortorella@khmarino.com

Stephen L. Ascher
Andrew J. Lichtman
JENNER & BLOCK LLP
919 Third Avenue
New York, NY 10022-3908
Phone: 212-891-1600
Fax: 212-891-1699
sascher@jenner.com
alichtman@jenner.com

Howard S. Suskin
Theo A. Lesczynski
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654-3456
Phone: 312-222-9350
Fax: 312-527-0484
hsuskin@jenner.com
tlesczynski@jenner.com

*Attorneys for Defendants*

16