**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re AURORA CANNABIS INC. SECURITIES LITIGATION | Case No. 2:19-cv-20588-JMV-JBC |
| | Hon. John M. Vazquez, U.S.D.J. |
| This Document Relates To: | Motion Date:  April 17, 2023 |
| ALL ACTIONS | |
| | ORAL ARGUMENT REQUESTED |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS THE**
**THIRD AMENDED CLASS ACTION COMPLAINT**

Kevin H. Marino
John D. Tortorella
MARINO, TORTORELLA & BOYLE P.C.
437 Southern Boulevard
Chatham, NJ 07928-1488
Phone: 973-824-9300
Fax: 973-824-8425
kmarino@khmarino.com
jtortorella@khmarino.com

Stephen L. Ascher
Andrew J. Lichtman
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036-2711
Phone: 212-891-1600
Fax: 212-891-1699
sascher@jenner.com
alichtman@jenner.com

Howard S. Suskin
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654-3456
Phone: 312-222-9350
Fax: 312-527-0484
hsuskin@jenner.com

*Attorneys for Defendants*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS...........................................................................................4

I.     The Dismissal of the Amended Complaint and the Second
       Amended Complaint...........................................................................................4

II.    The Third Amended Complaint..........................................................................7

       A.     Aurora's September 11, 2019 Financial Results....................7

       B.     The October 9, 2019 Article .....................................................9

       C.     The October 17, 2019 Article ..................................................11

       D.     Aurora's November 14, 2019 Financial Results...................13

       E.     Aurora's Stock Traded Downward In Lockstep With
              Other Cannabis Stocks ...........................................................14

ARGUMENT .............................................................................................................15

I.     Count I Should Be Dismissed Because Plaintiffs Fail To Allege
       Loss Causation ................................................................................................15

       A.     Aurora's September 11, 2019 Financial Results..................15

       B.     The October 9, 2019 Article ....................................................19

       C.     The October 17, 2019 Yahoo Finance Canada Article........25

       D.     Aurora's November 14, 2019 Financial Results...................27

II.    Count II Should Be Dismissed Because There Can Be No Control-
       Person Liability Absent An Underlying Fraud. ........................................28

III.   Granting Leave to Amend Would Be Futile. ............................................28

CONCLUSION..........................................................................................................29

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Acterna Corp. Sec. Litig.*,
378 F. Supp. 2d 561 (D. Md. 2005)......................................................................23

*In re Arcimoto Inc. Sec. Litig.*,
2022 WL 17851834 (E.D.N.Y. Dec. 22, 2022)....................................................20

*Bartesch v. Cook*,
941 F. Supp. 2d 501 (D. Del. 2013).....................................................................18

*Belmont v. MB Inv. Partners, Inc.*,
708 F.3d 470 (3d Cir. 2013) .................................................................................28

*Canez v. Intelligent Sys. Corp.*,
2021 WL 3667012 (E.D.N.Y. Aug. 18, 2021) ...............................................22, 26

*Carey Camp v. Qualcomm Inc.*,
2020 WL 1157192 (S.D. Cal. Mar. 10, 2020)......................................................23

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. De Blasio*,
2022 WL 4095906 (S.D.N.Y. Sept. 7, 2022) .......................................................10

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
928 F. Supp. 2d 705 (S.D.N.Y. 2013) ................................................2, 21, 23, 24

*D.E. & J. Ltd. P'ship v. Conaway*,
284 F. Supp. 2d 719 (E.D. Mich. 2003) ..............................................................25

*Dura Pharmaceuticals, Inc. v. Broudo*,
544 U.S. 336 (2005)........................................................................................*passim*

*In re First Marblehead Corp. Sec. Litig.*,
639 F. Supp. 2d 145 (D. Mass. 2009)............................................................ 24-25

*First Nationwide Bank v. Gelt Funding Corp.*,
27 F.3d 763 (2d Cir. 1994) ..................................................................................24

*Ganske v. Mensch*,
480 F. Supp. 3d 542 (S.D.N.Y. 2020) ..................................................................10

*In re Ikon Office Solutions, Inc.*,
  277 F.3d 658 (3d Cir. 2002) ................................................................ 21-22

*In re IPO, Liu v. Credit Suisse First Boston Corp.*,
  399 F. Supp. 2d 261 (D.N.J. 2005) .............................................................16

*Lentell v. Merrill Lynch*,
  396 F.3d 161 (2d Cir. 2005) .....................................................................17

*In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*,
  2013 WL 2395035 (D.N.J. May 29, 2013)................................................ 26-27

*In re Merck & Co., Inc. Sec. Litig.*,
  432 F.3d 261 (3d Cir. 2005) .....................................................................19

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
  289 F. Supp. 2d 416 (S.D.N.Y. 2003) ........................................................25

*Meyer v. Greene*,
  710 F.3d 1189 (11th Cir. 2013) .............................................................20, 22

*In re NAHC, Inc. Sec. Litig.*,
  306 F.3d 1314 (3d Cir. 2002) .....................................................................7

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*,
  720 F. Supp. 2d 517 (D.N.J. 2010) ..................................................... 16-17, 18

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010) ...............................................................*passim*

*Paxton v. Provention Bio, Inc.*,
  2022 WL 3098236 (D.N.J. Aug. 4, 2022) .....................................................18

*Rescue Mission of El Paso, Inc. v. K-Sea Transp. Partners L.P.*,
  2013 WL 3087078 (D.N.J. June 14, 2013)....................................................22

*Shire US, Inc. v. Allergan, Inc.*,
  375 F. Supp. 3d 538 (D.N.J. 2019)...............................................................7

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
  545 F. Supp. 3d 120 (S.D.N.Y. 2021) .......................................................3, 26

*Teamsters Local 617 Pension & Welfare Funds v. Apollo Grp., Inc.*,
  633 F. Supp. 2d 763 (D. Ariz. 2009) ...................................................................20

*In re Tellium, Inc. Sec. Litig.*,
  2005 WL 2090254 (D.N.J. Aug. 26, 2005) .............................................2, 16, 28

*Waters v. General Electric Co.*,
  2010 WL 3910303 (S.D.N.Y. Sept. 29, 2010) ....................................................21

iv

Defendants Aurora Cannabis, Inc. ("Aurora" or the "Company"), Terry Booth, and Allan Cleiren respectfully submit this Memorandum of Law in support of their motion to dismiss the Third Amended Complaint.[1]

## PRELIMINARY STATEMENT

In granting Defendants' most recent motion to dismiss, the Court concluded that Plaintiffs failed to establish loss causation because they did not allege that they suffered "any loss caused by the Radient transaction." ECF No. 64 at 18-19. Plaintiffs' Third Amended Complaint attempts to cure this pleading deficiency by pointing to four specific dates on which Aurora's stock price dropped. But because Plaintiffs do not and cannot allege that those price decreases were caused by any fraudulent statement or omission concerning the Radient transaction, that attempt fails.

*First*, Plaintiffs allege that Aurora's stock dropped after Aurora announced financial results on September 11, 2019. This allegation does not cure Plaintiffs' pleading deficiency because the Court has already determined that the announcement did not constitute a "corrective disclosure[] related to the Radient deal." *Id.* Indeed, even Plaintiffs do not contend that Aurora's September 11 financial results disclosed information about Radient. To the contrary, they

---

[1] The Third Amended Complaint does not assert claims against previously named Defendants Stephen Dobler, Glen Ibbott, Cameron Battley, Michael Singer, or Jason Dyck.

characterize those results as continuing "to conceal Aurora's sham transaction with Radient." ECF No. 68 ("TAC") ¶ 195.  The law is crystal clear that "loss causation is not pled upon allegations of drops in stock price following an announcement of bad news that does not disclose the fraud." *In re Tellium, Inc. Sec. Litig.*, 2005 WL 2090254, at *4 (D.N.J. Aug. 26, 2005).

*Second*, Plaintiffs rely on an October 9, 2019 article that speculates about Aurora's alleged sham transaction with Radient.  This too fails to support loss causation.  To begin, instead of serving as a corrective disclosure, the article merely raised questions and expressed opinions about the Aurora-Radient transaction based on a review of publicly available information.  However, a "negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010).

Moreover, the article was published before the market opened on October 9, and Plaintiffs do not allege that they suffered a loss that day.  Instead, Plaintiffs allege that Aurora's stock dropped on October 10 in response to the article, but that is obviously not the relevant date. *See City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 715 (S.D.N.Y. 2013).  In fact, the Court can take judicial notice of facts showing that the price decline that day was caused by one of the major cannabis companies withdrawing its revenue guidance.  As a result, the

2

stock price of the five largest Canadian cannabis companies (including Aurora) dropped significantly. These "changed economic circumstances" and "new industry-specific . . . facts" defeat Plaintiffs' loss-causation allegations. *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 343 (2005).

*Third*, Plaintiffs allege that Aurora's stock price dropped in response to an October 17, 2019 article about the Aurora-Radient transaction. This article does not advance Plaintiffs' case because it contains information that is "substantially similar"—if not identical—to information that was previously revealed eight days earlier in the October 9 article. *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 545 F. Supp. 3d 120, 148 (S.D.N.Y. 2021). In addition, as with the October 9 article, Plaintiffs fail to allege that Aurora's stock price dropped in response to the October 17 article as opposed to other industry-specific facts. Cannabis stocks dropped across the board that day in response to a series of articles highlighting challenges facing the industry.

*Fourth*, Plaintiffs repeat the same allegations from their Second Amended Complaint about Aurora's stock dropping in response to "disappointing" financial results reported on November 14, 2019. TAC ¶ 225. The Court has already correctly concluded that these financial results were not "corrective disclosures related to the Radient deal." ECF No. 64 at 18–19.

The bottom line is that Aurora's stock performed poorly in the fall of 2019,

3

but so did the stocks of every other major player in the industry.  Aurora's share-price decline had nothing to do with an alleged sham transaction with Radient and everything to do with difficult conditions facing the entire sector, including an oversupplied market, lack of sufficient retail stores, and a robust black market— economic circumstances that the Court has already determined were adequately disclosed by Aurora.

After dismissing Plaintiffs' two prior complaints, the Court gave Plaintiffs "one further, and final, opportunity to file an amended pleading." ECF No. 64 at 20. Because Plaintiffs have (again) failed to allege "any loss caused by the Radient transaction," the Court should dismiss the Third Amended Complaint—this time with prejudice.

## STATEMENT OF FACTS

### I.    The Dismissal of the Amended Complaint and the Second Amended Complaint

On September 21, 2020, Plaintiffs filed their Amended Complaint, which alleged that Aurora and six of its current and former officers and directors engaged in securities fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  ECF 24 at 75-77.  As previously described by the Court, "[t]he crux of Plaintiffs' case is that Aurora's statements about the Company's ability to achieve positive EBITDA were materially false and misleading because of omissions of known risks—the Company knew or recklessly disregarded that its sales were

4

severely constricted by (1) an oversupplied market, (2) lack of sufficient retail stores, and (3) a robust black market." ECF No. 42 at 24.

On July 6, 2021, the Court granted Defendants' motion to dismiss the Amended Complaint, holding that Plaintiffs failed to allege any material misrepresentation or omission. As to Plaintiffs' allegations of "an oversupplied market," the Court pointed to numerous relevant disclosures associated with Aurora's expansion strategy and concluded that "Plaintiffs do not sufficiently contest the sufficiency of [Aurora's] disclosures," which were included in Aurora's "SEC filings, earnings calls, and press releases." *Id.* at 25. Likewise, with respect to Plaintiffs' allegations about "insufficient retail stores," the Court highlighted numerous on-point disclosures by Defendants, including, for example, that "the pace of provincial licensing of new retail stores" was a factor that would "continue to affect the slope of and smoothness of Aurora's revenue ramp-up." *Id.* at 25-26 (internal quotations omitted). The Court also concluded that Plaintiffs failed to allege any material misrepresentation or omission regarding sales from the "black market"—a "specific risk [that] was publicly disclosed" by Defendants. *Id.* at 26-27.

On September 7, 2021, Plaintiffs filed the Second Amended Complaint, which was substantively identical to the Amended Complaint except that (1) Plaintiffs dropped their allegations about the "black market" and (2) added allegations about Aurora's relationship with Radient. ECF No. 49. As the Court

5

described it, Plaintiffs alleged that Aurora entered into a "sham transaction with Radient." ECF No. 64 at 3. Basically, "Plaintiffs allege[d] that Radient purchased $21.7 million of dried cannabis biomass from Aurora" and that Aurora "repurchased the biomass from Radient for $18 million." *Id.* at 4 (internal quotations omitted). According to Plaintiffs, "there was no business reason for this transaction, and it was simply an orchestrated round-trip transaction to boost Aurora's financials." *Id.* (internal quotations omitted).

On September 23, 2022, the Court granted Defendants' motion to dismiss the Second Amended Complaint, holding that Plaintiffs failed to allege loss causation. *Id.* at 18-19. The Court concluded that "Defendants are correct that Plaintiffs do not identify any corrective disclosures related to the Radient deal." *Id.* Moreover, Plaintiffs failed to allege that "Aurora's stock dropped after analyst articles about the Radient transaction were published on October 9, 2019 and October 1[7], 2019." *Id.* at 18. The Court went on to explain that, "[e]ven if the Court were to take judicial notice of stock prices, Plaintiffs' argument that the articles constitute corrective disclosures that resulted in a stock drop do not appear in the SAC." *Id.* at 19. For these reasons, Plaintiffs did not adequately allege "any loss caused by the Radient transaction." *Id.* at 18-19. In dismissing the Second Amended Complaint without prejudice, the Court warned Plaintiffs that they had "one further, and final,

6

opportunity to file an amended pleading."[2] *Id.* at 20.

## II. The Third Amended Complaint[3]

In an attempt to allege "loss caused by the Radient transaction," Plaintiffs' Third Amended Complaint alleges that Aurora's stock dropped on four particular days. We address each in turn.

### A. Aurora's September 11, 2019 Financial Results

Aurora announced Q4 2019 and full-year 2019 financial results on September 11, 2019. TAC ¶ 194. Crucially, the Third Amended Complaint does not contain any new substantive allegations about the September 11 announcement that are relevant to the loss-causation analysis.

Just as they alleged in their Second Amended Complaint, Plaintiffs allege that (1) Aurora posted an EBITDA loss of C$11.7 million for Q4 2019 despite Aurora's "repeated, positive pronouncements throughout much of the Class Period of adjusted

---

[2] Although the Court dismissed the Second Amended Complaint based on loss causation, the Court determined that Plaintiffs (1) "sufficiently plead actionable omissions related to the Radient deal," ECF No. 64 at 14; and (2) "sufficiently plead scienter as to Aurora, Cleiren, and Booth," but that Plaintiffs "fail[ed] to sufficiently plead scienter as to the remaining Individual Defendants," *id.* at 17-18.

[3] Well-pleaded factual allegations in a complaint are taken as true, but a court is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations." *Shire US, Inc. v. Allergan, Inc.*, 375 F. Supp. 3d 538, 545 (D.N.J. 2019). In addition, a court may consider "public disclosure documents filed with [the] SEC" and documents "integral to or explicitly relied upon in the complaint." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (citations omitted).

EBITDA positivity by the end of FQ4 2019," TAC ¶ 194; (2) Aurora "blamed the EBITDA loss on challenges at the retail level in key markets," *id.* (internal quotations omitted); and (3) Aurora's stock price dropped 9.2% the following day (September 12) in response to Aurora's financial results, *id.* ¶ 206.  Notably, the Court has already concluded that these same allegations do not support a showing of loss causation with respect to the Radient transaction because "Plaintiffs do not identify any corrective disclosures related to the Radient deal." ECF No. 64 at 18-19.

In their Third Amended Complaint, instead of alleging that Plaintiffs suffered any loss related to the Radient transaction on September 12, Plaintiffs allege the *opposite*.  Specifically, Plaintiffs allege that "Defendants continued to conceal Aurora's sham transaction with Radient and its true financial condition."  TAC ¶ 195.  Thus, Plaintiffs allege that Aurora's stock price "remained inflated" at this time because, "[w]ithout the sham sale, [Aurora] would have missed the [positive EBIDTA] projection by more than $30 million."  *Id.* ¶¶ 200, 208 ("Had investors been told the true nature of Aurora's transaction with Radient, Aurora's stock price would have fallen further.  Instead, it remained inflated.").

Plaintiffs attempt to avoid this conclusion by adding an incongruous allegation that the September 11 financials somehow represented the "materialization of the risks associated with the undisclosed sham transaction."  *Id.* ¶ 206.  But Plaintiffs do not allege that anything materialized regarding the Radient

8

transaction at this time.  To the contrary, Plaintiffs allege that the Radient deal remained "conceal[ed]" and "undisclosed." *Id.* ¶¶ 195, 206.  Accordingly, Plaintiffs do not allege that they suffered any loss related to Radient in connection with the September 12 stock drop.

### B.    The October 9, 2019 Article

As with their Second Amended Complaint, Plaintiffs' Third Amended Complaint contains allegations about an October 9, 2019 article written by Craig Wiggins entitled "Aurora's $20 Million Wholesale Revenue from Q4 F2019 and the Radient Relationship – Lingering Questions." *Id.* ¶ 211; *see also* Ex. M.  Plaintiffs admit that the Wiggins article raises "for the first time" concerns "about a possible sham transaction between Aurora and Radient." *Id.* ¶ 14.

Unlike their Second Amended Complaint, which did not allege that this article caused Plaintiffs any loss, Plaintiffs now allege that Aurora's stock price dropped by 9.5% between October 9 and 10 in response to this article.  *Id.* ¶ 219.  Plaintiffs' prior decision to omit this allegation was correct.

For one thing, although Wiggins voiced his concerns about the Radient transactions based on his reading of Aurora's and Radient's public disclosures, he forthrightly and repeatedly emphasized that his view about the substance of the transactions and the propriety of the accounting treatment were his speculation and

opinion. *See, e.g.*, TAC ¶ 213 ("I wish to emphasize again that the foregoing is my opinion from simply a credit perspective.") (emphasis omitted).

Moreover, Plaintiffs have pointed to a stock drop on the wrong day. Specifically, Plaintiffs allege that Aurora's stock dropped from $49.32 per share at closing on October 9, 2019, to $44.64 per share at closing on October 10, 2019. *Id.* ¶ 219. However, the Wiggins article was published *before* markets opened on October 9, which means that the markets digested this information that day—not the next day, October 10.[4] As a result, the relevant comparison is between Aurora's closing prices on October 8 ($49.80) and October 9 ($49.32), which shows an immaterial drop of less than 1% following the Wiggins article. Ex. B. The Court may take judicial notice of these stock prices on a motion to dismiss. *See infra* pp. 24-25.

In any case, even if the Court considers Aurora's 9.5% stock drop between October 9 and 10, Plaintiffs fail to allege that Aurora's decline that day was a result of disclosures about the Radient transaction as opposed to other factors impacting

---

[4] TheCannalysts, which published the Wiggins article, posted a link to the article on its Twitter account at 9:23 a.m. ET on October 9, 2019. Ex. A (the timestamp of a "tweet" is based on the time zone in which the viewer is located). The Court may take judicial notice of the existence of this tweet, including its timestamp. *See, e.g.*, *Ganske v. Mensch*, 480 F. Supp. 3d 542, 545 (S.D.N.Y. 2020) (taking judicial notice of tweets, including the time of the tweets); *Christa McAuliffe Intermediate Sch. PTO, Inc. v. De Blasio*, 2022 WL 4095906, at *4 n.9 (S.D.N.Y. Sept. 7, 2022) (taking judicial notice of tweets and noting the date of their publication).

the entire cannabis market.  In fact, other Canadian cannabis companies' stock prices cratered on October 10 because one of the major cannabis companies at the time—Hexo—announced that it was withdrawing its full-year revenue guidance for 2020. Ex. C ("Weed stocks plummet after Canadian cannabis company Hexo withdraws its profit guidance for 2020").  In addition to Hexo's stock, which dropped 22.6%, the stocks of the five largest Canadian cannabis companies dropped significantly that day (in order of market capitalization): (1) Canopy (10.6%); (2) Cronos (7.2%); (3) Aurora (9.5%); (4) Tilray (13.5%); and (5) Aphria (13.5%).[5]  Thus, Aurora's stock drop on October 10 was on the lower end of the range for major cannabis companies.  The Court may take judicial notice of these economic circumstances, which Plaintiffs nowhere mention in their Third Amended Complaint.  *See infra* pp. 24-25.

### C.    The October 17, 2019 Article

Plaintiffs also rely on an October 17, 2019 *Yahoo Finance Canada* article entitled "Aurora Cannabis Ties to Extraction Firm Raise Questions About Potential For 'Fluffing Sales.'"  TAC ¶ 220.  Plaintiffs allege that Aurora's stock price declined by 5.4% in response to this article, *id.* ¶ 223, but Plaintiffs fail to allege that this loss was caused by the Radient transaction.

---

[5] See Exs. B, D-H for a comparison of the closing prices on October 9, 2019, and October 10, 2019.

To begin, just like the October 9 Wiggins article, the October 17 article is based on Wiggins' speculation and opinion concerning public information. Ex. I. For example, the article contains the following quotes attributed to Wiggins: "I *think* you have to put a big asterisk beside a material chunk of Aurora's sales, gross margin and EBITDA until we get answers on this"; "If you *assume* all of that biomass, or the majority of that biomass, came from Aurora, Aurora then becomes their biggest vendor, their biggest supplier and biggest creditor"; "I'm *hoping* that I'm wrong. My gut tells me I'm not." *Id.* (emphasis added).

In addition, the October 17 article merely regurgitates the contents of Wiggins' October 9 article about the same subject. Indeed, Plaintiffs' allegations confirm that "*Yahoo Finance Canada* reported on Wiggins' analysis of the FQ4 2019 Transaction." TAC ¶ 220. Thus, the conclusions of both articles are identical. *Compare id.* ¶ 218 (October 9 article) ("**IF** Aurora sells product to Radient and Aurora repurchases it, Aurora get[s] to claim a Sale and then reacquire the extracted biomass in inventory, and then they resell it again. Essentially the **potential** to double dip on sales."), *with id.* ¶ 222 (October 17 article) ("If Aurora sells product to Radient and Aurora repurchases it, Aurora gets to claim a sale and then reacquire the extracted biomass in inventory, and then they resell it again. Essentially there's potential to double dip on sales."). The October 17 article did not contain any new material information about Aurora's relationship with Radient.

12

Moreover, Plaintiffs again fail to allege that Aurora's stock dropped as a result of the Radient transaction as opposed to other market forces. The *Yahoo Finance Canada* article was published on October 17, 2019, which marked the one-year anniversary of the recreational cannabis market in Canada. On that day, news outlets published a slew of articles highlighting the disappointing first year for legal cannabis. *E.g.*, Exs. J–L. Indeed, the October 17 *Yahoo Finance Canada* relied upon by Plaintiffs highlights this issue:

> The cannabis sector is under mounting pressure to deliver stronger financial results to satisfy pent-up demand for profitability and sustainable growth one year into Canadian recreational legalization. Shares of several big Canadian players are trading near 52-week lows as regulatory uncertainty, health concerns around vaping, and fallout from the ongoing troubles at CannTrust Holdings Inc. . . . dampen investor enthusiasm.

Ex. I. As a result, the stocks of the largest five Canadian cannabis companies dropped on October 18 as follows: (1) Canopy (2.6%); (2) Cronos (6.1%); (3) Aurora (5.4%); (4) Tilray (5.0%); and (5) Aphria (3.3%).[6] As this list demonstrates, Aurora's stock traded downward, essentially in lockstep with other major cannabis companies, due to industry-specific conditions.

### D.    Aurora's November 14, 2019 Financial Results

The last stock drop Plaintiffs point to occurred after Aurora announced its

---

[6] See Exs. B, E–H for a comparison of the closing prices on October 17, 2019, and October 18, 2019.

financial results for Q1 2020 on November 14, 2019.  TAC ¶ 225.  Plaintiffs'

allegations about the November 14 results remain unchanged from the allegations in

the Second Amended Complaint:  (1) Aurora's net income declined by "nearly 90%"

year-over-year; (2) Aurora's adjusted loss was "nearly 50%" larger than the number

expected by analysts; (3) Aurora "admitted that recreational cannabis orders from

the provinces had 'slowed considerably' in the summer"; (4) Aurora "announced

that it was indefinitely deferring the remaining construction and commission

activities at Aurora Sun and Aurora Nordic 2, despite reassuring investors about the

purportedly successful progress on the facilities only six weeks previously"; and

(5) "Aurora, for the first time, informed investors that the lack of sufficient numbers

of retail stores would affect the growth of Aurora's revenue."  *Id.* ¶¶ 225–226.

Based on these "deeply disappointing financial results," *id.* ¶ 225, Plaintiffs

allege that Aurora's stock price declined by 17% on November 15, 2019, *id.* ¶ 233.

But Plaintiffs' own allegations show that this decline had nothing to do with the

Radient transaction.  Indeed, the Court has already determined—based on the same

allegations—that Plaintiffs "do not identify any corrective disclosures related to the

Radient deal."  ECF No. 64 at 18–19.

### E.   Aurora's Stock Traded Downward In Lockstep With Other Cannabis Stocks

Finally, Plaintiffs point out that Aurora's stock dropped significantly during

the fall of 2019.  TAC ¶ 234.  What Plaintiffs fail to mention, however, is that the

14

stock prices of all five of the largest Canadian cannabis companies fell in similar fashion during those few months.  Between September 11, 2019 (when Aurora announced its Q4 2019 financials) and November 14, 2019 (when Aurora announced its Q1 2020 financials), these companies' stock prices dropped as follows: (1) Canopy (42.2%); (2) Cronos (40.9%); (3) Aurora (49.3%); (4) Tilray (35.5%); (5) Aphria (35.9%).[7]  Thus, although Plaintiffs claim that Aurora's stock drop was because "the risks associated with the sham Radient transaction materialized," TAC ¶ 234, in reality, Aurora's shares tumbled as part of a broader market collapse.

## ARGUMENT

I.      **Count I Should Be Dismissed Because Plaintiffs Fail To Allege Loss Causation**

Plaintiffs have not adequately alleged a causal connection between any misrepresentation or omission about the Radient transaction and their loss.  As such, their securities fraud claim must be dismissed.

A.      **Aurora's September 11, 2019 Financial Results**

The financial results Aurora reported on September 11, 2019, cannot support a finding of loss causation because Plaintiffs do not allege that Aurora's announcement disclosed any fraud regarding Radient.  To the contrary, Plaintiffs allege that Defendants "conceal[ed] Aurora's sham transaction with Radient and its

---

[7] See Exs. B, E–H for a comparison of the closing prices on September 11, 2019, and November 14, 2019.

true financial condition," and that Aurora's stock price "remained inflated" at that time. TAC ¶¶ 195, 208.

The Supreme Court has squarely rejected loss causation in these circumstances in the context of a motion to dismiss. In *Dura*, the Court determined that an "inflated purchase price" does not by itself "constitute or proximately cause the relevant economic loss." 544 U.S. at 342. In concluding that the complaint should have been dismissed, the Court explained that "[s]hares are normally purchased with an eye toward a later sale," but if the purchaser sells the shares "before the relevant truth begins to leak out, the misrepresentation will not have led to any loss." *Id.* Thus, when an alleged scheme has not been disclosed, plaintiffs cannot show that they suffered any economic loss from the scheme, as required by the federal securities law.

For example, the court in *In re IPO, Liu v. Credit Suisse First Boston Corp.*, rejected similar allegations of an undisclosed "scheme" causing the plaintiffs' loss. 399 F. Supp. 2d 261, 266 (D.N.J. 2005). The court explained that because the defendants did "not disclose the scheme," plaintiffs failed to allege that the announcement "correct[ed] the artificial inflation caused by the scheme." *Id.* Likewise, another court concluded that "loss causation is not pled upon allegations of drops in stock price following an announcement of bad news that does not disclose the fraud." *Tellium*, 2005 WL 2090254, at *4; *see also Nat'l Junior Baseball League*

16

*v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 561 (D.N.J. 2010) ("These allegations are not sufficient to meet the loss causation element; noticeably absent is any assertion that any wrongdoing was disclosed to the market.  In fact, none of the announcements made by Defendants mention any alleged fraudulent practices."); *Lentell v. Merrill Lynch*, 396 F.3d 161, 173 (2d Cir. 2005) ("[A] plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." (citation omitted)).

As in those cases, Plaintiffs allege that Aurora's stock price dropped 9.2% in response to Aurora's September 11 financial results, but they do not allege that this loss was because of any corrective disclosure about Radient.  TAC ¶ 206.  On the contrary, they allege that the share price "remained inflated" and that, "[h]ad investors been told the true nature of Aurora's transaction with Radient, Aurora's stock price would have fallen further." *Id.* ¶ 208.  Accordingly, Plaintiffs improperly rely on negative financial results without any allegation that the market was informed about the alleged fraud regarding Radient or that the decline in stock price was substantially caused by disclosure of the alleged fraud.

Plaintiffs try to avoid this result by alleging that "Aurora's September 11, 2019 disclosure of missed adjusted EBITDA guidance was a materialization of the

17

concealed risk that Defendants' guidance was premised on Aurora's anticipated effectuation of the sham transaction." TAC ¶ 265. However, Plaintiffs' "materialization of the risk" theory cannot save their claims.

As an initial matter, the "[t]he Third Circuit has not adopted the 'materialization of risk' test but, instead, requires that there have been corrective disclosures that exposed the alleged fraud." *Bartesch v. Cook*, 941 F. Supp. 2d 501, 512 (D. Del. 2013); *see also Nat'l Junior Baseball League*, 720 F. Supp. 2d at 563 n.35 (concluding that the court need not consider the materialization-of-the-risk theory because the Third Circuit had not endorsed it as a method of proving loss causation). Thus, without a corrective disclosure from Aurora on September 11, Plaintiffs fail to allege loss causation.

Even if the Court does consider this theory, Plaintiffs' allegations still fail. Alleging loss causation requires the plaintiff to show that the loss caused by the alleged fraud resulted from the truth "leak[ing] out." *See Dura*, 544 U.S. at 342; *see also Paxton v. Prevention Bio, Inc.*, 2022 WL 3098236, at *18 (D.N.J. Aug. 4, 2022) ("[Plaintiffs] can prove loss causation by showing . . . an event that reveals that an earlier statement was false, or in other words, by showing the materialization of a risk that was misrepresented by the Company.").

Here, instead of alleging that the September 11 financials "revealed" or "disclosed" anything about Aurora's relationship with Radient, Plaintiffs allege the

18

opposite. They allege that Aurora's September 11 financial results "continued to conceal Aurora's sham transaction with Radient and its true financial condition." *Id.* ¶ 195; *see also id.* ¶ 200 ("Aurora missed its positive EBITDA projection by a much wider margin, the true extent of which was undisclosed to investors because the sham transaction with Radient remained concealed."). Accordingly, the September 11 financial results cannot support loss causation under any theory.

### B. The October 9, 2019 Article

Likewise, Plaintiffs' loss-causation allegations based on the October 9, 2019 article fail for multiple, independent reasons.

*First*, Wiggins' article does not constitute a corrective disclosure that both revealed to the market the falsity of any prior statement and caused any loss. Rather, Wiggins' article raised questions and expressed "opinion[s]" about the nature of the Aurora-Radient transaction based on his review of publicly available information, including Aurora's and Radient's financial statements and press releases. TAC ¶¶ 214–217.

A "negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions." *Omnicom*, 597 F.3d at 512; *In re Merck & Co., Inc. Sec. Litig.,* 432 F.3d 261, 270–71 (3d Cir. 2005) (holding that analysis of previously available information by *The Wall Street Journal* was not a corrective disclosure). As one court noted in terms

19

that are particularly apt here: "If every analyst or short-seller's opinion based on already-public information could form the basis for a corrective disclosure, then every investor who suffers a loss in the financial markets could sue under § 10(b) using an analyst's negative analysis of public filings as a corrective disclosure. That cannot be—nor is it—the law." *Meyer v. Greene,* 710 F.3d 1189, 1199 (11th Cir. 2013); *see also In re Arcimoto Inc. Sec. Litig.*, 2022 WL 17851834, at *6 (E.D.N.Y. Dec. 22, 2022) ("[P]ublications that merely characterize information already circulating in the public sphere in a negative way cannot prove loss causation."); *Teamsters Local 617 Pension & Welfare Funds v. Apollo Grp., Inc.*, 633 F. Supp. 2d 763, 820 (D. Ariz. 2009) (analyst report questioning stock option was not a corrective disclosure because "speculative observations" do not satisfy *Dura*'s pleading requirements). Thus, Plaintiffs fail to allege that Wiggins' "article[] constitute[s] [a] corrective disclosure[]," as the Court already concluded. ECF No. 64 at 19.

*Second*, Plaintiffs fail to allege any loss resulting from the article because they rely on a stock drop that occurred on the wrong day. *See supra* p. 10. Because the article came out *before* markets opened on October 9, the relevant day for assessing any stock drop is October 9—not October 10. Courts dismiss complaints for lack of causation in these circumstances.

For example, in *Westland Police*, the insurance company MetLife revealed

20

the alleged fraud "before the stock market opened on August 5." 928 F. Supp. 2d at 715. That day, MetLife's stock closed "just slightly below (*i.e.*, 1.5%) the previous day's close." *Id.* To amplify its losses, rather than focusing on the August 5 stock price, the plaintiff alleged that MetLife's "stock dropped 11 percent in value from August 4 to August 8." *Id.* at 714. But the court found these allegations "misleading" because the plaintiff failed to mention that the "entire market dropped precipitously on . . . August 8." *Id.* at 714–15. In holding that the plaintiff failed to allege loss causation, the court took judicial notice of the stock prices of other insurance companies and determined that they "suffered nearly uniform declines in the same period." *Id.*

Likewise, in *Waters v. General Electric Co.*, the plaintiffs alleged that GE disclosed a risk on October 1, but the plaintiffs did not allege that GE's stock declined when trading "reopened after the October 1 announcement." 2010 WL 3910303, at *8, 9 (S.D.N.Y. Sept. 29, 2010). Instead, plaintiffs alleged that GE's stock dropped the next day, October 2. *Id.* The court held that plaintiffs failed to allege loss causation because, "when GE revealed the concealed risk on October 1, no loss ensued." *Id.*; *see also*, *e.g.*, *In re Ikon Office Solutions, Inc.*, 277 F.3d 658, 664 (3d Cir. 2002) (assessing the stock drop between the closing prices on April 21 and April 22 where the defendant announced disappointing financial results "before the stock market opened" on April 22); *Rescue Mission of El Paso, Inc. v. K-Sea*

21

*Transp. Partners L.P.*, 2013 WL 3087078, at *2 (D.N.J. June 14, 2013) (noting decline in stock price on the day that results were announced before market opened); *Canez v. Intelligent Sys. Corp.*, 2021 WL 3667012, at *3 (E.D.N.Y. Aug. 18, 2021) (noting decline in stock price on the day that article was published before market opened).

Confirming that October 9 is the applicable date, Plaintiffs explicitly allege that the "market for Aurora common stock was an efficient market" because, among other reasons, "Aurora was followed by securities analysts" who wrote reports that were "publicly available and entered the public marketplace." TAC ¶ 272. As such, "the market for Aurora common stock *promptly digested* current information regarding Aurora from all publicly available sources and reflected such information in the price of the common stock." *Id.* ¶ 273 (emphasis added). Having sought to establish the element of reliance based on the fraud-on-the-market theory, *id.* ¶ 271, Plaintiffs cannot disavow their "efficient market" allegations for purposes of establishing loss causation. *See Meyer*, 710 F.3d at 1198-99 ("The efficient market theory . . . is a Delphic sword[;] . . . [a plaintiff] cannot contend that the market is efficient [and incorporates all available data] for purposes of reliance and then cast the theory aside when it no longer suits their needs for purposes of loss causation.").

Plaintiffs, therefore, fail to establish loss causation based on the October 9 article because they do not even allege that Aurora's stock dropped that day—and

22

for good reason. Aurora's stock dropped less than 1% between closing on October 8 and 9, *see supra* p.10, which is negligible under the securities laws. *See, e.g.*, *Carey Camp v. Qualcomm Inc.*, 2020 WL 1157192, at \*6 (S.D. Cal. Mar. 10, 2020) (describing a 4.02% decline as "minimal" and confirming that "securities complaints tend to be predicated on double digit declines"); *City of Westland Police*, 928 F. Supp. 2d at 715 (concluding that 1.5% decline was insufficient to show loss causation); *In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561, 588 (D. Md. 2005) (concluding that a 3% decline was insufficient to show loss causation, especially when read in the context of the stock's performance over the week and the state of the economy).

*Third*, even if the Court considers the October 10 stock drop, Plaintiffs fail to allege that Aurora's stock dropped on that day as a result of disclosures about the Radient transaction as opposed to other economic factors. As discussed above, the stocks of all five of the biggest Canadian cannabis companies dropped significantly on October 10 because one of the major cannabis companies withdrew its revenue guidance. *See supra* p. 10-11. In fact, Aurora's stock drop that day was on the lower end of the range for major cannabis companies.

Private securities fraud actions are "available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Omnicom*, 597 F.3d at 510. In

23

assessing loss causation on a motion to dismiss, courts consider whether a stock drop was the result of "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events." *Dura*, 544 U.S. at 343.

Courts regularly dismiss complaints in similar circumstances to those here, where plaintiffs fail to "ascribe some rough proportion of the whole loss to [the alleged] misstatements" as opposed to other economic factors. *City of Westland Police*, 129 F. Supp. 3d at 85; *see also First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994) ("[W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases.").

In doing so, courts take judicial notice of market trends and stock prices. For example, in *City of Westland Police*, the court took judicial notice of MetLife's competitors' stock prices and determined they traded downward in "lockstep with one another" because of external market forces. 928 F. Supp. 2d at 716. Similarly, another court took judicial notice of stock prices and found no loss causation because the defendant's "drop in share price coincided with a significant downturn in the credit markets." *In re First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 165 (D. Mass. 2009). Likewise, after taking judicial notice of the burst of the internet bubble, another court held that the "harm suffered by the plaintiffs was not caused

24

by any alleged fraud of the defendants; rather, it was caused by the direct intervention of the crash of the internet bubble in the market for which the defendants were not responsible." *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 419, 421 (S.D.N.Y. 2003); *see also D.E. & J. Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 749 n.26 (E.D. Mich. 2003) ("Nor have Plaintiffs pleaded facts to show that their losses were caused by defendants' alleged misstatements as opposed to intervening events.").

Just as in these cases, Plaintiffs seek to hold Defendants responsible for losses that were due to economic factors unrelated to any alleged fraud regarding Radient. The securities laws, however, are not intended to provide Plaintiffs with "insurance against market losses." *Omnicom*, 597 F.3d at 510.

### C.   The October 17, 2019 Yahoo Finance Canada Article

Plaintiffs similarly fail to allege loss causation based on the October 17, 2019 *Yahoo Finance Canada* article.

For starters, the article contains reporters' opinions and speculation based on a review of publicly available information, *see supra* p. 12, but as discussed above in connection with the October 9 article, a "negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions." *Omnicom*, 597 F.3d at 513.

Relatedly, the October 17 article cannot serve as a corrective disclosure because it regurgitates the same information about the Aurora-Radient relationship that Wiggins reported on eight days earlier. *See supra* p. 12. The law is clear that Plaintiffs cannot establish loss causation by citing disclosures or articles that do not reveal new substantive information to the market.

In *Sjunde AP-Fonden*, the plaintiff identified a series of news reports that came out on six separate dates that it argued were corrective disclosures. 545 F. Supp. 3d at 146. The court concluded that four of the articles reported only on "known risks" because previous reporting and public statements had already made the market aware of the risks discussed in the articles. *Id.* at 147–49. Those four articles were "not actionable" for purposes of the loss-causation analysis because they discussed information that was "substantially similar" to previous reporting and public statements and thus "constitute[d] mere materialization of known risk." *Id.*; *see also Canez*, 2021 WL 3667012, at *9 ("Because the Lumense-related disclosures that plaintiff relies on as corrective disclosures merely republished information that was already publicly available, those disclosures are not corrective for purposes of pleading loss causation."); *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 2013 WL 2395035, at *4–5 (D.N.J. May 29, 2013) (holding that article did not "disclose any previously unknown information that revealed the falsity of [defendant's] statements and omissions"); *Omnicom*, 597 F.3d at 513 (holding that

26

article did not constitute a corrective disclosure because the plaintiff did not demonstrate that the article contained any new information).

Moreover, Plaintiffs fail to allege that Aurora's stock drop on October 18 was caused by the October 17 article as opposed to other economic circumstances impacting the cannabis market. *See supra* p. 13. The stocks of all five major Canadian cannabis companies dropped on October 18 as a result of an onslaught of articles highlighting the disappointing one-year anniversary of legal cannabis. *See supra* p. 13. The Court may take judicial notice of these facts, which confirm that Plaintiffs fail to allege loss causation as a matter of law. *See supra* pp. 24–25; *Dura*, 544 U.S. at 345 (considering on a motion to dismiss whether a stock drop was the result of "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events").

### D.    Aurora's November 14, 2019 Financial Results

Finally, Aurora's November 14 financial results cannot support a finding of loss causation because Plaintiffs do not allege that the stock drop the next day had anything to do with the Radient transaction. *See supra* pp. 13–14. To the contrary, Plaintiffs allege that the drop was the result of "deeply disappointing financial results," TAC ¶ 225, which the Court has already determined "do not identify any corrective disclosures related to the Radient deal." ECF No. 64 at 18–19. As discussed above in connection with the September 11 financial results, *see supra* pp.

27

17–18, "loss causation is not pled upon allegations of drops in stock price following an announcement of bad news that does not disclose the fraud." *Tellium*, 2005 WL 2090254, at *4. For the same reasons, Plaintiffs cannot rely on a materialization-of-the-risk theory because Plaintiffs do not allege that Aurora revealed anything—let alone anything new—about the Radient transaction on November 14. *See supra* pp. 17–19.

## II.    Count II Should Be Dismissed Because There Can Be No Control-Person Liability Absent An Underlying Fraud.

Plaintiffs' claim against Booth and Cleiren for control-person liability also fails as a matter of law. The three elements to this claim are (1) the defendant controlled another person or entity; (2) the controlled person or entity committed a primary violation of the securities laws; and (3) the defendant was a culpable participant in the fraud. *See Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 484–85 (3d Cir. 2013). The claim for control-person liability fails because Plaintiffs do not allege a primary violation of securities fraud.

## III.    Granting Leave to Amend Would Be Futile.

The Court previously dismissed the Amended Complaint and the Second Amended Complaint. In dismissing the Second Amended Complaint, the Court warned Plaintiffs that they had "one further, and final, opportunity to file an amended pleading." ECF No. 64 at 20. Now that Plaintiffs have had an "opportunity to

address [the] deficiencies" identified by the Court relating to the Radient transaction, *id.*, the Court should dismiss the Third Amended Complaint with prejudice.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Third Amended Complaint should be dismissed for failure to state a claim, with prejudice.

Dated: January 6, 2023

By: _____

Kevin H. Marino
John D. Tortorella
MARINO, TORTORELLA & BOYLE, P.C.
437 Southern Boulevard
Chatham, NJ 07928-1488
Phone: 973-824-9300
kmarino@khmarino.com
jtortorella@khmarino.com

Stephen L. Ascher[†]
Andrew J. Lichtman
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036-2711
Phone: 212-891-1600
sascher@jenner.com
alichtman@jenner.com

Howard S. Suskin[†]
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654-3456
Phone: 312-222-9350
hsuskin@jenner.com

*Attorneys for Defendants*

---

[†] Admitted *pro hac vice*.

29