**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re AURORA CANNABIS INC. SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>    ALL ACTIONS. | Civil Action No. 19-20588(JMV)(JBC) |

**MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED COMPLAINT**

James E. Cecchi
Lindsey H. Taylor
Donald A. Ecklund
CARELLA, BYRNE, CECCHI, OLSTEIN,
  BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
973/994-1744 (fax)
jcecchi@carellabyrne.com
ltaylor@carellabyrne.com
decklund@carellabyrne.com

*Local Counsel for Lead Plaintiffs*

Samuel H. Rudman
Alan I. Ellman
ROBBINS GELLER RUDMAN
  & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
aellman@rgrdlaw.com

Steve W. Berman
Shayne C. Stevenson
HAGENS BERMAN SOBOL
  SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone: 206/268-9340
206/623-0594 (fax)
steve@hbsslaw.com
shaynes@hbsslaw.com

*Co-Lead Counsel for Lead Plaintiffs*

*[Additional counsel appear on signature page.]*

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION..............................................1

II.  BACKGROUND AND POSTURE OF THE CASE.........................5

     A.   The Court found that plaintiffs' Second
          Amended Complaint sufficiently pled
          violations of federal securities law—save
          for loss causation....................................5

     B.   Plaintiffs' Third Amended Complaint provides
          detailed allegations of loss causation: the
          undisclosed risk associated with defendants'
          false and misleading statements materialized
          in a sequence of financial disclosures and
          investigative reports.................................8

          1.   On September 11, 2019, Aurora disclosed
               missing its EBITDA guidance, causing a
               9% drop in its share price.......................9

          2.   On October 9, 2019, industry analyst
               Craig Wiggins published a report
               raising concern about a potential sham
               sale, causing a 9.5% drop in Aurora's
               share price.....................................11

          3.   On October 17, 2019, *Yahoo Finance
               Canada* published a report that further
               raised the possibility of a sham sale,
               causing a 5.4% drop in Aurora's share
               price...........................................12

          4.   On November 14, 2019, Aurora disclosed
               additional negative financial news,
               causing a 17% drop in its share price...........14

III. ARGUMENT.................................................15

     A.   Plaintiffs adequately plead loss causation...........15

          1.   Aurora's September and November 2019
               financial disclosures materialized the
               risk associated with its knowingly
               false guidance and sham sale to

- i -

Radient——a recognized approach establishing loss causation here.................18

    2. Plaintiffs sufficiently plead loss causation stemming from the four identified events——courts do not resolve contests over the substantive causes of stock price drops at the pleading stage..................................24

    3. The partial disclosures in the Wiggins and *Yahoo Finance* reports caused investor harm——and there is no pleading requirement that losses be recognized only when taken on the first trading day of a disclosure............................27

        a. The Wiggins and *Yahoo Finance* reports constitute partial corrective disclosures of Aurora's fraudulent Radient transaction.............27

        b. At the pleading stage in particular, loss causation can be alleged beyond the first trade day of a disclosure...........................32

  B. Plaintiffs sufficiently allege Section 20(a) claims...............................................34

IV. CONCLUSION................................................34

010871-11/2127071 V1

**TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Alaska Electrical Pension Fund v. Flowserve Corp.,*
   572 F.3d 221 (5th Cir. 2009) ...........................22, 23

*In re Apollo Grp., Inc. Sec. Litig.,*
   2010 WL 5927988 (9th Cir. June 23, 2010) ...................29

*Bishins v. Cleanspark, Inc.,*
   2023 WL 112558 (S.D.N.Y. Jan. 5, 2023) ....................31

*In re Celegene Corp. Secs. Litig.,*
   2019 WL 6909463 (D.N.J. Dec. 19, 2019) ....................18

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC,*
   750 F.3d 227 (2d Cir. 2014) ...............................25

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC,*
   310 F.R.D. 69, 96 (S.D.N.Y. 2015) .........................33

*In re Chi Bridge & Iron Cp. N.V. Sec. Litig.,*
   2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ..................30

*City of Westland Police & Fire Ret. Sys.,*
   928 F. Supp. 2d 705 (S.D.N.Y. 2013) ...................27, 33

*De Vito v. Liquid Holdings Grp., Inc.,*
   2018 WL 6891832 (D.N.J. Dec. 31, 2018) .............17, 25, 26

*Dura Pharms., Inc. v. Broudo,*
   544 U.S. 336 (2005) ...............................16, 17, 26

*In re Eros Int'l PLC Secs. Litig.,*
   2021 WL 1560728 (D.N.J. Apr. 20, 2021) .............16, 18, 25

*In re First Marblehead Corp. Sec. Litig.,*
   639 F. Supp. 2d 145 (D. Mass. 2009) .......................27

*Fogarazzo v. Lehman Bros., Inc.,*
   232 F.R.D. 176 (S.D.N.Y. 2005) ............................33

*FTC v. Wyndham Worldwide Corp.,*
   799 F.3d 236 (3d Cir. 2015) ...............................15

- iii -

*In re Galena Biopharma, Inc. Sec. Litig.,*
  2019 WL 5957859 (D.N.J. Nov. 12, 2019) .......................18

*Halliburton Co. v. Erica P. John Fund, Inc.,*
  573 U.S. 258 (2014) .........................................15

*Howard v. Arconic Inc.,*
  2021 WL 2561895 (W.D. Pa. June 23, 2021) ................18, 19

*Industriens Pensionsforsikring A/S v. Becton,*
  *Dickinson & Co.*
  2022 WL 3273879 (D.N.J. Aug. 11, 2022) ......................19

*Institutional Invs. Grp. v. Avaya, Inc.,*
  564 F.3d 242 (3d Cir. 2009) .................................34

*Kanefsky v. Honeywell Int'l Inc.,*
  2020 WL 2520669 (D.N.J. May 18, 2020) ...................20, 25

*King Cty., Wash. v. IKB Deutsche Industriebank AG,*
  708 F. Supp. 2d 334 (S.D.N.Y. 2010) .........................27

*Kux-Kardos v. VimpelCom, Ltd.,*
  151 F. Supp. 3d 471 (S.D.N.Y. 2016) .........................21

*Laasko v. Endo Int'l PLC,*
  2022 WL 3444038 (D.N.J. Aug. 17, 2022) ......................17

*Meyer v. Greene,*
  710 F.3d 1189 (11th Cir. 2013) ..............................28

*McCabe v. Ernst & Young, LLP,*
  494 F.3d 418 (3d Cir. 2007) .............................16, 20

*In re Merck & Co., Inc. Sec., Derivative & ERISA*
  *Litig.,*
  2011 WL 3444199 (D.N.J. Aug. 8, 2011) ..........18, 19, 23, 27

*In re Merck & Co., Inc. Sec. Litig.,*
  432 F.3d 261 (3d Cir. 2005) .................................30

*Mineworkers' Pension Scheme v. First Solar Inc.,*
  881 F.3d 750 (9th Cir. 2018) ................................22

*Nat'l Junior Baseball League v. PharmaNet Dev. Grp.*
  *Inc.,*
  720 F. Supp. 2d 517 (D.N.J. 2010) ...................16, 28, 29

- iv -

*In re Omnicom Grp., Inc. Sec. Litig.,*
    597 F.3d 501 (2d Cir. 2010) ..................................30

*In re Petrobas Sec. Litig.,*
    150 F. Supp. 3d 337 (S.D.N.Y. 2015) ..........................31

*In re Signet Jewelers Ltd. Sec. Litig.,*
    2019 WL 3001084 (S.D.N.Y. July 10, 2019) ....................30

*Sjunde AP-Forden v. Goldman Sachs Grp., Inc.,*
    545 F. Supp. 3d 120 (S.D.N.Y. 2021) ..........................31

*Swanson v. Interface, Inc.,*
    2022 WL 2003990 (E.D.N.Y. June 6, 2022) .................32, 33

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ..........................................15

*In re Urban Outfitters, Inc. Sec. Litig.,*
    103 F. Supp. 3d 635 (E.D. Pa. 2015) ..........................18

*Waters v. Gen. Elec. Co.,*
    2010 WL 3910303 (S.D.N.Y. Sept. 29, 2010) ...............33, 34

*In re Wilmington Tr. Sec. Litig.,*
    29 F. Supp. 3d 432 (D. Del. 2014) ............................17

## OTHER AUTHORITIES

Fed. R. Civ. P. 8(a)(2)......................................*passim*

Louis Loss & Joel Seligman, *Fundamentals of Sec. Reg.*
    276 (Supp. 2007) ............................................16

## I.    INTRODUCTION

In full satisfaction of Rule 8(a)(2)'s pleading standard, plaintiffs' Third Amended Complaint[1] answers the Court's sole remaining concern regarding the sufficiency of the allegations by alleging in detail how a series of false and misleading statements and omissions regarding Aurora's earnings, financial prospects, and operations proximately caused Plaintiffs to suffer losses.[2]

The TAC more than satisfies the pleading standard for loss causation under federal securities law, alleging as it does that the risk associated with defendants' false statements materialized first when Aurora missed its 2019 fourth quarter adjusted EBITDA guidance, and materialized further as facts about Aurora's sham transaction——which Defendants engineered to meet Aurora's guidance——and its true financial condition were increasingly disclosed.

The Court previously found plaintiffs sufficiently alleged all other required elements of their Section 10(b) claims, with

---

[1] Third Amended Complaint ("TAC"), Dkt. 68. All "¶" citations are to the TAC, brought on behalf of a class of investors who purchased shares of Aurora (NYSE: ACB) from Jan. 8, 2019 to Nov. 14, 2019 (the "Class Period"). Emphasis is added unless otherwise specified, and internal citations and quotations are omitted unless otherwise noted. Capitalized terms not defined herein have the meanings ascribed to them in the TAC.

[2] Fed. R. Civ. P. 8(a)(2).

- 1 -

allegations that defendants' repeated projections of profitability were materially false and misleading because defendants failed to disclose the fraudulent and known premise upon which those projections rested, namely, the orchestration and execution of a $21.7M sham transaction with Radient Technologies Inc. (the "Radient transaction"), an affiliated entity. Ultimately, Aurora's scheme proximately caused plaintiffs to suffer losses on several trading days.

First, on September 11, 2019, Aurora reported revenue of $21.7M during 4Q19[3] from its sham transaction—but still reported negative adjusted EBITDA for that quarter despite issuing positive guidance *more than 35 days after the quarter closed*.[4] Failing to meet its fraudulently predicated EBITDA projection, Aurora's stock price dropped over 9%, reflecting a materialization of the risk caused by defendants' false and misleading statements projecting positive EBITDA since the beginning of the Class Period.[5]

---

[3] Aurora's fiscal year ends on June 30. Accordingly, its Q1 ends Sept. 30; Q2 ends Dec. 31; Q3 ends March 31; and Q4 ends June 30. ¶ 3 n.2.

[4] As the Court noted before, "it is suspicious that on August 6, 2019—after the close of FQ4 2019 but before the results from that quarter were released—defendants reiterated their expectation of achieving positive EBITDA." Order on Motion to Dismiss Plaintiffs' Amended Complaint, Dkt. 42, at 30.

[5] ¶ 265. Aurora's announcement of missed guidance was also a corrective disclosure that its August 6, 2019 statement—that Aurora "continues to track toward positive adjusted EBITDA"—was

- 2 -

Defendants' argument that "crystal clear" caselaw requires that Aurora's "bad news" must have "disclose[d] the fraud" in order to trigger loss causation entirely misrepresents the applicable law, as argued below.[6]

Second, and although the September 11 allegation of loss causation alone satisfies the loss causation pleading requirement to that point in the Class Period, Aurora's stock price remained inflated by Aurora's failure to disclose the $21.7M sham sale. On October 9, 2019, however, industry analyst Craig Wiggins raised concerns about the Radient transaction and analyzed the possibility it was a sham sale—a partial disclosure causing Aurora's stock to decline by 9.5% the following day.[7]

Third, additional analysis of the Radient transaction that explored the very real possibility it was a $21.7M sham was made public by *Yahoo Finance Canada* on October 17, 2019. The following day, this further partial disclosure drove Aurora's stock price down by 5.4%.

Defendants argue that disclosures by third-party industry

---

false and misleading because defendants already knew Aurora would miss that guidance.

[6] Defendants' Memorandum of Law in Support of Motion to Dismiss the Third Amended Complaint, Dkt. 72-1, at 2 (hereafter "MTD").

[7] ¶ 267.

- 3 -

analysts are categorically irrelevant to loss causation and submit purported evidence disputing the relevant dates on which to look for the impact of events on a stock price and the supposed causes of Aurora's stock price drops.[8] With respect to both of these partial disclosures, again, the defendants misstate the relevant law and attempt to have contested facts resolved at the pleading stage. As argued below, precedent widely supports the proposition that third-party analysis can constitute a partial disclosure of the truth, and the relevant dates and explanations for the impact of a disclosure on a stock price is a fact-specific, case-specific inquiry properly resolved at summary judgment or trial.

Lastly (defendants having to this day failed to admit the sham nature of the Radient transaction), on November 14, 2019, a fuller extent of the risk created by Aurora's false and misleading statements and material omissions manifested, as Aurora disclosed an EBITDA loss of $39.7M and admitted that revenue and sales volume are "difficult to forecast with precision," causing its inflated stock price to plummet 17% the following day.

Defendants respond to the November 14 event by arguing that Aurora's financial disclosures were not *corrective* disclosures

---

[8] MTD at 2-3.

- 4 -

and therefore cannot support loss causation⸺this because defendants want the Court to ignore the materialization of risk analysis for loss causation that is well-established in the Third Circuit and this Court.

In sum, despite the Court's rejection of defendants' prior efforts to litigate the facts prematurely, defendants' motion again seeks to do just that. Defendants essentially argue that because Aurora *has never admitted* the Radient transaction was a sham, the plaintiffs were not harmed by it. But this argument ignores the plain fact that a bald confession by Aurora that it engaged in the sham transaction with Radient was not necessary for its investors to be harmed. Defendants' false and misleading statements inflated Aurora's stock and created a known risk that materialized months later and harmed plaintiffs when Aurora's fraudulently inflated projections were missed and its actual financial condition and reliance upon a sham sale were increasingly laid bare.

Because plaintiffs sufficiently plead loss causation, they respectfully request that the Court deny defendants' motion to dismiss the TAC.

## II.   BACKGROUND AND POSTURE OF THE CASE

**A.   The Court found that plaintiffs' Second Amended Complaint sufficiently pled violations of federal securities law⸺ save for loss causation.**

Plaintiffs' Second Amended Complaint alleged in detail how

- 5 -

defendants' statements to investors in 2019 that Aurora would achieve positive adjusted EBITDA in 4Q19 were knowingly and materially false and misleading because defendants were concocting and executing a secret sham transaction with Radient that allowed Aurora to recognize $21.7M in improper revenue for the year ended June 30, 2019.[9]

As the Court put it, plaintiffs alleged "that defendants' statements about Aurora's positive 4Q19 EBITDA projection were false because they knew that the Radient transaction was fraudulently engineered to boost Aurora's sales."[10]

Rejecting consideration of the "counter-narrative" documents presented by the defendants in an attempt to establish (without actually demonstrating) that Aurora's biomass sale to Radient was bona fide,[11] the Court noted that "[a]t this stage, the Court is focused on plausible allegations."[12]

---

[9] Plaintiffs' Second Amended Complaint ("SAC"), Dkt. 49, ¶ 208.

[10] Opinion on Motion to Dismiss Plaintiffs' Second Amended Complaint ("Opinion"), Dkt. 64, at 4.

[11] *Id*. at 11 n.4 ("Defendants fail to explain how the Court could properly consider these documents in deciding the motion to dismiss," noting also that defendants' purported evidence did not actually "reflect whether Aurora repurchased the biomass or instead purchased extracts from Radient, or whether Radient ever took possession of the product.").

[12] *Id*. at 10 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 555 (2007) ("explaining that Fed. R. Civ. P. 8(a)(2) requires that pleadings include '[f]actual allegations' that 'raise a right to relief above the speculative level'")).

- 6 -

The Court concluded that former employees relied upon in the SAC to support allegations that the transaction with Radient was a sham were sufficiently credible[13] and that "plaintiffs plausibly allege that the deal lacked commercial substance" and "that Radient should not have recognized the revenue."[14] Therefore, plaintiffs "sufficiently plead actionable omissions related to the Radient deal."[15]

In addition to satisfying the falsity requirement, the Court also concluded that plaintiffs had sufficiently established defendants' scienter with respect to the Radient transaction.[16] The Court found it "more than plausible to infer that [defendants] Cleiren and Booth knew that Radient would have difficulty processing and paying for the biomass" it purported to purchase from Aurora, given their service on Radient's Board of Directors, and that information regarding Aurora's failure to "relinquish[] control of the product and repurchase[]" it "as is" was "information...clearly within Aurora's control and reflects a sham transaction."[17] The Court also found that allegations of Aurora's motive to inflate its stock in order to

---

[13] *Id.* at 12.

[14] *Id.* at 13.

[15] *Id.* at 14.

[16] *Id.* at 14-18.

[17] *Id.* at 16.

- 7 -

010871-11/2127071 V1

"consummate five acquisitions as part of its expansion strategy" served to "make the inference of scienter more compelling."[18] Further, "the Court [did] not consider defendants' theory at the motion to dismiss stage."[19]

The Court did find that the SAC failed to "sufficiently plead loss causation" and gave plaintiffs leave to "address any deficiencies related to" the previously untested "allegations about the Radient transaction."[20] Specifically, the Court held the SAC "fail[ed] to plead that Aurora's stock price declined after the two analyst articles," and that even were the Court to take "judicial notice of stock prices," because "Plaintiffs fail[ed] to include these critical allegations" that the reports *caused* the stock price declines, loss causation was insufficiently pled.[21]

**B.    Plaintiffs' Third Amended Complaint provides detailed allegations of loss causation: the undisclosed risk associated with defendants' false and misleading statements materialized in a sequence of financial disclosures and investigative reports.**

Plaintiffs allege in their TAC that at the start of the

---

[18]   *Id.*

[19]   *Id.*

[20]   *Id.* at 19-20. The Court also dismissed the claims against the named defendants other than Booth and Cleiren.

[21]   *Id.* at 19. Contrary to defendants' argument, the Court did not address whether the September 11 and November 14, 2019 financial disclosure were sufficiently pled as materializations of a known risk.

- 8 -

Class Period, in January of 2019, the defendants began to make false and misleading statements projecting positive, unrealistic EBITDA for 4Q19, the quarter ending on June 30, 2019.[22] Despite massive cannabis over-production and limited retail stores, defendants made these bold projections because they devised a $21.7M round-trip sham sale with Radient, an affiliated entity.[23] Even as late as August 6, 2019——weeks after the fiscal quarter had ended——investors were told Aurora continued on track for positive EBITDA.[24] Plaintiffs acquired and held Aurora stock during the Class Period based on these false representations.

In truth, Aurora's undisclosed financial predicament was unfavorable rather than positive, and its reliance upon a $21.7M sham sale still failed to push its earnings into positive territory. Aurora, just weeks after confirming expectations of positive EBITDA, reported an adjusted EBITDA loss of $11.7M in its 4Q19 filing.[25] Thus began a series of partial disclosures that caused plaintiffs to suffer losses.

    **1.   On September 11, 2019, Aurora disclosed missing its EBITDA guidance, causing a 9% drop in its share price.**

On January 8, 2019, Aurora for the first time as a public company——and unique among its competitors——provided EBITDA

---

[22] ¶ 3.

[23] ¶¶ 5, 7, 56-101, 179, 192.

[24] ¶ 9.

[25] ¶ 10.

guidance to the market with a statement that Aurora was well-positioned "to rapidly achieve positive EBITDA within the next two quarters," that is, "beginning in Fiscal Q4 2019."[26] Because this guidance lacked a reasonable basis and was predicated on the execution of a sham transaction with Radient, it distorted Aurora's financial outlook for investors.[27] This distorted guidance was repeated by the defendants all the way through the subsequent fiscal quarters of the Class Period and even after fiscal Q4 had already been over for more than a month, artificially inflating Aurora's stock price throughout.[28]

The risk that inhered in defendants' knowingly false EBITDA guidance and sham-sale scheme to achieve that guidance first materialized for investors on September 11, 2019, after the market closed, when defendants announced that instead of positive adjusted EBITDA, Aurora incurred an adjusted EBITDA loss of $11.7M.[29] The projection miss was narrower than it would have been had the sham transaction not been executed—absent the Radient transaction, Aurora would have missed positive adjusted EBITDA by more than $30M.[30]

---

[26] ¶¶ 177-78.

[27] ¶ 179.

[28] ¶¶ 180-191.

[29] ¶ 194.

[30] ¶ 200.

010871-11/2127071 V1

Aurora's stock price declined 9.2% on the first trading day following the disclosure.[31]

Despite this partial disclosure of Aurora's financial condition, defendants continued to conceal the nature of the Radient transaction and Aurora's true financial condition, which remained distorted and inflated by the $21.7M in improperly recognized revenue still on the books, and falsely claimed that Aurora "continues to track toward positive adjusted EBITDA."[32]

**2. On October 9, 2019, industry analyst Craig Wiggins published a report raising concern about a potential sham sale, causing a 9.5% drop in Aurora's share price.**

Respected industry analyst Craig Wiggins——made suspicious by Aurora's conference call with analysts the day Aurora revealed its poor Q4 performance on September 11 and the discussion on the call of Aurora's "miraculous $20M in wholesale revenue (a +870% incremental increase QoQ)" from the Radient transaction——investigated the possibility the transaction was a sham.[33]

On October 9, 2019, Wiggins published his report: "Aurora's $20 Million Wholesale Revenue from Q4 2019 and the Radient Relationship——Lingering Questions."[34] This report was the first

---

[31] ¶ 206.

[32] ¶¶ 194-195, 200.

[33] ¶¶ 207, 251.

[34] ¶ 211.

010871-11/2127071 V1

public disclosure of the possibility that the $21.7M Radient transaction was a sham.[35] In addition to analyzing public data associated with Aurora's and Radient's financials and the Radient transaction, Wiggins reported that Aurora confirmed to him that Radient could purchase outside of its tolling agreement (which made no economic sense) but with no explanation as to why.[36] This fact led Wiggins to raise the specter of a possible round-trip, sham sale——given Radient's dependence upon Aurora and defendants' seat on Radient's Board, "there is simply far too much opportunity for financial engineering in this relationship."[37]

In response to the publication of Wiggins' report, Aurora's stock price fell 9.5% on the following day, and further the following days.[38]

> **3.** **On October 17, 2019, *Yahoo Finance Canada* published a report that further raised the possibility of a sham sale, causing a 5.4% drop in Aurora's share price.**

Eight days after it was made public, *Yahoo Finance Canada* reported on Wiggins' investigation into Aurora's financial condition and the Radient transaction, and published its own

---

[35] *Id.*

[36] ¶¶ 211, 215; *see also* ¶¶ 124, 132.

[37] ¶ 216.

[38] ¶ 219.

original reporting.[39] The financial news outlet investigated both Aurora and Radient, asking them to comment on Wiggins' analysis.[40] In response, Radient cautiously affirmed that its transaction with Aurora complied with regulations and that it had nothing further to add.[41] Aurora did not answer questions posed by *Yahoo Finance* and instead provided a statement sounding more like a release from Radient than Aurora: "In June, RTI [Radient] purchased their initial inventory from Aurora and other [licensed producers] to commence their commercial extractions runs. RTI has purchased from other licensed producers and can sell its products to Aurora or any other licensed producers."[42] It added that "Aurora's disclosure is compliant with its IFRS obligations."[43]

Wiggins, interviewed for the *Yahoo Finance* story, concluded: "I think you have to put a big asterisk beside a material chunk of Aurora's sales, gross margin and EBITDA until we get answers on this."[44]

---

[39] ¶ 220.

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] ¶ 222.

010871-11/2127071 V1

The day following publication of the *Yahoo Finance* story, Aurora's stock price declined by 5.4%, and further in the days that followed.[45]

**4.    On November 14, 2019, Aurora disclosed additional negative financial news, causing a 17% drop in its share price.**

On the heels of unexpected negative financial disclosures for the prior quarter and Wiggins' and *Yahoo Finance Canada's* reporting and analysis of the Radient transaction, investors eagerly awaited Aurora's next reporting period the following month.[46] Because Aurora and Radient continued to deny that they engaged in a sham transaction and reaffirmed Aurora's expectation of achieving positive adjusted EBITDA, Aurora's stock price remained inflated.[47]

However, on November 14, 2019, in announcing deeply disappointing financial results for the first fiscal quarter of 2020, with an adjusted EBITDA loss of $39.7M, a fuller extent of the known risk associated with the sham Radient transaction materialized. Aurora also acknowledged that "quarter-to-quarter sales volume and revenue are difficult to forecast with precision," despite providing financial forecasts to the market

---

[45] ¶ 223.

[46] ¶ 224.

[47] ¶ 222.

- 14 -

regarding EBITDA profitability since January 2019.[48] Analysts viewed the November 14 disclosure as an indication that Aurora's projections could not be trusted.[49] This disclosure caused Aurora's stock to decline more than 17% on the first trading day following the disclosure.[50]

### III.  ARGUMENT

### A.    Plaintiffs adequately plead loss causation.

The Court previously found that plaintiffs sufficiently allege, under Section 10(b), material misrepresentations or omissions by defendants and scienter.[51] Only the sufficiency of loss causation allegations is before the Court and defendants here seek dismissal of the TAC on that score alone.

On this Rule 12(b)(6) motion, the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."[52]

---

[48] ¶ 226.

[49] ¶¶ 16, 230.

[50] ¶ 233.

[51] Defendants did not challenge that plaintiffs adequately pled the Section 10(b) elements of a connection with the purchase or sale of securities; reliance; and economic loss. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014).

[52] *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 242 (3d Cir. 2015); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

- 15 -

As the Supreme Court made plain in *Dura Pharmaceuticals, Inc. v. Broudo*, with respect to loss causation, "the ordinary pleading rules are not meant to impose a great burden upon a plaintiff," and "require only" satisfaction of Rule 8(a)(2)'s pleading standard, without "any special further requirement in respect to the pleading of proximate causation or economic loss."[53] Plaintiffs "need not satisfy the PSLRA or Rule 9(b)'s heightened pleading requirements to survive a motion to dismiss for loss causation; rather, a plaintiff need only satisfy the requirements of Rule 8(a)(2)."[54] It suffices to plead with "fair notice" to defendants "some indication of the loss and the causal connection that the plaintiff has in mind."[55]

The TAC provides abundant notice of "a causal connection between the material misrepresentation[s] and the loss[es]" plaintiffs suffered and suffices for loss causation at this

---

[53] 544 U.S. 336, 347-48 (2005).

[54] *In re Eros Int'l PLC Sec. Litig.*, 2021 WL 1560728, at *15 (D.N.J. Apr. 20, 2021) (Vazquez, J.) (quoting *Nat'l Junior Baseball League v. PharmaNet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 558 (D.N.J. 2010)); *see also Dura*, 544 U.S. at 346 (at pleading stage, Rule 8(a) applies); *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 427 (3d Cir. 2007) (noting same).

[55] *Dura*, 544 U.S. at 346-347; Louis Loss & Joel Seligman, *Fundamentals of Sec. Reg.* 276 (Supp. 2007) ("At its core, *Dura* is largely a case about pleading. The Court concluded its analysis by highlighting how little would have been necessary by the plaintiffs to have effectively pled this cause of action.").

- 16 -

stage.[56]

In addition to the Rule 8 threshold, and as the Court noted previously, "[t]he proper place to resolve factual disputes is not on a motion to dismiss...."[57] Long-standing "Third Circuit precedent instructs that loss causation is a fact intensive inquiry which is best resolved by the trier of fact."[58]

The TAC adequately pleads loss causation: (1) the losses associated with Aurora's financial disclosures in September and November 2019 were foreseeable and proximately caused by the materialization of the risk concealed by defendants' fraudulent EBITDA guidance; and (2) the losses associated with publication of the Wiggins report and *Yahoo Finance* report in October 2019 were proximately caused by the partial disclosures of Aurora's sham sale to Radient.[59]

---

[56] *Dura*, 544 U.S. at 341-42.

[57] Opinion at 11 (quoting *Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. 2022)).

[58] *In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 450 (D. Del. 2014) (citing *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000)("[w]hether the plaintiff has proven [loss] causation is usually reserved for the trier of fact")); *accord Laasko v. Endo Int'l PLC*, 2022 WL 3444038, at *9 (D.N.J. Aug. 17, 2022)("But whether a plaintiff has proven causation is an issue reserved for the trier of fact, not a Court considering a motion to dismiss.").

[59] *De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at *39 n.37 (D.N.J. Dec. 31, 2018) (noting both the "materialization of the risk" and "corrective disclosure" theories for loss causation); *Wilmington Tr.*, 29 F. Supp. 3d at 450 ("where some or all of the risk is concealed by the defendant's misrepresentation or omission" and its

- 17 -

Critically, and on either ground, "the exposure of the alleged fraud need not occur in a single, all-encompassing corrective disclosure; instead, the truth can be revealed through a series of partial corrective disclosures."[60]

### 1. Aurora's September and November 2019 financial disclosures materialized the risk associated with its knowingly false guidance and sham sale to Radient—a recognized approach establishing loss causation here.

Defendants slough off the materialization of risk allegations, instead calling into question this well-established approach to evaluating loss causation—an approach long-recognized in the Third Circuit and by this Court.[61] As the Court has observed, "Plaintiff[s] [can] utilize[] the 'materialization of the risk' approach to demonstrate when a misrepresentation or omission 'proximately causes' the economic loss in the context of an undisclosed risk."[62] Put another way, "Plaintiffs can prove

---

materialization causes a loss, "courts have found loss causation sufficiently pled").

[60] *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 655-56 (E.D. Pa. 2015) (quoting *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 2011 WL 3444199, at *32 (D.N.J. Aug. 8, 2011)).

[61] *See, e.g., In re Celgene Corp. Sec. Litig.*, 2019 WL 6909463, at *22 (D.N.J. Dec. 19, 2019) (Vazquez, J.) (finding loss causation sufficiently pled under a "materialization of the risk approach"); *In re Eros Int'l*, 2021 WL 1560728, at *15; *see also Howard v. Arconic Inc.*, 2021 WL 2561895 at *17 (W.D. Pa. June 23, 2021)(noting that "district courts in this Circuit have applied" the materialization of risk analysis and that "the Third Circuit has discussed the theory without rejecting it").

[62] *In re Galena Biopharma, Inc. Sec. Litig*, 2019 WL 5957859, at *18-19 (D.N.J. Nov. 12, 2019) (Vazquez, J.) (finding plaintiffs

- 18 -

loss causation by showing an event that reveals that an earlier statement was false, or in other words, by showing the materialization of a risk that was misrepresented by the Company."[63]

Defendants mistakenly argue that because there was no confession by Aurora of improperly "recognized revenue from its sale of biomass to Radient," Plaintiffs could not have suffered loss.[64] But there is no such "mirror image" requirement for loss causation in this Circuit,[65] nor is there a requirement that "the hidden truth" be revealed.[66] Despite defendants' efforts to short-circuit the materialization-of-risk approach to loss causation,[67] the fact that Aurora's negative financial

---

"plausibly alleged loss causation" under the materialization of risk approach).

[63] *Arconic*, 2021 WL 2561895, at *17.

[64] MTD at 18.

[65] *Merck*, 2011 WL 3444199, at *32 ("*Dura* and its progeny do not demand, as set forth above, that corrective disclosures be complete, or put differently be the 'mirror image' of the alleged fraud. As the Fifth Circuit observed, '[i]f a fact-for-fact disclosure were required to establish loss causation, a defendant could defeat liability by refusing to admit the falsity of its prior misstatements.'").

[66] *See Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 2022 WL 3273879, at *20 (D.N.J. Aug. 11, 2022)(plaintiffs adequately pled "the link between [ ] misrepresentations and Plaintiff's loss following" a disclosure that "'did not reveal any hidden truth'").

[67] *E.g.*, MTD at 15 (arguing that disclosure of financial results "cannot support a finding of loss causation because Plaintiffs do not allege that Aurora's announcement disclosed any fraud regarding Radient").

- 19 -

disclosures in September and November of 2019 did not *admit* to the sham nature of the Radient transaction has no bearing on the risk manifested by them.

The Radient transaction and defendants' attendant misstatements regarding the contrived revenue derived from it, and Aurora's false and misleading EBITDA projections and statements about its financial condition, constitute "undisclosed risk[s]" that materialized beginning in September 2019, when plaintiffs first learned of Aurora's missed projections and actual financial condition and began to suffer losses.[68] This undisclosed risk was known and foreseeable to defendants——"a foreseeable consequence of [defendant's] alleged fraud."[69]

In fact, the manner in which the "misrepresentation[s] or omission[s] proximately caused the economic loss" alleged here is straightforward.[70] In early 2019, while Aurora's CEO Booth sat on Radient's board, defendants began to mislead investors with fraudulent projections about Aurora's 4Q19 EBITDA as they

---

[68] ¶ 223; *McCabe*, 494 F.3d at 426.

[69] *Kanefsky v. Honeywell Int'l Inc.*, 2020 WL 2520669, at *7 (D.N.J. May 18, 2020) (finding loss causation allegations that an SEC investigation was a "foreseeable consequence of Honeywell's alleged fraud" sufficient under materialization of risk approach——"the alleged fraud sufficiently caused...the corresponding loss.")

[70] *McCabe*, 494 F.3d at 426.

- 20 -

orchestrated and then executed the 4Q19 Radient transaction and inflated Aurora's stock price. The undisclosed risk of defendants' fraudulent EBITDA projections materialized when defendants announced on September 11, 2019 that Aurora missed its much-touted projection of positive adjusted EBITDA for 4Q19, *notwithstanding* the Radient transaction.[71]

The damages to plaintiffs caused by defendants' misstatements regarding Aurora's revenue and earnings first materialized with this disclosure and more than 9% decline in Aurora's stock price.[72] Indeed, Wiggins himself wrote that his suspicions about the Radient transaction first arose with Aurora's September 11 conference call.[73]

Still, defendants did not disclose that Aurora's negative EBITDA for 4Q19 was in fact *approximately 47% understated*—instead they continued to make false and misleading statements regarding Aurora's finances, failing to disclose their resort to a $21.7M sham sale and reliance on improper revenue recognition.[74] Aurora's stock thereby remained inflated through the period of subsequent partial disclosures.[75] Each disclosure

---

[71] ¶ 209.

[72] ¶ 10.

[73] ¶¶ 207, 251.

[74] ¶ 166.

[75] *See Kux-Kardos v. VimpelCom, Ltd.*, 151 F. Supp. 3d 471, 476 (S.D.N.Y. 2016) ("loss causation may be premised on partial

- 21 -

caused additional harm to plaintiffs who paid an inflated price for the stock by virtue of the improper Radient transaction and the related false statements regarding Aurora's finances.

An announcement of missed earnings guidance can suffice to plead loss causation.[76] The Fifth Circuit's decision in *Alaska Electrical Pension Fund v. Flowserve Corp.* is instructive.[77] There, the plaintiff alleged that Flowserve engaged in fraud when it knowingly released overly optimistic earnings guidance in October 2001. When Flowserve revised its guidance downward in July and September 2002, its stock declined substantially. When it later announced that it would downwardly restate earnings for three years, however, no statistically significant share-price decline occurred.[78] The district court held that the reductions in July and September 2002 earnings guidance did not reveal the "relevant truth" concerning the inaccuracy of the October 2001 earnings projection.[79] The Fifth Circuit reversed, holding as

---

revelations that do not uncover the complete extent of the falsity of specific prior statements where the partial disclosure somehow reveals to the market that a defendant's prior statements were not entirely true").

[76] *See, e.g., Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018) ("A plaintiff may also prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss.").

[77] 572 F.3d 221 (5th Cir. 2009).

[78] *Id.* at 226.

[79] *Id.* at 231.

follows:

> [The district court] must have reasoned that the July and September 2002 statements need not have simply reduced Flowserve's earnings-per-share guidance, but had directly to reveal that the October 2001 guidance was fraudulent. That is not required; *it was enough that the market learned that the October 2001 guidance was wrong* and that other negative information unrelated to the reduced FY2002 guidance did not cause the decline in Flowserve's share price.[80]

Thus, contrary to defendants, plaintiffs do not need to allege that Aurora's September 11, 2019 EBITDA-guidance miss "revealed" or "disclosed" anything about Aurora's relationship with Radient.[81] It is sufficient for purposes of pleading loss causation that the September 11 announcement revealed that Aurora's EBITDA guidance was wrong.[82]

In response, defendants point to *Dura*.[83] But *Dura* does not do the work defendants ask of it. In holding that purchase of

---

[80] *Id*. *Flowserve* was decided at the class certification and summary judgment stages, and expert testimony was permitted concerning the cause of the decline in share price. *See id*. at 221, 231.

[81] MTD at 18.

[82] Defendants contend that because the TAC alleges that Aurora's September 11 financial results "continued to conceal Aurora's sham transaction with Radient and its true financial condition," the disclosure of those financial results cannot support loss causation. MTD at 19 (quoting ¶ 195). This point, for which defendants cite no case law, is plainly refuted by the principle that "the exposure of the alleged fraud need not occur in a single, all-encompassing corrective disclosure," and partial corrective disclosures of the truth suffice to plead loss causation. *See Merck*, 2011 WL 3444199, at *31-32.

[83] MTD at 16, 18.

- 23 -

010871-11/2127071 V1

stock at an inflated price cannot by itself establish loss causation, the Court in *Dura* did not hold that "when an alleged scheme has not been disclosed, plaintiffs cannot show that they suffered any economic loss."[84] And the cases cited by defendants with regard to failure to show a *corrective disclosure by the company* are inapposite as it concerns Aurora's own September and November 2019 financial disclosures—those disclosures partially corrected defendants' false statements regarding Aurora's financial condition and projections and materialized the risk associated with them.[85]

2. **Plaintiffs sufficiently plead loss causation stemming from the four identified events—courts do not resolve contests over the substantive causes of stock price drops at the pleading stage.**

Notably, defendants do not contest that Aurora's September and November financial disclosures caused Aurora's stock price to drop. Defendants do, however, point to other possible causes

---

[84] MTD at 16.

[85] *Id.* at 16-17. Notably, defendants fail to address two sets of allegations presented in the TAC and therefore waive argument on both. *See* Opinion at 14 n.6 ("The Court will not consider new arguments made in the reply that could have been made in the initial brief.").

First, the TAC addresses the Court's concern that the "related party" allegations under IAS 24 were not pled with sufficient clarity. *Id.* at 13; *see* ¶¶ 159-163 (now pled with specificity).

Second, the TAC pleads that the September 11, 2019 financial disclosures were (in addition to materializing the known risk) also corrective to the false August 6, 2019 statement that Aurora continued to track toward positive adjusted EBITDA. ¶ 266. This allegation is pled with scienter. ¶ 255.

- 24 -

for the respective declines in Aurora's stock price in the wake of the Wiggins and *Yahoo Finance* reports in October.[86] But "Plaintiffs need not demonstrate on a motion to dismiss" that their allegations point to "the *only* possible cause for decline in the stock price."[87]

As this Court recently stated in *In re Eros Int'l*——despite the defendants' arguments there that *other* factors (a ratings downgrade) caused the drop in share price and that disclosures "did not actually reveal any wrongdoing"——"[a]t the motion to dismiss stage, Plaintiffs do not need to explain why other market forces did not affect the share price."[88]

Defendants argue that Aurora's share price on October 10, 2019——the day following the Wiggins report——"cratered" for another reason, *to wit*, because a competing cannabis company announced a withdrawal of revenue guidance.[89] They similarly

---

[86] MTD at 23-25, 27.

[87] *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014)(emphasis in original); *accord De Vito*, 2018 WL 6891832, at *39 n.37 ("[a] complaint is not required to 'plead facts indicating that disclosure of the alleged fraud was the sole reason for the investment's decline in value")(quoting *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 265 (D.N.J. 2007)).

[88] 2021 WL 1560728, at *15; *accord Kanefsky*, 2020 WL 2520669, at *7 ("At this stage, Plaintiff need not disaggregate the damage caused by the alleged fraud from changes due to other market forces.").

[89] MTD at 11 (citing Exhs. B-H).

- 25 -

argue that the price drop following the *Yahoo Finance* report was caused by a "slew of articles" highlighting industry struggles.[90] In both instances they point to varied price drops among a handful of cannabis companies on those dates. Plaintiffs disagree, but a weighing of competing theories (or expert opinions and event studies) is not necessary to resolve the question of causation at the pleading stage.

In *De Vito*, as here, defendants contested loss causation on the ground that other events explained the decline in stock price. And as here, that contest was found to be premature: "Plaintiffs, they say, cannot disaggregate the effects of these corrective disclosures from other factors that might have affected Liquid's stock price. They may or may not turn out to be correct, but it is not possible or even necessary to back out confounding causes at the motion to dismiss stage."[91]

Defendants' argument that plaintiffs failed to plead why "market conditions, macroeconomic or industry factors" did not cause the stock decline is a non-starter.[92] "Neither *Dura*" nor any other legal authority "impose such a pleading requirement on a securities fraud plaintiff," so plaintiffs need not "rule out

---

[90] *Id.* at 13 (citing same).

[91] *De Vito*, 2018 WL 6891832, at *41 (citing *EP Medsystems,* 235 F.3d at 884; *Dura*, 544 U.S. at 347).

[92] MTD at 23-25.

010871-11/2127071 V1

the possibility that other market forces" caused the stock to decline.[93] To accept defendants' logic that a general cannabis industry decline during the Class Period fully explains stock price declines for Aurora and some other cannabis companies[94] would mean no investors in any of those companies could have suffered losses for any other reason. Such an absolute conclusion cannot possibly be reached at the pleading stage.

Despite defendants' argument, "neither" *Dura* nor any other controlling authority "burden plaintiffs with pleading that *no other possible* event could have caused plaintiffs' losses..."[95]

3.  **The partial disclosures in the Wiggins and *Yahoo Finance* reports caused investor harm——and there is no pleading requirement that losses be recognized only when taken on the first trading day of a disclosure.**

    a.  **The Wiggins and *Yahoo Finance* reports constitute partial corrective disclosures of Aurora's fraudulent Radient transaction.**

On October 9 and October 17, 2019, when Wiggins and *Yahoo Finance* respectively called into question the propriety of the

---

[93] *Merck*, 2011 WL 3444199, at *31. Both of defendants' cases, *City of Westland Police & Fire Ret. Sys. v. MetLife , Inc.*, 928 F. Supp. 2d 705, 714-15 (S.D.N.Y. 2013) and *In re First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 164 (D. Mass. 2009), concerned unprecedented market deterioration and the courts in neither case engaged in an examination of purported industry price moves as defendants attempt here. *See* MTD at 24-25.

[94] MTD at 15.

[95] *King Cty., Wash. v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 343 (S.D.N.Y. 2010)(emphasis in original).

- 27 -

Radient transaction, Aurora's stock price declined materially in response. In addition to arguing about what else might have caused the price declines, defendants argue that these disclosures cannot support loss causation.[96] Defendants are wrong.

Courts widely recognize that third-party analysis of public information is capable of contributing new information to the market—and here, both the Wiggins and *Yahoo Finance* reports contributed new information through original analysis of the sham nature of the Radient transaction not previously disclosed and questioning of defendants.

Because they can "reveal to the market something previously hidden or actively concealed," such third-party analysis often constitutes a partially corrective disclosure.[97] "A corrective disclosure by the defendant is not the only means by which the market may learn of a defendant's fraudulent statement or omission";[98] for example, "'the market may learn of possible

---

[96] MTD at 25-26. Defendants misleadingly state that the Court "already concluded" that "Plaintiffs fail to allege" that Wiggins' "article[] constitute[s] [a] corrective disclosure[]." *Id*. at 20. The Court only found that Plaintiffs did not plead in the SAC that the Wiggins and *Yahoo Finance* articles constitute corrective disclosures that resulted in a stock drop. Opinion at 19. Plaintiffs have now alleged those facts in the TAC. *See* ¶¶ 14-15, 219, 223, 267-268.

[97] *Meyer v. Greene*, 710 F.3d 1189, 1199 n.10 (11th Cir. 2013).

[98] *Nat'l Junior Baseball League*, 720 F. Supp. 2d at 560.

- 28 -

fraud [from] a number of sources: *e.g.*, from whistleblowers, analysts questioning financial results...newspapers, journals, etc.'"[99]

In *In re Apollo Group, Inc. Securities Litigation,* the Ninth Circuit held that a "jury could have reasonably found that [securities analyst] reports following various newspaper articles were 'corrective disclosures' providing additional or more authoritative fraud-related information that deflated the stock price."[100] Here, Wiggins' articles were based on extensive analysis of myriad SEC filings by both Radient and Aurora, and revealed the suspicious nature of the Radient transaction. Wiggins and *Yahoo Finance* independently investigated the allegations and both questioned Aurora and Radient with original reporting. The *Yahoo Finance* article did not "merely regurgitate[]" the Wiggins report; among other things, in this more widely accessible report, the *Yahoo Finance* story elicited

---

[99] *Id.* (quoting *Enron Corp. Sec. Derivative & "ERISA" Litig.*, 2005 WL 3504860 at 16 (S.D. Tex. Dec. 22, 2005)).

[100] 2010 WL 5927988, at *1 (9th Cir. June 23, 2010) (citing *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1058 (9th Cir. 2008) (later disclosure corrective when public initially "failed to appreciate [the] significance" of negative information); and *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 503 (9th Cir. 1992) (what market understands depends on "intensity and credibility" of information)).

- 29 -

new, suspicious, defensive comments from both Radient and Aurora that concerned investors.[101]

The cases defendants rely on in response are easily distinguished.[102] First, courts routinely reject invitations from defendants to extend the holding in *Omnicom*. In *In re Chicago Bridge & Iron Co.*, the court rejected defendant's argument that "in effect [] any third party's analysis of a company's already-public financial information cannot contribute new information to the marketplace," holding simply "[t]his is incorrect."[103] The court declined to extend the holding from *Omnicom*, finding that the information from third-party analysis was "specific, new and related directly" to the fraud allegations.[104]

---

[101] MTD at 12; ¶ 220.

[102] MTD at 19, 23, 25-26. In *In re Omnicom Grp., Inc. Sec. Litig.*, unlike here, "the use of the [allegedly fraudulent] transaction as an accounting method to remove losses from Omnicom's books was *known to the market a year before* [the Audit Committee Chair's] resignation. . . . All that the June 12 article stated was that [the] resignation was due to general concerns over an aggressive accounting strategy . . ." 597 F.3d 501, 511-12 (2d Cir. 2010). In *In re Merck & Co., Inc. Sec. Litig.*, the court rejected a purported corrective disclosure that consisted of a reporter "simply [doing] the math" using "minimal[] arithmetic complexity" on information disclosed two months earlier. 432 F.3d 261, 270-71 (3d Cir. 2005).

[103] *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at *7 (S.D.N.Y. Mar. 23, 2020).

[104] *Id.* at *8; *see also In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *17 (S.D.N.Y. July 10, 2019)("third-party report was not, as [d]efendants contend, merely a journalist's negative opinion, but an analysis of how and why [defendant

- 30 -

Furthermore, as the court in *Bishins v. Cleanspark, Inc.,* very recently observed in rejecting reliance on *Omnicom* and holding that third-party analysis of public information was sufficient for a finding of loss causation, "it is not clear that district courts should apply *Omnicom* at the motion to dismiss stage."[105]

Defendant's reliance upon *Sjunde AP-Fonden v. Goldman Sachs Group, Inc.*[106] to discount the impact of the *Yahoo Finance* report backfires. In *Sjunde*, the court rejected Goldman Sachs' argument that all six purported disclosures revealed "no new news"——an argument "premised on a too-strict interpretation of the requirements of loss causation, particularly at the pleading stage," leading the court to find two sequential news reports "sufficient as a partial disclosure to satisfy loss causation at the pleading stage."[107] And *Sjunde* also took place against an entirely different scandalous backdrop of disclosures——including

---

company's] underlying business was weaker than most people realized [and therefore qualified as corrective]").

[105] 2023 WL 112558, at *13 (S.D.N.Y. Jan. 5, 2023) ("find[ing] Plaintiffs' view of the case law to be more compelling..."); *see also In re Petrobas Sec. Litig.*, 150 F. Supp. 3d 337, 343 (S.D.N.Y. 2015)("*In re Omnicom*, [ ] concerned a motion for summary judgment. On a motion to dismiss, all that is required is some indication of the loss and the causal connection that the plaintiff has in mind.").

[106] 545 F. Supp. 3d 120 (S.D.N.Y. 2021).

[107] *Id*. at 147.

- 31 -

indictments——preceding the news disclosures in question; here, the Wiggins and *Yahoo Finance* reports were the first inkling of the sham Radient transaction.

### b.   At the pleading stage in particular, loss causation can be alleged beyond the first trade day of a disclosure.

Defendants argue that market reaction to the Wiggins report cannot satisfy loss causation here for the additional reason that only "day of" stock-price drops are cognizable, and the market here is alleged to have reacted the day following the October 9 publication.[108] However, there is no per se rule limiting the pleading of loss causation to the day of disclosure. Moreover, though a premature contested fact at this stage, it bears noting that defendants' own Exhibit A shows that the Wiggins report was published that day behind a subscriber paywall, potentially impacting the market's ability to access it.[109]

A multi-day window for investor loss is commonly pled and recognized by courts. In *Swanson v. Interface, Inc.*, the court found it "plausible" that Interface's stock fell by 3.3.% the day *following* an SEC announcement that its reported earnings did not accurately reflect its performance, holding that "it is not

---

[108] MTD at 10, 20-23.

[109] MTD Ex. A.

- 32 -

fatal to plaintiff's case at this stage that Interface's stock price fell 3.3% one day after the SEC released its finding[]...and recovered from that loss soon after."[110]

Defendants rely upon *City of Westland* to argue against looking beyond the first trade day.[111] But the facts in *City of Westland* are extraordinary. There, plaintiffs filed a complaint found by the Court to be "remarkably misleading," as it ignored the stock price rise the day of the alleged event and stretched beyond reason to incorporate a five-day trading period into loss causation so as to capture the historically unprecedented effects of the S&P downgrade of the U.S. credit rating the week following.[112] The stock-price decline here, the day following the Wiggins report, is not comparably suspect.

The other cases relied upon by defendants are similarly distinguishable. For example, the plaintiffs in *Waters v. General Electric Co.* centered their allegations on a single disclosure—the revelation by GE on October 1, 2008 that, contrary to prior assurances, it would be offering $15 billion

---

[110] 2022 WL 2003990, at *3 (E.D.N.Y. June 6, 2022); *see also Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 96 (S.D.N.Y. 2015)("[a] two-to-three-day window is common in event studies"); *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 189 n.106 (S.D.N.Y. 2005) (same).

[111] MTD at 20-21; *City of Westland*, 928 F. Supp. 2d at 714-15.

[112] 928 F. Supp. 2d at 714.

- 33 -

in new equity.[113] Following the announcement, GE's share price traded *up*. The next day, GE's share price traded down, but "defendants disclosed the entire truth of the allegedly fraudulently concealed statements on October 1."[114] Notably, the *Waters* court stated: "[t]he Court cannot find, and Plaintiffs have not cited, a single section 10b-5 case in which the plaintiff prevailed on a motion to dismiss when the stock price *increased* after an announcement revealing an alleged fraud."[115] Here, Aurora's stock did not trade up in response to the Wiggins report——it traded down the day of release and the day after. That suffices at the pleading stage.

**B.    Plaintiffs sufficiently allege Section 20(a) claims.**

Because plaintiffs have pled Section 10(b) claims against defendants, plaintiffs have pled Section 20(a) claims as well.[116]

### IV.    CONCLUSION

For the reasons argued, plaintiffs respectfully ask the Court to deny defendants' motion to dismiss.

---

[113] 2010 WL 3910303, at *8 (S.D.N.Y. Sept. 29, 2010). None of the other cases cited by defendants stand for the proposition that stock declines the day following a revelation cannot support loss causation. MTD at 21-22.

[114] *Waters*, 2010 WL 3910303, at *8 n.6.

[115] *Id*. at *8 (emphasis in original).

[116] *See Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 280 (3d Cir. 2009).

- 34 -

Dated: March 7, 2023

Respectfully submitted,

CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.

By _____/s/ James E. Cecchi_____
    James E. Cecchi
Lindsey H. Taylor
Donald A. Ecklund
5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
973/994-1744 (fax)
jcecchi@carellabyrne.com
ltaylor@carellabyrne.com
decklund@carellabyrne.com

*Local Counsel for Lead Plaintiffs*

Samuel H. Rudman
Alan I. Ellman
ROBBINS GELLER RUDMAN & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
aellman@rgrdlaw.com

Steve W. Berman
Shayne C. Stevenson
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone: 206/268-9340
206/623-0594 (fax)
steve@hbsslaw.com
shaynes@hbsslaw.com

*Co-Lead Counsel for Lead Plaintiffs*

- 35 -

010871-11/2127071 V1

Brian Schall
SCHALL LAW FIRM
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: 310/301-3335
310/338-0192 (fax)
brian@schallfirm.com

*Additional Plaintiffs' Counsel*

- 36 -