Kevin H. Marino
John D. Tortorella
MARINO, TORTORELLA & BOYLE P.C.
437 Southern Boulevard
Chatham, NJ 07928-1488
Phone: 973-824-9300
Fax: 973-824-8425
kmarino@khmarino.com
jtortorella@khmarino.com

Stephen L. Ascher†
Andrew J. Lichtman
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036-2711
Phone: 212-891-1600
Fax: 212-891-1699
sascher@jenner.com
alichtman@jenner.com

Howard S. Suskin†
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Phone: 312-222-9350
Fax: 312-527-0484
hsuskin@jenner.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| In re AURORA CANNABIS INC. SECURITIES LITIGATION<br><br><br>This Document Relates To:<br>ALL ACTIONS | Case No. 2:19-cv-20588-JMV-JBC<br><br>Hon. John M. Vazquez, U.S.D.J. |

**CERTIFICATION OF KEVIN H. MARINO IN SUPPORT OF**
**REPLY BRIEF IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO**
**DISMISS THE THIRD AMENDED CLASS ACTION COMPLAINT**

KEVIN H. MARINO, of full age, hereby certifies and states:

---

† Admitted *pro hac vice.*

1.      I am an attorney at law of the State of New Jersey and a member of the law firm of Marino, Tortorella & Boyle, P.C., attorneys for Defendants Aurora Cannabis, Inc. ("Aurora"), Terry Booth, and Allan Cleiren (collectively, "Defendants"), in the above-captioned matter.  I am fully familiar with the facts set forth in this Certification, which I submit in support of the Reply Brief in Further Support of Defendants' Motion to Dismiss the Third Amended Class Action Complaint.

2.      Attached hereto as Exhibit A is a true and correct copy of the October 9, 2019 article titled *Aurora's $20 Million Wholesale Revenue from Q4 F2019 and the Radient Relationship – Lingering Questions* published by TheCannalysts.

In accordance with 28 U.S.C. § 1746, I certify under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Dated: April 6, 2023

Respectfully submitted,

_____
Kevin H. Marino

**EXHIBIT CITED IN REPLY BRIEF IN FURTHER SUPPORT
OF DEFENDANTS' MOTION TO DISMISS THE
THIRD AMENDED CLASS ACTION COMPLAINT**

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| A | *Aurora's $20 Million Wholesale Revenue from Q4 F2019 and the Radient Relationship – Lingering Questions* |

# EXHIBIT A

# Aurora's $20 Million Wholesale Revenue from Q4 F2019 and the Radient Relationship – Lingering Questions

thecannalysts.blog/auroras-20-million-wholesale-revenue-from-q4-f2019-and-the-radient-relationship-lingering-questions

October 9, 2019

This article will explore the **potential** for Aurora to inflate Sales, Gross Margin and EBITDA by wholesaling to Radient Technologies and buying back extract outside of their tolling agreement. The article will also suggest disclosure needed to reduce the risks arising from operating outside of the tolling agreement.

**Author's Note:** I have tried to keep the below factual, noting when I am providing an opinion and where "potential" for impropriety exists. The information below is incomplete.  As, although we did receive a reply from Aurora, there was not complete closure on the risk windows that I perceive in the Aurora-Radient relationship.  The reply did clarify that there is no buyback agreement on wholesale biomass sold in the Q ended June 30, 2019, but the reply did not eliminate the latitude to potentially exploit the Aurora-Radient relationship without much improved disclosure by both parties.  The texture of information that I would require to satisfy my inquiry would likely fall into selective disclosure, and thus not be made available outside a public disclosure.  I am hoping Aurora and Radient improve disclosure around this area in the September 30, 2019 reporting quarter, and this matter can be put to rest.

In the quarter ended June 30, 2019 Aurora reported wholesale revenue of $20 million on the sale of 5,570 KGs.  This "bulk wholesale cannabis trim" was sold at a Gross Margin of 61% with revenue of $3.61/gram.  The customers for this wholesale trim were not disclosed in MDA.

Wholesale was the strongest segment Gross Margin ("GM") for Aurora in the Q, surpassing the 55% GM and 60% GM of Recreational and Medical cannabis, respectively.  The Wholesale GM allowed Aurora to post Quarter over Quarter ("QoQ") improvement in GM% from 55.6% to 55.7%, and Cannabis GM from 55% to 58%.

The Wholesale Gross Margin of $12.3 million, an $11 million QoQ increase, would have contributed substantially to the Adjusted EBITDA improvement of $9 million for the Q. [**Note**: I am using the negative $25 million Adjusted EBITDA cited by their CFO in the Conference Call and not the reported $11.7 million in their MDA. The negative $11.7 million reported does not take into account the 4th Quarter "true-ups" to reconcile accounting restatements from Q1-3 F2019 which were loaded into Q4F19 in the MDA.]

Aurora did disclose to us that Radient was a customer for trim sales and that Aurora can use either the tolling agreement or sell directly via wholesale.  We didn't get confirmation as to why the tolling agreement was not used in the June Q biomass sales, although it was indicated that Radient may be pursuing extract sales to LP's like MediPharm and Valens business model.   Aurora selling to Radient outside tolling agreement was confirmed.  No comment as to whether Aurora will be buying from Radient outside tolling agreement was provided.

**To summarize… without the Wholesale Revenue figure and the accompanying Gross Margin contribution Aurora would have had a much different Quarter, with Cannabis Sales of $74.6 million versus $94.6 million and likely back sliding on Adj EBITDA QoQ instead of improving.  If sales of biomass to Radient outside the tolling agreement by Aurora are then repurchased in extract form by Aurora and restocked as extraction inventory at a later date for resale, it raises concerns around why a sale took place in lieu of using the tolling agreement. The issue we are raising is not the sale of trim, but potential future repurchases of that biomass in extracted form outside of the tolling agreement.**

In the same Q ended June 30, 2019, Radient Technologies, which is +12% owned by Aurora and Aurora Chief Operating Officer sits on Radient board, purchased biomass which resulted in an inventory of dried cannabis of $21.7 million at the end of June. Radient started the Q with $0 dried cannabis biomass. For the Q, Radient had total revenue of $61K, of which 100% is contract manufacturing (I would assume "tolling" contracts). Radient also evidenced a negative EBITDA greater than $5.0 million for the quarter, and their cash reserves of $24 million (decreased QoQ from $32 million) are less than their Accounts Payable and Accrued Liabilities of $27 million.

From June 30, 2019 Radient MDA:

> During the quarter ended June 30, 2019, **Radient delivered its first commercial batch of cannabis extract products to Aurora**. This was completed under the terms of the **MSA** [Master Sales Agreement], **which provides Radient with a tolling fee for processing Aurora's product**.

> As disclosed in the Company's annual financial statements, in addition to tolling arrangements, Radient began purchasing cannabis for its own account. During the quarter ended June 30, 2019, **the Company entered into agreements with Licensed Producers, including Aurora, to purchase approximately $21.7 million of dried cannabis biomass.**

The above does indicate that more than one LP provided biomass, but there is no mention of split of purchased amounts.  Consider this… it appears whoever sold Radient the biomass availed trade terms, as Accounts Payable increased by $23.9 million to $27.4 million.

There are certain provisions in Canada's bankruptcy laws that allow trade creditors rights to repossess inventory sold, so long as its form hasn't been transformed. Those protections would fall away if biomass was transformed to extracts.  Accordingly, the creditworthiness of the Buyer is particularly important.  As such, biomass providers to extractors would likely be providing limited days of credit availability.

I reached out to two LPs to determine what sample credit terms are in the industry for biomass sales.

- LP #1 indicated 50% down payment and 50% due within 30 days, with credit amount availed fully dependent on financial condition of buyer.
- LP #2 indicated they look to get a down payment, the amount of which depends on the buyer's credit quality, with 30 days as their maximum terms for payment.

One of the big differences between tolling and extract sales for an extractor is the capital requirement changes substantially.  Tolling you do not purchase the inventory; you service the biomass, return it to the customer, and collect your service fee.  If you are going to do third party extraction, you now need capital to purchase inventory, then capital to bridge the processing, shipment and to carry the trade terms you offer customers.  A much greater amount of working capital is required in the latter business model.

My **opinion** is that Radient's present capital structure does not allow them extract large dollar volumes of biomass **without** preferred trade payable terms from vendors **and** very short trade credit terms offered to customers.

In the **opinion** of this credit guy, availing +$20 million in credit to a company with $61k in sales, with a quarterly EBITDA of negative $5 million, and a cash balance of $23.4 million is very generous, unless you have plans to buy back extracted product to extinguish the obligation, and/or you are very close to the operation.  As we have seen of late in this industry raising credit is extremely difficult and expensive.  A, presumably, unsecured $20 million trade credit does cause me pause.  **[I wish to emphasize again that the foregoing is my opinion from simply a credit perspective].** And consider… if a vendor is owed more than $6.5 million in trade payables by Radient they would become Radient's largest creditor.

**But is Aurora planning on buying back biomass from Radient in near term?**

On October 3, 2019 Aurora issued a <u>corporate update</u> which included the following statement:

**Radient Technologies Inc. ("RTI")**

> Radient is **currently extracting/processing a large inventory of cannabis biomass for Aurora** at its Edmonton I cannabis processing facility (designed for 56,000 kg / year throughput capacity).

I do note that the corporate update falls after the September 30, 2019 quarter ends for Aurora and Radient.  As such, Radient may be processing a different biomass than was reported at end of June 30, 2019.

**Radient has an Account Payable for greater than $20 million at June 30, 2019, does Aurora have an Account Receivable for over $20 million?**

From note 26a in Aurora's Audited June 30, 2019 Financial Statements:

> Credit risk for non-government wholesale customers is assessed on a case-by-case basis and a provision is recorded where required. As of June 30, 2019, **$25.1 million of accounts receivable are from non-government wholesale customers.**

Since medical sales are largely cash (sales reimbursed by Veteran Affairs would be non-cash but also governmental, thus excluded from the $25.1 million), and recreational provincial sales are largely to governmental agencies, this $25.1 million is likely owing from whomever purchased the wholesale, any sale of medical cannabis sold through a redistributor, or those provinces where the LP can sell direct to retail. The above bullet is a new addition to financial statements, as it was not included last quarter.

There is no comment about concentration risk in these non-governmental sales, which is something I am used to seeing in notes to financial statements. 20% of last Q sales were wholesale and 29% of receivables are owing to non-government.  If the majority of non-government receivables are owed by a single entity, concentration disclosure should be included in my **opinion**.

So, we have confirmation of Aurora selling biomass to Radient and receiving a "large inventory" of biomass back from Radient. The above does raise questions:

- How much of the $20 million in wholesale that Aurora sold in Q4F2019 was sold (or on-sold) to Radient?
- Will Aurora be buying any of that wholesale biomass extracted product back from Radient?
- And if so, why wouldn't the Master Sales Agreement (which includes the tolling agreement), mentioned above, be used?

Aurora has confirmed to us that **if** there was a buy back agreement, they would not have booked the sale as revenue. They indicate that **sales** to Radient under tolling **and** wholesale to Radient are "two separate things". No mention if buying under tolling agreement and outside of agreement are two different things, and that is the concern of this article.

In my **opinion**, the comment provided doesn't preclude Aurora from circumventing the tolling agreement in order to potentially artificially boost their wholesale revenue and repurchasing Aurora extracted biomass inventory at a later date. And if Aurora is the only company willing to provide significant trade credit to Radient, couple that with their investment, board seat, the fact Aurora will be Radient's largest customer, and if they provide greater than $6.5million in credit they would be their largest creditor (and one could easily argue Radient would not be in existence without Aurora support)… **there is simply far too much opportunity for financial engineering in this relationship.**

**Should sales to Radient be disclosed by Aurora as a Related Party?**

From Aurora Notes to June 30, 2019 Financial Statements

Note 21 Related Party Transactions:

> Accounting Policy: The Company considers a person or entity as a related party if they are a member of key management personnel including their close relatives, an associate or joint venture, those having significant influence over the Company ["Company" would be Aurora not Radient], as well as entities that are under common control or controlled by related parties.

Under this policy, any sales to Radient are not considered "Related Party" transactions, unless they considered them a joint venture and not an investment. Radient is accounted for in notes to Financial statements as a "Strategic Investment" under Level 1 hierarchy. As such, they would not report sales to Radient as "related".

I do note that Aurora's June 30, 2019 statements were audited by a big four firm, as it was year-end. **I am not an accountant and I am unsure if Radient should be treated as a Related Party. The above is my interpretation of their definition offered in the notes to the financial statements.**

[And – tinfoil hat adjusted tightly – in order to circumvent any related party (note not capitalized) the product could always be sold to a third party before resale to Radient if Radient were a "Related Party". **So, in the opinion of the author** there are avenues available to circumvent even "Related Party" disclosures. **There is absolutely no evidence of the foregoing taking place in the transactions above, it is cited simply to establish a potential route to circumvent "Related Party" disclosure.**]

What I am getting at, **and this is opinion**, even without a legal buyback agreement Aurora wields significant economic influence over Radient:

- Investment of +12%,
- Board seat,
- Largest customer,
- **And IF**
  > they provided more than $6.5 million of the +$20 million in trade credit, the largest creditor to Radient,
  > they provided over 50% of the biomass, the largest supplier to Radient.

In my **opinion** there does not need to be a written buyback agreement when you have a de facto captive supplier in a potential financial bearhug. Would Radient say "no" to the opportunity to take revenue from $61k a quarter to multi-millions if their investor and biggest client were to agree to bankroll a transaction by availing the supply of inventory and the trade credit necessary to accomplish it?

While Radient might be outside the definition of Related Party to Aurora their economic influence over Radient is considerable, thus the need for disclosure. I recognize that there is an audit opinion by a big-4 firm, but the potential for perception issues are present. And we have recently had a big-4 firm <u>retract an audit opinion</u> in this very industry. Aurora uses the same audit firm.

As such, tolling, wholesale, and buying back extracts outside of tolling in my **opinion** SHOULD BE SEPARATED AND DISCLOSED by both parties to avoid possible perception of impropriety. The separation for Aurora should be in sales disclosure, accounts receivable disclosure and gross margin disclosure (gross margin, as the credit risk of Radient should be isolated from commercial transactions and priced distinctly).  Radient should also be stepping up disclosure measurably.  Including the terms offered by material vendors to them, especially while their Accounts Payable exceed their cash position.

Lord Denning once said, "**Not only must justice be done it must be perceived to be done**". The present scenario and its disclosure would not pass the "perceived to be done" test if issues arose.

We have often praised Aurora for their disclosure both on segmentation and in their capital structure.  They really do an excellent job. We hope that they step up their disclosure to remove the risk windows that are presently open for potential manipulation in this relationship.

On the heels of the CannTrust bomb crater, previous intercompany transparency issues at Aphria, and the present negative industry sentiment, transparency is very important in this industry.

6/9

I am truly hoping that the biomass at Radient at June 30, 2019 isn't substantially the $20 million Aurora wholesale trim from the June 30, 2019 Q.  And if Aurora does buy inventory from Radient outside of the tolling agreement, they disclose same in the future.

**To summarize:**

What we know from Financial statements, MDA, press releases and correspondence with Aurora:

- Aurora has a +12% investment in Radient
- Aurora has a board seat at Radient
- Aurora and Radient have a tolling agreement to process biomass
- As confirmed to us, the Aurora June 30, 2019 Q sale of biomass to Radient was outside of the tolling agreement
- Aurora also has the ability to sell/purchase to/from Radient outside the tolling agreement
- Last quarter 20% or $20 million of Aurora sales were wholesale – we consider that a material amount
- Radient purchased $21.7 million in biomass trim from Aurora and other LPs in Q ending June 30, 2019
- Radient was granted +$20 million in trade credit this past Q
- Aurora has $25 million in non-governmental trade receivables
- Aurora indicated on October 3, 2019 that Radient is working on "**large**" extraction contract for Aurora

What we don't know:

- The $ amount of Radient's purchase from Aurora in June/19 Q
- The amount of trade credit extended by Aurora to Radient, if any.
- Is Radient presently "extracting/processing a large inventory of cannabis biomass" for Aurora **under the tolling agreement OR are they repurchasing product sold by Aurora**?
  - If it is the latter, will Aurora disclose the repurchase and set off against previous sales?
  - Better yet, Aurora should simply not be buying back inventory processed from Radient outside of the tolling agreement, it creates to much room for financial engineering.
- Based on the credit profile of Radient at June 30, 2019, who thought Radient was credit worthy for trade terms (Accounts Payable or A/P) of +$20 million and how many days does Radient have to repay the invoices, as their A/P now exceeds cash reserves?

- **If** Aurora did extend that level of credit to Radient, is taking that credit risk the reason the Gross Margin was 60% (was the purchase price of trim risk adjusted for credit risk of repayment?).

> **IF** Aurora has advanced in excess of $6.5 million in trade credit then Aurora would be Radient's largest creditor.

## Why is this important?

**IF** Aurora sells product to Radient and Aurora repurchases it, Aurora get to claim a Sale and then reacquire the extracted biomass in inventory, and then they resell it again. Essentially the **potential** to double dip on sales.

> By doing this Aurora would get the benefit of the Sale, the Gross Margin in $'s, and the contribution to EBITDA in the quarter the biomass is sold not when extracted biomass is sold into recreational or medical channels.
> By using the tolling agreement this potential is averted.
> **IF** Radient was an arm's length company, not reliant on Aurora economically, then this would not be as big a potential issue.

Is the extension of credit (by Aurora or whomever extended the $20 million to Radient) above a dollar level of what would be considered "normal terms"? And when is it due to be repaid?

> If whoever extended the trade credit is not buying back extracted product, they are taking the business risk of Radient.  They are not taking simple production risk of being delivered extracted product.  In my opinion, with Radient's current financial condition the business risk of being repaid $20 million in Trade Payable in normal course of business is considerably more than taking back extracted product.

Without a blanket commitment that Aurora will not purchase any extracted product outside of their tolling agreement from Radient (which would be restrictive), and when selling biomass to Radient Aurora would extend prudent trade credit reflective of the transaction, the door of potential impropriety will not be fully closed.

In closing and in our **opinion**, given the investment by Aurora into Radient and the economic clout they wield over Radient it would be beneficial if Aurora increased disclosure on their transactions between Radient: with a clearer demarcation of what is happening under the tolling agreement and what Radient has amassed under their own efforts [including using Radient's own access to arms-length credit terms] and resold.  As presently disclosed there exists potential for impropriety and it will continue if disclosure is not enhanced substantially.

GoBlue

The author has no position in Aurora or Radient and doesn't intend to open one in the next five days. Nor does any member of TheCannalysts Inc. or TheCannalysts Inc.