# EXHIBIT B

| | |
|---|---|
| James E. Cecchi<br>~~Lindsey H. Taylor~~<br>Donald A. Ecklund<br>CARELLA, BYRNE, CECCHI, OLSTEIN,<br>  BRODY & AGNELLO, P.C.<br>5 Becker Farm Road<br>Roseland, NJ  07068<br>Telephone:  973/994-1700<br>973/994-1744 (fax)<br>jcecchi@carellabyrne.com<br>~~ltaylor@carellabyrne.com~~<br>decklund@carellabyrne.com<br><br>*Local Counsel for Lead Plaintiffs*<br><br>~~*Local Counsel for Lead Plaintiffs*~~ | Samuel H. Rudman<br>Alan I. Ellman<br>Magdalene Economou<br>ROBBINS GELLER RUDMAN &<br>  DOWD LLP<br>58 South Service Road, Suite 200<br>Melville, NY  11747<br>Telephone:  631/367-7100<br>631/367-1173 (fax)<br>srudman@rgrdlaw.com<br>aellman@rgrdlaw.com<br>meconomou@rgrdlaw.com<br><br><br>Steve W. Berman<br>Shayne C. Stevenson<br>HAGENS BERMAN SOBOL<br>  SHAPIRO LLP<br>1301 Second Avenue, Suite 2000<br>Seattle, WA  98101<br>Telephone: 206/268-9340<br>206/623-0594 (fax)<br>steve@hbsslaw.com<br>shaynes@hbsslaw.com<br><br>~~*Co-*~~*Lead Counsel for Lead Plaintiffs* |

[Additional counsel appear on signature page.]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re AURORA CANNABIS INC. SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>   ALL ACTIONS. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | ~~Civil Action~~ No. 2:19-cv-20588 ~~(JMV)(~~ BRM-JBC~~)~~<br><br>~~THIRD~~ CLASS ACTION<br><br>**[PROPOSED] FOURTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

**Formatted:** Centered

**TABLE OF CONTENTS**

**Page**

I.    NATURE OF THE ACTION ................................................................................1

II.   JURISDICTION AND VENUE ..........................................................................8

III.  PARTIES ............................................................................................................9

IV.   CLASS ACTION ALLEGATIONS ..................................................................10

V.    SUBSTANTIVE ALLEGATIONS ...................................................................12

      A.    The Company and Its Business.................................................................12

      B.    Legalization of Recreational Cannabis in Canada ...................................13

      C.    Aurora Aggressively Expanded Its Cannabis Production..................1414

      D.    Defendants' Ability to Reach Profitability by FQ4 2019 Was Severely
            Constrained, So They Resorted to a Fraudulent Transaction. ..............17

            1.    Aurora and Its Competitors Created a Massive Oversupply of
                  Cannabis in Canada.................................................................1717

            2.    The Lack of Cannabis Retail Stores in Canada's Most Populous
                  Provinces Undermined Defendants' Profitability Projections..................29

      E.    Aurora's EBITDA Projections Raised Red Flags.............................3535

      F.    Aurora Improperly Recorded Revenue on a Sham "Sale" to a Related
            Entity in June 2019 to Artificially Inflate Its Adjusted EBITDA. ........37

            1.    The History of Aurora's Relationship with Radient. ................38

            2.    Defendants Knew Radient Did Not "Purchase" Biomass from
                  Aurora. ...........................................................................4040

            3.    Defendants Knew that Recording the FQ4 2019 Transaction as
                  Revenue Contravened IFRS, Was Materially False and Misleading,
                  and Artificially Inflated Aurora's FQ4 2019 EBITDA.............................43

            4.    Aurora's Financial Statements Improperly Failed to Disclose the
                  Fraudulent and Related-Party Nature of the FQ4 2019 Transaction. ........50

**Page**

5. Defendants' Improper Recognition of the FQ4 2019 Transaction Resulted in Material Misstatements in Aurora's Financial Statements. ................................................................52

6. Aurora's Representations About Its Disclosure Controls Were Materially False and Misleading.................................................53

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ........................................58

 A. Aurora Provides Guidance and Profitability Expectations. ...................................58

 B. The Truth Starts to Emerge as the ~~Concealed Risk Associated with~~Subject of the Sham Transaction Begins to ~~Materialize~~Be Disclosed..............................65

VII. POST-CLASS PERIOD ALLEGATIONS...........................................................92

VIII. ADDITIONAL SCIENTER ALLEGATIONS....................................................97

IX. LOSS CAUSATION/ECONOMIC LOSS ........................................................101

X. NO SAFE HARBOR ........................................................................................104

XI. APPLICABILITY OF PRESUMPTION OF RELIANCE ...............................105

COUNT I .........................................................................................................107107

Violation of Section 10(b) of the Exchange Act  and Rule 10b-5 Promulgated Thereunder Against All Defendants...........................................................................................107

COUNT II ...............................................................................................................108

Violation of Section 20(a) of the Exchange Act Against the Individual Defendants..................108

XII. JURY DEMAND.............................................................................................109109

**Formatted:** Centered

Lead Plaintiffs Doug Daulton, Francisco Quintana, Donald S. Parrish, and Quang Ma (collectively, "Lead Plaintiffs"),[‡] individually and on behalf of all others similarly situated, by Lead Plaintiffs' undersigned attorneys, for Lead Plaintiffs' complaint against Defendants (defined below), make the following allegations based upon personal knowledge as to Lead Plaintiffs and Lead Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiffs' counsel, which included, among other things, a review of United States Securities and Exchange Commission ("SEC") filings by Aurora Cannabis, Inc. ("Aurora," "ACB," or the "Company"), Company press releases, analyst reports, media reports, and other publicly disclosed reports and information about the Company, and interviews with former employees of Aurora and Radient Technologies Inc. ("Radient" or "RTI"), an entity related to Aurora.  Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of all purchasers of Aurora securities on the New York Stock Exchange ("NYSE") between January 8, 2019 and ~~November 14, 2019~~February 28, 2020, inclusive (the "Class Period"), against Aurora and certain of its officers and/or directors seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    Aurora is headquartered in Edmonton, Alberta, Canada, and describes itself as one of the world's largest cannabis companies, using extensive automation to produce cannabis on a

---

[‡] ~~Matt Golis is no longer serving as a Lead Plaintiff.  This will not result in prejudice to the Class, as the remaining Lead Plaintiffs will continue to adequately represent the Class.~~

massive scale.  On October 23, 2018, Aurora common shares began trading on the NYSE under the ticker symbol "ACB" shortly after the legalization of recreational use of cannabis in Canada.

3.      During the Class Period, Defendants repeatedly touted the massive, growing demand for consumer cannabis in Canada and the Company's priority of ramping up production and capacity to meet this demand.  For example, during an earnings call hosted by Aurora on February 11, 2019, to report on the Company's results for the fiscal second quarter of 2019,[2] Defendant Terry Booth, Aurora's CEO, claimed that he "lose[s] sleep over [the Company's] ability to supply this global cannabis market."  Defendants were so confident of massive consumer demand and their plans to scale up to supply it that—unlike their competitors—in January 2019 they began projecting positive (and unrealistic) adjusted earnings before interest, taxes, depreciation and amortization ("EBITDA") for FQ4 2019, the quarter ending June 30, 2019.

4.      Throughout the Class Period, however, Aurora's sales of cannabis in Canada were severely constrained by at least two factors that were known, or recklessly disregarded, by Defendants: (1) immense over-production of cannabis by Aurora and other Canadian licensed producers; and (2) woefully limited numbers of retail stores in Ontario and Quebec, where nearly two-thirds of Canadian citizens reside.

5.      This did not hinder Defendants from boldly making projections of positive adjusted EBITDA because they devised a scheme they thought would ensure that Aurora met their projections—a sham, round-trip wholesale cannabis transaction with a related party.  Thus, Defendants' projections of profitability were materially false and misleading, and contained

---

[2]   Aurora's fiscal year ends on June 30 of the calendar year.  Accordingly, Aurora's first fiscal quarter ends on September 30 (FQ1); the second fiscal quarter ends on December 31 (FQ2); the third fiscal quarter ends on March 31 (FQ3); and the fourth fiscal quarter ends on June 30 (FQ4).

material omissions, because Defendants omitted to disclose the fraudulent means they intended to, and did, employ in an effort to ensure they met their otherwise unreasonable projections.

6. Recognizing that Aurora would fall short of its financial projections for FQ4 2019, beginning in January or February 2019, Defendants engineered, oversaw, and executed a scheme with a then-undisclosed related entity to artificially and materially inflate Aurora's adjusted EBITDA, a key financial measure that Defendants, analysts, and investors used to evaluate the Company.

7. As detailed herein, at or near the end of FQ4 2019, Aurora, in contravention of International Financial Reporting Standards ("IFRS"), recorded as revenue ~~a~~an approximately $21.7 million "round-trip sale" of dried cannabis biomass to Radient that lacked commercial substance. This action artificially and materially inflated Aurora's FQ4 2019 operating results, including its reported adjusted EBITDA. Pursuant to this scheme, Aurora later repurchased the biomass it previously "sold" to Radient, *i.e.*, it executed a round-trip sale.

8. In light of these facts known to Defendants, Aurora misled investors regarding the Company's expected financial performance. Specifically, Defendants repeatedly stated that the Company expected to achieve positive adjusted EBITDA in FQ4 2019. Even when the Company was "still a ways away from profitable" in the third fiscal quarter of 2019 according to an analyst, Defendants reiterated their expectation of Aurora achieving positive adjusted EBITDA in FQ4 2019. Defendants were adamant about Aurora's financial expectations because they orchestrated a sham biomass sale to Radient to artificially and materially boost Aurora's adjusted EBITDA.

9. Knowing that Aurora had improperly recorded the transaction, weeks after FQ4 2019 and full fiscal year 2019 had *already ended*, on August 6, 2019, Defendants provided a misleading corporate update for the quarter in which they stated that "[t]he Company continues to

track toward positive adjusted EBITDA, and in particular adjusted EBITDA from cannabis operations." Investors thus heard the Company say that it was still on track to achieve adjusted EBITDA profitability in FQ4 2019.

10. As it turned out, however, the revenue improperly recognized on the sham transaction was not quite enough to meet the projection. On September 11, 2019, Aurora reported its financial results for FQ4 2019 and the 2019 fiscal year. Included in the financial results was the adjusted EBITDA metric, showing a loss of C$11.7 million[3] and a miss of Defendants' much-touted projection. The Company stated that the loss resulted from "challenges at the retail level in key markets" that were experienced throughout "the Canadian consumer channel," and that "resolution of this issue [was] beyond the Company's control." On this news, Aurora's stock price fell more than 9%. But for the sham transaction, Aurora would have missed its projection by a much wider margin.

11. Aurora's September 11, 2019 disclosure of missed adjusted EBITDA guidance was a materialization of the concealed risk that Defendants' guidance was premised on Aurora's anticipated effectuation of the sham transaction. Legitimate support for Aurora's guidance was non-existent because it was necessarily predicated on a transaction without economic substance. Defendants' guidance misrepresented Aurora's earnings power and the September 11, 2019 disclosure began to reveal Aurora's true earnings power. When Aurora announced its guidance miss and negative EBITDA for the period, the concealed risk materialized and Aurora's stock declined materially.

---

[3] As of the date of this filingJanuary 22, 2024, C$1 is equal to US$0.74.

- 4 -

11.    ~~Moreover~~Aurora's September 11, 2019 statements disclosed for the first time the subject of Defendants' fraud: Aurora's "miraculous"—in the words of Craig Wiggins ("Wiggins"), a cannabis industry analyst—$20 million wholesale bulk cannabis revenue, which represented an **870% increase** from the previous quarter.  Wiggins also noted that the $12.3 million of wholesale gross margin reported by Aurora for Q4 2019 represented an $11 million quarter-over-quarter increase—reflecting an astonishing **896% increase**—and contributed substantially to the adjusted EBITDA improvement of $9 million for the quarter.  Thus, the September 11, 2019 statements disclosed that Aurora's wholesale segment, which had been Aurora's smallest contributor of revenue, jumped by an astronomical amount.

12.    In addition, Aurora's September 11, 2019 announcement of missed guidance was a corrective disclosure that Defendants' August 6, 2019 statement that "[t]he Company continues to track toward positive adjusted EBITDA" was materially false and misleading because the quarter and full fiscal year had already been over for more than a month, and Defendants had access to the Company's FQ4 2019 financial results and knew, or recklessly disregarded, that Aurora would miss its guidance.

13.    ~~Indeed,~~ Aurora's ~~guidance miss in~~ September 2019 announcement of the wholesale transaction was only the first of several ~~materializations and~~partial disclosures of the ~~concealed risk associated with its~~subject of the sham transaction and its corresponding profitability.  Aurora's stock price—because the sham transaction and Aurora's true earnings power remained partially concealed and Defendants continued to project positive adjusted EBITDA—remained artificially inflated.

14.    Aurora's September 11, 2019 financial disclosures raised ~~suspicion.~~suspicions in the analyst community.  For example, on October 9, 2019, Craig Wiggins~~, a cannabis industry~~

analyst, of *The Cannalysts* published a report explicitly raising, for the first time, concerns about a possible sham transaction between Aurora and Radient. In fact, Wiggins expressly acknowledged that his suspicions of a sham transaction began with Aurora's September 11, 2019 disclosures, triggered by the comparatively large size of the biomass sale in a declining pricing environment.

15. Additionally, on October 23, 2019, Piper Jaffray analysts revised their FQ1 2020 sales estimate in response to Aurora management's statement during the FQ4 2019 earnings call that it expected a "bit of a plateau between now and the advent of the cannabis legalization 2.0 products." Piper Jaffray wrote: "We had imagined this characterization to apply at the total company level, but closer scrutiny suggests that the $20M lift from wholesale sales was likely not included as part of the reference run-rate that management had in mind." Thus, Piper Jaffray interpreted the September 11, 2019 disclosures to mean that Aurora's wholesale sales were not sustainable—and they were not, because they were the product of a sham transaction.

16. In response to the September 11, 2019 disclosures, Aurora's stock price declined by 9.5% the next day, and further in the days that followed.

14.17. On October 9, 2019, Wiggins published his first report raising concerns about a possible sham transaction between Aurora and Radient. In response, Aurora's stock price declined by 9.5% the next day, and further in the days that followed.

15.18. And onOn October 17, 2019, *Yahoo Finance Canada* provided additional discussion and analysis of the transaction between Aurora and Radient. In response, Aurora's stock price declined by 5.4% the next day, and further in the days that followed.

16.19. In light of these allegations regarding the sham transaction, investors kept watch to see any further disclosures from Aurora. On November 14, 2019, Aurora reported its financial

results for FQ1 2020.  Included in the financial results was a 24% decline in total net revenue, a 33% decline in Canadian consumer cannabis revenue, and an adjusted EBITDA loss of C$39.7 million.  The Company stated that "[t]he decline in cannabis net revenues is primarily attributable to previously identified constraints in Canadian consumer retail and distribution infrastructure coupled with a decline in wholesale revenues.  The Canadian wholesale market is rapidly evolving and remains an important long-term opportunity for Aurora."  Aurora acknowledged that quarter-to-quarter sales volume and revenues were difficult to forecast with precision, despite providing EBITDA forecasts since January 2019.  Analysts viewed this disclosure as an indication that Aurora's forecasts could not be trusted and investors reacted further.  ~~In response, Aurora's stock price plummeted 17% the next day.~~

~~17.    These disclosures effectuated a materialization of the risk created by the $21.4 million sham transaction, as Aurora's price inflation during the Class Period dissipated.~~

20.    On February 6, 2020, Aurora announced that Terry Booth, Aurora's CEO, was retiring from his position.  In the same statement, Aurora also announced "sweeping changes intended to rationalize the cost structure and balance sheet going forward."

21.    The same day, Aurora also announced that its cannabis revenues for FQ2 2020 would be approximately $62-66 million with provisions for returns, price reductions and future provisions of approximately $12 million partially as a result of "much lower bulk sales."  The Company explained that net cannabis revenue was expected to be between $50-54 million— significantly lower than Aurora's prior revenue guidance.  Aurora's announcement of the collapse of its wholesale bulk revenue was another partial corrective disclosure of the truth about Aurora's FQ4 2019 wholesale bulk sales: that they had been fraudulently engineered.  In response, Aurora's stock price declined by 22%.

22.    On February 28, 2020, Wiggins published a report titled "Aurora and Radient Technologies: The Possible Return Flight of the Wholesale Biomass Boomerang," discussing Radient's December 31, 2019 earnings.  Wiggins stated in pertinent part: "Today Radient Technology posted their December 31, 2019 earnings.  In these earnings they record sales of $11 million[,] an increase from last Q's $1.2 million, and June 30, 2019 Q of $61 thousand.  Much like the September 2019 statements, which included in Note 15 b) 'Information about major customers' indicating that RTI earned 89% of its revenue from one customer, this Q **indicates Note 16 b) that RTI earned 100% of its revenue from one customer**. . . ." (Emphasis in original).  Wiggins' February 28, 2020 report confirmed the sham transaction link between Radient and Aurora by explaining that Radient earned 100% of its revenue from Aurora.  In response to Wiggins' article, Aurora's stock price fell 7.6%.

18.23.  As a result of Defendants' wrongful acts and omissions, Lead Plaintiffs and other Class members have suffered significant losses and damages.

II.    **JURISDICTION AND VENUE**

19.24.  The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

20.25.  This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

21.26.  Venue is properly laid in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b) and (c).  The acts and transactions giving rise to the violations of law complained of occurred in part in this District, including the dissemination of false and misleading statements into this District.

22.27.  In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the NYSE, a national securities exchange.

### III.   PARTIES

23.28.  Lead Plaintiff Doug Daulton, as set forth in the certification previously filed with the Court and incorporated herein by reference, purchased Aurora common stock during the Class Period and was damaged thereby.

24.29.  Lead Plaintiff Francisco Quintana, as set forth in the certification previously filed with the Court and incorporated herein by reference, purchased Aurora common stock during the Class Period and was damaged thereby.

25.30.  Lead Plaintiff Donald S. Parrish, as set forth in the certification previously filed with the Court and incorporated herein by reference, purchased Aurora common stock during the Class Period and was damaged thereby.

26.31.  Lead Plaintiff Quang Ma, as set forth in the certification previously filed with the Court and incorporated herein by reference, purchased Aurora common stock during the Class Period and was damaged thereby.

27.32.  Defendant Aurora is a manufacturer and distributor of cannabis products based in Canada.  Aurora's common stock trades on the NYSE under the ticker symbol "ACB."

28.33.  Defendant Terry Booth co-founded Aurora in 2006 and served as Chief Executive Officer ("CEO") of Aurora and a member of Aurora's Board of Directors ("Board") from December 9, 2014 until June 26, 2020.  Booth signed the Company's SEC filings, including the

Annual Report on Form 40-F.  Booth was also a member of the Board of Directors of Radient from late 2017 until February 2019.

29.34.  Defendant Allan Cleiren served as the Company's Chief Operating Officer ("COO") from May 2017 through March 2021.  Cleiren was also a member of the Board of Directors of Radient from February 2019 through December 2020.

30.35.  Defendants Booth and Cleiren are collectively referred to herein as the "Individual Defendants."  Aurora and the Individual Defendants are collectively referred to as "Defendants."

31.36.  During the Class Period, the Individual Defendants ran the Company as hands-on managers overseeing Aurora's operations and finances and made the materially false and misleading statements described herein.  The Individual Defendants had intimate knowledge about core aspects of Aurora's financial and business operations, including demand for the Company's products, capital expenditures, and compliance with licensing requirements.  They were also intimately involved in deciding which disclosures would be made by the Company.

## IV.    CLASS ACTION ALLEGATIONS

32.37.  Lead Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all persons who purchased Aurora securities on the NYSE during the Class Period and were damaged thereby (the "Class").

33.38.  Excluded from the Class are Defendants, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

34.39. The members of the Class are so numerous that joinder of all members is impracticable. More than one million shares of Aurora common stock were outstanding and actively traded during the Class Period. The precise number of Class members is unknown to Lead Plaintiffs at this time but is believed to be in the thousands. In addition, the names and addresses of the Class members can be ascertained from the books and records of Aurora or its transfer agent. Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

35.40. Lead Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Lead Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intend to prosecute this action vigorously.

36.41. Lead Plaintiffs' claims are typical of the claims of the other members of the Class because Lead Plaintiffs' and Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants. Lead Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

37.42. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members to seek redress for the wrongful conduct alleged. Lead Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

38.43.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants during the Class Period were materially false and misleading;

(c)     whether the price of Aurora common stock was artificially inflated during the Class Period; and

(d)     the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     The Company and Its Business

39.44.  Defendant Aurora markets and sells cannabis, hemp, cannabis devices, and related products in the cannabis consumer and medical markets.  Aurora operates in more than 25 countries on five continents, presenting itself as one of Canada's leading licensed producers ("LP") and a developer of quality cannabis products.

40.45.  Aurora describes itself as vertically integrated and horizontally diversified across each segment of the value chain, from facility engineering and design to cannabis breeding and genetics research, cannabis and hemp production, derivatives, high value-add product development, home cultivation, wholesale and retail distribution.  Aurora describes its production facilities as intended to be replicable and scalable globally, and designed to produce cannabis of significant scale with low per gram production costs.

41.46.  Aurora was founded in 2006 and received its license to grow cannabis in Canada in 2014.  Aurora has been publicly traded on the Toronto Stock Exchange since July 2017, was traded over-the-counter in the United States under the ticker symbol "ACBFF" until October 2018, and has traded on the NYSE under the ticker symbol "ACB" since October 23, 2018.  Although cannabis is not legal in the United States on the federal level, certain foreign companies that sell, grow, or harvest cannabis can be traded on the NYSE and Nasdaq because they are not subject to the same restrictions as U.S. cannabis companies.

42.47.  Canadian cannabis sales comprise Aurora's core operations.  For FQ1 2019, the three months ended September 30, 2018, Aurora reported $29.674 million in total revenue.  Of that total, $25.865 million in revenue was attributed to the Company's business in Canada.  Thus, Canadian revenue constituted about 87% of the Company's total revenue for FQ1 2019.  For the same quarter, Aurora reported $28.316 million in cannabis revenue, constituting about 95% of the Company's total revenue for FQ1 2019.  For Aurora, Canadian cannabis revenue is clearly the foundation of its business.

B.    Legalization of Recreational Cannabis in Canada

43.48.  On June 18, 2018, Canada became the second country in the world to legalize recreational cannabis when the government approved the Cannabis Act.  Under the Cannabis Act, production of cannabis is regulated by the Canadian federal government, while provinces and cities have greater powers over retail sales either through private or government-owned stores.  Specifically, the Cannabis Act leaves much to the country's thirteen provinces and territories with respect to carrying out the new legislation and setting their own rules, creating a patchwork of regulations.

- 13 -

44.49.  Passage of the Cannabis Act in June 2018 paved the way for a fully legal cannabis market within eight to twelve weeks.  Critics accused the government of moving too quickly and said the new distribution and sales network was too limited to curb black market sales.  Similarly, Canada's provinces complained to the federal government that the eight- to twelve-week schedule put forth as of mid-June 2018 was too abbreviated for them to set up distribution and sales networks before scrambling to establish their regulations and distribution and sales networks.

45.50.  As an example of the varying marijuana availability across the country, Aurora planned to sell cannabis via its investment in Alcanna, Inc. ("Alcanna"), the largest private liquor retailer in Canada.  Alcanna planned to open 37 stores in the province of Alberta—the maximum number of retail locations allowable by law in the province.  In contrast, the province of Ontario stated in September 2018 that federally licensed producers were allowed to open only one retail location in the province, before later announcing that it would have no stores until April 2019.  Ontario is home to Toronto, Canada's most populous city.

**C.    Aurora Aggressively Expanded Its Cannabis Production.**

46.51.  In response to the impending legalization of recreational cannabis in Canada, Aurora engaged in an aggressive expansion strategy leading up to and during the Class Period.  The Company justified its expansion plans based on the purported need to rapidly ramp up production to meet massive, growing consumer demand, both in Canada as well as in the international medical-marijuana space.

47.52.  In one of its largest acquisitions to date, on May 1, 2018, Aurora announced that it completed the purchase of all issued and outstanding shares of CanniMed Therapeutics Inc. ("CanniMed"), which became the first federally regulated cannabis producer in Canada when it was granted a contract by Health Canada in 2000 to produce medical cannabis.  The Company

- 14 -

executed the acquisition with the goal of transforming Aurora into a leading company in the global medical cannabis space.

48.53.  Less than three months later, on July 25, 2018, Aurora acquired all of the issued and outstanding common shares of MedReleaf Corp. ("MedReleaf"), a well-known Canadian Licensed Producer based in Markham, Ontario, that claimed to deliver "premium medical cannabis" products to domestic and global markets, and compelling brands for the adult-use recreational market.

49.54.  The MedReleaf acquisition sought to create a "well capitalized company positioned exceptionally well to generate further shareholder value, driven by the low-cost production of high-quality cannabis products," according to Booth's statement in a press release.  The MedReleaf acquisition is still the largest completed deal in cannabis history, not counting equity investments.

50.55.  On August 14, 2018, weeks after the MedReleaf acquisition was completed, Aurora announced that it completed its acquisition of Anandia Laboratories Inc. ("Anandia").  Aurora claimed that Anandia was considered the industry leader in science, genetics, and independent cannabis product testing.  Aurora justified the acquisition by asserting that the strength of Anandia's expert staff, proprietary assets, and know-how would provide Aurora with an advantage in developing new cannabis cultivars.  In announcing the acquisition, Aurora also stated that Anandia intended to expand its research and development, product testing, and product development facilities to meet both domestic and international demand in advance of the forthcoming legalization of the adult-use market and associated growth.

51.56.  In addition to the aforementioned acquisitions completed before the Class Period began, Aurora acquired five entities during the Class Period: ICC Labs Inc. ("ICC"), Whistler,

- 15 -

Chemi, EnWave, and Hempco.  All of these acquisitions were paid for, in whole or in part, with Aurora stock.

52.57.  Recognizing the Company's aggressive expansion strategy, a Laurentian Bank Securities analyst issued a report on December 7, 2018, naming Aurora as "one of the most aggressive" companies in the industry given "the largest acquisition (CanniMed) followed by the even larger acquisition of MedReleaf."  The analyst provided a near-term forecast "below consensus estimates for the next couple of years," reasoning that sales "will be hampered in the near-term by limited retail distribution outlets in [Ontario] and [British Columbia]."  The analyst also cited "broader concerns of an oversupplied market."

53.58.  On January 17, 2019, Stone Fox Capital Advisors, LLC ("Stone Fox" or "Stone Fox Capital"), a registered investment advisory firm, published an article on investing website Seeking Alpha stating that Aurora "continues to make the wrong deals," describing the Company as "making too many deals and aggressively expanding cannabis production into the inevitable sector crash."

54.59.  On February 19, 2019, Winds Research published an article stating that "Aurora's (ACB) acquisitions when looked through an objective lens are nothing short of gluttonous, as in, they are beyond the order of reason.  This vapid approach of Aurora to expansion, a company that to date displayed little strategic acumen, has rendered their balance sheet as a largely worthless amalgamation of intangible assets and goodwill."

55.60.  On October 29, 2019, Cornerstone Investments wrote that Aurora was overbuilding its cannabis-growing facilities.  In response to the question, "Is Aurora overbuilding?," Cornerstone explained:

> To answer this question, we only need to consider the fact that Aurora is building roughly 400,000 kg of annual capacity in its Canadian facilities alone, in addition

to the >128,000 kg designed for its Denmark facilities.  However, the total Canadian cannabis market is running at 350,000 kg per year currently.  **By common sense, it seems almost impossible to see a scenario where Aurora will be able to find markets for its entire Canadian production**.[4]

**D.    Defendants' Ability to Reach Profitability by FQ4 2019 Was Severely Constrained, So They Resorted to a Fraudulent Transaction.**

~~56.~~61.  As explained in ¶¶~~106-175~~111-180 below, Defendants' projections of profitability ~~were materially misleading because Defendants~~ omitted to disclose the fraudulent means they intended to, and did, employ in an effort to ensure they met their otherwise unreasonable projections.

~~57.~~62.  To put Defendants' EBITDA projections, and the unlikelihood of Aurora meeting them, into context, it is necessary to understand that Aurora's sales of cannabis in Canada were severely constrained by at least two material factors: (1) over-production of cannabis by Aurora and other Canadian licensed producers; and (2) woefully limited numbers of retail stores in Ontario and Quebec, where more than 60% of Canadian citizens reside.

**1.    Aurora and Its Competitors Created a Massive Oversupply of Cannabis in Canada.**

~~58.~~63.  Even before the legalization of cannabis became effective in October 2018—and before the start of the Class Period—certain financial writers began to calculate the amount of cannabis that Canadian growers were planning to produce and warned about oversupply.

~~59.~~64.  For example, on January 9, 2018, Matt Lamers of Marijuana Business Daily wrote an article titled, "Canadian marijuana producers have bankrolled more than enough capacity to meet rec demand."  In the article, Lamers explained that Canada's publicly traded licensed

---

[4]    Unless otherwise noted, emphasis has been added.

producers already had capacity to produce *three times* more cannabis than would be needed to serve the legal cannabis market in the first year of legalization, stating as follows:

> **On paper, at least, the Canadian marijuana industry has plenty of paid-for production capacity to meet demand by mid-2019**.
>
> Companies, in short, have been spending hundreds of millions of dollars to boost production to meet demand starting this summer.
>
> The Marijuana Policy Group (MPG) – a Denver company that provides analysis and policy advice to private and government clients – and a *Marijuana Business Daily* analysis have found that **Canada's publicly traded licensed producers have already bankrolled (or mostly bankrolled) capacity to produce over 1.25 million kilograms (1,370 tons) of cannabis slated to come online between this year and 2019**.
>
> **That's about three times more than MPG believes will be needed to serve the legal cannabis market in the first year**.  (The consultancy serves as an adviser to Health Canada, but this batch of data wasn't compiled for a particular government.)
>
> *        *        *
>
> "**You're unlikely to have a systematic shortage or bottleneck in cultivation, but there may be bottlenecks further down the supply chain, especially in distribution and retailing**," [Miles] Light, [a co-founder and partner with MPG,] said.
>
> **That's because there may not be enough sales outlets, particularly in provinces opting for government-run retail monopolies, including Ontario and Quebec**.
>
> Those two provinces, for example, account for almost two-thirds of Canada's population and will have around 70 adult-use marijuana outlets in 2019 – far less than their combined 1,066 government-run liquor stores – and the current crop of approximately 250 illegal marijuana dispensaries.
>
> Market imbalances might be seen regionally, with some places having too much marijuana and other places not enough.
>
> Conversely, analysts expect provinces with private-sector retail systems will see entrepreneurs address any retail bottleneck by opening outlets with a greater selection of products as well as a wider range of prices.
>
> Khurram Malik – a partner with Jacob Capital Management, a Toronto-based financial advisory firm – said regional retail networks will be key.

**"If you have 50 stores in Ontario where you need 500 stores, that's not a supply glut, that's a bottleneck in distribution," he said. "There will be an inventory glut first before there is excess supply in the market**."

Any inventory glut in the industry will benefit smaller producers, who will find it easier to produce at a higher utilization rate, he said.

60.65. Further, on March 10, 2018, Sean Williams wrote on the Motley Fool investing website about oversupply as follows:

As you might imagine, Canadian cannabis growers have been angling to get as much of the medicinal cannabis and recreational market as they possibly can, though recreational sales will account for a significantly larger share of total sales. Organic expansion, strategic partnerships, and acquisitions have been occurring at a blistering pace. In fact, four of the five largest marijuana acquisitions of all-time have occurred within a four-month span.

**Unfortunately, this rush to grow capacity as quickly as balance sheets will allow could be setting Canada up for an overabundance of cannabis of epic proportions**. Even though no one has any real idea how much marijuana Canadians will demand, there's no shortage of guesstimates. . . .

Everything is a guess at this point, and most folks probably have their preferred source, but **the relative consensus is that 730,000 kilograms to 800,000 kilograms is where the annual demand floor lies**.

61.66. Williams analyzed the annual production estimates of the ten largest Canadian growers (including Aurora), and concluded that just this small group of growers—representing only 20% of the growing licenses issued by Health Canada—are capable of 1,500,000 kilograms of capacity by 2020. That was more than double the consensus estimate for demand in Canada, and it did not even take into account approximately 60 additional licensed growers.

62.67. Indeed, by the start of the Class Period, more companies than ever were lining up to be licensed cannabis cultivators in Canada despite an increasingly competitive market outlook, according to data from Health Canada. As of December 31, 2018, almost 840 site applications were in the licensing pipeline, which was a more than 40% increase from August 2018, when 588 applicants were in the queue. As of January 2019, there were already 145 authorized cultivators,

- 19 -

processors, and sellers licensed under the Cannabis Act.  An analyst from Beacon Securities estimated that the Canadian market alone could not support all the prospective cultivators in the pipeline: "Within Canada there are over 130 licensed producers, and we don't need 130 of anything for the Canadian market on its own.  There has to be a reckoning.  It's a when and not an if."

63.68.  On February 8, 2019, Stone Fox Capital reported that Aurora "has plans to alone flood the global market with production targets in excess of demand."  Indeed, "[t]he mind-numbing stats from Health Canada support **a total cannabis market size in Canada that falls below the size of the production goals of Aurora Cannabis alone**."  Stone Fox also stated that "all signs" indicate "that the cannabis market is going to face a fundamental oversupply scenario. . . ."  According to the author, Aurora, by itself, had forecasted 1.2 million kilograms of annual cannabis production; when combined with the other nine top cannabis producers, the total annual cannabis production was forecasted to be 3.3 million kilograms.  According to Stone Fox, however, Health Canada had projected total market demand in the Canadian cannabis market of 77,000 kilograms per month, or only *926,000 kilograms per year*.

64.69.  Stone Fox noted that "[w]hat is incredibly troubling for a company like Aurora Cannabis that is too focused on cannabis production growth is the ability of relatively small and unknown firms to have plans to join the top 10 list."  For example, British Columbia-based Zenabis "plans to ramp production from 10,000 kilograms to 480,000 kilograms by 2020.  The total cannabis production of an updated top 10 producers list would reach 3.7 million kilograms and the combined group of 3.8 million kilograms or **nearly 4x the forecasted demand**."  In a statement made around the time of the article, Zenabis's CEO said, "we believe there will be producers, ourselves included, who are able to grow high-quality product and **actually satisfy the recreational market in Canada**."  According to Stone Fox, "[s]uch a statement from the CEO of

- 20 -

a relatively unknown firm should scare investors in Aurora Cannabis and the sector in general. Zenabis is planning a production jump that alone would cover 50% of the projected demand in the country. . . .   The mind-numbing part is that [Aurora] itself links to a report by Deloitte that discusses a recreational market with cannabis demand of **only 600,000 kilograms**."  Moreover, "all of the numbers don't even take into account the illegal supplies that still exist and weren't welcomed into the Canadian legalization system."

65.70.  On February 25, 2019, Aurora announced that both its Aurora Sky and MedReleaf Bradford facilities were fully licensed by Health Canada for the production and sale of cannabis and cannabis derivative products.  Aurora stated that these two facilities would add more than 128,000 kilograms per year in capacity.  Stone Fox reported the next day that Aurora was on a path to bring on nearly five times the quarterly supply of Canadian cannabis by June 2019.

66.71.  On March 21, 2019, during an earnings call, Brendan Kennedy, the CEO of Aurora competitor Tilray, provided the first real admission from a cannabis CEO of an oversupply situation on the horizon in Canada.  Kennedy stated, "Over the next 18 months, **we believe there will be oversupply**, just as we have seen in certain U.S. states as operators in new legal markets race and government regulators catch up to find an equilibrium between supply and demand."

67.72.  On March 24, 2019, Sean Williams, writing again for the Motley Fool, explained that "there's no way that Canada can support 1,000 licensed producers, let alone 200."  The result, Williams wrote, would be plummeting prices:

> What happens if domestic supply gets out of hand? For that answer, just look at Colorado, Washington state, or Oregon.  In each of these adult-use legal states, oversupply has run rampant, causing the per-gram price of dried cannabis flower to drop precipitously.  Oregon's supply chain has been particularly troublesome since the state doesn't limit the number of licenses that can be issued.  **If even a couple of hundred licensed producers make it to market in Canada, the country will be glutted with so much dried flower that wholesale and retail prices will plummet**.

- 21 -

68.73. On April 10, 2019, Aurora announced plans to further expand its Aurora Sun cannabis cultivation facility. Aurora said it would expand production space by 33%. The facility would grow from the listed 150,000 kilogram goal to a new production capacity plan of more than 230,000 kilograms. According to Stone Fox, which discussed the announcement the following day, "[i]nvestors need to take note that the forecast capacity went up over 50% on only a 33% increase in additional space." Stone Fox wrote further, "[t]he company already had an aggressive expansion plan in the works and was just entering a period of additional inventory hitting the market to test the supply/demand equation. The question is why the company felt the need to rush into even more future expansion."

69.74. Aurora, Stone Fox explained, "has consistently discussed plans for cannabis production capacity going from 120,000 kg currently to over 500,000 kg by mid-2020 or only one year away now." However, "[a]fter this quarter, Aurora Cannabis now expects production capacity to jump 6 fold to reach over 625,000 kg per annum of dried cannabis."

70.75. According to Stone Fox, Aurora "faces a market that still wasn't showing much in the way of sales growth all the way through January. Yes, after about 3.5 months of recreational-use sales, the Canada market is still only consuming about 7,000 kg of cannabis each month." Stone Fox illustrated the inventory and sales trends, using data from Health Canada, as follows:

- 22 -



71.76.  Pointing to the data, Stone Fox explained the concern based on supply and demand,

as follows:

> The number is problematic as **sales actually declined in January from the November and December levels while finished inventory was growing**.  The big looming issue supporting the theory the market is going to be flooded with supply is that **the unfinished inventory is surging having reached 115,000 kg in January or nearly 20x monthly sales**.
>
> These key data points are problematic for the industry.
>
> - Total sales of dried cannabis in January decreased by 3.7% compared to December (from 7,385 kg to 7,115 kg).
>
> - Total sales of cannabis oil increased by 4.3% (from 7,534 litres to 7,856 litres).
>
> - Total inventory of dried cannabis (finished and unfinished) held by cultivators, processors, distributors and retailers stood at 134,148 kg at the end of January – **18.9 times total sales in the month**.  Cannabis oil inventories totaled 79,703 litres – over 10 times total sales.
>
> - The total amount of finished dried cannabis products held in inventory at the end of January increased by 4.7% compared to the end of December (from 18,646 kg to 19,520 kg). The total amount of finished cannabis oil products increased 26.0% (from 41,986 litres to 52,921 litres).

- 23 -

> **More importantly, the data points don't provide any logic for expanding production**. . . .
>
> Despite any data points supporting a scenario where demand will exceed supply when all of the already planned capacity expansion reaches market, especially with a still strong black market, Aurora Cannabis is investing even more into their farming operations.

~~72.~~77.  On April 18, 2019, Cowen issued a report reflecting on investor meetings they hosted with Chief Corporate Officer ("CCO") Cameron Battley, Chief Financial Officer ("CFO") Glenn Ibbott, and Executive Vice President of Corporate Development and Strategy Carey Squires.  The report indicated that, during the meeting, "**management commented that it is not worried about a potential industry oversupply in the near term**."

~~73.~~78.  During Aurora's May 15, 2019 earnings call, Booth said that "one thing I lose sleep about is our ability to supply the global demand for cannabis. . . .  [W]ith Australia, Mexico and other countries that are coming online, it would take nearly 50 years to meet that demand."  In response, Stone Fox Capital wrote, "[t]he key investor takeaway is that **Aurora Cannabis is increasingly making us nervous that the company is blind to the oncoming flood of cannabis supply**.  The company appears far too bullish on the pricing environment under this scenario."

~~74.~~79.  On May 16, 2019, a Canaccord Genuity analyst issued a report stating that, "after speaking with management and considering its EBITDA guidance for Q4," Canaccord was "admittedly too high in our forecasts for the remainder of the year and have lowered our remaining FY 2019 forecasts as summarized below."

~~75.~~80.  In a June 3, 2019 article, Stone Fox raised additional concerns that legal cannabis sales were stalling at the same time that Aurora was set to start flooding the market with cannabis inventory.  Stone Fox wrote, in pertinent part, as follows:

> Only back at the start of April, Aurora Cannabis announced the decision to increase production by ~80,000 kg to a total of 625,000 kg.  The move remains troubling

- 24 -

because demand in Canada isn't growing with the legalization of adult-use cannabis and the company is effectively blocked out of the U.S. market.

After the initial boost in sales last October, Canadians haven't rushed to the legal weed due to a supposed shortage of legal supplies and retail locations. Or at least the market leaders suggested so, but the sales and inventory data from Health Canada continues to tell a far different story.

During Q1, finished inventory of dried cannabis surged over 60% to 30,802 kg while sales in March was basically flat with December at 7,600 kg. Even more troublesome, unfinished inventory surged to 143,773 kg. **Combined inventory of 174,575 kg is enough supply for nearly 23 months or almost two years at current monthly sales levels**.

~~76.~~81.  Stone Fox cited the following chart to illustrate this trend:



Total Inventories and Sales – Dried Cannabis (Kilograms)

~~77.~~82.  According to Stone Fox, "[w]hat is clear is that the supply flood is already showing up in the monthly data from Canada, yet companies like Aurora Cannabis haven't even seen a big ramp in production through the March data. **The company expects to supply enough cannabis in Q2 alone at 25,000 kg to supply the whole dry cannabis market for the quarter**." Indeed, "[e]ven in March, Aurora Cannabis reached over 9,000 kg of dried flower equivalent or enough for the whole country of Canada in the month."

78.83.  Stone Fox was concerned by Booth's statement during the May 15, 2019 earnings call that "it would take nearly 50 years to meet [global] demand," because it meant that "Management has the mindset that Canadian producers need to supply the world. . . ."  Stone Fox wrote that this mindset "should make investors very nervous based on the above data points."  "The key takeaway," wrote Stone Fox, "is that Aurora Cannabis still hasn't made the case of where all of this supply is going to end up when so many competitors are equally adding supply.  The legal demand in Canada hasn't shown up as expected to support any thesis of expanding supply at such a rapid clip by the end of 2020."

79.84.  On June 14, 2019, Common Sense Trades published an article criticizing Aurora for not devoting one second of their FQ3 2019 earnings call "to discussing the rate of growth in operating expenses versus revenues," leading the author "to believe that the problem will only get worse."  Moreover, the author referenced market data provided by Health Canada, depicted above in ¶76,81 "showing that Canadian marijuana sales have remained stagnant," with sales for March 2019 coming in at roughly the same as sales for December 2018.  The data further showed that "cannabis companies are saturating the market with supply at significantly increasing rates."  According to Common Sense Trades, "[o]ur analysis, therefore, is obvious – **ACB's increase in production in no way correlates to an increase in actionable demand**.  Not to mention any chance of any increase in future revenues outpacing the increasing costs and expenses."

80.85.  On June 18, 2019, Stone Fox reported that Aurora had forecasted supply to reach 25,000 kilograms in the current June quarter, up from sales of only 9,160 kilograms in the prior quarter.  Aurora had recently increased production capacity by approximately 80,000 kilograms to a total target of 625,000 kilograms by 2020 excluding operations in South America.  Stone Fox wrote: "Within the course of a little over a year, Aurora Cannabis alone will grow cannabis

production by ~140,000 kg per quarter or nearly 900% growth.  The company desperately needs demand to surge in just a few quarters."

81.86.  Although Defendants repeatedly affirmed their guidance of positive EBITDA by the fourth fiscal quarter, ending June 30, 2019, Aurora's ability to achieve that goal was threatened by oversupply.  According to a July 1, 2019 article by Stone Fox, "[s]ooner or later, pricing is going to become problematic for reaching that goal."  Stone Fox wrote:

> If [Aurora] sold all of the supply while keeping prices at C$6 per gram, the company is indeed on path to solid EBITDA profits.  **The risk to the story is a gross margins squeeze along with the dip in the net average selling price per gram to C$5.00 or lower while sales fall far short of the 25,000 kgs available in inventory for FQ4**.
>
> - Revenue - 20,000 kgs @ C$6 per gram = C$120M
>
> - Gross Margins @ 60% = C$72M
>
> - OpEx = C$75M
>
> - Adj EBITDA = -C$3M
>
> What about the scenario where the company only sells 15,000 kgs to hold back inventory for edibles and vapes while gross margins dip from the 55% level in FQ3 instead of rising to 60%.
>
> - Revenue - 15,000 kgs @ C$5 per gram = C$75M
>
> - Gross Margins @ 50% = C$37.5M
>
> - OpEx = C$75M
>
> - Adj EBITDA = -C$37.5M
>
> * The analysis doesn't include the C$6-7 million in non-cannabis sales that Aurora Cannabis has on a quarterly basis.
>
> **In either scenario, higher supply crushing prices and gross margins have a devastating impact on the ability of Aurora Cannabis to reach adjusted EBITDA positive any time soon**.  In FQ4, the company is likely to hit the top target of where adjusted EBITDA is within reach of positive territory, but the bottom scenario becomes the reality in the September quarter as industry inventories boom.

> The likelihood of Aurora Cannabis maintaining average selling prices above C$5 per gram is unlikely suggesting any attempt to breakeven will quickly fade. . . .
>
> **The key investor takeaway is that Aurora Cannabis is in a precarious position of being unable to reach adjusted EBITDA positive as industry inventories soar.** The opening up of Ontario stores helped boost cannabis sales in April, but the industry is far ahead of meager demand now.

~~82.~~87. On July 12, 2019, Cornerstone Investments published an article titled "The Looming Risk of Oversupply Is Real," explaining that the rising cannabis inventory would lead to falling prices in Canada. According to the article, "[t]he latest data from Statistics Canada just confirmed our long-held view that the Canadian domestic market will face a wall of supply in the coming quarters. Aurora stands to face immense pressure on pricing as it relies almost entirely on the Canadian market for its revenue." Cornerstone Investments analyzed the data from Statistics Canada,[5] stating, in pertinent part, as follows:

> Based on the latest data published by Statistics Canada, Canadians bought a total of 8,853 kg of dried cannabis in April. Although April saw a 16% increase in dried cannabis sold, **the bigger concern should be the amount of inventory and unfinished products that recorded**. Based on the data, there is currently 31,880 kg of finished inventory in the system which is held roughly equally between distributors/retailers and LPs. **More concerning, there is over 183k kg of dried cannabis that is currently labeled unfinished inventory that presumably should be in the process of being turned into finished products. In summary, the amount of finished inventory is roughly 4x current sales and 21x unfinished inventory. In other words, it takes 4 months to clear the current inventory and another 21 months to clear unfinished inventory**.

~~83.~~88. Cornerstone Investments cited the following chart with data from Health Canada to illustrate this trend:

---

[5] Statistics Canada is the country's national statistical office. The government agency produces publicly available statistics to help Canadians better understand the country's population, resources, economy, society, and culture.

- 28 -

**Total Inventories and Sales – Dried Cannabis (Kilograms)**



84.89. Another important observation, according to Cornerstone Investments, is that cannabis inventory had been rising steadily since legalization in October 2018. Sales, meanwhile, had been stagnant and without any sustained growth.

85.90. With respect to pricing pressure, Cornerstone wrote: "For Aurora, we believe the company will face increasing pressure to lower prices as supply and inventories increase while most consumers refuse to pay the current higher prices from legal channels. . . . Most consumers are already paying far less from illegal channels and we see the current undersupply turning into oversupply within the next few quarters."

> **2.    The Lack of Cannabis Retail Stores in Canada's Most Populous Provinces Undermined Defendants' Profitability Projections.**

86.91. Defendants also were unlikely to reach their projections of EBITDA profitability because the woefully insufficient number of cannabis retail stores in Canada's most populous provinces was adversely impacting Aurora's ability to sell its cannabis products to consumers.

87.92.  Aurora was unable to adequately distribute its products to consumers in Ontario and Quebec, which account for nearly two-thirds of Canada's population.  Those provinces opted to sell cannabis through government-run retail monopolies, leaving the provincial governments to decide how many retail cannabis stores to open.  The result was an acutely inadequate number of stores that created a bottleneck in distribution of an already oversupplied product.

88.93.  After less than one month of legalization, the *Financial Post* reported on November 16, 2018, that Canada had struggled to meet demand for recreational cannabis, with some licensed producers blaming the distribution methods employed by certain provinces, and provinces saying that they did not receive enough product from producers.  On November 15, 2018, Aurora CEO Booth spoke at the Marijuana Business Conference in Las Vegas, at a panel session titled "Canada: Assessing the First Month of Recreational Sales."  The *Financial Post* reported Booth's comments, which it described as at times laced with profanity, and met by the audience with a mix of laughter and shock.

89.94.  During the conference, Booth said that Ontario and British Columbia "shat the bed" when rolling out their retail models for recreational cannabis, and that the only provinces that "got it right" were Alberta and "perhaps" Saskatchewan.  Booth added, "I would say Ontario shat the bed the worst."  Booth said Aurora had lived up to its obligations but suggested that problems with the rollout were holding the Company back.  "We have contractual commitments with the provinces and we have met them," Booth said, adding that "we would be ready right now if the government had let us."  In response to Booth's assessment of the retail rollout, the Ontario Ministry of Finance stated, "the Government is moving forward with a strict private model for recreational cannabis by April 1, 2019."

90.95.  On December 13, 2018, Ontario's Attorney General and Minister of Finance released a statement concerning changes being made to the licensing process for recreational retail cannabis stores in Ontario.  The officials announced that a lottery would be conducted for the issuance of a mere 25 licenses to operators of retail cannabis stores in Ontario, which would not even open for business until April 1, 2019.  The lottery was scheduled for January 11, 2019.

91.96.  On May 3, 2019, *The Globe and Mail*, a Canadian newspaper, reported that since recreational cannabis was legalized the previous October, many Canadians were struggling to buy product in person due to the scant number of storefronts.  *The Global and Mail* compared Canada to Colorado, which legalized recreational marijuana in 2014.  In 2019, Colorado had more than 560 recreational sales outlets serving a population of 5.7 million, or approximately 10 stores for every 100,000 residents.  Citing a May 2019 analysis from AltaCorp Capital, a Canadian investment bank, *The Globe and Mail* explained that Canada had just over 360 actual or planned retail locations, or 10% of the 3,640 locations that AltaCorp said were needed to match Colorado's density.  The shortage was less severe in some parts of Canada, but glaring in others.  For example, according to AltaCorp:

> [I]n Ontario, the first licensed cannabis stores didn't open until April [2019], and only 25 store licenses have been issued to date.  Though not every store has opened, **the planned 25 amounts to 0.2 stores for every 100,000 residents.  To close the gap with Colorado, Ontario would need to add nearly 1,400 stores**.

92.97.  AltaCorp suggested that Quebec would need to add more than 800 stores.  Ontario and Quebec, the largest two provinces based on population in the 2016 Canadian census, only had approximately 60 stores (as of May 2019), when the estimate was a need for *more than 2,200 stores based on Colorado*.  Not only are these two provinces the largest based on population, but the combined population of 21.6 million people accounts for 61.5% of the population in Canada.  "Canada needs more brick-and-mortar retail stores," AltaCorp said.  Cannabis sales growth was

- 31 -

"weak," and AltaCorp attributed a big part of that to the "lack of physical retailers across the country."

93.98. The following chart from AltaCorp illustrates the stores needed by province to match Colorado's density:



94.99. On May 6, 2019, a GMP Securities analyst issued a report decreasing GMP's revenue forecasts for Aurora FQ3 2019 and FQ4 2019 "to reflect the low sales volumes reported by Health Canada in the recreational channel for January and February of 2019." The analyst indicated that "the main reason for the limited sales growth is the cap that has been placed on the retail network by the provincial regulators, limiting the number of cannabis stores and hindering black market penetration."

95.100. Not surprisingly, Ontario's store openings on April 1, 2019, did not save the Canadian cannabis industry. The province had only approved 25 stores and about half those stores were open by then. The problem, as Stone Fox characterized it in a July 1, 2019 article, "isn't the

doubt that sales would eventually start growing as more stores open and Cannabis 2.0[6] launches in mid-December.  The problem is that the market is going to be flooded with supply by the time all these stores open."  For April, Health Canada reported that dried flower inventory surged by approximately 41,000 kilograms.  By comparison, the March inventory level only jumped by 30,000 kilograms, demonstrating how supply was ramping up.  The surge in dried cannabis inventory in April 2019 is represented in the chart in ¶8588 above.

96.101.Indeed, total inventory of dried cannabis held by cultivators, processors, distributors, and retailers at the end of April 2019 stood at "an incredible" 216,000 kilograms, meaning, according to Stone Fox, that the industry then had more than 24 months of supply.

97.102.On July 3, 2019, the Alcohol and Gaming Commission of Ontario ("AGCO") announced that a lottery would be held on August 20, 2019, to determine the recipients of licenses to open an additional 50 cannabis retail stores.  At the time of the July 3, 2019 announcement, AGCO anticipated that new stores would only begin to open in October 2019, as they become ready.[7]

98.103.On September 10, 2019, Stephen Kanaval, writing on business news website Equities, analyzed the problem of too few stores and too much supply in the cannabis industry, explaining, in pertinent part, as follows:

> **The Story of Canadian Cannabis: Incremental Retail and Massive Amounts of Supply**
>
> To cover that point more directly, Aurora Cannabis is partly directly responsible for this oversupply.  There are only 600 retail locations across Canada (to compare, Colorado alone has 100,000 retail locations) amounting to a need of

---

[6]    Canadian cannabis industry participants described a new segment of the industry, defined by the launch of derivative products such as vapes, edibles, infused beverages, concentrates, and topicals, as "Cannabis 2.0."

[7]    As of December 2019, only 24 cannabis stores were open in the entire province of Ontario.

10,000 kilograms per month. Just look at the numbers in Q2 [Aurora's FQ4], **Aurora produced 28,374 kilograms while all of Canada sold 9,976 kilograms** (numbers are for dried cannabis). **The total inventory total across Canada surpassed 250,000 kilograms of cannabis just sitting around**. Even as more stores open and legalization 2.0 – allowing the sale of edibles and infusions – kicks into gear, these numbers will rise incrementally over time. I stress *incrementally*.

This incremental methodology comes from Health Canada. I have covered this before, but in Ontario, the most populous province, only 75 stores have received approval. So, Health Canada is grooming Canada for one scenario and its largest LPs are doing another, and what has transpired is a flood of supply. A flood that will take years to smoke. . . .

You would think a supply correction would be made, but, no, **Canadian LPs are set to produce more than 2 million kilograms of cannabis next year and ACB is the biggest offender with 662,000 kilograms coming from its 15 total production facilities. This is a 5-fold increase from 2019**. The only question to ask is why?

99.104. The swelling inventories at the end of June 2019 are depicted in the following graph

based on Health Canada statistics, which was included in a September 10, 2019 analysis by Stone

Fox Capital:



Figure 1. Total Inventories and Sales – Dried Cannabis (Kilograms)

100.105.    In its September 10 article, Stone Fox echoed its previous sentiment about

the flood of supply, writing as follows:

My articles have constantly preached the Canadian market is headed towards a flood of supply. **The issue is the additional retail locations in Canada aren't going to provide a leap forward in sales**.

The details are clear that Canada lacks retail stores in comparison to the U.S. market. With Ontario having 25 stores now and planning to add up to 50 more in October, the market will see growth, but the growth rate will be muted. **The new stores will cannibalize the existing ones, and the total growth rate won't match up**.

Back in May, Canada only had 360 actual or planned retail locations per the *Globe and Mail* in comparison to the 560 outlets in Colorado alone. Nobody doubts that more stores are needed, and the state needs over 3,600 stores to match the density of 10 stores per 100,000 locations currently in Colorado. . . .

The problem here is that one can't invest based on the need when it differs from the reality of what the government is going to approve. Ontario has only licensed 50 more stores for October bringing the total in the most populous province at only 75 stores by the end of 2019. . . .

In essence, the industry is building for the Colorado use case, but the government hasn't approved such a scenario. **Aurora Cannabis needs to lead the industry in reigning in supply growth. The top 10 companies are still on a path to produce ~2.5 million kg by next year**. . . .

**Aurora Cannabis is leading the industry with plans to go from the 30,000 kg available for sale in the June quarter to over 165,000 kg per quarter by only mid-2020. The industry already has plentiful supply, yet the leading cannabis producer still has plans to grow 5-fold in the next year**.

101.106.    Accordingly, Defendants were disregarding market conditions and the demand picture during the Class Period as they projected positive EBITDA by FQ4 2019. As the charts above demonstrate, there was basically no change in demand throughout fiscal year 2019, the period in which Aurora aggressively ramped up production. Given the fact that Defendants were aggressively pumping out cannabis and onboarding new cannabis facilities while the demand picture was stagnant, the pressure to "create" wholesale biomass sales becomes clear.

**E.    Aurora's EBITDA Projections Raised Red Flags.**

102.107.    Despite providing EBITDA guidance to investors throughout much of the Class Period, Aurora's quarterly financial reports lacked general details on EBITDA, diluted

shares, and earnings per share ("EPS").  On February 14, 2019, Stone Fox Capital wrote, "the big problem" with Aurora's FQ2 2019 earnings reported on February 11, 2019, "is that the company again left out key details such as diluted share counts, EPS numbers and an actual EBITDA number despite discussing the goal of reaching positive EBITDA."  According to Stone Fox, "[t]he even more worrying fact is that **the management team discussed the path to turning EBITDA positive in FQ4 without even providing the FQ2 metric anywhere in the earnings release**."  Stone Fox added, "[o]ne can make an educated guess that the adjusted EBITDA loss was somewhere in the $34 million range" for FQ2 2019.  "The key investor takeaway," according to Stone Fox, "is that Aurora Cannabis continues to provide a lot of financial and operating details, yet the company manages to bury the key metrics.  In addition, the overall strategy continues to be scattered with the company flooding the market with cannabis over the next 18 months. . . ."

103.108.    On May 16, 2019, an analyst at Canaccord Genuity wrote, "[a]lthough improved, **FQ3/19 was still a ways away from profitable**; however, management once again reiterated its expectation of achieving positive EBITDA in [FQ4/19]."

104.109.    On May 18, 2019, Stone Fox Capital wrote, "[t]he biggest promise maintained by management is the goal to reach EBITDA positive by FQ4.  **The company produced a C$36.6 million EBITDA loss in the last quarter so Aurora Cannabis has a huge step to make in the current quarter**."

105.110.    On August 6, 2019, Aurora updated the market with a positive pre-announcement on FQ4 results for the period ending in June.  According to an August 8, 2019 Stone Fox Capital article, "Health Canada data doesn't support these healthy numbers with industry inventory levels soaring."  Stone Fox explained as follows:

> Remember, **Health Canada doesn't support the substantial growth in the market purported by the preliminary numbers from Aurora Cannabis**.  The

data shows that both dried cannabis and cannabis oil has surging inventories and in quarter growth only in the 10% to 20% range.  Total inventory of dried cannabis (finished and unfinished) held by cultivators, processors, distributors and retailers stood at 264,000 kgs at the end of May – **27.8 times total sales in that month**. Cannabis oil inventories totaled 128,000 litres – 13.1 times total sales.

**F.      Aurora Improperly Recorded Revenue on a Sham "Sale" to a Related Entity in June 2019 to Artificially Inflate Its Adjusted EBITDA.**

106.111.      Recognizing that the Company would fall short of its financial projections during FQ4 2019, beginning in January or February 2019, Defendants engineered, oversaw, and executed a scheme with a then-undisclosed affiliated entity to artificially and materially inflate Aurora's adjusted EBITDA.[8]

107.112.      Specifically, at or near the end of FQ4 2019, Aurora, in contravention of IFRS, recorded a $21.7 million "round-trip sale" of dried cannabis biomass to Radient (the "FQ4 2019 Transaction")—a company it held more than 10% of at the time and on whose Board of Directors Aurora's CEO or COO sat.  This sham transaction, engineered to bolster Aurora's underperforming revenue metrics, lacked commercial substance and artificially and materially inflated Aurora's FQ4 2019 operating results, including its reported adjusted EBITDA.  Pursuant to this scheme, Aurora later repurchased the biomass it previously "sold" to Radient, *i.e.*, it executed a round-trip sale.

108.113.      Compliance with applicable accounting standards is a basic and fundamental obligation of publicly traded companies.  As set forth in SEC Rule 4-01(a) of SEC

---

[8]      In its filings with the SEC, Aurora states that adjusted EBITDA is a "Key Performance Indicator" used by the Company to evaluate its business on a day-to-day basis.  Aurora defines adjusted EBITDA as net income (loss) excluding: interest income (expense), accretion, income taxes, depreciation, amortization, changes in fair value of inventory sold, changes in fair value of biological assets, share-based compensation, changes in fair value of financial instruments, gains and losses on deemed disposal, and non-cash impairment of equity investments, goodwill and intangible assets.

Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [IFRS] will be presumed to be misleading or inaccurate . . . ."[9]

109.114.    Defendants falsely and misleadingly disclosed to the public that Aurora's consolidated financial statements for the year ended June 30, 2019, including the accompanying notes thereto, (the "Financial Statements"), were prepared in accordance with IFRS issued by the International Accounting Standards Board ("IASB"), stating as follows:[10]

> The consolidated financial statements of the Company have been prepared in accordance with International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board ("IASB") and interpretations of the IFRS Interpretations Committee ("IFRIC").

110.115.    As detailed below, this representation was a materially false and misleading statement of fact when made because Defendants, knowingly or recklessly, caused Aurora to issue the Financial Statements that were materially false and misleading and presented in violation of IFRS by reporting $21.7 million of revenue on the FQ4 2019 Transaction and failing to disclose its related-party nature.

### 1.    The History of Aurora's Relationship with Radient.

111.116.    In 2001, Radient was formed to pursue commercial opportunities in pharmaceutical, nutraceutical, food, and cosmetic applications utilizing its patented Microwave Assisted Process ("MAP") natural product extraction technology.

112.117.    In January 2017, Aurora and Radient entered into a joint venture research agreement whereby the parties agreed to research the extraction of materials from cannabis. Shortly thereafter, in November 2017, Radient and Aurora entered into a Master Services

---

[9]    17 C.F.R. §210.4-01(a)(1-2).

[10]    IFRS also include international accounting standards ("IAS") issued by the IASB's predecessor, the Board of the International Accounting Standards Committee.

Agreement ("MSA" or "Tolling Agreement") with an initial five-year term.  Under the terms of

the MSA, Radient, using its proprietary MAP technology, agreed to process cannabis biomass

received from Aurora into extracts, distillates, concentrates or oils for a specified fee (*i.e.*, a "toll").

The following graphic generally illustrates the nature of the MSA:



113.118.    The MSA also sets forth the pricing Aurora is to pay Radient for its

extraction services and provides Aurora with rights of priority, including first rights of refusal to

acquire certain cannabis-related intellectual property.

114.119.    Further, the MSA includes an Investor Rights Agreement that provides

Aurora with the right to appoint a director to Radient's Board of Directors and certain rights to

participate in Radient equity offerings, enabling Aurora to acquire, and expand, its ownership in

Radient, which it proceeded to do.

115.120.    Upon entering into the MSA, Aurora invested approximately $14.0 million

in Radient through a combination of private placements, warrant exercises, and convertible

debentures (that Aurora converted into equity in fiscal 2018).

116.121.    As of March 31, 2019, Aurora owned approximately 14%, or 37.6 million,

of Radient's issued and outstanding common shares and 4.5 million Radient common share

purchase warrants.  Additionally, Defendant Allan Cleiren, Aurora's COO, served as a member of

Radient's Board of Directors from February 2019 through December 2020, and Defendant Terry Booth, Aurora's CEO, served as a member of Radient's Board of Directors from late 2017 until February 2019.  Further, certain of Radient's public disclosures from July 8, 2019 state: "Aurora and its affiliates will have access to material confidential information respecting the Company [Radient]."

117.122.      These factors enabled Aurora to exert significant influence over Radient at the time the parties entered into the FQ4 2019 Transaction.[11]  In fact, in its financial disclosures for the year ended March 31, 2020, Radient stated that "the future of the Company [Radient] would be uncertain and the Company's [Radient's] business and financial condition may suffer" in the event Aurora transfers all, or a substantial portion of, its then, 11.93% ownership interest in Radient to a third party.

### 2.      Defendants Knew Radient Did Not "Purchase" Biomass from Aurora.

118.123.      As noted above, at the time of the FQ4 2019 Transaction, Aurora possessed a significant ownership interest in Radient and one of Aurora's senior executives sat on Radient's Board of Directors.  Thus, Defendants possessed material knowledge about and significant insight into Radient's financial and business affairs.

119.124.      Defendants knew, or recklessly ignored, that Radient was in the business of producing extracts and ingredients from plant biomass, including cannabinoids, and that, in June 2019, its extraction technology capability was limited and generated revenue of only $214,000 during the year ended March 31, 2019 ("Radient's 2019 fiscal year"), or just $18,000 in revenue

---

[11]    IFRS defines significant influence as the power to participate in, but not control, the financial and operating policy decisions of the investee.  *See, e.g.*, IFRS *Glossary of IFRS Terms*, IAS 24 *Related Party Disclosures* and IAS 28 *Investments in Associates and Joint Ventures*.

per month.  Though Radient's 2019 public disclosures discuss efforts to expand its manufacturing capability, the construction of any facilities related thereto were not expected to be completed until the second half of 2020.

120.125.      Accordingly, Defendants knew, or recklessly ignored, that there was no plausible business reason for Radient to purchase $21.7 million of cannabis biomass in June 2019, particularly when, as detailed herein: (i) the oversupply of cannabis was then resulting in a steady decline in its price; (ii) Radient's extraction technology capability was limited; (iii) the strength of tetrahydrocannabinol, or THC, in biomass diminishes over time; and (iv) Radient did not possess the financial wherewithal to pay for the FQ4 2019 Transaction.

121.126.      Former Employee ("FE") 1[12] characterized the amount of  biomass in the FQ4 2019 Transaction as "outrageous" and "abnormal."  He[13] said Radient's then-current operating plant was not large enough to process $21 million in biomass in a reasonable amount of time.

122.127.      Other former employees of Radient made similar representations.

123.128.      For example, FE 2[14] stated that he first heard that Radient was going to make a large biomass purchase from Aurora in early 2019, "probably January or February."  "That would be outside the initial tolling agreement," he said.

---

[12]   FE 1 worked at Radient's corporate office as a manager from mid-2018 until at least March 2020.

[13]   All FEs are referenced using male gender pronouns to protect their identities.

[14]   FE 2 worked in operations at Radient from before the beginning of the Class Period until mid-2019.

124.129.    FE 2 said that in May 2019, Radient's extraction technology was still in the testing phase, and the extraction process was not a "validated process" by the time he left Radient later that year.  For several reasons, FE 2 continued to say, it made "no sense" for Radient to make such a large, single biomass purchase rather than a series of purchases over time, particularly when Radient was cash-strapped and Radient could not process it in the current facility.  Moreover, FE 2 stated that you would not want to purchase that much biomass at one time because you would want fairly fresh product or your yield will diminish over time.

125.130.    In addition and as noted herein, at the time of the FQ4 2019 Transaction, the then-existing market conditions were resulting in a steady decline in the price of biomass. According to Craig Wiggins, a cannabis industry analyst, wholesale prices for biomass were falling at the time of the FQ4 2019 Transaction.

126.131.    Moreover, Defendants knew, or recklessly ignored, that Aurora and Radient designed the MSA to specifically address the extraction services Radient was to provide to Aurora – in fact, the MSA explicitly set forth the fee Aurora was to pay Radient for such services. Defendants also knew, or recklessly ignored, that Radient is in the business of producing extracts and ingredients from plant biomass and that it was not in the business of selling, nor had it ever sold, cannabis biomass to third parties.

127.132.    Accordingly, Defendants knew, or recklessly ignored, that there was no plausible business reason for Radient to "purchase" $21.7 million of cannabis biomass from Aurora in June 2019.  As Defendants knew or recklessly ignored, Radient was not Aurora's customer; it was, and is, Aurora's affiliated service provider.

128.133.    The totality of these facts make plain that Defendants knew, or recklessly ignored, that the biomass Radient received from Aurora on the FQ4 2019 Transaction was not a

- 42 -

bona fide sale transaction in the ordinary-course-of-business and should not have been recorded as such in Aurora's Financial Statements.

### 3. Defendants Knew that Recording the FQ4 2019 Transaction as Revenue Contravened IFRS, Was Materially False and Misleading, and Artificially Inflated Aurora's FQ4 2019 EBITDA.

129.134.    Recognizing that Aurora's FQ4 2019 adjusted EBITDA would otherwise miss their publicly issued projections, Defendants orchestrated a scheme with Radient to provide Aurora with a false basis upon which to improperly recognize and report $21.7 million in revenue on a round-trip FQ4 2019 Transaction.  Pursuant to the scheme, Aurora "transferred" dried cannabis biomass to its then-undisclosed affiliate Radient in June 2019, which Aurora later reacquired from Radient.

130.135.    Upon the transfer, Defendants knowingly, or recklessly, caused Aurora to falsely and misleadingly recognize and report in its Financial Statements $21.7 million in revenue on the FQ4 2019 Transaction, which artificially inflated Aurora's FQ4 2019 operating results, including its reported adjusted EBITDA.  Thereafter, during the nine months ended March 31, 2020, Radient "sold" approximately $18 million of cannabis biomass back to Aurora, even though Radient was not in the business of selling, nor had it ever sold, cannabis biomass.  Indeed, in its financial statements for the year ended March 31, 2020, Radient reported total revenue of $18.4 million, *98% of which, or $18.1 million, were from "sales" made to Aurora*.

131.136.    FE 3[15] confirmed that Radient was going to purchase $21 million worth of biomass from Aurora and then sell it back to Aurora, noting "the vast majority, my understanding was going to be sold right back to Aurora."

---

[15]  FE 3 worked at Radient's corporate office in the finance department from the fall of 2019 to at least March 2020.  FE 3 had access to Radient's accounting system.

132.137.     FE 3 also stated it did not make sense for Radient to buy such a large quantity of biomass when it had no customers to buy its finished product and was short on cash: "We were just hemorrhaging cash so it was always going to be a turnaround deal because we were never going to be able to pay cash for $21 million of cannabis that we hadn't processed yet without lining up any other customers yet," he said.

133.138.     FE 1 confirmed Radient's cash-flow problems at around the time of the FQ4 2019 Transaction.  FE 1 said that in the summer of 2019, the company that rented Radient a specialized forklift came to repossess it for non-payment.  He said Radient's CEO cut the rental company a check to avoid repossession; Radient, however, did not pay the next payment when due.  He also stated that a lot of Radient's equipment was being repossessed beginning no later than October 2019.

134.139.     FE 1 confirmed that Radient was having issues making payroll in late 2019/early 2020.  He stated that Radient had insufficient cash to make its $150,000-$160,000 bi-weekly payroll.  According to FE 1, just a few months after Aurora recognized and reported revenue on the FQ4 2019 Transaction, a letter was written to Radient's employees (but not sent) informing them that Radient was not going to be able to make payroll.  FE 1 also noted that, strapped for cash, Radient used funds in its employee-benefit accounts to pay outstanding bills.

135.140.     In fact, since Aurora did not pay for the product it "purchased" from Radient, Radient continued to experience financial distress and struggled to pay its day-to-day operating expenses even after its purported $18 million "sale" back to Aurora during the quarter

- 44 -

ended March 31, 2020.  For example, FE 4[16] stated Radient laid off employees in March 2020, while other employees went unpaid for months.  FE 4 also stated that as of May 2020, the funds from Radient's purported biomass sale to Aurora had not been deposited in Radient's bank accounts, noting the bank balance was "not over a $1 million, definitely not, and certainly not $18 million."

136.141.        Accordingly, Radient transferred back to Aurora a substantial majority of the cannabis biomass "sold" to it by Aurora in the round-trip FQ4 2019 Transaction.  As such, it lacked commercial substance and no revenue should have been recorded by Aurora on the FQ4 2019 Transaction.

137.142.        The accounting rules governing the FQ4 2019 Transaction are neither complex, nor a matter of subjective interpretation.  Aurora's Financial Statements disclose that Aurora applied IFRS 15 - *Revenue from Contracts with Customers* ("IFRS 15") in accounting for its reported revenue.  The *Basis for Conclusions* of IFRS 15 state plainly, in pertinent part, as follows:[17]

> The boards decided to include 'commercial substance' as a criterion when they discussed whether revenue should be recognised in contracts with customers that include non-monetary exchanges.  **Without that requirement, entities might transfer goods or services back and forth to each other (often for little or no cash consideration) to artificially inflate their revenue.  Consequently, the boards decided that an entity should not recognise revenue from a non-monetary exchange if the exchange has no commercial substance**.
>
> [T]he boards also observed that this criterion [commercial substance] is important in all contracts (not only non-monetary exchanges) because without commercial

---

[16]    FE 4 worked in Radient's finance department with access to all of Radient's accounts payable information.  He was at Radient in September 2019 when he began seeing problems with Radient's accounts payable.  FE 4 left Radient after the Class Period ended.

[17]    Generally, an exchange transaction has commercial substance if the risk, timing, and amount of the cash flows associated with the asset received differ from those of the asset transferred. *See, e.g.*, IFRS 15.

substance it is questionable whether an entity has entered into a transaction that has economic consequences. Consequently, the boards decided that all contracts should have commercial substance before an entity can apply the other requirements in the revenue recognition model.

138.143.    IFRS 15 requires contracts have commercial substance before revenue can be recognized, *i.e.*, that the customer acquires all of the significant risks and rewards of ownership of the product sold and has obtained the ability to direct the use of, and obtain substantially all of the remaining benefits from, the goods received.

139.144.    Here, however, Aurora never relinquished control over the biomass it transferred to Radient on the FQ4 2019 Transaction. Rather, the material was simply warehoused until it was subsequently returned to Aurora.

140.145.    As such, the FQ4 2019 Transaction lacked commercial substance and it was improper for Aurora to recognize and report revenue on the FQ4 2019 Transaction. Indeed, Radient never paid for the biomass it received from Aurora, nor did it acquire substantially all of the remaining benefits from, or the significant risks and rewards of, ownership of the product it received.

141.146.    FE 4 stated that he never received, nor did he ever see in the SAP-based accounting system, a $21 million invoice from Aurora. He recalled that he would have been "blown away" by an invoice that size, as Radient did not have the ability to pay such a large invoice. FE 4 further stated that he recalls only seeing an invoice for approximately $2.5 to $5 million from Aurora, which he posted in the accounting system. He said that this invoice sat on Radient's books as a payable throughout his tenure with Radient. "It was never paid and it was processed pretty close to when I had just started there. It sat there for a year, at least," he said.

142.147.    FE 4 confirmed that he had access to paid-bill history and never saw a $21 million invoice being recorded as a payable, nor did he ever see a $21 million accounts payable

balance on the system.  FE 4 reiterated that Radient never had the money to pay that kind of invoice.

143.148.    Securities regulators routinely scrutinize the recognition of revenue on round-trip arrangements similar to the FQ4 2019 Transaction and often bring enforcement actions against such transactions.[18]

144.149.    In fact, Lynn E. Turner, then the SEC's Chief Accountant, issued a statement in 2001 critical of round-trip-type arrangements resulting in revenue recognition, expressing concern about these "sham transactions" engineered simply to inflate reported revenue:

> Companies are increasingly entering into complex strategic alliances, joint ventures, cross licensing and cross ownership agreements.  These arrangements often involve two parties, each providing goods or services to each other, and may also involve the issuance of equity from one party to the other . . . .
>
> **The staff is concerned when it appears Company A has taken $1 million out of its left pocket only to receive that $1 million back in its right pocket, and wants to record the $1 million received in revenue**.  For example, assume that Company A pays Company X $1 million to enter into the purchase and supply arrangement under which Company A agrees to supply a product to Company X and Company X agrees to purchase a specified minimum volume of product from Company A.  Company A gets the $1 million that it gave Company X back through Company X's guaranteed product purchases.  **The staff questions how these types of "round-trip" arrangements result in revenue, and whether, in substance, they are sham transactions engineered solely to inflate the revenue line in the income statement**[.]

145.150.    In addition, Defendants knew, or recklessly ignored, that it was also improper for Aurora to recognize and report revenue on the FQ4 2019 Transaction because Radient did not possess the financial wherewithal to pay for the FQ4 2019 Transaction.  Given their access to Radient's material confidential information, Defendants possessed material knowledge about,

---

[18]    *See, e.g., S.E.C. v. Neil R. Cole & Seth Horowitz*, No. 19-cv-11148, Litigation Release No. 24682 (S.D.N.Y. filed Dec. 5, 2019); *S.E.C. v. Longfin Corp.*, No. 1:19-cv-05296, Litigation Release No. 24706 (S.D.N.Y. filed June 5, 2019); and *S.E.C. v. Mattes*, No. 5:19-cv-01689, Litigation Release No. 24440 (N.D. Cal. filed Apr. 3, 2019).

- 47 -

and significant insight into, Radient's financial and business operations, including Radient's ability to pay for the FQ4 2019 Transaction.

146.151.    Pursuant to IFRS 15, the collection of the consideration to which the entity is entitled from the goods it has exchanged must be probable before revenue is recognized.

147.152.    During Radient's 2019 fiscal year, its operations consumed cash of $6.7 million per quarter.  In addition, its revenue totaled only $214,000.  Further, Radient had entered into a non-cancellable commitment to construct a manufacturing facility obligating it to pay $12.7 million as of March 31, 2019.

148.153.    Given its non-cancellable financial commitments, its fiscal 2019 cash-burn rate, and its cash balance on March 31, 2019 of only $23.5 million, absent an infusion of additional capital, Radient was poised to run out of cash within the following twelve months.

149.154.    Armed with material, confidential information about Radient's financial and business operations, Defendants knew, or recklessly ignored, that Radient's ability to pay the $21.7 million consideration due on the FQ4 2019 Transaction was improbable when Aurora recognized and reported revenue on the FQ4 2019 Transaction.

150.155.    In fact, numerous former Radient employees detailed the difficulties Radient was then having paying ordinary day-to-day operating expenses.

151.156.    FE 2 stated that Radient could not afford to finish paying to construct the new manufacturing facility.

152.157.    FE 3 stated that Radient was experiencing cash-flow problems in May 2019. FE 3 also noted that Radient was not able to make payroll in March 2020.  He also recalled at some point seeing a journal entry identifying a personal loan used by Radient to cover payroll for a different period.

153.158.    FE 4 stated Radient was struggling to pay bills in September 2019 and that in or around May 2020 Radient received calls from angry vendors and bill collectors for bills that were 12 months past due.  FE 4 stated 90% to 95% of the invoices that were processed while he was at Radient went unpaid when he left the company.  FE 4 also noted that certain Radient vendors attempted to repossess certain equipment for non-payment.

154.159.    In addition, FE 4 stated Radient did not have the funds to pay for the $21 million FQ4 2019 Transaction.  He knew this when he began working at Radient; Radient did not have money to pay sub-contractors on a monthly basis, and struggled to make payroll in March 2020.

155.160.    Despite the totality of the foregoing, Aurora's Financial Statements falsely and misleadingly recognized and reported $21.7 million in revenue on the FQ4 2019 Transaction. Defendants knew, or recklessly ignored, that the Financial Statements were intentionally presented in violation of IFRS and materially false and misleading.

156.161.    While the application of IFRS may in some instances require subjective judgment, Defendants made no subjective judgments—other than to commit fraud—when accounting for the FQ4 2019 Transaction because their actions were not supported by any application of IFRS.

157.162.    Thereafter, on November 14, 2019, in its financial statements for the quarter ended September 30, 2019 filed with the SEC on Form 6-K, Aurora issued the following false and misleading statement of fact: "[a]ll outstanding wholesale accounts receivable as at June 30, 2019 [*i.e.*, the FQ4 2019 Transaction] were collected by November 13, 2019."

#### 4.    Aurora's Financial Statements Improperly Failed to Disclose the Fraudulent and Related-Party Nature of the FQ4 2019 Transaction.

158.163.    Pursuant to IAS 24, *Related Party Disclosures* ("IAS 24"), IFRS requires that financial statements provide detailed disclosures about related-party transactions so that investors understand the potential effect of the relationship on the financial statements.[19]  IAS 24 states disclosure about related parties is necessary because, among other things, related parties may enter into transactions that unrelated parties would not and transactions between related parties may not be made at the same amounts as between unrelated parties.

159.164.    Pursuant to ¶9(b)(ii) of IAS 24, a related party is a person or entity that is "an associate or joint venture of the other entity."  IFRS' glossary of IFRS terms defines an "associate" as an "entity, including an unincorporated entity such as a partnership, over which the investor has *significant influence* and that is neither a subsidiary nor an interest in a joint venture."[20]

160.165.    In addition, IAS 24 requires disclosure of related party relationships, transactions and outstanding balances of an investor with *significant influence over* an investee.[21]

---

[19]    According to IAS 24, a related-party transaction is a transfer of resources, services, or obligations between a reporting entity and a related party, regardless of whether a price is charged.

[20]    *See, e.g.*, *Glossary of IFRS Terms* (with reference to IAS 28 *Investments in Associates and Joint Ventures*) defining an associate as "[a]n entity, including an unincorporated entity such as a partnership, over which the investor has significant influence and that is neither a subsidiary nor an interest in a joint venture."

[21]    *See, e.g.*, paragraphs 5, 18, 19 and 21 of IAS 24 *Related Party Disclosures*.

161.166.        As noted herein, IFRS defines significant influence as "the power to participate in, but not control, the financial and operating policy decisions of the investee."[22]

162.167.        During the Class Period, Aurora had the ability to exert significant influence over Radient.  As noted herein, during the Class Period Aurora owned approximately 14% of Radient's stock and its CEO (Defendant Booth) and COO (Defendant Cleiren) each sat on Radient's board.  Each of these factors, standing alone, provided Aurora with the power to participate in, but not necessarily control, the financial and operating policy decisions of Radient.

163.168.        In fact, after the Class Period, when Aurora's ownership interest in Radient had declined from 14% during the Class Period to approximately 12%, Radient conceded as much when it publicly disclosed that "[Radient] has determined that a related party relationship with Aurora exists as at March 31, 2020 through their ability to exert significant influence over [Radient]" and that Radient's "future . . . would be uncertain and [its] business and financial condition may suffer" if Aurora transferred all, or a substantial portion, of its ownership interest in Radient to a third party.

164.169.        Nonetheless, in an attempt to avoid investor and analyst scrutiny about the bona fides of and the accounting for the FQ4 2019 Transaction, Aurora's Financial Statements, in violation of IFRS, failed to identify the related-party nature of the FQ4 2019 Transaction or provide the related-party disclosures required by IFRS.

---

[22]  *See, e.g.*, IFRS *Glossary of IFRS Terms*, IAS 24 *Related Party Disclosures* and IAS 28 *Investments in Associates and Joint Ventures*.

- 51 -

**5.    Defendants' Improper Recognition of the FQ4 2019 Transaction Resulted in Material Misstatements in Aurora's Financial Statements.**

165.170.    As articulated in the SEC's Codification of Staff Accounting Bulletins Topic 1M, *Materiality* ("CSAB Topic 1M"), materiality in the context of financial information not only includes an assessment of the magnitude of the misstatement in percentage terms, but also requires an assessment of the factual context in which the user of financial statements would view the financial information (referred to in accounting and auditing literature as "quantitative" and "qualitative" factors).

166.171.    Thus, CSAB Topic 1M notes, in pertinent part, that:

The FASB rejected a formulaic approach to discharging "the onerous duty of making materiality decisions" in favor of an approach that takes into account all the relevant considerations.  In so doing, it made clear that -

[M]agnitude by itself, without regard to the nature of the item and the circumstances in which the judgment has to be made, will not generally be a sufficient basis for a materiality judgment.  [Footnotes omitted.]

167.172.    During the FQ4 2019 quarter, Aurora reported negative adjusted EBITDA of $11.7 million.  Lead Plaintiffs estimate that Defendants' improper accounting for the FQ4 2019 Transaction understated Aurora's true negative adjusted EBITDA of approximately $22.2 million by $10.5 million, or approximately 47%.  Accordingly, the misstatements of Aurora's income-related financial measures, including its adjusted EBITDA, during the Class Period are quantitatively material.

168.173.    With respect to the qualitative factors that may render a financial misstatement material, CSAB Topic 1M notes that a matter is material if there is a substantial likelihood that a reasonable person would consider it important.  In this regard, CSAB Topic 1M provides:

**[T]he staff believes that a registrant and the auditors of its financial statements should not assume that even small intentional misstatements in financial**

**statements, for example those pursuant to actions to "manage" earnings, are immaterial**. While the intent of management does not render a misstatement material, it may provide significant evidence of materiality. **The evidence may be particularly compelling where management has intentionally misstated items in the financial statements to "manage" reported earnings. In that instance, it presumably has done so believing that the resulting amounts and trends would be significant to users of the registrant's financial statements. The staff believes that investors generally would regard as significant a management practice to over- or under-state earnings up to an amount just short of a percentage threshold in order to "manage" earnings**. Investors presumably also would regard as significant an accounting practice that, in essence, rendered all earnings figures subject to a management-directed margin of misstatement. [Footnotes deleted, emphasis added.]

169.174.    In addition, CSAB Topic 1M notes that among the considerations that a reasonable person may deem important and render material a quantitatively small financial misstatement include:

- "[w]hether the misstatement masks a change in earnings or other trends"; and

- "[w]hether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise."

170.175.    Accordingly, the factual allegations herein demonstrate intentional misconduct by Defendants during the Class Period that caused the Financial Statements to be materially misstated, both quantitatively and qualitatively.

**6.    Aurora's Representations About Its Disclosure Controls Were Materially False and Misleading.**

171.176.    Form 40-F required Aurora's management, with the participation of its principal executive and principal financial officers, to evaluate the effectiveness of Aurora's disclosure controls and procedures.

172.177.    Disclosure controls and procedures are defined as the "controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the Act (15 U.S.C. §78a, *et seq*.) is recorded,

- 53 -

processed, summarized and reported, within the time periods specified in the Commission's rules and forms.[23]

173.178.    In its Form 40-F for the period ended June 30, 2019, filed with the SEC on September 11, 2019, Aurora disclosed:

**Disclosure Controls and Procedures**

Disclosure controls and procedures are defined in Rule 13a-15(e) and 15d-15(e) under the Exchange Act to mean controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the Exchange Act is recorded, processed, summarized, and reported, within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Exchange Act is accumulated and communicated to the issuer's management, including principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

As of the end of the period covered by this report, our management carried out an evaluation, under the supervision of our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the effectiveness of the Company's disclosure controls and procedures. Based upon that evaluation, our CEO and CFO concluded that, as of the end of the period covered by this report, the Company's disclosure controls and procedures **were effective** in providing reasonable assurance that the information required to be disclosed by the Company in reports that we file or submit to the SEC under the Exchange Act is:

- recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and

- accumulated and communicated to our management, including our CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure.

It should be noted that while our CEO and CFO believe that the Company's disclosure controls and procedures provide a reasonable level of assurance that they are effective, they do not expect that the Company's disclosure controls and procedures or internal control over financial reporting will prevent all errors and fraud. A control system, no matter how well conceived or operated, can provide

---

[23]    17 C.F.R. §240.13a-15 - *Controls and procedures*.

only reasonable, not absolute, assurance that the objectives of the control system will be met.

~~174.~~179.    Thereafter, Defendant Booth issued fraudulent certifications mandated by the Sarbanes-Oxley Act of 2002 attesting to these material false and misleading representations of fact, as well as fraudulently representing that any fraud and all significant deficiencies and material weaknesses in the design or operation of internal control over Aurora's financial reporting were reported to Aurora's external auditors, KPMG, LLP, and the Audit Committee of its Board of Directors:[24]

I, [Defendant Booth], certify that:

1.      I have reviewed this annual report on Form 40-F of Aurora Cannabis Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the statements and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this report;

4.      The issuer's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act

---

[24]   Internal control over financial reporting is defined as a process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, or persons performing similar functions, and effected by the issuer's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that: (1) Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer; (2) Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the issuer are being made only in accordance with authorizations of management and directors of the issuer; and (3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the issuer's assets that could have a material effect on the financial statements.  17 C.F.R. §240.13a-15 - *Controls and procedures*.

Rules 13a-15(e) and 15d-15(e)) [omitted pursuant to Exchange Act Rule 13a-14(a)] for the issuer and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    [omitted pursuant to Exchange Act Rule 13a-14(a)];

(c)    Evaluated the effectiveness of the issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)    Disclosed in this report any change in the issuer's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the issuer's internal control over financial reporting; and

5.    The issuer's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the issuer's auditors and the audit committee of the issuer's board of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the issuer's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal control over financial reporting.

175.180.    Defendant Booth also issued fraudulent certifications concerning Aurora's interim financial reports on May 15, 2019 and November 14, 2019, stating as follows:

I, [Defendant Booth], certify the following:

1.    ***Review***: I have reviewed the interim financial report and interim MD&A (together, the "interim filings") of Aurora Cannabis Inc. (the "issuer") for the interim period ended [March 31, 2019 and September 30, 2019, respectively].

2.    ***No misrepresentations***: Based on my knowledge, having exercised reasonable diligence, the interim filings do not contain any untrue statement

- 56 -

of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings.

3.      *Fair presentation*: Based on my knowledge, having exercised reasonable diligence, the interim financial report together with the other financial information included in the interim filings fairly present in all material respects the financial condition, financial performance and cash flows of the issuer, as of the date of and for the periods presented in the interim filings.

4.      *Responsibility*: The issuer's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (DC&P) and internal control over financial reporting (ICFR), as those terms are defined in National Instrument 52-109 Certification of Disclosure in Issuers' Annual and Interim Filings, for the issuer.

5.      *Design*: Subject to the limitations, if any, described in paragraphs 5.2 and 5.3, the issuer's other certifying officer(s) and I have, as at the end of the period covered by the interim filings

      (a)      designed DC&P, or caused it to be designed under our supervision, to provide reasonable assurance that

           (i)      material information relating to the issuer is made known to us by others, particularly during the period in which the interim filings are being prepared; and

           (ii)      information required to be disclosed by the issuer in its annual filings, interim filings or other reports filed or submitted by it under securities legislation is recorded, processed, summarized and reported within the time periods specified in securities legislation; and

      (b)      designed ICFR, or caused it to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with the issuer's GAAP.

5.1      *Control framework*: The control framework the issuer's other certifying officer(s) and I used to design the issuer's ICFR is the Internal Control – Integrated Framework (COSO Framework 2013) published by The Committee of Sponsoring Organization of the Treadway Commission (COSO).

5.2      *ICFR – material weakness relating to design*: N/A

5.3    ***Limitation on scope of design***: The issuer has disclosed in its interim MD&A

    (a)    the fact that the issuer's other certifying officer(s) and I have limited the scope of our design of DC&P and ICFR to exclude controls, policies and procedures of

        (i)    a proportionately consolidated entity in which the issuer has an interest;

        (ii)    N/A;

        (iii)    a business that the issuer acquired not more than 365 days before the last day of the period covered by the interim filings; and

    (b)    summary financial information about the proportionately consolidated entity, special purpose entity or business that the issuer acquired that has been proportionately consolidated or consolidated in the issuer's financial statements.

6.    ***Reporting changes in ICFR***: The issuer has disclosed in its interim MD&A any change in the issuer's ICFR that occurred during the period beginning on October 1, 2018 and ended on December 31, 2018 that has materially affected, or is reasonably likely to materially affect, the issuer's ICFR.

## VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

~~176.~~181.    Throughout the Class Period, Defendants artificially inflated the trading price of Aurora common stock by issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements not misleading.

### A.    Aurora Provides Guidance and Profitability Expectations.

~~177.~~182.    On January 8, 2019, Aurora issued a press release providing updated FQ2 2019 results for the quarter ended December 31, 2018. The Company continued to represent that its strategic expansion was well underway and that it was not only increasing revenues, but also controlling costs. And for the first time as a public company, Aurora provided EBITDA guidance to the market. The press release stated in pertinent part:

Paired with strong current and future anticipated demand for the Company's products across its different market segments, this is expected to result in continued strong revenue growth.

\*        \*        \*

Consequently, management believes the combination of substantial revenue growth and disciplined cost management positions the Company well to **achieve sustained positive EBITDA beginning in Fiscal Q4 2019 (Calendar Q2 2019)**.

\*        \*        \*

"Aurora continues to execute effectively across all market segments, as demonstrated by its revenue growth anticipated to exceed 68% as compared to last quarter, supported by continued strong performance in the Canadian adult consumer use market," said Terry Booth, CEO of Aurora. "Our consistent and high-quality production continues to significantly ramp up as expected, fueling even further growth. **Going forward, we see sustained strong demand from the adult usage market**, as evidenced by public statements from the Canadian provinces, as well as strong patient-driven demand for medical cannabis in Canada and abroad. **These factors, together with our focus on disciplined management of operating expenses, and our growing portfolio of higher margin products, put us in a position to rapidly achieve positive EBITDA within the next two quarters**."

178.183.    Aurora's publicly traded competitors, however, did not provide financial guidance to investors during the Class Period.

179.184.    Aurora's guidance was materially false and misleading because, as explained in ¶¶57-175, it lacked a reasonable basis and was premised on Defendants' plan to engage in a sham sale to Radient.  As explained in ¶¶61-180, Defendants omitted the material fact that Aurora's guidance was based on the execution of the FQ4 2019 Transaction, without which Aurora otherwise would be unable to meet the stated guidance.  Accordingly, Defendants' guidance distorted Aurora's financial outlook for investors.

180.185.    On February 11, 2019, the Company issued a press release announcing its FQ2 2019 results.  The press release quoted Defendant Booth at length, highlighting the purported strong and sustained demand for the Company's products and the completion of progress

milestones at the Company's production facilities, and reiterating Defendants' positive EBITDA

projection by fiscal Q4 2019.  The release stated in pertinent part:

> Consequently, and consistent with previous guidance, management believes that the combination of substantial revenue growth, low cost of production, and disciplined operating cost management will position Aurora to **achieve sustained positive EBITDA beginning in fiscal Q4 2019 (calendar Q2 2019)**.

*     *     *

> **Management Commentary**
>
> "Aurora continues to execute strongly across all of its market segments, as demonstrated by the 83% revenue growth over last quarter and the significant increase in confirmed production results," said Terry Booth, CEO of Aurora.  "Our brands continue to resonate extremely well in the consumer market, our patient numbers continue to increase steadily, and we have maintained our market leadership in Germany and other key international markets.  **We are experiencing exceptional demand for our Canadian medical and consumer products, as well as sustained strong demand internationally.  With our Aurora Sky and MedReleaf Bradford facilities ramping up production as anticipated and our other licensed facilities operating at full capacity, we are reiterating our earlier guidance of achieving sustained EBITDA positive results from the second calendar quarter of this year (our fiscal Q4)**."

181.186.　　　During the same call, Aurora CFO Ibbott similarly emphasized the "very

strong demand" for Aurora's products, and said that Aurora was "very comfortable in reiterating

our earlier guidance of achieving positive EBITDA in our fiscal Q4," stating in pertinent part:

> **With the rapid scale-up of our production and the related increase in product availability, the continued very strong demand for our products**, our planned expansion of a derivative product portfolio of these higher-margin products and continued discipline in our operating cost, **we are very comfortable in reiterating our earlier guidance of achieving positive EBITDA in our fiscal Q4, that's April to June 2019**, with positive operational cash flow following shortly thereafter.  We are executing well as reflected in these results and in our expectations going forward, and we are exceptionally well positioned as one of the clear leaders in the global cannabis industry.

182.187.　　　Despite data indicating that oversupply would be a problem earlier than

Defendants were disclosing to the market, Aurora continued its aggressive expansion approach.

On March 4, 2019, Aurora announced that it completed the acquisition of all the issued and

- 60 -

outstanding shares of privately held Whistler Medical Marijuana Corporation, a certified organic Canadian cannabis brand.  Through Whistler's two indoor licensed production facilities, Aurora sought to increase product offerings for both domestic and global markets.

183.188.    On April 10, 2019, Aurora issued a press release providing an update on its Aurora Sun construction project.  The press release stated in pertinent part:

> "Aurora Sun represents the next evolution in our Sky Class facility design, delivering massive scale, low cost production, and consistent, high-quality cannabis," said Terry Booth, CEO of Aurora.  "Particularly in newly-opened markets, establishing first-mover position and embedding Aurora's market share and brand requires a stable and reliable supply of high-quality cannabis for these markets.  **The increased scale of Aurora Sun reflects our expectations for the long-term growth in global demand, especially the higher margin international medical markets which will be faced with significant supply shortages for the foreseeable future**.  Sun is also designed with flexibility in mind to enable us to quickly meet changing market demands, particularly as breeding and cultivation technologies evolve and as customer preferences and requirements change."

> \*       \*       \*

> **Ground work at the facility is nearing completion, erection of the steel structure is advancing and installation of the glass at Sun is expected to be completed in May 2019**.  Like Aurora Sky, Health Canada licensing requests have determined that rooms will be available for planting before the entire facility is completed.

184.189.    On May 14, 2019, Aurora issued a press release announcing its FQ3 2019 financial results for the quarter ended March 31, 2019.  The release again highlighted Aurora's purported strong execution in meeting growing consumer demand and controlling costs, and reiterated EBITDA guidance.  The press release stated in pertinent part:

> Glen Ibbott, CFO, added, "Aurora is an extremely active and diversified company, leading the industry in cannabis research, product development, cultivation, global scale, and revenue growth.  With a solid Q3 on all fronts, it's time to move the yardsticks for the industry again.  **The company we have built with purpose through both organic growth and targeted acquisitions has provided a unique opportunity: continue to lead the industry in revenue growth while also progressing to positive operating earnings in the near term**."

> \*       \*       \*

**With Aurora Sky now operating at full capacity, the Company anticipates continued reduction in production and manufacturing costs allowing cash costs per gram to continue to trend lower.** Management reiterates its expectation that the average cash cost to produce per gram at its Sky Class facilities will be below $1.

With disciplined cost management, **the Company expects SG&A costs to grow modestly over the remainder of the fiscal year**. Consequently, management anticipates that with sustained revenue growth and lower cash costs per gram, **Aurora is well positioned to achieve positive EBITDA beginning in fiscal Q4 2019 (calendar Q2 2019)**.

~~185.~~190.    Aurora's Management's Discussion and Analysis for the quarter, filed as an

exhibit to a Form 6-K on May 15, 2019, stated in pertinent part:

**With our increased availability of supply and broad global reach, Aurora is well on its way to near term profitability and the shift to a strong cash flow position**. Based on currently planted, regulator approved, cultivation rooms, Aurora is on track to harvest and dry in excess of 25,000 kilograms of high-quality cannabis in the quarter ended June 30, 2019, with additional production through the remainder of the calendar year as Sky and Bradford achieve optimal production levels. With additional capacity coming onstream over the next 12 to 18 months, product availability will continue to increase materially.

\*       \*       \*

The Company expects adjusted EBITDA to continue to improve due to higher sales, improved gross margins through economies of scale, and contained SG&A growth. **For fiscal Q4 2019, the Company is targeting to achieve positive adjusted EBITDA**.

\*       \*       \*

**Facility Updates**

On April 10, 2019, the Company announced an update on the status of Aurora Sun, the Company's latest and largest "Sky Class" facility, which is currently under construction in Medicine Hat, Alberta. **To support rapidly growing global demand for high-quality medical cannabis in Canada and abroad, the facility will be expanded to 1.62 million square feet, representing a 33% increase from its originally planned 1.2 million square feet**. With the Sky Class production philosophy proven at Aurora Sky, the Company is confident in projecting an expected production capacity at Aurora Sun in excess of 230,000 kg of high-quality cannabis per annum.

186.191.      Also on May 15, 2019, Aurora hosted an earnings call led by Defendant Booth, CFO Ibbott, and CCO Battley.  During the call, Battley reiterated prior guidance, stating, "I'm happy to say that we are still tracking for positive EBITDA in this quarter," ending June 30, 2019.

187.192.      During the same call, Ibbott reiterated the Company's guidance, stating in pertinent part:

> In Q3 2019, our adjusted EBITDA loss decreased by 20% in the quarter to $36.6 million from the $45.5 million in Q2.  I should note that we have defined adjusted EBITDA in our Q3 2019 MD&A.  Through the combination of substantial revenue growth, a declining unit cost of production, increased availability of higher-margin derivative products, increased shipments to the EU and ongoing disciplined operating cost management, **Aurora continues to track towards achieving positive EBITDA beginning in this current fiscal Q4 2019**.

188.193.      By not contradicting Battley's and Ibbott's statements concerning Aurora's EBITDA projections, Booth tacitly endorsed them.

189.194.      On August 6, 2019, Aurora issued a press release providing an update on its FQ4 2019 results for the quarter ended June 30, 2019.  The press release indicated that the "Company continues to track toward positive adjusted EBITDA, and in particular adjusted EBITDA from cannabis operations."  In the press release, the Company projected net revenue of C$100 million to C$107 million, net of excise taxes.  *At the time of the August 6, 2019 press release, Aurora's fiscal quarter had already been over for more than a month*.

190.195.      On August 23, 2019, Battley was interviewed by James West of Midas Letter.  The interview focused on Aurora's ability to meet its guidance for FQ4 2019, which had already ended nearly two months earlier.  Battley conveyed the sense that Aurora was confident it had met its guidance, which was supposed to be announced before September 15, 2019.  Battley stated, in pertinent part, as follows:

- 63 -

**James West**: And your recent projections suggest that, the guidance suggests that, you are getting very close to that and some serious revenue.

**Cam Battley**: Well, so, yeah. **We put out guidance, you know, a little over a week ago, and I think it was pretty important. We've seen some kind of weak earnings reports from some companies; we wanted it to be clear that we're not experiencing some of the challenges that some of the others are, temporary or otherwise**. And so based on our guidance, we're anticipating in excess of 100 million in net revenues – over 90 million, between 90 and 95 million, in cannabis revenues, and that makes Aurora the global revenue leader in the cannabis sector, which is gratifying, because it's something that we anticipated quite some time ago, and I think a lot of people found – I think they had a hard time believing that we'd be able to achieve it.

But we have, and you know, if you just take a look at **the last 18 months, Aurora's production has gone from about 5,000 kilograms per year to over 150,000 kilograms per year. So it's a, you know, 30 times increase in a very short period of time**. And beyond that, we've established what we believe is the global benchmark for cannabis production: no lost crops, very high quality, yields that I don't think anybody's ever seen at scale before. And we've found the markets, globally, to be able to distribute that. So we're the leaders in medical cannabis in Canada. We're the leaders in medical cannabis internationally. And we're the leaders now, apparently, according to third party reports, in the Canadian adult consumer market, as well.

~~191.~~196.        When pressed on how Aurora's EBITDA number was going to look relative to analysts' consensus, Battley confidently said that Aurora was "going to be pretty darn close," stating, in pertinent part, as follows:

**James West**: Okay. So you're reporting your Q4 and year-end for fiscal 2018, correct? Now, how is your net number going to look relative to analysts' consensus?

**Cam Battley**: **We're going to be pretty darn close**. We, you know, obviously maintain close relationships with the analysts; we give them access to all the information that they need. **So we're going to be pretty close to where analysts have anticipated that we would be. It's one of the reasons that we put out this guidance; we want there to be no surprises**. We want to lead this sector in transparency as well as in other things, and we want to have clarity, and we want to let people know what to expect.

**So that's why we put out the guidance. We are continuing to track towards positive EBITDA, as indicated earlier in the year, and I'm very, very pleased with that**. And I'll tell you why: we, by putting a stake in the ground that we were taking profitability and that that path to profitability, seriously, it applied a whole

- 64 -

new level of discipline to our operations.  We're not pushing out the promise of profitability, you know, year after year after year.  And while we do believe that it's critical to establish infrastructure globally while this window of opportunity exists, we don't think that that conflicts with the opportunity to achieve profitability.

**So, I'm very, very pleased with the way we're doing**. . . .

192.197.    Defendants' statements referenced in ¶¶177, 180-181, 183-187,182, 185-186, 188-192 and 189-191 were materially false and/or misleading because they failed to disclose that Aurora's adjusted EBITDA projections were premised on Defendants' plan to engage in a sham transaction with Radient.   Defendants194-196 omitted the material fact that Aurora's guidance was based on the execution of the FQ4 2019 Transaction, without which Aurora otherwise would be unable to meet the stated guidance.  Accordingly, Defendants' guidance distorted Aurora's financial outlook for investors.

193.198.    Additionally, Defendants' statements referenced in ¶¶189-191194-196 concerning the Company continuing to track toward positive adjusted EBITDA were materially false and misleading and/or omitted material information because at the time of the statements, Aurora's fiscal quarter had already been over for more than a month and Defendants had access to the Company's FQ4 2019 financial results and knew, or recklessly disregarded, that Aurora would miss its guidance.  Defendants also omitted the material fact that Aurora's guidance was based on the execution of the FQ4 2019 Transaction, without which Aurora otherwise would be unable to meet the stated guidance.

**B.    The Truth Starts to Emerge as the Concealed Risk Associated withSubject of the Sham Transaction Begins to MaterializeBe Disclosed.**

194.199.    On September 11, 2019, after the market closed, Defendants issued a press release announcing Aurora's FQ4 2019 and full-year 2019 financial results and filed a quarterly report on Form 6-K.  Defendants disclosed that Aurora incurred an adjusted EBITDA loss of

C$11.7 million.    Defendants also disclosed wholesale revenues of $20.1 million.    Aurora's

adjusted EBITDA loss came despite Defendants' repeated, positive pronouncements throughout

much of the Class Period of adjusted EBITDA positivity by the end of FQ4 2019.  Defendants

blamed the EBITDA loss on "challenges at the retail level in key markets" but maintained that

Aurora "continues to track toward positive adjusted EBITDA," stating, in pertinent part, as

follows:

> [T]he Canadian consumer channel continues to experience challenges at the retail
> level in key markets and resolution of this issue is beyond the Company's control.
> Aurora is working closely with all our regulatory and channel partners to streamline
> distribution as **the Company continues to track toward positive adjusted
> EBITDA on a consolidated basis**.

195.200.    Despite this partial corrective disclosure about the subject of the sham

transaction, namely, Aurora's wholesale bulk cannabis sales, Defendants continued to conceal

Aurora's sham transaction with Radient and its true financial condition.  The September 11, 2019

press release represented that Aurora was continuing to meet evolving demand and successfully

keeping costs under control as it continued to ramp up production, and expected continued

improvement in adjusted EBITDA.  The press release stated in pertinent part:

> The global cannabis and hemp markets represent a significant opportunity for
> Aurora and the Company will continue to make the necessary investments today to
> build long-term value for shareholders.  However, Aurora will take a balanced
> approach to these investments with a focus on operating a sustainable and profitable
> business.

> The introduction of new product formats to the Canadian consumer market this fall
> represents a significant opportunity for the Company.  Aurora expects to have a
> robust product line-up ready to launch in December.  Given the very early stage of
> development of the consumer market in Canada and international medical markets,
> management anticipates that quarter to quarter sales volumes and revenues may be
> volatile.  **The Company expects adjusted EBITDA to continue to improve in
> the future due to expected revenue growth, improvements in gross margin and
> prudent SG&A growth**.

196.201.    On September 12, 2019, before the market opened, Aurora hosted an earnings call, led by Defendant Booth, and including executives Ibbott, Executive Chairman Michael Singer, and Battley.  During the call, Battley indicated that the Company generated C$99 million of net revenue, missing the guidance it provided to the market only five weeks earlier, having previously projected C$100 million to C$107 million in overall net revenue.

197.202.    During the call, Aurora leadership discussed the bulk wholesale revenue Aurora achieved during the quarter.  Knowing that the FQ4 2019 Transaction was a one-time sham transaction intended to meet Defendants' projections, Ibbott cautioned investors against "expecting bulk sales of the magnitude we achieved in Q4 2019 to be consistent or repeatable." Ibbott stated, in pertinent part, as follows:

> **As you'll note, our fiscal Q4 included approximately $20 million is [sic] wholesale bulk cannabis revenue**.  We sold cannabis trim for an average price of $3.61 and a margin of 61%.  **In the future, we expect to sell into the wholesale channel opportunistically and when pricing and terms are appropriate.  We caution against expecting bulk sales of the magnitude we achieved in Q4 2019 to be consistent or repeatable**.  However, we do maintain a focus on the bulk sales market, **and we do believe there will be further opportunities there in the future**.

198.203.    Battley discussed the demand for wholesale product, which he knew Defendants fabricated, as follows:

> **Matt Bottomley** - Canaccord Genuity Corp., Research Division - Analyst
>
> [W]hat's the best way for . . . analysts to look at this considering that the wholesale may not be repeatable and the recreational revenues could still see potential headwinds?  [J]ust trying to anticipate the potential magnitude of the lumpiness going forward."
>
> **Cam Battley** - Aurora Cannabis Inc. - Chief Corporate Officer
>
> "Yes.  I'll take the first crack at this and then hand off to Glen.  **First thing is, the demand is actually there for wholesale product**.  And you'll note that we got an extremely attractive price for trim, $3.61 a gram, and that the margins were even better than overall gross margin.  **So if we have opportunities and it's likely we will, we will proceed with additional bulk wholesale**.

199.204.    Battley also explained that Aurora's failure to achieve positive EBITDA was due to the constraints in retail infrastructure, which Defendants were aware of much earlier. Battley stated, in pertinent part, as follows:

> **Now would we have like to be at positive EBITDA at this point? Sure. Part of the reason that we're still working towards that is, as Glen mentioned earlier, we would have liked to have seen greater retail infrastructure in Canada. More stores, obviously is better for the whole sector and disproportionately beneficial to us as the leaders in the consumer market**.

200.205.    In reality, Aurora missed its positive EBITDA projection by a much wider margin, the true extent of which was undisclosed to investors because the sham transaction with Radient remained concealed. It took the sham transaction to come within $11 million or so of its projections. Without the sham sale, it would have missed that projection by more than $30 million, a material difference to investors. The failure to achieve positive EBITDA was because even the FQ4 2019 Transaction was not sufficient for Defendants to meet their guidance.

201.206.    During the call, Ibbott said the Company expected EBITDA to improve:

> **There are remaining constraints to face the growth in the Canadian market that we would like to see resolved, including the timing of currently approved and future retail stores**. The resolution of these constraints will impact the timing of our EBITDA positive target, but we do expect these constraints become less of an issue over the next several quarters. **As we continue to execute on our strategy, the company expects adjusted EBITDA to improve in the future due to higher sales, improved gross margins and prudent SG&A growth**.

202.207.    Also on September 12, 2019, Executive Chairman Singer, during an interview with BNN Bloomberg, discussed Aurora's expectation that achieving positive EBITDA was still feasible. Singer said: "If [there is a] rollout of additional retail outlets in Canada and a successful rollout by Health Canada with regards to the derivative market, we anticipate that going into the second half of this year, we should be able to deliver positive EBITDA."

203.208.    On September 13, 2019, Jonathan Cooper, writing on Seeking Alpha, discussed Aurora's missed projections, stating:

**Unfortunately, Aurora also sho[t] itself in the foot by making promises it could not keep consistently promising EBITDA profits in the fourth quarter and failing to hit its own preliminary revenue forecast range. The market punished Aurora for those missteps, and management should learn to provide more conservative guidance or to skip providing guidance altogether**.

~~204.~~209.    Discussing the guidance miss on September 24, 2019, Stone Fox Capital

wrote:

For anybody fighting against supply rationalization, the FQ4 revenues, margins and prices flew in the face of those theories. **The company had long predicted positive adjusted EBITDA during the June quarter and the actual results didn't come close**.

Aurora Cannabis generated an adjusted EBITDA loss of C$11.7 million in the quarter **while even missing preliminary revenue guidance provided over 35 days after the quarter closed**. At this point, investors shouldn't focus on the pure growth metrics over the bottom line numbers and the ability to hit corporate targets.

Aurora Cannabis guided to FQ4 revenues of at least C$100.0 million and the company only hit C$98.9 million. **Good companies just don't miss updated guidance from after the quarter closed**. . . .

The real issue remains the amount of supply and the pricing scenario.

~~205.~~210.    On September 13, 2019, Sean Williams published an article on the Motley

Fool website titled, "Aurora Cannabis Missed Its Own Sales Guidance . . . . From 5 Weeks Ago,"

stating, in pertinent part, as follows:[25]

**No joke: Aurora Cannabis missed its own recently issued guidance**

To many investors, the headline figures for this quarterly report looked like nothing more than a formality, with a number of other underlying numbers expected to take precedence. That's because**, five weeks ago on Aug. 6, Aurora Cannabis provided an update on its fourth-quarter operating results**.

Included in that update was (unaudited) guidance to expect 100 million Canadian dollars (CA$100 million) to CA$107 million in fourth-quarter net revenue after accounting for net excise taxes paid. The company also guided for CA$90 million to CA$95 million in cannabis revenue and upped its quarterly production from a previous forecast of 25,000 kilos to a fresh range of 25,000 kilos to 30,000 kilos.

---

[25]    Alterations in original.

Lastly, the company suggested that it was continuing to "track toward positive adjusted EBITDA [earnings before interest, taxes, depreciation, and amortization]."

Put a bow on it and it's ready to serve, right?  Well, not exactly.

**When Aurora reported its fiscal fourth-quarter results on Wednesday, a few things were . . . amiss.  For starters, even though the company's adjusted EBITDA headed in the right direction -- negative CA$11.7 million in Q4 2019, vs. negative CA$36.6 million in Q3 2019 -- this isn't exactly "on track toward positive adjusted EBITDA."  Aurora has made it seem for months that the company would be turning the corner to recurring positive adjusted EBITDA by the fourth quarter, and that simply wasn't the case**.

More egregious, though, was the fact that Aurora Cannabis only generated CA$98.9 million in net revenue.  That's right.  **Despite providing quarterly guidance just five weeks earlier, Aurora Cannabis missed its own range by more than CA$1 million. It also missed Wall Street's consensus revenue figure by more than CA$9 million**.

~~206.~~211.     In response to Defendants' partial corrective disclosures regarding Aurora's financial condition and the ~~materialization of the risks associated with~~subject of the undisclosed sham transaction, the price of Aurora common stock declined materially.  Aurora's stock price fell from $77.88 per share on September 11, 2019, to $70.68 per share on the following day, a decline of 9.2%.[26]

~~207.~~212.     Indeed, Craig Wiggins, the analyst who wrote extensively about the FQ4 2019 Transaction, stated that his suspicions about the FQ4 2019 Transaction first arose with Aurora's September 11, 2019 conference call~~.  *See infra* ¶251.~~ due to the comparatively large size of the biomass sale in a declining pricing environment.  *See infra* ¶273.

~~208.~~213.     Defendants, however, continued to misrepresent the true condition of Aurora's business and operations and Aurora's ability to achieve positive adjusted EBITDA. Defendants' statements referenced in ¶¶~~194-199 and 201-202 were materially false and/or~~

---

[26]   All share prices are adjusted to account for a 1:12 reverse stock split on May 11, 2020.

~~misleading because they failed to disclose that Aurora's adjusted EBITDA projections were premised on Defendants' plan to engage in a sham transaction with Radient. Defendants~~199-204 and 206-207 omitted the material fact that Aurora's guidance was based on the execution of the FQ4 2019 Transaction, without which Aurora otherwise would be unable to meet the stated guidance. Accordingly, Defendants' guidance distorted Aurora's financial outlook for investors. Had investors been told the true nature of Aurora's transaction with Radient, Aurora's stock price would have fallen further. Instead, it remained inflated.

~~209.~~214.    On October 3, 2019, Aurora issued a press release updating investors on its global growth initiatives and operations, and specifically on the status of its construction projects for the Aurora Nordic 2 and Aurora Sun facilities. The press release stated in pertinent part:

> "Aurora takes its leadership position in the global cannabis industry seriously, and is committed to being open and transparent with all of our stakeholders," said Terry Booth, CEO of Aurora. "The Aurora team is working to advance several major strategic initiatives in Canada, the United States and abroad aimed at further strengthening Aurora's global position. We are laser-focused on delivering on our business plan and prudently managing our investors' capital."
>
> **Update on Facilities in Construction**:
>
> As Aurora executes on its strategy of leading scalable, purpose-built cultivation, it continues to prudently manage capital allocation decisions driven by global forecasts for demand. Many of the Company's significant construction projects are nearing completion of major milestones with significant capital investments concluded.
>
> **Aurora Sun and Aurora Nordic 2 Construction Update**
>
> **Aurora continues to progress construction of its 1.6 million square foot facility, Aurora Sun, located in Medicine Hat, Alberta**, and its 1 million square foot facility, Nordic Sky, strategically located in Odense, Denmark. **The new purpose-built, "Sky Class" facilities Aurora are [sic] constructing will have full control over all anticipated environmental and harvest conditions, resulting in the production of consistently high yielding, high-quality cannabis at low-cost**.
>
> Mr. Booth added, "**Aurora Sun in Medicine Hat and Aurora Nordic in Denmark represent the next evolution of our "Sky Class" cultivation philosophy and construction of these projects is proceeding well. Aurora Sun**

**is nearing completion with the majority of capital investment now behind us, while at Aurora Nordic the primary outdoor construction, including the enclosure of the facility, nears completion**.  Our design philosophy allows for flexibility in licensing and commissioning in-line with the long-term growth in global demand for medical cannabis."

210.215.    Defendants' statements referenced in ¶209214 were materially false and misleading because Defendants' positive statements regarding Aurora Sun and Aurora Nordic 2 concealed the true financial condition of the Company, which had been artificially supported by the FQ4 2019 Transaction, and the plain fact that demand could not justify the massive expansion of production facilities.

216.    The truth about Defendants' fraud further emerged on October 9, 2019, when Craig Wiggins of the cannabis industry research group *The Cannalysts* published a report titled "Aurora's $20 Million Wholesale Revenue from Q4 F2019 and the Radient Relationship – Lingering Questions," raising concerns about dealings between Aurora and Radient.  Wiggins has been described by Aurora CCO Battley as a "respected observer of the sector."  Wiggins noted that in:

In the quarter ended June 30, 2019, Aurora reported wholesale revenue of $20 million on the sale of 5,570 kg.  The KGs.  This "bulk wholesale gross margincannabis trim" was sold at a Gross Margin of 61% with revenue of $3.61/gram.  The customers for this wholesale trim were not disclosed in MDA.

**Wholesale was the strongest segment Gross Margin ("GM") for Aurora in the Q, surpassing the 55% GM and 60% GM of Recreational and Medical cannabis, respectively**.  The Wholesale GM allowed Aurora to post Quarter over Quarter ("QoQ") improvement in GM% from 55.6% to 55.7%, and Cannabis GM from 55% to 58%.

**The Wholesale Gross Margin of $12.3 million, an $11 million quarter-over-quarterQoQ increase, would have contributed substantially to the adjustedAdjusted EBITDA improvement of $9 million for the quarter. Q.**

211.217.    Wiggins reported that "Aurora did disclose to us that Radient was a customer for trim sales and that Aurora can use either the tolling agreement or sell directly via

- 72 -

Formatted: Font: Italic

Formatted: Font: Bold
Formatted: Font: Bold
Formatted: Font: Bold
Formatted: Font: Bold

wholesale.  We didn't get confirmation as to why the tolling agreement was not used in the June

Q biomass sales, although it was indicated that Radient may be pursuing extract sales to LP's like

MediPharm and Valens business model.  Aurora selling to Radient outside tolling agreement was

confirmed."

212.218.    Wiggins raised the specter that Aurora had engaged in a round-trip

transaction, stating, in pertinent part, as follows:

> **To summarize ... without the Wholesale Revenue figure and the accompanying Gross Margin contribution Aurora would have had a much different Quarter, with Cannabis Sales of $74.6 million versus $94.6 million and likely back sliding on Adj EBITDA QoQ instead of improving.  If sales of biomass to Radient outside the tolling agreement by Aurora are then repurchased in extract form by Aurora and restocked as extraction inventory at a later date for resale, it raises concerns around why a sale took place in lieu of using the tolling agreement.  The issue we are raising is not the sale of trim, but potential future repurchases of that biomass in extracted form outside of the tolling agreement**.
>
> In the same Q ended June 30, 2019, Radient Technologies, which is +12% owned by Aurora and Aurora Chief Operating Officer sits on Radient board, purchased biomass which resulted in an inventory of dried cannabis of $21.7 million at the end of June. Radient started the Q with $0 dried cannabis biomass.  For the Q, Radient had total revenue of $61K, of which 100% is contract manufacturing (I would assume "tolling" contracts).  Radient also evidenced a negative EBITDA greater than $5.0 million for the quarter, and their cash reserves of $24 million (decreased QoQ from $32 million) are less than their Accounts Payable and Accrued Liabilities of $27 million.  (Emphasis in original).

213.219.    Wiggins wrote that whomever Aurora sold the biomass to, Aurora availed

trade terms, as its Accounts Payable increased by $23.9 million to $27.4 million.  He noted that

due to certain provisions in Canada's bankruptcy laws that allow trade creditors rights to repossess

inventory sold, so long as its form has not been transformed (*e.g.*, into extracts), the

creditworthiness of the buyer of the biomass is particularly important and, as such, biomass

providers to extractors would likely be providing limited days of credit availability. Wiggins wrote

that:

[A]vailingOne of the big differences between tolling and extract sales for an extractor is the capital requirement changes substantially. Tolling you do not purchase the inventory; you service the biomass, return it to the customer, and collect your service fee. If you are going to do third party extraction, you now need capital to purchase inventory, then capital to bridge the processing, shipment and to carry the trade terms you offer customers. A much greater amount of working capital is required in the latter business model.

My **opinion** is that Radient's present capital structure does not allow them [to] extract large dollar volumes of biomass **without** preferred trade payable terms from vendors **and** very short trade credit terms offered to customers.

In the **opinion** of this credit guy, availing +$20 million in credit to a company with $61k in sales, with a quarterly EBITDA of negative $5 million, and a cash balance of $23.4 million is very generous, unless you have plans to buy back extracted product to extinguish the obligation, and/or you are very close to the operation. As we have seen of late in this industry raising credit is extremely difficult and expensive. A, presumably, unsecured $20 million trade credit does cause me pause. [**I wish to emphasize again that the foregoing is my opinion from simply a credit perspective**]. And consider. . . if a vendor is owed more than $6.5 million in trade payables by Radient they would become Radient's largest creditor. (EmphasisEmphases in original).

214.220.    Wiggins noted that Aurora issued a corporate update on October 3, 2019, in which it stated that Radient was "currently extracting/processing a large inventory of cannabis biomass for Aurora," but since the corporate update fell after the September 30, 2019 quarter-end, Radient could have been processing a different biomass than was reported at the end of June 30, 2019. He also noted that in Aurora's June 30, 2019 Financial Statements, Aurora reported that, as of June 30, 2019, "$25.1 million of accounts receivable are from non-government wholesale customers." Thus, Wiggins reported that "we have confirmation of Aurora selling biomass to Radient and receiving a 'large inventory' of biomass back from Radient." Wiggins wrote that the above raised the following questions:

- How much of the $20 million in wholesale that Aurora sold in Q4F2019 was sold (or on-sold) to Radient?

- Will Aurora be buying any of that wholesale biomass extracted product back from Radient?

- And if so, why wouldn't the Master Sales Agreement (which includes the tolling agreement), mentioned above, be used?

215.221.    When Wiggins asked Aurora to comment, Aurora "confirmed to us that **if** there was a buy back agreement, they would not have booked the sale as revenue. They indicate that **sales** to Radient under tolling **and** wholesale to Radient are 'two separate things'. No mention if buying under tolling agreement and outside of agreement are two different things, and that is the concern of this article." (Emphasis in original).

216.222.    In the report, Wiggins raised the possibility that Aurora and Radient were engaged in financial engineering:

> In my **opinion**, the comment provided doesn't preclude Aurora from circumventing the tolling agreement in order to potentially artificially boost their wholesale revenue and repurchasing Aurora extracted biomass inventory at a later date. And if Aurora is the only company willing to provide significant trade credit to Radient, couple that with their investment, board seat, the fact Aurora will be Radient's largest customer, and if they provide greater than $6.5 million in credit they would be their largest creditor (and one could easily argue Radient would not be in existence without Aurora support) . . . **there is simply far too much opportunity for financial engineering in this relationship**. (Emphasis in original).

217.223.    Wiggins summarized the evidence of an improper transaction, as follows:

What we know from Financial statements, MDA, press releases and correspondence with Aurora:

- Aurora has a +12% investment in Radient

- Aurora has a board seat at Radient

- Aurora and Radient have a tolling agreement to process biomass

- As confirmed to us, the Aurora June 30, 2019 Q sale of biomass to Radient was outside of the tolling agreement

- Aurora also has the ability to sell/purchase to/from Radient outside the tolling agreement

- Last quarter 20% or $20 million of Aurora sales were wholesale – we consider that a material amount

- 75 -

- Radient purchased $21.7 million in biomass trim from Aurora and other LPs in Q ending June 30, 2019

- Radient was granted +$20 million in trade credit this past Q

- Aurora has $25 million in non-governmental trade receivables

- Aurora indicated on October 3, 2019 that Radient is working on "large" extraction contract for Aurora

218.224.    Wiggins also noted that there were significant facts that were not publicly known about the FQ4 2019 Transaction, including the dollar amount, the amount of trade credit extended by Aurora to Radient, if any, and whether Radient was "extracting/processing a large inventory of cannabis biomass" for Aurora under the tolling agreement or Radient was repurchasing product sold by Aurora.  Wiggins continued:

> **IF** Aurora sells product to Radient and Aurora repurchases it, Aurora get[s] to claim a Sale and then reacquire the extracted biomass in inventory, and then they resell it again.  Essentially the **potential** to double dip on sales.
>
> By doing this Aurora would get the benefit of the Sale, the Gross Margin in $'s, and the contribution to EBITDA in the quarter the biomass is sold not when extracted biomass is sold into recreational or medical channels.  By using the tolling agreement this potential is averted.  **IF** Radient was an arm's length company, not reliant on Aurora economically, then this would not be as big a potential issue. (Emphasis in original).

219.225.    In response, Aurora's stock price fell from $49.32 per share on October 9, 2019, to $44.64 per share on the following day, a decline of 9.5%, and further in the days that followed.

220.226.    On October 17, 2019, *Yahoo Finance Canada* reported on Wiggins' analysis of the FQ4 2019 Transaction.  The news outlet asked Aurora and Radient to address Wiggins' report.  In response to those questions, Radient said it had nothing to add to what it had disclosed publicly, and affirmed it was compliant with regulatory requirements.  Aurora did not answer emailed questions but issued a statement: "In June, RTI purchased their initial inventory

from Aurora and other LPs to commence their commercial extractions runs.  RTI has purchased

from other licenced producers and can sell its products to Aurora or any other licenced producers,"

the statement read in part. "Aurora's disclosure is compliant with its IFRS obligations."

221.227.        "The thing that drew my attention is someone gave Radient, who only had

$61,000 in sales last quarter, $21 million in trade credit.  That's astonishing," Wiggins told *Yahoo*

*Finance Canada*, noting that licensed producers typically require down payments, and often full

payment within about 30 days.  "If you assume all of that biomass, or the majority of that biomass,

came from Aurora, Aurora then becomes [Radient's] biggest vendor, their biggest supplier and

biggest creditor," Wiggins said.  "[Radient's] relationship (with Aurora) you could argue is arms

length, and it is not 'related parties' as per the definition in Aurora's financial statements.  But do

they exercise significant financial control over this entity?  I think the answer comes back yes.

This is an item that requires further disclosure."

222.228.        "If Aurora sells product to Radient and Aurora repurchases it, Aurora gets

to claim a sale and then reacquire the extracted biomass in inventory, and then they resell it again.

Essentially there's potential to double dip on sales," Wiggins told *Yahoo Finance Canada*.  "I think

you have to put a big asterisk beside a material chunk of Aurora's sales, gross margin and EBITDA

until we get answers on this."  The fact that a sale took place while the two companies have a

"tolling agreement" where Radient can simply process the raw material for a fee is a red flag if

Aurora buys back the extract, Wiggins added.

223.229.        In response, Aurora's stock price fell from $46.68 per share on October 17,

2019, to $44.16 per share on the following day, a decline of 5.4%, and further in the days that

followed.

224.230.    With these allegations of a sham transaction, investors eagerly awaited Aurora's next financial disclosure.  In the absence of Aurora's disclosure that its transaction with Radient was a sham, Aurora's stock price remained inflated.

231.    On October 23, 2019, an analyst from Piper Jaffray revised his FQ1 2020 sales estimate following Aurora's FQ4 2019 earnings call:

> Further scrubbing color on F1Q20 revises our estimates lower. On its F4Q19 call, management noted that it expected a 'bit of a plateau between now and the advent of the cannabis legalization 2.0 products', which are set to launch at the end of this calendar year. We had imagined this characterization to apply at the total company level, but **closer scrutiny suggests that the $20M lift from wholesale sales was likely not included as part of the reference run-rate[27] that management had in mind.** Therefore, we are trimming our F1Q20 revenue estimate from $106M to $86M, as we now anticipate a bit of a plateau off of just the core sales run-rate, not that of the total company. Our new F1Q20 sales estimate is 13% below F4Q19 total company sales.

232.    Thus, Piper Jaffray interpreted the September 11, 2019 disclosures to mean that Aurora's wholesale sales were not sustainable—and they were not, because they were the product of a sham transaction.

225.233.    On November 14, 2019, Aurora announced deeply disappointing financial results for its FQ1 2020, ended September 30, 2019.  In a Form 6-K, the Company stated it had generated net income of only C$12.8 million compared to C$105.5 million in the year-ago period, representing a nearly 90% decline.  The Company also posted an adjusted loss of C$39.7 million, nearly 50% larger than the C$20.8 million expected by analysts.  The results further showed a C$23.8 million, or 25%, sequential decline in sales, despite Defendants' claims of plateauing, or stable, demand.  Shockingly, Aurora's consumer cannabis revenue fell by 33% and its wholesale bulk revenue fell by 49% sequentially.  In the release, Aurora admitted that recreational cannabis

---

[27]    Reference run-rate refers to Aurora's expectation of revenues going forward.

orders from the provinces had "slowed considerably" in the summer. Aurora also announced that it was indefinitely deferring the remaining construction and commission activities at Aurora Sun and Aurora Nordic 2, despite reassuring investors about the purportedly successful progress on the facilities only six weeks previously.

226.234.    In the November 14, 2019 Form 6-K, Aurora, for the first time, informed investors that the lack of sufficient numbers of retail stores would affect the growth of Aurora's revenue. Importantly, Aurora finally acknowledged that quarter-to-quarter sales volumes and revenues were difficult to forecast with precision, despite providing financial forecasts to the market regarding EBITDA profitability since January 2019. Aurora stated, in pertinent part, as follows:

> Given the early stage of development of the consumer market in Canada, **quarter to quarter sales volumes and revenues are difficult to forecast with precision. Factors that are expected to continue to affect the ramp and growth of Aurora's revenue includes, but are not limited to, the pace of provincial licensing of new retail stores, the ability to capitalize on wholesale bulk sales opportunities**, the impact of industry supply and demand balance on average market pricing, and the ability of Aurora and its competitors to meet rapidly evolving consumer preferences for certain product forms and strains.

227.235.    In the same Form 6-K, Defendants acknowledged that Aurora management monitors the forecast balance of supply and demand in the domestic and international cannabis markets as part of its production planning, stating, "Management continues to monitor the forecast balance of supply and demand in the Canadian and international cannabis markets in order to time the scale-up of further Aurora production capacity as needed."

228.236.    In addition, Aurora issued the following false and misleading statement of fact in the November 14, 2019 Form 6-K: "[a]ll outstanding wholesale accounts receivable as at June 30, 2019 [*i.e.*, the FQ4 2019 Transaction] were collected by November 13, 2019."

229.237.    On the same call, CFO Ibbott noted how Defendants closely monitor sales data from the provinces to retailers, stating: "We monitor the sell-through rates from the provinces to the retailers very carefully as we believe that to be a strong indicator that our products are meeting the needs of consumers for both quality and pricing."  Ibbott also said, "We continue to monitor and forecast the supply and demand in the Canadian and international cannabis market in order to time our scale up of further Aurora production capacity as needed."

230.238.    Analysts were shocked and dismayed by the Company's disclosures.  For example, an article in *Marketwatch.com* dated November 18, 2019, titled "Aurora Cannabis stock suffers worst day in more than five years, analyst says 'it would be fair for investors not to believe them,'" provided the following additional detail:

> Analysts said that investors had a reason for anger and distrust after the report, and should be thinking about whether it means that it is time to run away from the cannabis industry altogether.

> *            *            *

> Jeffries analyst Owen Bennett noted that dilution from the debenture conversion could swing investor sentiment even more, and believes a writedown for a goodwill impairment from the MedReleaf acquisition could be on the way.  **He also suggested that beyond negative sentiment, investor trust could be a real issue after Aurora's optimistic statement before Thursday's disappointment**.

> "**With possible cash pressures evident, announcing ceased construction at facilities despite a press release just 6 weeks ago praising progression, and now EBITDA (and cash) positive looking unlikely this year, it would be fair for investors not to believe them**," wrote the analyst.

231.239.    Daniel Jones of Seeking Alpha described the cessation of construction of the Nordic 2 and Sun facilities as "necessary in order to curb excess production in an industry that's already being faced with oversupply."

232.240.    Accordingly, the announcement that Aurora was ceasing production of Sun and Nordic 2 was a corrective disclosure that Aurora was facing oversupply and insufficient demand to support these two facilities, and revealed the true financial condition of the Company.

233.    These revelations further materialized the risks concealed by the FQ4 2019 Transaction. In response, Aurora's stock price fell from $39.48 per share on November 14, 2019, to $32.76 per share on the following day, a decline of just over 17.0%.

234.    The day before Defendants' September 11, 2019 disclosure of Aurora's missed guidance, the Company's stock price closed at $77.88 per share. Over the subsequent weeks through November 15, 2019, the risks associated with the sham Radient transaction materialized and the Company's stock price declined to $32.76 per share as investors became aware of Aurora's true earnings power — a decline of 58%.

## VII.I.  POST-CLASS PERIOD ALLEGATIONS

241.    Also on the November 14, 2019 call, Ibbott made the following false and misleading statements:

> **During Q1, Aurora generated $10 million in wholesale revenues compared to $20 million in the prior quarter.** Although the selling price per gram declined from the previous quarter, we consider that selling excess extraction-grade product at a 58% margin was a very prudent decision. As we noted on our last conference call, we expect our wholesale revenues to continue to be uneven, but with our reliable production of quality cannabis at a very low cost, Aurora is uniquely positioned to capitalize on this wholesale revenue opportunity. **We do have line of sight to further wholesale revenues in Q2 2020** and are actively pursuing the development of a white label business as well.
>
> *    *    *
>
> **Vivien, you're asking how we get a view on wholesale as a long-term business**. What we are seeing is that the extractors, and as you know, there's a number that have scaled up over the last year and are playing an important role in the industry right now, are actually being selective about the quality of the inputs that they're getting. **And so we, in this quarter, of the $10 million, there's at least 3 -- it's kind of spread evenly amongst 3 extraction companies and a small bit to an LP.** And we do continue to get sort of the interest as long as we can supply the quality of cannabis that they're looking for, for continued buying. **We're just**

**trying to be cautious as we were last quarter because we still think it will be a little bit lumpy, and there'll be sort of an opportunistic element to this. But we do have a view for continued revenues. I'm not going to go as far as saying as much as this quarter but certainly enough to pay attention to**.

242.    Ibbott's statements referenced in ¶241 were materially false and misleading because they failed to disclose that the wholesale revenues for FQ1 2020 were the result of a sham transaction with Radient. Ibbott's statements also indicated that the sham transaction continued for another quarter.

235.243.    On December 6, 2019, Wiggins published another report on December 6, 2019, titled "Occam's Razor, Aurora and Radient Technologies— –June/2019 ACB wholesale revenue— – September 30, 2019 Update," that analyzed the FQ4 2019 Transaction. Wiggins questioned the dubious circumstances of that transaction for Radient, writing, in pertinent part, as follows:

"Occam's Razor: The simplest explanation is usually the right one."

After the June 30, 2019 financial statement releases of Aurora and Radient I wrote an article about concerns I had as to disclosure by both parties about their relationship.

The gist of the article was

Aurora wholesaled +$22 million in biomass in the Q ending June 30, 2019 without disclosing who they sold it to. Aurora had sales of $98 million that Q, so biomass revenue was greater than 10%.

IFRS 8.34 does require disclosure on sales if a customer makes up more than 10% of period sales. Aurora did not disclose any customers over 10%. You would think some of the provinces are over 10%, no?

**Without that wholesale revenue Aurora would have backslid on adjusted EBITDA in a quarter they were calling to be +EBITDA, and they were facing a significant refinance burden from their $230 million convertible debenture that was maturing in March 2020**.

Aurora had a NEW non-government Account Receivable outstanding of $25.1 million

Radient bought +$20 million in biomass, their first biomass purchase ever, and someone gave a company with more Accounts Payable than Cash trade credit of +$20 million. As a credit guy this REALLY sticks out to me.

Radient had NEW biomass of $21.7 million at end of Q.

Radient confirmed they purchased biomass from Aurora and other LP's in their MDA.

Radient had Accounts Payable of $27 million an increase of $23.9 million QoQ Radient had $23.5 million in cash

Radient sales in the June 30, 2019 Q were only $61 thousand.

Radient has not announced any large offtake contracts which would give reason to a purchase $21.7 million in biomass for a company with minimal sales.

Radient does not have the capital structure to finance $21 million in biomass inventory. They would need VERY favorable trade terms from the biomass vendor.

Aurora and Radient have a tolling agreement whereby Aurora sends biomass to Radient, but retains title, and Radient processes that biomass and returns it to Aurora and charges a service fee.

The tolling agreement was not used in this instance.

Our position is … given Aurora is a +12% investor in RTI, has a board seat and is RTI's biggest client they are creeping up on having "**significant influence**" over RTI, and as such their disclosure should increase on transactions with RTI so as to avoid the perception of "financial engineering".

**IF Aurora also sold the biomass and provided the trade credit to RTI then they most certainly have "significant influence" over RTI.**

October 3, [2019] Aurora, in a corporate update, confirmed that "Radient is **currently extracting/processing a large inventory of cannabis biomass for Aurora** at its Edmonton I cannabis processing facility[.]" (Emphasis in original).

\*       \*       \*

**This set of circumstances gives rise to the possibility that Aurora sold biomass to RTI with the intention of re-purchasing the extracted product outside of the tolling agreement.**

**Why should this matter?**

- 83 -

**Aurora would be inflating their sales by the amount of biomass they sold to RTI and repurchased, and they would be inflating Gross Margin $, Gross Margin % and EBITDA. The repurchase would return through the balance sheet into inventory of Aurora at a later date for resale.**

\*      \*      \*

Selling biomass to RTI versus using the tolling agreement has the following analogous affect:

> Tolling Agreement is like Aurora wanting to get a vehicle painted for $2,000. They drop off the vehicle and RTI paints it. Aurora picks it up and pays them $2,000. [Aurora Inventory increases by $2,000]

> Selling biomass is the equivalent of Aurora selling the vehicle to RTI for $20,000 [Aurora sales], having RTI paint it and sell the painted vehicle back to Aurora for $22,000 [Aurora inventory increase by $22,000].

\*      \*      \*

**Radient at September 30, 2019**

Sales have increased from $61 thousand to $1.2 million QoQ.

Biomass has increased to $25 million, after sales of $0.9 million in inventory. **So, RTI purchased another $4.2 million in biomass for the Q despite having $20 million of it on hand, and in a decreasing pricing environment due to high supply of trim and low THC flower. Usually in a decreasing pricing environment you wouldn't be adding inventory well ahead of sales.**

\*      \*      \*

RTI purchased $21.7 million in biomass in June 2019 for sales that are largely forecasted to occur in Oct. 1- Dec 31, 2019 and Jan. 1- March 31, 2020 timeframe, when they were in a cash crunch. Further, **consider that wholesale prices are falling for biomass. Why buy biomass early when the price is coming down and it is plentiful**? Then they purchased another $4 million in biomass in September 30, 2019, despite having $20 million in biomass available. [Keep in mind we approached Aurora about our concerns after their October 3, 2019 corporate update, which fell after September 30, 2019 quarter end. We were expecting more sales to RTI in the Q.]

**I would need to hear a VERY compelling story to understand why RTI purchased +$21 million biomass and then purchased $4 million more, when they were strapped for cash, so far in advance of sales, in a market where they could buy biomass today at a cheaper rate than in June 2019**. And they state

- 84 -

that after guiding for $22-26 million in revenue in the next TWO quarters, it would not account for all of their biomass on hand.

I am deeply puzzled by the decision making at RTI.

Aurora still has a +$20 million non-government Account Receivable [they did sell $10 million in wholesale in Sept 30, 2019 Q so there would be an A/R from that in the nongovernment A/R] and RTI still has a +$21 million Account Payable of which $16 million is biomass.

Had Radient repaid the full A/P on the biomass and had Aurora A/R **NOT** gone down by a like amount we could likely **rule out** that RTI purchased bulk of their June 30/19 biomass from Aurora.  That did not happen.  RTI still has the A/P and Aurora still has the A/R.  (Emphasis in original).

244.    Wiggins continued: "Occam's Razor would suggest that **Aurora sold biomass outside of tolling agreement in June/19 Q, and quite possibly in the Sept/19 Q**, to RTI to artificially boost sales, Gross Margin and EBITDA that would not have been recorded had they used the tolling agreement.  The trade credit availed by Aurora, which is running +134 days, would be extinguished via cash repayment OR by purchasing back the extracted biomass and having the A/R contra against what Aurora would owe RTI for extracted biomass."

236.245.    Wiggins noted that, according to Aurora, all outstanding wholesale accounts receivable as of June 30, 2019 were collected by November 13, 2019.  He also questioned why Aurora was not disclosing revenue with customers with greater than 10% sales in the period as required by IFRS 8.34.

237.246.    Shortly thereafter, on December 21, 2019, after an internal memo leaked, Aurora issued a press release announcing that Battley, the Company's CCO, would be stepping down.  Media reports stated that Battley had been forced out.

238.247.    On December 23, 2019, Jefferies analysts downgraded Aurora stock, and wrote about Battley's departure and investors' lack of trust in Aurora, stating, in pertinent part, as follows:

Formatted: Font: Bold

Formatted: Font: Bold

For many **this is likely to be seen as Battley jumping ship from a company that has struggled to support credibility on the back of a number of recent actions**. . . .  It is clear to us that the market is lacking conviction in Aurora . . . . The biggest issue though, for us, and one we highlighted again at recent numbers is trust, with multiple instances of Aurora missing targets or going against its word, and with Battley the 'face' of the company this could have been a factor in his departure.  **Key examples are missing revenue guidance despite issuing it after quarter-end at Q4, still little visibility on near-term profitability despite promised since January and throughout 2019 this would happen by Q4**, continued dilution (debenture conversion, ATM used) despite reassurances this would not be the case, **announcement of ceasing facility constructions just weeks after a press release praising their progression**, and most recently the embarrassment of having to freeze sales in Germany over an investigation into the company's processing methods.

239.248.    On January 6, 2020, media reports stated that the Company had listed its nine-hectare greenhouse in Exeter, Ontario, for sale for $17 million. Aurora had obtained the greenhouse as part of its $3.2 billion acquisition of MedReleaf Corp. in 2018.  Analysts immediately connected the move as implying that significant writedowns could be on the horizon. For example, MKM Partners analyst Bill Kirk said in a January 6, 2020 note to clients: "This listing, for 75% of former MedReleaf's capacity, signals major writedowns ahead."  Kirk further criticized Aurora's management for their lack of candor: "We are also discouraged with the visibility of Aurora's strategy – investors were unaware Aurora was trying to sell Exeter," despite a corporate update on December 23, 2019. Kirk said he expected the Company to record C$2 billion worth of write-downs.  Kirk wrote, in pertinent part, as follows:

The Exeter facility represented [75%] of MedReleaf's capacity. . . .  Aurora then said the first harvest would be 1Q'19.  As far as we can tell, the facility was never licensed, and no product was ever sold from Exeter.  This listing, for 75% of former MedReleaf's capacity, signals major writedowns ahead. Aurora's acquisition of MedReleaf (C$3.2b) added ~C$2.4b to the goodwill & intangibles on Aurora's balance sheet (currently C$3.9b). . . .  We are extremely surprised Aurora did not have to take a large goodwill impairment at its year end, but we anticipate ~C$2.0b worth of writedowns coming (market cap just C$2.7b). We believe more divestitures are likely. . . .  With profitability timing uncertain, Aurora's obligations will continue to be difficult to meet.  We are also discouraged by the visibility of Aurora's strategy—investors were unaware Aurora was trying to sell Exeter

- 86 -

(despite a facilities update on Dec. 23, 2019) and in the dark regarding timing as Aurora used its ATM equity facility.

240.249.    On February 6, 2020, the Company announced that Booth would be "retiring" and that Executive Chairman Singer was appointed Interim CEO, effective immediately. In the same statement, the Company announced that two new independent directors were joining the board.

250.    Aurora alsoAurora also announced that its cannabis revenues for FQ2 2020 would be approximately $62-66 million with provisions for returns, price reductions and future provisions of approximately $12 million partially as a result of "much lower bulk sales."  The Company explained that the net cannabis revenue was expected to be between $50-54 million—significantly lower than Aurora's prior revenue guidance.

241.251.    Aurora further announced "sweeping changes intended to rationalize the cost structure and balance sheet going forward."  These changes included significant and immediate decreases in SG&A expenses to the range of C$40 million to C$45 million per quarter by the end of the fiscal fourth quarter of 2020 (by contrast, SG&A expenses for the first fiscal quarter of 2020 topped C$59 million).  As part of the changes to operations, the Company eliminated about 500 full-time staff positions, including approximately 25% of its corporate positions.  Severance and other one-time charges related to the SG&A reductions were expected to range from C$2 million to C$4 million.

242.252.    In addition, on February 6, 2020, Aurora announced that it expected to report asset impairment charges on certain intangibles and property, plant, and equipment in a range of C$190 million to C$225 million and write-downs of goodwill in the range of C$740 million to C$775 million.  The Company also announced its intention to reduce capital expenditures to below C$100 million in total for the second half of fiscal 2020.  In its "business

- 87 -

transformation plan," Aurora announced a number of amendments to its secured credit facilities, including removing EBITDA ratio covenants and reducing the total credit facility by C$141.5 million. ~~On this news, Aurora's stock price fell 22% over the next two trading days.~~

253.   Analysts were disappointed by Aurora's statements and commented on the Company's returns.

254.   On February 6, 2020, a Cantor Fitzgerald analyst wrote: "Dec qtr sales guidance of $62-66Mn in net sales, minus a $12Mn provision for future returns and discounts on slow-moving, low-potency flower sold in earlier quarters, is below previous guidance of a flat qtr, which had implied ~$75Mn. True, the silver lining is that ex provisions, the Canada rec business saw 'modest seq growth,' with the seq drop caused by much **lower bulk sales** and a hiatus in Germany."

255.   On the same day, MKM Partners wrote: "Aurora Preannounces 2Q Results: Additionally, Aurora preannounced its FY2Q'20 (CY4Q'19). Aurora expects cannabis revenue of C$62mn - C$66mn not including provisions for returns of ~C$12mn. Usually Aurora has ~C$5mn in non-cannabis revenue, so this pre-announcement (C$50mn - C$54mn) compares to a consensus estimate of ~$73mn. Aurora also indicated they expected little to no growth in their 3Q, which would include 2.0 products.

256.   On February 7, 2020, additional analysts commented on Aurora's disappointing guidance with many of them blaming the decreased revenue on lower bulk sales.

257.   AltaCorp Capital wrote:

Aurora expects to report net cannabis revenue of $50mm to $54mm in Q2/FY20 (quarter ending December 31, 2019), below previously published ACCe of $75.9mm and the Consensus estimate of $79.2. Aurora's net cannabis revenue was affected by ~$12mm provisions for returns, price reductions, and future provisions, all related to product sold in previous quarters. According to management, Aurora's revenue **was impacted by significantly lower bulk sales**, lower international revenue due to a short-term interruption in German supply, and flat medical revenue quarter over quarter.

- 88 -

258.    Jeffries commented, "Aurora's Q2 net revenue estimate of between C$62m and C$66m reflects continued consistent medical sales, modest sequential growth in recreational sales, a decrease in international sales (due to the German supply interruptions) and '**much lower bulk sales**.'"

259.    BofA Global Research also blamed the decline on the drop in bulk wholesale revenue:

> Aurora indicated that its revenue was flat for Canada medical, slightly up for Canada adult use, lower int'l cannabis revs (German supply issues), and **"much lower bulk sales"** vs C$10mn last quarter. **Basically, the key q-q decline is likely to be driven by a roughly C$9mn drop in bulk wholesale rev (B2B flower in Canada), which disproportionately benefitted ACB last qtr,** and maybe a C$3mn drop in int'l medical, before applying the C$12mn in provision the company is taking on product in the channel (others have taken provisions, ACB had not).

260.    Eight Capital wrote: "FQ2/20 preliminary results disappoint with weak sales and sales returns: Net cannabis revenue is expected to be $50 MM - $54 MM, which includes return provision of roughly $12 MM, a 23% miss on our estimate and an implied 28% miss on consensus. **While we expected sales returns to occur in the quarter, the magnitude was much greater than expected, in addition to lower overall volumes.** Medical sales remain flat, adult-use sales increased moderately while international medical and **wholesale sales declined**."

261.    On February 13, 2020, Alta Corp Capital reported again on Aurora's revenue, writing:

> **Net revenue was impacted by provisions of $10.6mm ($6.1mm related to actual returns and $4.5mm related to provisions for future returns and price adjustments).** The adjusted gross profit was $22.8mm, below ACCe of $25.8mm and the Consensus estimate of $24.0mm. **The overall gross margin was ~41% (below ACCe of 50%). The gross margin was negatively impacted by provisions related to product returns and price adjustments, and a lower proportion of medical revenue** due to a temporary suspension (here) of medical

sales in Germany. The adjusted gross margin on net cannabis revenue (including the impact of provisions) was ~44%.

262.    Thus, Aurora's February 6, 2020 announcement of the collapse of its wholesale bulk revenue, falling gross margin, and further revenue shortfalls the next quarter was another partial corrective disclosure of the truth about Aurora's FQ4 2019 wholesale bulk sales: that they were unsustainable (because they had been fraudulently engineered).  In response, Aurora's stock price declined by 22%.

243.263.    On February 28, 2020, Wiggins published another report on the FQ4 2019 Transaction, titled "Aurora and Radient Technologies: The Possible Return Flight of the Wholesale Biomass Boomerang," writing:

> Has Radient Technologies Inc. ("RTI") returned a portion of the biomass purchased from Aurora Cannabis ("ACB") in June 30, 2019 quarter in the form of extracted product in their December 31, 2019 quarter?  Today Radient Technology posted their December 31, 2019 earnings. In these earnings they record sales of $11 million an increase from last Q's $1.2 million, and June 30, 2019 Q of $61 thousand.
>
> Much like the September 2019 statements, which included in Note 15 b) "Information about major customers" indicating that RTI earned 89% of its revenue from one customer, this Q **indicates Note 16 b) that RTI earned 100% of its revenue from one customer**.  (Emphasis in original).
>
> *     *     *
>
> - Why was the tolling agreement between ACB and RTI not used **if** Aurora planned on re-purchasing this extracted biomass 2-3 Q's later?  (Emphasis in original).
>
>   **From an ACB accounting standpoint: Had the tolling agreement been used Aurora would not have recorded a sale to RTI of the biomass, and ACB would not have had a Gross Margin nor EBITDA benefit from the sale**.
>
> - **If Aurora was not the destination for the extracted biomass**, why would RTI purchase +$20 million in biomass in June 2019 Q on **speculation** of selling it WITHOUT an announced offtake, when RTI had only $61 thousand in sales in the preceding quarter AND their Accounts Payable ($27 million) exceeded their cash position ($23.5 million)? **This is an incredibly risky purchase without a known offtake AND favorable credit terms.**  (Emphasis in original).

- 90 -

- **If Aurora was the destination of the extracted biomass**, why would Aurora allow a competitor to supply the biomass to RTI that Aurora would be repurchasing in extracted form, when Aurora has increasing and surplus inventory levels?  (Emphasis in original).

- As RTI A/P was greater than cash, how was RTI to going pay the associated A/P for the biomass purchase without an offtake from a customer who paid their A/R to RTI before RTI A/P was due to their supplier?

*    *    *

You may recall Aurora had planted an EBITDA+ flag on their December 2018 conference call for the June 30, 2019 quarter.  The June 30, 2019 results, without the $20 million in wholesale revenue and associated Gross Margin and contribution to EBITDA, Aurora would have shown a marked backslide from the March 31, 2019 Q EBITDA.  **Not the image a company striving for +EBITDA, and in need of cash to pay off a looming +$200 million convertible debenture, would want to convey to the market**.

Did Aurora decide to sell $20 million of biomass (or a material amount of same) to RTI in the June 30, 2019 Q with the intent to repurchase the extracted biomass at a later date, so as to inflate sales, GM and EBITDA in the June 30, 2019 Q? Unfortunately, with ACB and RTI's disclosure to date that scenario cannot be ruled out.

*    *    *

**Aurora shareholders likely relied on the June 30, 2019 financial reports with its 52% increase in sales QoQ, Gross Margin of 57% (assisted by wholesale revenue with a GM of 61%, greater than medical GM%) and reported EBITDA of -$11.7 million for their continued investment.  If ACB RTI wholesale was backed out of these results, what would the results have been? Would investors have made the same decisions**?

RTI shareholders are now looking at the 11-fold increase in QoQ on sales this quarter with a similar optimism.  Are these sales repeatable? Or are they a result of "financial engineering" intended to inflate sales of BOTH Aurora and RTI, and are reliant on the provision of very favorable trade terms from a cash strapped Aurora, a related company?  **What would these results have looked like if the tolling agreement had been used**? ~~(Final emphasis in original).~~

The cannabis industry has seen its share of scandals.  But IF the above is not addressed investors and the public will be left with the **possibility that two publicly traded companies may have colluded** to inflate their sales figures in order to impress current and future investors.  (Final two emphases in original).

264.    In response, Aurora's stock fell 7.6%.

- 91 -

265.    The day before Defendants' September 11, 2019 statements disclosing the $20 million wholesale bulk cannabis revenue, Aurora's stock price closed at $77.88 per share.  Over the following months through February 28, 2020, the truth about the sham Radient transaction were disclosed and the Company's stock price declined to $16.08 per share—a decline of 79.4%.

## VII.    POST-CLASS PERIOD ALLEGATIONS

244.266.    On March 12, 2020, *Yahoo Finance Canada* reported that sales at Radient surged 805% quarter-over-quarter to $11.2 million in its recently reported fiscal third quarter of 2020.  Radient stated in financial filings that **all of its revenue in the three months ended December 31, 2019 came from one customer**.  *Yahoo Finance Canada* confirmed through Radiant that **the customer was Aurora**.  The news outlet quoted Wiggins as follows:

> "When I see a company that doesn't have any cash, not just putting their toe in the water and buying $5 million of biomass, but buying $20 million in biomass on their first purchase, it is shocking," he told *Yahoo Finance Canada*.

> Wiggins said the fact that a sale from Aurora to Radient took place while the two companies have a "tolling agreement," where Radient could simply process the raw material in the same way for a fee rather than booking it as a sale, is another significant red flag.  He estimates Radient would have booked about $3 million in sales in its most recent quarter, rather than $11.2 million, if the tolling agreement was used in place of sales.

> [Denis] Taschuk [Radient's CEO] said, "While we are capable of providing tolling services, we wanted to expand our offerings and leverage our team of in-house scientists and product development specialists so that we are more than just a service provider."

> "Is this financial engineering?  Absolutely," said Wiggins.  "There is a perception of collusion, with ample evidence supporting that perception.  With no denial from either company, the evidence seems to suggest that this is no longer a question of 'if [Aurora] sold product that they bought back,' and more a question of 'how much did they do it?'"

> Wiggins estimates of the $32 million worth of cannabis that Aurora wholesaled in its last three quarters, Radient likely received at least $20 million.

> In December, Aurora's then-executive chairman, and now interim CEO, Michael Singer boasted in a press release about the company's "effort to be explicitly

**Formatted:** Font: Bold

**Formatted:** Font: Bold

**Formatted:** Font: Bold

transparent with our shareholders" and its "commitment to enhancing overall governance."

For Wiggins, those words ring hollow. . . .

245.267.    On May 11, 2020, Aurora carried out a reverse stock split after shares plunged so low that the NYSE threatened to drop the stock from its listings.  Specifically, Aurora announced that it would grant shareholders one share for every 12 currently outstanding, reducing the amount of shares from more than 1.3 billion to roughly 110 million, but also issue even more stock.  In total, these actions would dilute shares more than 30%, according to an analyst estimate.

246.268.    In addition to reverse-splitting its stock to maintain its NYSE listing status, Aurora planned to sell more shares to generate cash reserves.  Specifically, the Company planned to raise more cash via a stock sale, selling as much as C$350 million in shares into the open market in small batches.  The Company said that it exhausted its prior at-the-market financing program of C$400 million, meaning that Aurora burned through more than C$200 million during the Company's third fiscal quarter, according to a Cowen analyst.

247.269.    On June 16, 2020, Aurora announced that co-founder Steve Dobler was retiring from his roles as President and Director, effective June 30, 2020.  Dobler had been the President of Aurora and a member of the Board since December 2014.  The Company cited its "business transformation plan" as part of the reason for Dobler's departure.

248.270.    On June 23, 2020, Aurora provided additional updates on its business transformation plan.  Specifically, the Company announced that it planned to close operations at five facilities over the next two quarters, including Aurora Prairie, Aurora Mountain, Aurora Ridge, Aurora Vie, and Aurora Eau.  In connection with the closing of facilities, Aurora announced that it expected to record production asset impairment charges of up to C$60 million during the

fourth fiscal quarter of 2020.  In the same corporate update, the Company announced that it expected to record a charge of up to C$140 million in the carrying value of certain inventory.

249.271.    On June 29, 2020, Aurora announced that Booth "retired" from his role as Director of the Company.

250.272.    On September 8, 2020, Aurora again announced that it expected to record a number of balance sheet adjustments in FQ4 2020, including a fixed asset impairment charge of up to $90 million, a charge of approximately $140 million in the carrying value of certain inventory, and a write-down of goodwill and intangible assets of up to $1.8 billion.

251.273.    On September 15, 2020, Wiggins published another report entitled "Radient Technologies Discloses Size of Biomass Boomerang with Aurora."  Wiggins wrote, in pertinent part, as follows:

> **Our suspicions, that started September 11, 2019 with Aurora's June 30, 2019 conference call**, regarding Aurora's **miraculous $20 million in wholesale revenue (a +870% incremental increase QoQ)** have now come full circle with **RTI declaring Aurora a "Related Party" on their March 31, 2020 year end audited exhibits.**

Formatted: Font: Bold

252.274.    Wiggins highlighted Radient's March 31, 2020 disclosure of the related-party relationship between Aurora and Radient, and that Radient recognized revenue of $18.1 million in relation to transactions with Aurora:

**b) Aurora Cannabis Inc. "Aurora"**

On November 6, 2017, the Company entered into a Master Services Agreement (MSA) with Aurora. The term of the MSA is 5 years, with an option for Aurora to extend an additional 5 years. The terms of the MSA include certain requirements around pricing for extraction services related to cannabis to parties other than Aurora, within a specified geographic territory. Additionally, it provides Aurora with priority for extraction services, and certain first right of refusal to acquire certain cannabis related intellectual property, and sets pricing for the extraction services currently provided to Aurora. In addition to the MSA, the Company and Aurora entered into an Investor Rights Agreement on the same date, that provides Aurora with certain rights to participate in future offerings up to 19.99%, and appoint one director to the board of directors of the Company.

As at March 31, 2020, Aurora held 33,101,542 shares in the Company resulting in a effective ownership of 11.9 % of all issued and outstanding shares. Aurora has representation on the Company's board of directors and accounts for 98% of all revenue for the year ended March 31, 2020. The Company has determined that a related party relationship with Aurora exists as at March 31, 2020 through their ability to exert significant influence over the Company. During the year ended March 31, 2020, the Company purchased $24,604,773 of cannabis and recognized revenue of $18,120,586 in relation to transactions with Aurora. As at March 31, 2020, $480,042 was included in accounts receivable and $3,187,315 in accounts payable for amounts owing from/to Aurora.

**b) Aurora Cannabis Inc. "Aurora"**

On November 6, 2017, the Company entered into a Master Services Agreement (MSA) with Aurora. The term of the MSA is 5 years, with an option for Aurora to extend an additional 5 years. The terms of the MSA include certain requirements around pricing for extraction services related to cannabis to parties other than Aurora, within a specified geographic territory. Additionally, it provides Aurora with priority for extraction services, and certain first right of refusal to acquire certain cannabis related intellectual property, and sets pricing for the extraction services currently provided to Aurora. In addition to the MSA, the Company and Aurora entered into an Investor Rights Agreement on the same date, that provides Aurora with certain rights to participate in future offerings up to 19.99%, and appoint one director to the board of directors of the Company.

**As at March 31, 2020, Aurora held 33,101,542 shares in the Company resulting in a effective ownership of 11.9% of all issued and outstanding shares. Aurora has representation on the Company's board of directors and accounts for 98% of all revenue for the year ended March 31, 2020. The Company has determined that a related party relationship with Aurora exists as at March 31, 2020 through their ability to exert significant influence over the Company. During the year ended March 31, 2020, the Company purchased $24,604,773 of cannabis and recognized revenue of $18,120,586 in relation to transactions with Aurora. As at March 31, 2020, $480,042 was included in accounts receivable and $3,187,315 in accounts payable for amounts owing from/to Aurora.**

275. Wiggins also noted:

We had "mathed out" that the Boomerang was between $22-24 million, so we are quite content with ourselves that it was $24.6 million. . . .

\*          \*          \*

- 95 -

> Since RTI indicated that the June 30, 219 purchase was its first biomass purchase, ACB's wholesale of $32 million in June-Dec 2019 Q's would show that 78% of its wholesale revenue went to RTI where they had ownership of 12%, a board seat and was RTI's biggest customer at +98% of RTI revenue. (Makes me wonder where the remaining 22% of wholesale went and if it was a boomerang)

253.276.    Wiggins asked the obvious question: "What this also confirms is ACB was also RTI's largest supplier and likely its largest creditor.  Which begs the question: **Why did RTI wait until March 31, 2020 to declare ACB a 'Related Party'?  Why not June 30, 2019, September 30, 2019, or December 31, 2019**?"  He explained that the facts of the FQ4 2019 Transaction lead to the logical conclusion that Aurora intended it to be a round-trip transaction from the start, as follows:

> The one question (if I were a lawyer) to ask Glen Ibbott, Aurora CFO would be: **When you shipped the $25 million biomass to RTI (a company whom at June 30, 2019 had $23 million in cash yet $27 million in accounts payable) what trade terms did you offer for payment on the biomass?**  If they paid you they would almost be out of cash, so RTI would have needed some juicy terms to take all that biomass.  (Emphasis in original).

> Had Aurora agreed to be paid when the Boomerang was returned as extract (which is our thoughts given lack of cash at RTI and ACB being their only customer) that would indicate the [Aurora] CFO knew he was essentially selling product destined to be returned in extract form.  With a board seat on RTI[,] Aurora knew RTI's financial condition AND they knew they were RTI's ONLY CUSTOMER.

> **This, to me, is ample "intent" that this was to be a Biomass Boomerang from the start**.

> Most LP's we talked with were asking for 50% down payment and 30-day terms on the balance.  It is interesting to note that despite Aurora selling no wholesale in March 31, 2020 Q, RTI still owes at March 31, 2020 $3.2 million to Aurora. That Payable is over 90 days old.

> Had they used the Tolling Agreement RTI would not be writing down $5.8 million in inventory.  I was stunned that a company with no sales ordered $20 million in biomass on their first purchase, in a declining pricing environment to boot!

> RTI is in dire straits.

> They missed their Q4 guidance of $12-14 million in sales with $7.2 million.  They have a material going concern note from their auditors. They have $145k in cash

- 96 -

against A/P of $15 million.  They are burning cash in their operations. They still owe ACB $3 million, although with five and half months since their year-end, they might have delivered the remaining extract.

They had these beauties in their presser

- Gross profit of **$447,947 million** for the year reflecting the use of **high-priced legacy inventory**

- The Company recognized **impairment losses of $5.8M on inventory** and $4.5M on plant and equipment contributing significantly to the increase in losses for the year.  (Emphases in original).

Notwithstanding that I do not think they had $447 TRILLION in gross profit, it is laughable [that] they blame "high priced legacy inventory" for their GM when they could have used the Tolling Agreement and never had to outlay cash for inventory nor take the forward price risk on the biomass[.]

This whole series of transactions reeks.

277.    It also appears that Radient went out of business following the end of the Class Period.  On July 17, 2023, Moskowitz Capital Mortgage Fund II Inc. ("MCMF") filed an affidavit dated July 10, 2023 in a court in Edmonton, Canada, explaining that Radient defaulted on financial obligations owed to MCMF in 2022 (the "Affidavit").  The Affidavit explained that as of June 15, 2023, Radient had laid off all but one of its employees and that that employee was in the process of destroying the remaining inventory of Radient's cannabis products.

278.    Additionally, on July 13, 2023, MCMF submitted a report to the same Edmonton court explaining, among other things, that Radient never completed construction of the new manufacturing facility it had said it planned to build during the Class Period.

## VIII.    ADDITIONAL SCIENTER ALLEGATIONS

254.279.        As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading, knew, or recklessly disregarded, that such statements or documents would be issued or disseminated to the investing public, and

knowingly or recklessly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Aurora, their control over, and receipt and modification of, Aurora's allegedly materially misleading misstatements, and their associations with the Company which made them privy to confidential proprietary information concerning Aurora, participated in the fraudulent scheme alleged herein.

255.280.    Defendants knew, or recklessly disregarded, that Aurora's statements referenced in ¶¶189-191194-196 concerning the Company continuing to track toward positive adjusted EBITDA were materially false and/or misleading and/or omitted material information because at the time of the statements, Aurora's fiscal quarter had already been over for more than a month, and Booth, Cleiren, and Battley, by virtue of their positions as CEO, COO, and CCO, respectively, had access to the Company's FQ4 2019 financial results and knew, or recklessly disregarded, that Aurora would miss its guidance.

256.281.    In addition, as explained above, throughout the Class Period, Aurora's sales of cannabis in Canada were severely constrained by at least two factors that were known, or recklessly disregarded, by Defendants: (1) over-production of cannabis by Aurora and other Canadian licensed producers; and (2) woefully limited numbers of retail stores in Ontario and Quebec, where approximately 61% of Canadian citizens reside.  Defendants knew, or recklessly disregarded, these facts at the time they made their materially false and misleading statements and omissions because, as Aurora leadership acknowledged multiple times, they carefully monitored the forecast balance of supply and demand in the Canadian markets and the sell-through data from the provinces to cannabis retailers.  Indeed, sales and revenue from consumer cannabis in the

Canadian market went to Aurora's core operations and were of critical importance to the Company, raising a strong inference that Defendants were aware of this data, and consequently knew or recklessly disregarded that their guidance of positive adjusted EBITDA by FQ4 2019 lacked a reasonable basis. Moreover, since analysts and financial writers were publishing this data, it is reasonable to infer that Defendants—executives at a publicly traded cannabis company—were aware of this data as well.

257.282.     Indeed, Defendant Booth acknowledged the problems with Ontario's retail model before the Class Period began, when he said that Ontario and British Columbia "shat the bed" when rolling out their retail models for recreational cannabis, and that the only provinces that "got it right" were Alberta and "perhaps" Saskatchewan. Booth added, "I would say Ontario shat the bed the worst." *See supra* ¶8994.

258.283.     The adverse developments at issue also impacted the Company's most important revenue streams and directly contradicted Defendants' public representations regarding the state of Aurora's business and the success of its strategic initiatives. For example, Aurora revealed that it was halting construction on facilities only a few weeks after it had praised the construction of such facilities.

259.284.     Defendants had a motive to conceal this information from the investing public. Aurora needed to keep the price of its stock inflated in order to continue with its acquisition and expansion strategy, which included five acquisitions paid for with inflated Aurora stock, as follows:

| | Date | Shares Issued |
| --- | --- | --- |
| ICC Labs | 11/27/2018 | 31,904,668 |
| Whistler | 3/1/2019 | 13,667,933 |

- 99 -

| Chemi | 4/25/2019 | 833,300 |
| EnWave | 4/26/2019 | 840,576 |
| Hempco | 8/21/2019 | 2,610,642 |

260.285.    Aurora filed a shelf registration statement on Form F-10 on April 2, 2019, and May 10, 2019, to make offerings of common shares, debt securities, subscription receipts, units, warrants or any combination thereof of up to US$750 million during the Class Period.

286.    Additionally, Defendants were motivated to fraudulently achieve positive EBITDA to pay off a looming $200 million convertible debenture.  According to a September 29, 2019 article in the Motley Fool, Aurora "has a ticking time bomb on its hands that could cause more problems":

> What is this ticking time bomb?  Aurora has 230 million in Canadian dollars worth of convertible debentures that mature in March 2020.  This debt offering closed two years ago and all the cash is gone.  Aurora used the money primarily to fund its acquisition of CanniMed Therapeutics and toward the construction of the Aurora Nordic facility in Denmark.
>
> By definition, convertible debentures can be converted to stock if the holders choose that option.  But the conversion price for this particular debt offering was 13.05 Canadian dollars per share.  Aurora's current share price is less than half of that amount.  No one will convert a debenture to stock at such a huge loss.
>
> *        *        *
>
> The odds appear to be overwhelmingly high that Aurora will need to muster up CA$230 million to pay off the holders of its convertible debentures that mature in March 2020.  But where will the company get the money?

261.287.    The Individual Defendants have also held themselves out to investors as the executives most knowledgeable about the adverse facts impacting Aurora's business alleged herein, and have belatedly admitted on conference calls that they knew about slowing demand trends during the Class Period.  As such, the Individual Defendants knew or were reckless in not knowing of the undisclosed facts detailed herein.

- 100 -

## IX.  LOSS CAUSATION/ECONOMIC LOSS

262.288.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Aurora common stock, created a material risk that later materialized and was disclosed through a series of financial disclosures and public reports, and operated as a fraud or deceit on Class Period purchasers of Aurora common stock by failing to disclose and misrepresenting the adverse facts detailed herein. As detailed in ¶¶206, 219, 223,211, 225, 229, 262 and 233264, when the truth about Aurora's financial condition, including the subject of wholesale bulk sales and allegations of a sham transaction, was revealed over time through the materialization of the concealed risk and/or corrective disclosures, the value of the Company's common stock declined precipitously as the prior artificial inflation no longer propped up the common stock's prices.  The declines in the prices of Aurora common stock were the direct result of the nature and extent of Defendants' fraud as revealed to investors and the market.  The timing and magnitude of the price declines negate any inference that the losses suffered by Lead Plaintiffs and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of the Company's common stock and the subsequent significant decline in the value of the Company's common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

263.289.    At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by Lead Plaintiffs and other Class members.  Those statements were materially false and misleading

through their failure to disclose a true and accurate picture of Aurora's business, operations, and financial condition, as alleged herein.  Throughout the Class Period, Defendants issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing the prices of Aurora's common stock to be artificially inflated.  Lead Plaintiffs and other Class members purchased Aurora common stock at those artificially inflated prices, causing them to suffer damages as complained of herein.

264.290.    Aurora's adjusted EBITDA guidance was materially false and misleading because it was premised on Defendants' planning and execution of a sham sale to Radient. Defendants omitted the material fact that Aurora's guidance was based on the execution of the FQ4 2019 Transaction, without which Aurora otherwise would be unable to meet the stated guidance.  Accordingly, Defendants' guidance distorted Aurora's financial outlook for investors.

291.    Aurora's September 11, 2019 disclosure of missed adjusted EBITDA guidance was a materialization of the concealed risk that Defendants' guidance was premised on Aurora's anticipated effectuation of the sham transaction.  Aurora's September 11, 2019 statements first disclosed the subject of Defendants' fraud: the $20 million wholesale bulk cannabis revenue, which represented an 870% increase from the previous quarter.  Additionally, the $12.3 million of wholesale gross margin reported by Aurora for Q4 2019 represented an $11 million quarter-over-quarter increase—reflecting an 896% increase—and contributed substantially to the adjusted EBITDA improvement of $9 million for the quarter.  Thus, the September 11, 2019 statements disclosed that Aurora's wholesale segment, which had been Aurora's smallest contributor of revenue, jumped by an astronomical amount.  In response to the September 11, 2019 disclosures, Aurora's stock price declined by 9.5% the next day, and further in the days that followed.

292.    Legitimate support for Aurora's guidance was non-existent because it was based on a transaction without economic substance.  Defendants' guidance misrepresented Aurora's earnings power, and the September 11, 2019 disclosure began to reveal Aurora's true earnings power.

265.293.    Indeed, Craig Wiggins—the industry analyst who exposed Aurora's sham transaction with Radient—confirmed this,that Aurora's September 11, 2019 announcement was the first partial corrective disclosure of Defendants' fraud when he statedexpressly acknowledged that his suspicions about the FQ4 2019 Transaction first arose with Aurora's September 11, 2019 conference call.  When Aurora announced its guidance miss, that risk materializeddisclosed the subject of the fraud, *i.e.*, the suspicious wholesale bulk sales, the truth began to be disclosed and Aurora's stock declined by 9.2% the next day.

266.294.    Moreover, Aurora's September 11, 2019 announcement of missed guidance was a corrective disclosure that Defendants' statements from the month before on August 6, 2019 statement that "[t]he Company continues to track toward positive adjusted EBITDA" was materially false and misleading and/or omitted material information because the quarter and full fiscal year had already been over for more than a month, and Defendants had access to the Company's FQ4 2019 financial results and knew, or recklessly disregarded, that Aurora would miss its guidance.

295.    However, Aurora's stock price—because the sham transaction and Aurora's true earnings power were not fully disclosed and Defendants continued to project positive adjusted EBITDA—remained artificially inflated.

267.296.    Wiggins' October 9, 2019 report expressly raised concerns about a possible sham transaction between Aurora and Radient.  In response, Aurora's stock price declined by 9.5% the next day.

268.297.    A *Yahoo Finance Canada* October 17, 2019 article provided additional analysis of the transaction between Aurora and Radient.  In response, Aurora's stock price declined by 5.4% the next day.

269.    Finally, Aurora's November 14, 2019 Form 6-K acknowledged that quarter-to-quarter sales volume and revenues were difficult to forecast with precision, despite providing EBITDA forecasts since January 2019.  Analysts viewed this disclosure as an indication that Aurora's forecasts could not be trusted.  In response, Aurora's stock price declined by 17% the next day.

298.    Aurora's February 6, 2020 announcement of the collapse of its wholesale bulk revenue, falling gross margin, and further revenue shortfalls the next quarter was another partial corrective disclosure of the truth about Aurora's FQ4 2019 wholesale bulk sales: that they were unsustainable (because they had been fraudulently engineered).  In response, Aurora's stock price declined by 22%.

299.    Finally, Wiggins' February 28, 2020 report confirmed the sham transaction link between Radient and Aurora by explaining that Radient earned 100% of its revenue from Aurora.  In response to Wiggins' report, Aurora's stock price fell 7.6%.

## X.    NO SAFE HARBOR

270.300.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  Many of the specific statements pleaded herein were not identified as "forward-

looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Moreover, the cautionary statements were insufficient because they did not warn investors that Defendants were engaging in a fraudulent transaction designed to artificially and materially inflate Aurora's adjusted EBITDA.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and the forward-looking statement was authorized and approved by an executive officer of Aurora who knew that those statements were false when made.

## XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE

271.301.    Lead Plaintiffs are entitled to a presumption of reliance under the fraud-on-the market doctrine, because the market for Aurora's publicly traded common stock was open, well-developed, and efficient at all times during the Class Period.  As a result of the materially false and misleading statements alleged herein, Aurora's common stock traded at artificially inflated prices during the Class Period.  Further, Lead Plaintiffs and other members of the Class purchased Aurora's common stock in reliance on the integrity of the market price of the common stock and the market information relating to Aurora, and were damaged thereby.

272.302.    At all relevant times, the market for Aurora common stock was an efficient market for the following reasons, among others:

(a)    Aurora common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b)    as a regulated issuer, Aurora filed periodic public reports with the SEC and the NYSE;

(c)    Aurora regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Aurora was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

273.303.    As a result of the foregoing, the market for Aurora common stock promptly digested current information regarding Aurora from all publicly available sources and reflected such information in the price of the common stock.  Under these circumstances, all purchasers of Aurora securities during the Class Period suffered similar injury through their purchase of Aurora securities at artificially inflated prices and a presumption of reliance applies.

274.304.    Lead Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon omissions of material fact for which there was a duty to disclose. Specifically, Lead Plaintiffs are entitled to a presumption of reliance throughout the Class Period because, as more fully alleged above, Defendants failed to disclose material information regarding the Company's manufacturing, operations, forecasts, and business prospects.

<u>COUNT I</u>
**Violation of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder
Against All Defendants**

~~275.~~305.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

~~276.~~306.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

~~277.~~307.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

~~278.~~308.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Aurora securities.  Lead Plaintiffs and the Class would not have purchased Aurora common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

~~279.~~309.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Aurora securities during the Class Period.

## COUNT II
### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

280.310.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

281.311.    The Individual Defendants acted as controlling persons of Aurora within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and directors of Aurora, and their ownership of Aurora securities, the Individual Defendants had the power and authority to cause Aurora to engage in the wrongful conduct complained of herein.

282.312.    By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Lead Plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

A.    Determining, pursuant to Rule 23 of the Federal Rules of Civil Procedure, that this action may be maintained as a class action, and certifying Lead Plaintiffs as Class representatives and Lead Plaintiffs' counsel as Class counsel;

B.    Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such other relief as the Court deems just and proper.

## XII.    JURY DEMAND

Lead Plaintiffs demand a trial by jury.

DATED:  ~~November 7, 2022~~    CARELLA, BYRNE, CECCHI, OLSTEIN,
                                  BRODY & AGNELLO, P.C.
                                 JAMES E. CECCHI
                                 ~~LINDSEY H. TAYLOR~~
                                 DONALD A. ECKLUND


                                 */s/ James E. Cecchi*
                                 JAMES E. CECCHI

                                 5 Becker Farm Road
                                 Roseland, NJ  07068
                                 Telephone:  973/994-1700
                                 973/994-1744 (fax)
                                 jcecchi@carellabyrne.com
                                 ~~ltaylor@carellabyrne.com~~
                                 decklund@carellabyrne.com

                                 *Local Counsel*

                                 ROBBINS GELLER RUDMAN
                                   & DOWD LLP
                                 SAMUEL H. RUDMAN
                                 ALAN I. ELLMAN
                                 MAGDALENE ECONOMOU
                                 58 South Service Road, Suite 200
                                 Melville, NY  11747
                                 Telephone:  631/367-7100
                                 631/367-1173 (fax)
                                 srudman@rgrdlaw.com
                                 aellman@rgrdlaw.com
                                 meconomou@rgrdlaw.com

                                 HAGENS BERMAN SOBOL SHAPIRO LLP
                                 STEVE W. BERMAN
                                 SHAYNE C. STEVENSON
                                 1301 Second Avenue, Suite 2000
                                 Seattle, WA  98101
                                 Telephone:  206/623-7292
                                 206/623-0594 (fax)
                                 steveb@hbsslaw.com
                                 shaynes@hbsslaw.com

HAGENS BERMAN SOBOL SHAPIRO LLP
REED R. KATHREIN
LUCAS GILMORE
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone:  510/725-3000
510/725-3001 (fax)
reed@hbsslaw.com
lucasg@hbsslaw.com

*Lead Counsel for Lead Plaintiffs and the Proposed
Class*

SCHALL LAW FIRM
BRIAN SCHALL
1880 Century Park East, Suite 404
Los Angeles, CA  90067
Telephone:  310/301-3335
310/338-0192 (fax)
brian@schallfirm.com

*Additional Plaintiffs' Counsel*

- 110 -