UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| WILSON, | . |
| | . |
| Plaintiff, | . |
| | . Case No. 19-cv-20588 |
| vs. | . |
| | . Newark, New Jersey |
| AURORA CANNABIS INC., et al., | . January 28, 2025 |
| | . |
| Defendants. | . |
| | . |

TRANSCRIPT OF FINAL APPROVAL HEARING
BEFORE THE HONORABLE MICHAEL A. HAMMER
UNITED STATES MAGISTRATE JUDGE

APPEARANCES (the parties appeared in person):

For the Plaintiffs:    DONALD A. ECKLUND, ESQ.
Carella Byrne Cecchi Brody & Agnello
5 Becker Farm Road
Roseland, NJ 07068
(973) 994-1700
decklund@carellabyrne.com

ELLEN GUSIKOFF STEWART, ESQ.
Robbins Geller Rudman & Dowd LLP
655 W. Broadway
San Diego, CA 92101
(619) 231-1058

Audio Operator:

Transcription Service:    KING TRANSCRIPTION SERVICES, LLC
3 South Corporate Drive, Suite 203
Riverdale, NJ  07457
(973) 237-6080

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

(APPEARANCES continued)

For the Plaintiffs:    ALAN I. ELLMAN, ESQ.
                       Robbins Geller Rudman & Dowd LLP
                       58 S. Service Road
                       Melville, NY 11747
                       (631) 367-7100


For the Defendants:    ANDREW JOSHUA LICHTMAN, ESQ.
                       Jenner & Block LLP
                       1155 Avenue of the Americas
                       New York, NY 10036
                       (212) 891-1644
                       alichtman@jenner.com

                       JOHN D. TORTORELLA, ESQ.
                       Marino, Tortorella & Boyle, P.C.
                       437 Southern Boulevard
                       Chatham, NJ 07928
                       (973) 824-9300
                       Jtortorella@khmarino.com

(Commencement of proceedings)

THE COURT OFFICER:  All right.  We're on the record.

THE COURT:  All right.  We are on the record in In re Aurora Cannabis Inc. Securities Litigation, Civil No. 19-20588.

Can I have appearances, please, beginning with plaintiff.

MS. STEWART:  Good afternoon, Your Honor.  Ellen Gusikoff Stewart of Robbins Geller Rudman & Dowd on behalf of the lead plaintiffs in the class.

THE COURT:  All right. Good afternoon.

Who else do we have on the plaintiffs' side?

MR. ELLMAN:  Good afternoon, Your Honor.  Alan Ellman, also from Robbins Geller Rudman & Dowd on behalf of the plaintiffs.

THE COURT:  All right.

MR. ECKLUND:  And good afternoon, Your Honor.  Thank you for hearing us today.  Don Ecklund from Carella Byrne, also on behalf of the plaintiffs.

THE COURT:  All right.  Thank you.

For the defense?

MR. LICHTMAN:  Good afternoon, Your Honor.  Andrew Lichtman from Jenner Block for the defendants.

THE COURT:  Ah, Mr. Tortorella.

MR. TORTORELLA:  Hi, Your Honor.  John Tortorella from Marino Tortorella & Boyle on behalf of defendants.

THE COURT:  All right.  Thank you very much, Counsel.

At the outset, I want to commend counsel on the excellent briefing.  I know I sort of came into this late in the game.  And, as I said, we didn't want to disturb -- particularly when it goes out in the form of notices to the class and, here, given that there was approximately 515,000 postcard notices, I didn't want to cause inconvenience to the parties, the lawyers, or the class by putting this off.  And I just want to say the briefing really helped me get up to speed and get my arms around the substantial filings very efficiently.

So kudos to counsel.

I've reviewed all of the papers.  So I'm prepared to rule on the motion to approve the settlement class, to approve -- or to appoint the plaintiffs as class representatives and interim -- or preliminary counsel as class counsel, to the -- I can -- I don't -- in this building, you can't even worry about it -- on the motion to approve the settlement, and then attorneys' fees and the incentive awards.

So before I do that, though, I'll start with the

plaintiff, is there anything else that you want to add to the briefing?

MS. STEWART:  No, Your Honor.  I'm never one wanting to grab defeat from the jaws of victory.  I will -- we'll rest on our papers.

But I do want to echo Mr. Ecklund and thank the Court for hearing us today.  It was -- it's important to just -- we sent out so many notices --

THE COURT:  Right.

MS. STEWART:  -- to let the class know that this is an actual real settlement and have them keep submitting claims.

THE COURT:  No, I agree.  Once we saw the volume involved here, we realized that, you know, proceeding today was the only -- the only way to go.

MS. STEWART:  And we appreciate the Court spending, I'm sure, the weekend looking at our papers.

So with that, I am not going to add anything unless the Court has any questions.

And I thank you for your time.

THE COURT:  No.  Thank you.

Only two very quick ones, just to confirm the numbers.

As of the briefing, there were -- I know the early number was like 495,815 postcard notices.  I saw in the

second declaration -- I think was its was Mr. Luiggy?

MS. STEWART:  Yeah, Luiggy Segura.

THE COURT:  Segura, Mr. Segura, that that number was actually 515,000 or a hair over that?

MS. STEWART:  It is, Your Honor.

THE COURT:  Okay.

And then still no objectors?

MS. STEWART:  No objectors.

THE COURT:  And a total of 10 opt-outs?

MS. STEWART:  No.  The number of opt-outs, we kept getting opt-outs that were timely.  And attached to the proposed order that we submitted, we got a total of 27 --

THE COURT:  Okay.

MS. STEWART:  -- opt-outs.

And I think if the Court was to review them, you'd see many of them either don't provide any information about their holdings or they are probably members of the class in the Canadian case that is not before the Court, and they're probably not even class members here.

But there were no institutional opt-outs, no large opt-outs.  Just a small number of individuals relative to the number of notices that went out.

THE COURT:  Okay.

And I take it on the defense side, that doesn't affect the defendants' willingness to go forward with the

settlement; is that correct?

MR. LICHTMAN:  That's correct, Your Honor.

THE COURT:  Okay.  All right.

Let me turn to defense counsel.  Is there anything that you want to add on behalf of Aurora?

MR. LICHTMAN:  Nothing, Your Honor.  Just appreciate you keeping this on track.  Thanks very much.

THE COURT:  No problem.  My pleasure.

So let's begin because, of course, there are many factors and multi-factor tests that we need to get through.

So at the outset, let me make clear, I have read all of the papers submitted.  I also have reviewed, of course, the October 10th, 2024, order preliminarily approving the settlement and providing for notice as well as the briefs and exhibits and declarations in support of final approval.  And I'm going to grant the application to certify this as a settlement class under Rule 23(a) and (b)(3).  I am going to appoint plaintiffs' counsel as class counsel and the named plaintiffs as class representatives.  I'm going to approve the proposed settlement, after very careful review.  And then I'm going to approve the fee request, the expense request, and the incentive awards.

So why don't I start by explaining why I'm going to do that.

This action was initially filed on November 21,

2019.  Plaintiffs' allege that the defendants issued materially false and misleading statements that projected positive and unrealistic EBITDA for the fourth quarter of 2019 that ended June 30, 2019.  The complaint alleged that during the class period, the defendants touted large demand for consumer cannabis in Canada and that Aurora was ramping up production and its capacity to meet that demand.

The plaintiffs allege that during that class period, however, the sales of cannabis by Aurora in Canada were constrained by a number of factors that the defendants either knew or recklessly disregarded that included overproduction of cannabis by Aurora and other producers in Canada; a limited number of retail stores in Ontario and Quebec; and continued competition from the black market selling at a much lower price per gram.

The defendants moved to dismiss the complaint.  And on July 6th, 2021, the District Court dismissed the complaint without prejudice.

The plaintiffs filed the second amended complaint on September 7, 2021, adding some additional allegations, including that in early 2019, the defendants executed a $21.3 million sham transaction with Radiant, that the defendants devised that sham transaction to achieve their projections of positively adjusted EBITDA fourth quarter 2019.

|Final Approval Hearing
|19-cv-20588, January 28, 2025

I should note the defendants throughout the litigation have steadfastly denied the allegations.  And, as I'll discuss in a moment because it's relevant to the degree to which the matter was litigated, which, in turn, I think is probative of, one, the arm's-length relationship between the parties in the course of mediating this matter, which is certainly a factor that favors settlement but also the degree to which the parties and particularly on behalf of the class, the plaintiffs had the opportunity to fully investigate the underlying allegations, consider the legal theories, have them tested in a court of law, all of which, of course, informs settlement positions -- in any event, with regard to the second amended complaint, Judge Vazquez granted in part and denied in part the defendants' motion to dismiss in September 2022.

The plaintiffs filed a third amended complaint in November 2022.  And, again, as to that third amended complaint, Judge Vazquez granted in part and denied in part the defendants' motion to dismiss that in August 2023.

An issue then arose as to whether defendants would consent to the filing of a fourth amended complaint. Defendants would not consent, and the motion to -- for leave to file the fourth amended complaint was pending when this case ultimately reached settlement.

I should note that -- to backtrack for a moment --

in October 2023, after conducting a pretrial scheduling conference with counsel, Judge Clark entered a scheduling order, and discovery began.

In March 2024, the parties participated in a full-day mediation session with Robert Meyer from JAMS. I have reviewed Mr. Meyer's background and qualifications. He is an extremely experienced mediator with a vast degree of knowledge in both litigating and mediating PSLRA and securities fraud cases, among other types of cases, including very sophisticated business transactions, and ERISA-related issues.

In any event, it was Mr. Meyer who made the mediator's proposal to settle the case for the settlement sum of $8.05 million. The parties accepted Mr. Meyer's proposal -- that included the exchange of mutual releases and the cash payment of $8.05 million -- the parties signing the stipulation of settlement on June 7, 2024.

Plaintiffs immediately thereafter filed the unopposed motion for preliminary approval that Judge Clark considered.

And on October 10, 2024, he entered an order that granted the preliminary approval of settlement as well as the proposed manner notifying the class.

That preliminary approval order also set a deadline of June 6th, 2025, for any objections or requests to be

excluded from the settlement class.

As counsel noted just before, as of now, there are zero opt-outs -- I'm sorry -- zero objectors and only 27 opt-outs by individuals.  There are no institutional opt-outs or large corporate class member opt-outs.  And that's fairly extraordinary considering that after the Court approved the form and content of the postcard notice, the notice, the summary notice as well as JND Legal Administration as claims administrator -- to mail those notices out by October 31 and publish a summary notice by November 7, 2024, counsel tells me that in total more than 515,000 postcard notices were disseminated to potential class members by mail or email.

In addition to that, JND established a settlement website www.Auroracannabissecuritieslitigation.com that included the stipulation, the notice, the proof of claim and release, and an online claim submission page.

JND also published a summary notice in the Wall Street Journal and over PR Newswire.

So let me turn first to final certification of the settlement class for purposes of effectuating the settlement.  At the preliminary approval stage, the plaintiffs and the Court found that it was appropriate to preliminarily approve the settlement class and appoint lead plaintiffs as class representatives and lead counsel as class counsel.

The preliminary approval order found that the

prerequisites for a class action were satisfied under Federal Rule of Civil Procedure 23(a) and 23(b)(3).

Nothing has changed since the Court granted preliminary approval on October 10, 2024, and I agree with Judge Clark's findings.  So I won't belabor them here.

In brief, under Rule 23(a) and as the Court found in its October 10, 2024, order, the class is so numerous that joinder of all claims would be impracticable.  In fact, Aurora's common stock was listed on the New York Stock Exchange during the class period, and there were hundreds of millions of securities outstanding.

Two, there are questions of law and/or fact that are common to the class.  As is common in securities fraud classes, class members have alleged injuries due to similar misrepresentations and/or omissions by Aurora.  As well, the representative parties' claims or defenses are typical of the claims or defenses of the class.  Here, plaintiffs, like other members of the settlement class, allege that they purchased Aurora stock at artificially inflated prices and that those inflated prices were due to the defendants' omissions about the ability to meet demand, the competition from black market merchants as well as the availability of stores for retail in Quebec and Ontario, among other things.

I find also, four, the representative parties would fairly and adequately protect the interests of the class.

The plaintiffs' interest and those of the settlement class are aligned. They both purchased Aurora common stock during the class period. And they both allege injury due to the defendants' omissions. Proof of the plaintiffs' claims would constitute proof of the class's claims, if not in whole, in very large part.

Also, the plaintiffs -- and I'll touch on this in a moment when I get to fees, but plaintiffs are represented by qualified counsel who have actively and diligently litigated and mediated this matter. Under Rule 23(b)(3), one, the questions of law or fact common to the class members predominate over any questions unique to the individual members such that a class action is superior to other available methods to fairly and efficiently adjudicate the controversy.

Relatedly, a class action is a superior method of resolving the claims of both the plaintiffs and the settlement class members due to the large number of individual plaintiffs whose damages might not otherwise justify standalone suits against a corporate defendant.

It's also appropriate to appoint the plaintiffs as the class representatives and lead counsel as class counsel. The October 10, 2024, order preliminarily approved lead plaintiffs as the class reps, and both Robbins Geller and Hagens Berman as class counsel.

I hereby appoint the lead plaintiffs as class representatives and Robbins Geller and Hagens Berman as class counsel under Rule 23(g).  The Robbins Geller and Hagens Berman law firms have litigated this matter extensively and diligently and are well-experienced in the area of class securities litigation.  They've also expended considerable effort and resources litigating this matter from its inception through the extensive Rule 12 motion practice and a mediation session with Robert Meyer, JAMS.  They and lead plaintiffs are best positioned to serve as class counsel and class representatives respectively.

So I turn now to whether the settlement warrants final approval.

As we all know, in the Third Circuit, there is a strong presumption in favor of voluntary settlement agreements, particularly so in class actions and other complex litigation that can subsume substantial judicial resources absent litigation.  See, for example, Ehrheart v. Verizon Wireless, 609 F.3d 590 to 594 to 95 (3d Cir. 2010).  We turn to Rule 23(e)(2).  It provides that a class action settlement may be approved by the court if the court finds it "fair, reasonable, and adequate."  To guide that, the Court must consider a number of factors:  whether the class representatives and counsel have adequately represented the class; whether the proposal was negotiated or at arm's

|Final Approval Hearing
|19-cv-20588, January 28, 2025

15

length; the relief provided to the class and whether it is adequate, that takes into the account the costs, risks and delay of trial and appeal; the effectiveness of any proposed method of distributing relief to the class, including the method of processing the claims; the terms of any proposed attorneys' fee award, including timing of payment; any other agreement required to be identified under Rule 23(e)(3); and whether that proposed settlement and manner of distribution treats the class members equitably relative to each other.

These factors overlap considerably with the Third Circuit's <u>Girsh</u> factors.  Those are well-known to the litigants, and since I'm going to cover them as I go through this, I don't need to articulate all of them now.

But, as well, in <u>In re Prudential Insurance Company of America Sales Practice Litigation Agent Actions</u>, the Third Circuit added still more factors for the Court to consider, which I also will address in the context of going through the Rule 23 and <u>Girsh</u> factors.

So, first, the Court considers the adequacy of representation by the class representatives and class counsel.  This overlaps with the third <u>Girsh</u> factor concerning the stage of the proceedings and the amount of discovery completed.  I'm well-satisfied from my review of the docket and the papers submitted in support of final approval, that lead counsel conducted a thorough

investigation into the alleged violations of the federal securities laws.  They drafted detailed amended complaints.  The parties extensively litigated the motions to dismiss, including moving for a partial reconsideration of the Court's order on the motions to dismiss.  They moved to amend their complaint.  They utilized the services of experts and consultants, including investigators and economists and a damages expert.  They prepared a mediation statement and attended an all-day mediation session by Mr. Meyer.  They're highly qualified lawyers that are well-versed in prosecuting complex class actions under the PSLRA and federal securities laws.

There is a long list of cases in which Robbins and/or Hagens Berman have successfully litigated, so I'll add here only a few of those examples.  For example, In re Valeant Pharmaceuticals International Securities Litigation, 2021 WL 358611 (D.N.J. February 2021), in which the court noted the skill and efficiency of Robbins Geller in achieving a $1.21 billion settlement, among the largest PSLRA class actions ever recovered for the benefit of the class.  See also Roberts v. Zuora Inc., 19-3422 (N.D. Cal.).  On behalf of the certified class, Hagens Berman secured a $75.5 million settlement representing recovery five times greater than the median obtained in a comparable securities class action -- or in comparable securities class action cases in 2023.

As I said, review of the docket, the extensive litigation in this matter, and the papers prepared for today persuade the Court that the lead plaintiffs and lead counsel have adequately represented the class under Rule 23(e)(2)(A) and have an adequate appreciation of the merits of the case. See, e.g., Warfarin Sodium Antitrust Litigation, 391 F.3d 516 at 535 (3d Cir. 2004).

The next factor under Rule 23(e)(2) is whether the settlement was negotiated as arm's length. Where the parties through capable counsel engage in arm's-length negotiations, then a class action settlement that results from those negotiations is presumptively fair. See in re Warfarin sodium -- anybody know exactly how you pronounce that?

UNIDENTIFIED SPEAKER: Warfarin.

THE COURT: Warfarin. I'm going to go with that. Thank you. It's a lot easier to spell.

Warfarin, 391 F.3d at 535.

Here, as I've already noted, the parties conducted an all-day mediation through Robert Meyer at JAMS. They negotiated in good faith and ultimately agreed to the mediator's proposal to settle the case. When a settlement results from arm's-length negotiations, the assessment by experienced counsel that that settlement is in the class's best interests merits considerable weight. See In re vera pharma Inc. securities litigation, 2016 WL 312108 at *11

|Final Approval Hearing
|19-cv-20588, January 28, 2025

18

(E.D. Pa. 2016).  That's particularly true where, as here, the parties agreed to the settlement proposal of an experienced and sophisticated mediator.

I next turn to the third consideration under Rule 23(e)(2) as well as Girsh Factors 1 and 4 through 9, and that pertains to the adequacy of the settlement in light of the costs, risks, and delay of continued litigation. Securities cases are well known to be very complex, lengthy, and expensive.  The case here has already been litigated for nearly five years.  Discovery, really because of the substantial Rule 12 motion practice, had just begun, and the motion to amend the complaint was at least, until it was terminated in light of the parties' settlement or stipulation, was still pending.

There would be, even for experienced and sophisticated litigators as lead plaintiffs, substantial additional risks and costs down the road if the litigation continued, including even if the motion to amend the complaint were granted, invariably more Rule 12 motion practice as well as fact and expert discovery, summary judgment, trial and appeal.  At a bare minimum -- and well familiar with the Court's docket -- this litigation would have proceeded for at least another three to four years most likely, had it not settled, which would have significantly prolonged the time until any member saw any recovery, if they

saw any recovery at all.  Judge Vazquez did twice dismiss the case and partially dismiss the claims a third time.  The defendants have contested each of the lead plaintiffs' allegations, maintaining that their statements concerning the transactions between Aurora and Radiant were not false because was there no round-trip transaction.  Defendants have also argued that plaintiffs have not alleged a causal relationship between any misrepresentations or omission about the Radiant transaction and the alleged losses.

The other issue, of course, is nearly all of the evidence would need to be reviewed by subject matter experts. Proving damages in a securities case invariably requires expert testimony, which the jury might accept or reject.  In fact, it's at least conceivable, defendants could have prevailed at summary judgment on any one of these issues or prevailed in Daubert in terms of challenging the plaintiffs' experts.  Certainly, had the case proceeded to trial, it would have involved a so-called battle of the experts, the results of which are completely unascertainable.  See In re Viropharma, 2016 WL 312108 at *12.

Even if plaintiffs did prevail at trial, that inevitably would lead to an appeal, which, at a minimum, would have resulted in another year-to-two-year delay before seeing any financial recovery.

Given the extensive risks and delay associated with

establishing liability and damages and preserving any trial victory through appeal, this factor weighs strongly in favor of approving the settlement.

I turn now to the risks of maintaining the class through trial. Here, the motion for class certification had not yet been filed when the parties reached a stipulation of settlement. The defendants, I'm quite sure, would have opposed the motion vigorously, and had the Court declined to certify a class, the case likely would be over. Even if the Court granted the class certification motion, the defendants could have subsequently moved under Rule 23 to later decertify the class or narrow the class period or sought Rule 23(f) interlocutory relief since class certification can be reviewed at any stage of the litigation. Those risks cause me to conclude that the sixth Girsh factor supports approval of the settlement.

The next Girsh factor, the defendants' ability to withstand a greater judgment is neutral. Although the defendants might be able to withstand a greater judgment, it's well established that where the other Girsh factors favor approval, this factor should not influence the overall conclusions concerning the fairness, reasonableness, or adequacy of the settlement. See Healthcare Services Group, 2022 WL 118104 at *10.

I turn now to whether the settlement falls within

the range of reasonableness.  The final two Girsh factors concern themselves with whether the settlement is reasonable in light of the best possible recovery and the risks that the parties would face, had the case proceeded to trial.  These factors examine "whether the settlement represents a good value for a weak case or a poor value for a strong case." Utah Retirement Systems v. Healthcare Services, 2022 WL 118104 (E.D. Pa. 2022).  Therefore, the recovery must be considered in comparison to all of the risks factored under Girsh.  Typical settlement recoveries in security class action cases range from roughly 1.6 to 14 percent of the overall alleged loss.

In this case, the $8.05 million recovery under the settlement represents approximately 2.53 percent of the total estimated recoverable damages and is well beyond the 1.8 percent median settlement as a percentage of investor losses in securities class action cases settled between 2021 and 2023, relying on Edward Flores and Svetlana Starykh, "Recent Trends in Securities Class Action Litigation."  2023 full year review, at 26 in Figure 22 (January 23, 2024).

Also the estimate of potential recoverable damages assumes that the lead plaintiffs would prevail in all of their argument regarding the causes or declines -- sorry -- the causes of the declines in Aurora stock price on the corrected disclosure dates that the lead plaintiffs allege,

among other things.  That's certainly not a fait accompli because a jury could find at trial that recoverable damages are significantly lower, as the defendants have maintained throughout the litigation, and, therefore the settlement would represent a larger percentage recovery for the class.

So, therefore, given the complexity of the case and the risks and delay inherent in continued litigation, I must conclude that an $8.05 million recovery is quite a strong result, particularly given that this case has been litigated for near five years and the significant amount of the recovery, the settlement falls well within the reasonableness range pursuant to Girsh.

The remaining 23(e)(2) factors include the effectiveness of the proposed method for distributing relief; the terms of the proposed attorneys' fees, which I'll address separately; the existence of any other agreements; and whether the settlement treats class members equitably relative to each other.

First, the proposed method for distributing relief is effective and well consistent with established procedures for processing claims.  Settlement class members are required to provide basic personal information and trading records to substantiate their transactions in Aurora common stock and that it occurred during the class period.  Requiring this documentation is reasonable because it serves a number of

purposes. One, there's no central repository of the owners of the securities, and, of course, it's important to prevent fraudulent claims. Also claimants have the opportunity to cure claim deficiencies or request that the Court review any claim denied.

For those reasons, I'm well-satisfied that the proposed method for distributing relief is reasonable. To the extent I need to add on that, I'll deal with that when I get to that the settlement treats class members equitably.

But there are no other agreements other than the agreement to address requests for exclusion. This is a standard supplemental agreement that allows defendants with the right to terminate the settlement in the event valid requests for exclusion from the settlement class exceed the criteria set forth in the agreement. It's standard in securities class action litigation. But as I also understand, Mr. Lichtman and Mr. Tortorella, the defendants are not exercising their rights under that agreement to terminate the settlement?

MR. LICHTMAN: That's correct, Your Honor.

THE COURT: Okay. So we can move on.

In terms of settlement class members' treatment and the reaction of the class, in terms of the reaction of the class, that's easy, of course. There are no opt-outs in a class of this size with more than 515,000 postcard notices, I

think that speaks volumes about the class's favorable reaction.  A minimal number of opt-outs.

I would also note, although I guess I'll get to it in a moment, there are also no objections to the fee application.

So the class's reaction certainly favors approval.

But also under Rule 23(e)(2)(D), I must consider whether the class members will be treated equitably, and I find that they are under the terms of the stipulation because the stipulation provides each settlement class member who proper submits a valid proof of claim, will receive -- and this includes the lead plaintiffs -- will receive a pro rata share of the settlement proceeds based on the plan of allocation.  This certainly ensures that settlement class members' recovery are based on the relative losses they sustained and that eligible class members will receive a pro rata distribution from the settlement fund, calculated in the same manner.

Now, it does not favor the named plaintiffs.  It doesn't really favor any of the plaintiffs or the class members.

The settlement also satisfies the applicable Prudential factors.  Lead plaintiffs, as I've already noted, are well-informed about the strengths and weaknesses of the case, following an extensive investigation and motion

practice, and made an informed decision about the appropriate settlement value of the claims in response to Mr. Meyer's mediator's proposal.

They also had the opportunity of the class -- rather, to opt out of the settlement class. And the method for processing claims, as I've already said, is fair and reasonable.

Each factor identified Rule 23(e)(2) as well as the Girsh and Prudential factors are satisfied.

Therefore, I find that the settlement is fair, reasonable, and adequate and should be granted final approval.

I also approve the allocation plan. As I've already noted, the -- and as set forth in the notice, the net settlement fund will be divided pro rata among the class members who submit valid claims.

A plan of allocation need not be perfect. It merely need have a reasonable, rational basis, particularly where, as here, it's been recommended and endorsed by experienced and competent class counsel.

Where allocation plans reimburse class members based on the type of and extent of their injuries, courts generally consider them to be reasonable. See Rossini v. PNC Financial Services Group, 2020 WL 3481458 at *17 (W.D. Pa. 2020).

|Final Approval Hearing
|19-cv-20588, January 28, 2025                                                    26

The plan of allocation here was developed with the assistance of lead counsel's damages consultant.  It distributes the net settlement fund on a pro rata basis as determined by the ratio between each valid claim and the sum of all valid claims.

The calculation of each claim will depend on several factors, such as when the shares were purchased and whether they were sold or held.  Once that claim is calculated and verified and the distribution ratio is determined, the net settlement fund -- which will be, of course, the settlement fund less the notice and administration expenses, taxes, and tax expenses, and the Court-approved attorneys' fees and litigation expenses -- will be distributed to authorized claimants entitled to a distribution of at least $10.  Any amount remaining will be further distributed among authorized claimants to the extent that's economically feasible.  If a further redistribution of the funds remaining in the net settlement fund would not be cost-effective or economically feasible, the plan of allocation calls for that remaining balance to be contributed to an appropriate nonsectarian, nonprofit charitable organization serving the public interests as selected by lead counsel.

That plan is fair, reasonable, and adequate and consistent with standard practice in securities cases.  See

e.g. McDermid v. Inovio Pharmaceuticals, 2023 WL 227355 at *9 (E.D. Pa. 2023).

I would also note that there have been no objections to the plan of allocation, and, therefore, the plan is approved.

Anything before I turn to the motion for attorneys' fees, incentive awards, and expenses?

MS. STEWART:  No.  Thank you, Your Honor.

THE COURT:  Anything for the defense?

MR. LICHTMAN:  Nothing, Your Honor.  Thank you.

THE COURT:  If I mess up, I'm trusting you folks to keep me honest.

All right.  So let's turn to the fee award.  As I've indicated, I intend to grant the fee application, the incentive awards, and the expense application.  The Court, in a certified class action, may award reasonable attorneys' fees and nontaxable costs authorized by the law or by the parties' agreement.  See Federal Rule of Civil Procedure 23(h).  Under the PSLRA, "Total attorneys' fees and expenses awarded by the Court to counsel for the plaintiff class shall not exceed a reasonable percentage of any -- of the amount of any damages and prejudgment interest actually paid to the class."  15 U.S.C. § 78u-4(a)(6).  It is on the sound discretion of the court, based on the facts of the case, to determine the proper amount of attorneys' fees.

Here, lead counsel request attorneys' fees of 25 percent of the settlement fund plus litigation costs and expenses.  Per the stipulation, lead counsel will allocate the attorneys' fees among lead plaintiffs' counsel in a manner that lead counsel believe in good faith reflects the contributions of such counsel to the prosecution and resolution of the litigation.  Also, lead plaintiffs -- that would be Doug Daulton, Francisco Quintana, Donald Parish and Quang Ma each seek an award of $10,000 for a total of $40,000 in connection with their representation of the settlement class.

Let me turn to the factors.  One, it's well established that an attorney who recovers a common fund for the benefit of persons other than himself or the client is entitled to reasonable attorneys' fees from the fund as a whole.  See Boeing v. Van Gemert, 444 U.S. 472 at 478 (1980).  Courts in this circuit have consistently adhered to the proposition that the common fund provides that a private plaintiff or plaintiffs' attorney whose efforts create or preserve a fund to which others have a claim, is entitled to recover from the fund the costs of the litigation, including attorneys' fees and expenses.  See In re Viropharma Securities Litigation, 2016 WL 312108 at *15 (E.D. Pa. 2016).

The Supreme Court has recognized that it's appropriate to award counsel a reasonable percentage of a

common fund as a fee.  The Third Circuit, in fact, has noted, for example, in In re Cendant Corporate Securities Litigation, 404 F.3d 173 at 188 and n.7 (3d Cir. 2005), "The PSLRA has made percentage of recovery the standard for determining whether attorneys' fees are reasonable."

Here, the lead plaintiffs, as the investors who took the most active role in the litigation support approval of the requested fee, and that, in turn, supports or weighs in favor of approval.  See In re Lucent Technologies Securities Litigation, 327 F. Supp. 2d 426 at 442 (D.N.J. 2004).  In fact, a number of courts in the Third Circuit have found that the support of lead plaintiffs affords requested fee award a presumption of reasonableness.  See for example, Viropharma, 2016 Westlaw 312108 at *15.  See also Healthcare Services Group, 2022 WL 118104 at *11.

Under the well-familiar Gunter factors, pursuant to Gunter v. Ridgewood Energy Corporation, 223 F.3d 190 at 195 n.1 (3d Cir. 2000), the requested fee is fair and reasonable.

I note at the outset that the Gunter factors need not be applied in any particular formulaic way.  In fact, in any given case, the Court can find that one factor or certain subfactors outweigh the remaining factors.

With regard to the first factor, the size of the common fund and the number of persons benefitted by the settlement, a number of courts -- and most importantly the

|Final Approval Hearing
|19-cv-20588, January 28, 2025

30

Supreme Court in Hensley v. Eckerhart, 461 U.S. 424, 436 (1983), found this to be "the most critical factor in measuring the appropriateness of the award, that being the degree of success obtained.  Courts, therefore, consider the fee request compared to size of the fund created and the number of class members that stand to benefit.

Here, the $8.05 million settlement is a very strong result that provides immediate cash recovery to a large class of investors and does so that will largely avoid the substantial risks to proceeding and establishing liability and damages I've already described in approving the settlement.

In terms of the number of class members to be benefitted, that's a very substantial number, considering that it includes all persons who purchased Aurora common stock on the NYSE between October 23, 2018, and February 28, 2020, inclusive, which likely means thousands of investors if the number of postcard notices is any indication.

In terms of the class's reaction to the fee request, as I've already noted, there have been no objections to the fee request.  And, therefore, that certainly favors awarding the requested 25 percent.

In terms of the third Gunter factor, the skill and efficiency of counsel, that too favors granting the fee request.  Among other things, counsel experience and skilled

litigators in this arena, thoroughly investigated the conduct, drafted detailed complaints, engaged in extensive motion practice, and retained a number of experts to assist them in pursuing the claims, and engaged in arm's-length settlement negotiations with defense counsel and Mr. Meyer. Therefore, I'm satisfied that lead counsel's efforts resulted in a highly favorable outcome for the benefit of the settlement class in a situation where the settlement class otherwise could have very well received nothing.

The quality and vigor of defense counsel is also pertinent to evaluate the quality of the services rendered by plaintiffs' counsel. Here, the defendants were represented by attorneys from Jenner Block and Marino Tortorella & Boyle, two prominent law firms with widely respected and recognized experience and skill. Defense counsel defended this matter extremely diligently, including making several successful motions to dismiss, opposing the then-pending motion to file the fourth amended complaint, and similarly engaging in the all-day mediation. The ability of lead counsel to obtain such a favorable settlement for the class in the face of such formidable opposition, I think well supports approval of the request.

In terms of the complexity and duration of the litigation, I've already addressed in the context of the Girsh and Prudential factors and find that it supports the

award. By comparison, I would note in the Inovio matter, the court found that litigation spanning three years, as opposed to the five-or-so here, warranted a fee award of 27.5 percent compared to 25 percent sought here. See Inovio, 2023 WL 227355 at *12.

I turn now to the risk of nonpayment, certainly a factor in this case because lead plaintiffs' counsel prosecuted this case on a contingency fee basis. Without a settlement or trial victory, plaintiffs' counsel stood to go unpaid. Certainly, therefore, that created an incentive to litigate the case aggressively and seek the best possible recovery. In fact, lead plaintiffs' counsel tell me -- and I certainly believe them -- they've not been compensated for any time or expense since this case began in 2019. During that time, they've expended more than 6400 hours in the prosecution of litigation, and they've incurred just over $100,000 in litigation costs, expenses, and charges. Courts regularly allow that the risk created by undertaking an action on contingency militates in favor approval.

I've already highlighted the challenges that this case posed for plaintiff and plaintiffs' counsel in approving the settlement. In sum, the constellation of these factors posed considerable risk of nonpayment to plaintiffs' counsel, and this factor well supports the fee application.

In terms of the time devoted to the case, as I've

already said, it's more than 6400 hours of attorney and support staff time, $100,882.88 in expenses in terms of litigating and preparing this case for resolution with no promise of payment or compensation.

The successful resolution of this litigation required, therefore, lead plaintiffs' counsel to commit very significant resources, time, and expense to litigate this case.

I turn now to the range of fees typically awarded. There's no benchmark for the percentage of fee to be awarded in common fund cases. However, the Third Circuit has noted reasonable fee awards generally range from 19 to 45 percent of the common fund. See, for example, Whiteley v. Zynerba Pharmaceuticals, 2021 WL 4206696 at *12 (E.D. Pa. 2021) finding that the factor weighed in favor of approval for a 33 percent fee request and finding that the 33 percent fell in the middle of the range compared to securities class actions in the Third Circuit. See also Kanefsky, 2022 WL 1320827 at *11, finding that a 29.2 percent fee request was within the reasonable range for awards approved in the Third Circuit for similar class action settlements.

Because the requested fee is reasonable in relation to fees typically awarded in similar cases, this factor also supports approval of the requested fee award.

I turn now to conducting a lodestar crosscheck

which the Third Circuit and courts within the Third Circuit frequently do, to confirm the reasonableness of the percentage fee.  Now, this should not displace the district courts' primary reliance on the percentage of recovery method, nor does it require mathematical precision or bean counting, but it is certainly a measure by which the Court can verify the reasonableness.

The appropriate multiplier tends to vary based on the specifics of each case and does not -- need not fall within any predefined range.  See Schuler v. Meds. Co., 2016 WL 3457218 at *10, (D.N.J. 2016).

In In re Veritas Software Corporation Securities Litigation, 396 F.App'x 815 at 819 (3d Cir. 2010), the Third Circuit recognized that percentage awards resulting in positive multipliers from 1 to 4 are generally awarded in common fund cases when the lodestar method is applied.

Here, the lodestar crosscheck further supports the reasonableness of the requested fee percentage.  Counsel spent just over 6400 hours in attorney and other professional time prosecuting the litigation.  Counsel's lodestar, then, if one multiplies the hours spent on the litigation by each attorney or other professional by his or her hourly rate, is $4,713,395.  Therefore, the requested fee award at 25 percent is actually approximately 42 percent of the value of the time expended by lead plaintiffs' counsel.

By comparison, 25 percent seems quite reasonable and strongly supports award of the requested fee.

Therefore, I approve counsel's fee application.

I turn now to the litigation expense reimbursement request.  Lead plaintiffs' counsel essentially expended costs in the amount of $100,882.88.  It's well established that counsel are entitled to recover expenses that are adequately documented and reasonably and appropriately incurred in the prosecution of a class action.  See Viropharma, 2016 WL 312108 at *18.  The declarations that accompany the submissions, which I have reviewed, document the expenses.

The expenses fall into the typical categories one would expect:  consultants, expert, travel, research costs, mediation fees, filing fees, postage, copying and delivery.  I've reviewed those as reflected in the fee and expense declaration for both Robbins Geller and Hagens Berman as well as Carella Byrne.  The expenses were reasonable and necessary to investigate and prosecute these claims and to bring it to settlement.

Also, it's less than the projected maximum figure of $115,000 that was noticed to the class in the postcard notice and the notice, and still there were no objections to that significantly higher number, and, therefore, I approve the fee reimbursement requests.

Finally, I turn to the incentive awards under

15 U.S.C. § 78u-4(a)(4).  It's well established in the Third Circuit that incentive awards are an appropriate measure of or means to encourage class representatives to create common funds and to enforce laws.  The PSLRA expressly permits such an award under 78u-4(a)(4).

Here, the amount that is sought by each of the lead plaintiffs, $10,000 for a total of $40,000, is more than reasonable compared to the range of incentive awards that are sought within the Third Circuit.

I've reviewed the declaration of Mr. Daulton, Mr. Quintana, Mr. Parish and Quang Ma.  They persuade me that lead plaintiffs' activities directly related to representing the settlement class in terms of consulting with counsel concerning litigation responding to discovery requests and collecting documents for production, monitoring settlement negotiations, and conferring with counsel concerning litigation strategy.

As I said before, $10,000 as an incentive award is at or slightly below a number of other incentive awards.  So, for example, in the Kanefsky matter, 2022 WL 1320827 at *12, two class representatives were each awarded $10,000.  In the Healthcare Services Group matter, each -- or the class representative was awarded $12,500.  In the AdaptHealth case, two lead plaintiffs were awarded more than $13,000.  In Li v. Aeterna Zentaris, a 2021 District of New Jersey case, 2021 WL

2220565 at *2, $17,000 was awarded to each of the three lead plaintiffs.

For those reasons I'm satisfied that the incentive awards are fair and reasonable under the circumstances and, therefore, will approve those as well.

Okay.  So other than signing -- and I've reviewed the proposed order for class approval, Docket Entry 124-2; the proposed order granting attorneys' fees, Docket Entry 124-3; and the proposed final judgment and dismissal.

Other than signing this, are there anything else for to cover today?

MS. STEWART:  No, thank you, Your Honor.

We do have -- because we submitted those proposed judgments before we got some -- the later opt-outs.

THE COURT:  Should we go through and correct the numbers?

MS. STEWART:  Well, I have --

THE COURT:  Did you already give me -- did you already prepare a corrected final judgment?

MS. STEWART:  We did, Your Honor.

THE COURT:  All right.

MS. STEWART:  So we have those -- let me see -- here we go.  And if I may --

THE COURT:  Yeah, sure.  You can approach.  Yeah.

I assume defense counsel had an opportunity to

review this?

MS. STEWART:  We just added the last opt-out.

THE COURT:  Do you want to see it real quick?

MR. LICHTMAN:  Sure.  I'll take a quick look if I can.  Thank you.

MS. STEWART:  Right.  And we also -- we also -- actually, I should hand up proposed orders on the fee and on the allocation because we changed a name -- from Magistrate Judge Clark to your name.

THE COURT:  I appreciate that.

All right.

So -- oh, okay.  Great.  That's okay.  I've got -- that's fine.

MS. STEWART:  Thank you --

(Simultaneous conversation)

THE COURT:  So, wait, the stapled copy of -- you just gave me of the proposed final judgment, that's the same as the unstapled one -- right?

MS. STEWART:  It is, Your Honor.

THE COURT:  Okay.  All right.

Does anybody see any reason why I should not execute these?

MR. LICHTMAN:  No, Your Honor.  Thank you.

MS. STEWART:  No, Your Honor.  Thank you.

THE COURT:  So let me do that.

And if you folks want to wait around, it's entirely up to you.  We're happy to give you -- they're going to be obviously docketed if not today then tomorrow.  But I'm happy to give you folks copies of the signed versions, if you want to wait around.  It's up to you.

MS. STEWART:  I think we'll wait until they get docketed.

MR. LICHTMAN:  Yeah, that works for us too.

THE COURT:  All right.  All right.

Well, then, is there anything else that we should address today, Counsel?

MS. STEWART:  No.  And, again, thank you, Your Honor, for getting this over the finish line today.

THE COURT:  Actually, not a problem.  Again, I really appreciate the quality of the submissions.  The thoroughness and the care with which they were organized and written really facilitated that.  So -- I preside over a fair number of these, as I'm sure you folks can imagine because you're always litigating them.  And having seen all variety of quality, I really appreciate this level.

So thank you.

Anything else for the defense?

MR. LICHTMAN:  No, Your Honor.  Thank you very much.

THE COURT:  All right.  We're adjourned.  Have a

|Final Approval Hearing
|19-cv-20588, January 28, 2025

40

great day, Counsel.

(Conclusion of proceedings)

Certification

I, SARA L. KERN, Transcriptionist, do hereby certify that the 41 pages contained herein constitute a full, true, and accurate transcript from the official electronic recording of the proceedings had in the above-entitled matter; that research was performed on the spelling of proper names and utilizing the information provided, but that in many cases the spellings were educated guesses; that the transcript was prepared by me or under my direction and was done to the best of my skill and ability.

I further certify that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

s/ *Sara L. Kern*                              30th of January, 2025
_____    _____
Signature of Approved Transcriber                  Date

Sara L. Kern, CET**D-338
King Transcription Services, LLC
3 South Corporate Drive, Suite 203
Riverdale, NJ  07457
(973) 237-6080